# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| GARY B.; JESSIE K., a minor, by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated,<br><br>                Plaintiffs,<br><br>    v.<br><br>RICHARD D. SNYDER, in his official capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH; KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHISTON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and NATASHA BAKER, in her official capacity as the State School Reform/Redesign Officer,<br><br>                Defendants. | Civil Action No.: 16-CV-13292<br><br>**CLASS ACTION COMPLAINT** |

# TABLE OF CONTENTS

**Page**

INTRODUCTION .................................................................................................1

PARTIES.........................................................................................................17

FACTUAL ALLEGATIONS ..............................................................................23

I.    Literacy Is a Fundamental Right ........................................................24

    A.    The Meaning of Literacy and Literacy Instruction ...........................25

    B.    Literacy Is the Foundation of Citizenship and Well-Being in a Democratic Society .............................................................................30

    C.    The Tradition of Compulsory Education in the United States............39

    D.    Exclusion from Access to Literacy Creates an Enduring Stigma .......40

II.   The State of Michigan's Role in Securing Education Rights......................43

    A.    The State's Authority Over Public Education in Detroit ...................44

    B.    The Decimation of the Detroit Public Schools Under State Control...................................................................................................49

    C.    The State's Failed Interventions in Detroit Schools ...........................51

III.  The Failure to Provide Access to Literacy in Plaintiffs' Schools .................59

    A.    Demographic Data................................................................................59

    B.    State Achievement Data .......................................................................62

    C.    National Achievement Data .................................................................68

    D.    Graduation and College Attendance Rates .........................................70

IV.   Failure to Deliver Evidence-Based Literacy Instruction and Intervention Programs in Plaintiffs' Schools ........................................73

V.    Failure to Ensure Educational Conditions Necessary to Attain Literacy......77

    A.    Insufficient Course Offerings and Instructional Materials ................78

    B.    Decrepit and Unsafe Physical Conditions...........................................84

    C.    Failure to Meet Student Learning Needs ...........................................95

    D.    Unsupported and Unstable Teaching Staff .........................................98

    E.    Lack of Accountability for Charter Schools and School Closures ...104

VI.   The State's Failure to Implement Evidence-Based Reforms to Address Literacy ...............................................................................109

     A.    Establish an Evidence-based, Systemic Approach to Literacy Instruction and Intervention, with Appropriate Accountability Measures ............................................................................110

     B.    Increase Teacher Capacity and Stability ...........................117

     C.    Monitor and Eliminate Deplorable School Conditions that are Barriers to Learning ..............................................................118

     D.    Implement Practices to Promote Learning Readiness ......................118

CLASS ACTION ALLEGATIONS .......................................................119

CAUSES OF ACTION ...........................................................................123

REQUEST FOR RELIEF .......................................................................128

Unless explicitly stated to the contrary, all allegations are based on information and belief.  Plaintiffs allege as follows:

## INTRODUCTION

1.      Decades of State disinvestment in and deliberate indifference to Detroit schools have denied Plaintiff schoolchildren access to the most basic building block of education:  literacy.  Literacy is fundamental to participation in public and private life and is the core component in the American tradition of education.  But by its actions and inactions, the State of Michigan's systemic, persistent, and deliberate failure to deliver instruction and tools essential for access to literacy in Plaintiffs' schools, which serve almost exclusively low-income children of color, deprives students of even a fighting chance.  Michigan's compulsory attendance laws require Plaintiffs to attend these schools, but they are schools in name only, characterized by slum-like conditions and lacking the most basic educational opportunities that children elsewhere in Michigan and throughout the nation take for granted.  Plaintiffs sit in classrooms where not even the pretense of education takes place, in schools that are functionally incapable of delivering access to literacy.  This abject failure makes it nearly impossible for young people to attain the level of literacy necessary to function—much less thrive—in higher education, the workforce, and the activities of democratic citizenship.  The abysmal conditions and appalling outcomes in Plaintiffs' schools are

unprecedented.  And they would be unthinkable in schools serving predominantly white, affluent student populations.  In short, the schooling afforded to Plaintiffs is both separate and unequal.  These students are effectively excluded from Michigan's statewide system for the delivery of public education.  In 2009, U.S. Secretary of Education Arne Duncan described Detroit as "New Orleans . . . without Hurricane Katrina, and I feel a tremendous sense of both urgency and outrage."[1]  Seven years later, the Detroit schools have spiraled further downward into crisis and despair, irreparably damaging children's futures and depriving them of their constitutionally-guaranteed fundamental right of access to literacy.

2.     This action is brought on behalf of a class of Detroit schoolchildren from five of the lowest performing schools in Detroit:  three Detroit Public Schools Community District ("DPSCD") schools—Osborn Academy of Mathematics ("Osborn MST"), the Osborn Evergreen Academy of Design and Alternative Energy ("Osborn Evergreen"), and the Medicine and Community Health Academy at Cody ("Cody Health")—and two charter schools—Hamilton Academy ("Hamilton") and Experiencia Preparatory Academy ("Experiencia") (collectively, "Plaintiffs' schools").  Plaintiffs' schools serve more than 97% children of color and primarily low-income students:  Detroit is bounded by the most economically

_____

[1] *U.S. Education Secretary: Detroit Schools 'Ground Zero'*, MLive (May 29, 2009), *available at* http://www.mlive.com/education/index.ssf/2009/05/education_secretary_detroit_sc.html.

and racially segregating school district boundary in the country.[2]  Like all children, Plaintiffs desperately want to learn and succeed, and they depend on the promise of education to improve their lives.  But unlike most children, Plaintiffs—and other children attending Plaintiffs' schools—cannot take for granted that their public schools will serve as engines of democracy and social mobility, or even adequately provide the most fundamental elements of literacy.

3.      Literacy is the foundation of all education.  Experts agree that in the twenty-first century, literacy means having the ability to encode and decode language so as to access knowledge and communicate.  Literacy means not only the ability to recognize or pronounce a written word, but the ability to use language to engage with the world—to understand, analyze, synthesize, reflect, and critique. Literacy development is progressive and cumulative, and literacy instruction must therefore extend throughout both primary and secondary education.

4.      Educators agree that basic, commonsense conditions must be in place to ensure that all children have the opportunity to attain literacy.  Access to literacy requires evidence-based literacy instruction at both the elementary and secondary school levels, a stable, supported, and appropriately trained teaching staff, basic instructional materials and safe physical conditions that do not impede learning,

---

[2] EdBuild, Fault Lines: America's Most Segregating School District Borders, http://viz.edbuild.org/maps/2016/fault-lines/. The poverty rate in Detroit is seven times that of Grosse Pointe, and 75.3% of Grosse Pointe Public Schools students are white, compared to 2.2% of DPSCD students.

and support for students' social-emotional needs. Yet these conditions are almost entirely absent from Plaintiffs' schools. As a direct result, Plaintiff children predictably cannot attain literacy from their schools and are unjustly stigmatized as unwilling learners uninterested in education. Their families and communities are similarly stereotyped as uncaring about their children's education. And the teachers and administrators who strive to do everything in their power—often at great personal sacrifice—to assist Plaintiffs to overcome the overwhelming obstacles to achieving access to literacy are regarded as engaging in quixotic exercises or inexplicably tolerating conditions that demean their status as professional educators.

5.    Achievement data reveal that in Plaintiffs' schools, illiteracy is the norm. The proficiency rates in Plaintiffs' schools hover near **zero** in nearly all subject areas. On a percentile scale of zero to 100, Michigan's statewide accountability system rates Plaintiffs' schools that are currently open **one, two, four, and six**.[3] The non-profit organization Excellent Schools Detroit has likewise assigned grades of **Fs and Ds** to Plaintiffs' schools. Many students in Plaintiffs' schools cannot read, write, or comprehend at a grade-appropriate level. These students struggle to write proper paragraphs or even complete sentences, let alone essays or narratives. And because the rest of the curriculum assumes a level of

---

[3] Experiencia was not assigned a ranking by the State.

literacy that the students do not attain, they are also unable to learn State-mandated content in all other subject areas.

6.    Plaintiffs' schools have failed them at every stage of the educational system.  In the primary grades, Plaintiffs' elementary schools—Hamilton and Experiencia—have failed to deliver access to the foundational literacy skills of letter- and word-recognition and phonetics.  For example, in the third grade at Hamilton, only 4.2% of students scored proficient or above on the State of Michigan's 2015-16 English assessment test, compared with 46.0% of third-grade students statewide.  In practice, this means that many students have a vocabulary of only a couple hundred words.  Some students cannot even sound out letters.  Last year, the only books in the third-grade classroom at Hamilton were picture books, until the teacher purchased others with her own money more than halfway through the year.  Likewise, at Experiencia, only 9.5% of third-grade students scored proficient in English, as compared to 46.0% of third-graders statewide.  A number of second and third graders were still working on handwriting and sounding out the letters of the alphabet.  When students without basic literacy skills move on to middle and high school, they lack the foundation necessary to build on these skills and attain more sophisticated and grade-level appropriate comprehension and fluency in the higher grades.

7.     Moreover, literacy instruction cannot stop in elementary school. Dedicated literacy instruction must continue throughout middle and high school for students to develop the "knowledge capabilities" necessary for functional adult literacy, including the ability to comprehend, compose, reflect upon, and critique. But Plaintiffs' high schools—Osborn MST, Osborn Evergreen, Cody MCH, and Experiencia—do not provide meaningful access to such instruction.  So even if students somehow acquire basic, elementary-level literacy skills, they would still lack the opportunity to attain adolescent literacy skills.  For example, at Cody MCH, 12.5% of eleventh-graders scored proficient in English in 2014-15, compared with 49.2% statewide.  At Cody MCH, the ninth-grade English-Language Arts teacher spent a good part of the year reading, paragraph by paragraph, a novel with a third-grade reading level, because no more lexically advanced novel would have been readable by his students.  When the class was asked to read the book aloud in class, a number of students experienced enormous difficulty reading monosyllabic words.  Similarly, at Experiencia, the ninth and tenth grade class was assigned a book with a fourth-grade reading level, because the students lacked the literacy skills to access more complex texts and because they were the only books available.  At Osborn MST, in 2014-15, 1.8% of eleventh-graders were proficient in English.  A number of the students struggled to sound out basic words when they read aloud in class, and one student asked her

classmate how to spell the word "the". In all of Plaintiffs' high schools, the failure to offer access to literacy had dire consequences for students' overall education. Each currently open school's eleventh graders has *0%* proficiency in at least one of Math, Science, or Social Studies.

8.      The alarming outcomes in Plaintiffs' schools are a predictable consequence of the State's consignment of Plaintiffs to chaotic, under-resourced, and unsafe schools that lack the necessary learning and teaching conditions for effective delivery of literacy instruction. Plaintiffs' schools do not have appropriate literacy programs and curricula to effectively teach literacy in the first instance, or to intervene and remediate when students fall behind. Nor does the State operate any system of accountability to ensure that students are delivered access to literacy, are assigned to classrooms where access to literacy can be delivered by qualified and trained teachers, and are identified when they fall behind to receive professionally appropriate interventions. Instead of providing students with a meaningful education and literacy, the State simply provides buildings—many in serious disrepair—in which students pass days and then years with no opportunity to learn to read, write, and comprehend.

9.      The schools Plaintiffs attend, and attended, are not truly schools by any traditional definition or understanding of the role public schools play in

affording access to literacy.  They are instead marked by a host of shock-the-conscience conditions, including the following:

10.     <u>Lack of textbooks and instructional materials</u>.  Many classes in Plaintiffs' schools do not have appropriate textbooks.  Where they are provided, they are often long out of date, torn and beyond repair, or marked up to be unreadable in places.  One high school history text, for example, was published in 1998 when the president was Bill Clinton, making it older than the majority of the high school students in the class.  In multiple classes, students were forced to share a single book in groups of four or more during class periods, and were not able to take books home.  As a result, despite the teachers' best efforts, it was not possible to assign meaningful homework.

11.     <u>Lack of basic classroom resources</u>.  The State has failed to ensure that Plaintiffs schools have basic school supplies.  As a result, Plaintiffs' schools must either go without or must rely on donations from teachers or more affluent schools, unfairly stigmatizing students as victims in need of charity.  In many cases, the only books, furniture, pens, pencils, markers, paper, cleaning substances, or even toilet paper that are in the classroom or buildings are purchased by teachers with thousands of dollars of their personal funds.  Schools from affluent communities like Grosse Pointe donate surplus materials or materials the school would

otherwise throw away to Plaintiffs' schools, a humiliating fact of which the entire school community is aware.

12.   <u>Overcrowded classrooms</u>.  Classrooms are stuffed with as many as fifty students and often do not have enough chairs and desks.  Students sometimes sit on the floor, lean against walls, or congregate around teachers' desks.

13.   <u>Unsanitary and dangerous conditions in classrooms</u>.  For years, classrooms and campuses have been unable to satisfy minimal state health and safety standards, let alone deliver basic education.  Plaintiffs have been subjected to unsafe physical conditions in their schools that make learning nearly impossible.  Although the City of Detroit has recently reported that it brought buildings up to code and exterminated rodents in a number of schools including Osborn, the City has not completed repairs at Cody MCH or Hamilton, and unsafe physical conditions continue to exist at all Plaintiffs' schools.  The unsafe conditions that have plagued Plaintiffs' schools include the following:

   a. *Extreme classroom temperatures*.  Classroom temperatures in Plaintiffs' schools regularly exceed 90 degrees during both the summer and winter due to malfunctioning furnaces and, at other times during winter, are frequently so cold that students and their teachers can see their breath and must wear layers of winter clothing indoors.  Students and their teachers cannot receive or impart literacy instruction under such conditions;

b. *Vermin infestations.*  Mice, cockroaches, and other vermin regularly inhabit Plaintiffs' classrooms, and the first thing some teachers do each morning is attempt to clean up rodent feces before their students arrive.  Hallways and classrooms smell of dead vermin and black mold;

c. *Unsafe conditions throughout the school.*  Perilous conditions throughout these schools further destabilize the environment and pose additional obstacles to achieving literacy.  The drinking water in some of Plaintiffs' schools is hot, contaminated and undrinkable.  Bathrooms are filthy and unkempt; sinks do not work; toilet stalls lack doors and toilet paper.  In some classrooms, ceiling tiles and plaster regularly fall during class time.  In one elementary school, the playground slide has jagged edges, causing students to tear their clothing and gash their skin, and students frequently find bullets, used condoms, sex toys, and dead vermin around the playground equipment. In another school, fires have broken out in hallways and the school lacks the capacity to notify students and teachers and even lacks regulation fire safety equipment.  In the same school, the swimming pool has been unusable for over six years, sitting empty except for broken tiles, filth, and dead rodents.

14.    No material improvements were made at Plaintiffs' schools for the 2016-2017 school year, which just began on September 6.  In at least some of the schools, learning conditions have in fact worsened, making it all but impossible to

teach or learn.  At Hamilton, temperatures of over 100 degrees caused students and teachers to vomit and pass out during the first week of school, and at Osborn MST and Osborn Evergreen, school was closed early on September 7, 2016, because of sweltering temperatures.  Both Hamilton and the Osborn schools continue to have numerous teacher vacancies or absences in core subject areas, and teachers continue to have to purchase basic teaching materials using their personal funds.

15. _Unaddressed trauma_.  Plaintiffs' schools also lack the capacity to meet the specific learning needs of the students they serve, preventing them from providing conditions under which children attain literacy.  Plaintiffs' schools serve large numbers of low-income students, homeless youth, and students who have experienced or witnessed violence.  Unaddressed exposure to trauma and adversity impedes a child's ability to learn, and students impacted by trauma require social-emotional and trauma-informed support.  But Plaintiffs' teachers and staff are not trained to recognize or respond to childhood trauma, and counseling by mental health professionals is not available to support children with mental health needs. In those schools that do have access to a social worker, the social worker is often restricted to special education students, does not come every day, and is stretched beyond capacity, such that students wait months for an appointment.  The response to children who act in ways motivated by the trauma they have experienced is to

punish and exclude them from the classroom, rather than to implement restorative practices to provide support and assist in healing.

16.   <u>Lack of English Learner ("EL") instruction</u>.  Plaintiffs' schools also serve a number of students whose first language is not English.  But despite claiming to the contrary, Plaintiffs' schools provide no pedagogically-appropriate EL instruction and not one of Plaintiffs' schools consistently employed qualified teachers trained to deliver EL services.  In one school that aggressively recruited EL students, there were frequently no properly trained or qualified EL teachers, though a large percentage of the students enrolled required instruction to become fluent in English.  Students who spoke some English assisted other students who spoke English less fluently, effectively serving as their instructors.  There was no differentiated instruction meeting professional standards based on the level of English proficiency of individual students.

17.   <u>Insufficient or unqualified staff</u>.  Predictably, given the many challenges of teaching in Plaintiffs' schools, these schools lack the qualified teaching staff required to bring students to literacy—that is, teachers who are certificated, properly trained, and assigned to a class within the area of their qualifications and expertise.  Teacher shortages result from high turnover, appalling school conditions, insufficient materials and support, and uncompetitive salaries.  These classes are covered by non-certificated paraprofessionals,

substitutes, or misassigned teachers who lack any expertise or knowledge in the subject-matter of the course. In one case, an eighth grade student was put in charge of teaching seventh and eighth grade math classes for a month because no math teacher was available.

18.   In June 2016, the State further exacerbated this problem by passing legislation permitting non-certificated instructors to teach in DPSCD schools. This legislation does not apply to any school elsewhere in the State. Rather, it singles out the children of Detroit—the vast majority of whom are children of color—for separate and inferior treatment.

19.   The State of Michigan is the entity responsible for securing and ensuring Plaintiffs' opportunity to access literacy. Not only does the Michigan constitution assign responsibility for the state system of public education to the State, the State has directly controlled DPSCD—formerly known as Detroit Public Schools ("DPS")—for most of the past fifteen years through variations of an emergency manager system. The State has long been aware of the education crisis in Detroit, which is reflected in the State's own assessment data, has been the subject of countless news articles, and has prompted the State to implement an emergency manager system in Detroit. Yet despite this awareness, the State has failed to take necessary and effective steps to protect Plaintiffs' most basic right of access to literacy. To the extent that any literacy instruction is provided Plaintiffs,

it is in spite of, not because of, the State.  Rather than support Plaintiffs' education, the actions of the State—placing the Detroit schools largely in the hands of administrators with no backgrounds in education—have only hastened the demise of Plaintiffs' schools.  Indeed, the Emergency Manager appointed by Defendant Governor Richard Snyder in 2015 to administer the DPS schools was responsible for the actions that created the public health crisis of dangerous levels of lead in Flint's drinking water.  The State's failure to provide access to literacy in Plaintiffs' schools has caused a generation of children to grow up without access to the most elemental skills necessary to function in public and private life.

20.     By creating, permitting, failing to correct, and exacerbating the deplorable conditions that have persisted for decades in Plaintiffs' schools, the State has functionally excluded Plaintiffs from its system of public education available to other children throughout the State and denied Plaintiffs the critical opportunity to attain literacy.  As the U.S. Supreme Court held in *Plyler v. Doe*, the exclusion of a discrete group of children from the ability to attain literacy necessary to participate in college and career, and as citizens in our democracy, is incompatible with the guarantees of liberty and equality enshrined in the Fourteenth Amendment of the U.S. Constitution.  457 U.S. 202 (1982).  As the *Plyler* Court held:

14

> *Illiteracy is an enduring disability.  The inability to read and write will handicap the individual deprived of a basic education each and every day of his life*.  The inestimable toll of that deprivation on the social economic, intellectual, and psychological well-being of the individual, and the obstacle it poses to individual achievement, make it most difficult to reconcile the cost or the principle of a status-based denial of basic education with the framework of equality embodied in the Equal Protection Clause.

*Id.* at 222 (emphasis added).  *Plyler* struck down a Texas statute that excluded undocumented children from the public education system, but its basic holding stands apart from the fact that the children denied access to basic education lacked lawful immigration status.  Rather, the *Plyler* Court held that a state may not "deny *a discrete group of innocent children* the free public education that it offers to other children residing within its borders."  Id. at 230.  As in *Plyler*, Plaintiffs are a discrete class—nearly all children of color and low-income—who have been excluded from the access to literacy that public education provides to other students in the State of Michigan.  The consequences of denial of access to literacy are profound, both for the children who have been excluded, and for all citizens of the State of Michigan and the United States.  As the *Plyler* Court cautioned, "[w]e cannot ignore the significant social costs borne by our Nation when select groups

are denied the means to absorb the values and skills upon which our social order rests." Id. at 221. Our constitutional commitments to individual liberty, equality, and participatory democracy are empty unless all children enjoy equal opportunity to attain the basic literacy skills necessary to participate in the economic, political, and civic life of the nation.

21.    Plaintiffs' schools are unrecognizable by any of the characteristics traditionally associated with schools. As operated by the State, they wholly lack the capacity to deliver basic access to literacy, functionally delivering no education at all. These are precisely the types of schools about which the U.S. Supreme Court expressly reserved judgment in *San Antonio Independent School District v. Rodriguez*, acknowledging that a state system of education that "occasioned an absolute denial of educational opportunities to any of its children," or "fail[ed] to provide each child with an opportunity to acquire . . . basic minimal skills" may run afoul of the U.S. Constitution. 411 U.S. 1, 37 (1973).

22.    The functional exclusion of Plaintiffs from Michigan's statewide system of education has profound and predictable consequences. "The stigma of illiteracy will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." *Plyler*, 457 U.S. at 223. The

message communicated by excluding a discrete group of children from the most fundamental institution of our democracy is that these children are disposable or unimportant; they are not citizens invited to participate on equal terms in the economic, civic, and political life of our nation.  This message irreparably damages the dignity and life chances of Plaintiffs.  And it is not a message that our Constitution countenances.

## PARTIES

### *Plaintiffs*

23.    **Plaintiff Jessie K.** resides in Wayne County in the City of Detroit, Michigan, within the boundaries of the DPSCD.  Plaintiff Jessie K. lawfully attends school at Hamilton, a charter school, and is legally required to attend school.  Jessie K. is nine years old and is in the third grade.  She is African-American.  She has attended Hamilton since Kindergarten.  Plaintiff Jessie K. does not qualify for special education services.  Plaintiff Jessie K. has been denied access to literacy by being deprived of evidence-based literacy instruction and by being subject to school conditions that prevent her from learning.  As a direct result of the State's failure to ensure that Hamilton has the capacity to deliver access to literacy, Jessie K. has been functionally excluded from Michigan's statewide system of public education.  The mother of Plaintiff Jessie K., Yvette K., has

concurrently filed a petition with the Court to act as her guardian ad litem in connection with this litigation.

24.     **Plaintiffs Cristopher R., Isaias R., and Esmeralda V.** reside in Wayne County in the City of Detroit, Michigan, within the boundaries of the DPSCD.  Plaintiffs Isaias R., Cristopher R., and Esmeralda V. lawfully attended school at Experiencia and are legally required to attend school.  Plaintiff Cristopher R. is fourteen years old and is in the ninth grade, Isaias R. is twelve years old and in the seventh grade, and Esmeralda V. is thirteen years old and is in eighth grade. Plaintiffs Cristopher R., Isaias R., and Esmeralda V. are Latino.  Cristopher and Isaias R. attended Experiencia for one-and-a-half years, until the school closed at the end of the 2015-16 school year, and Esmeralda V. attended Experiencia for two years, from sixth to seventh grade, until it closed.  Plaintiffs Isaias R., Cristopher R., and Esmeralda V. do not qualify for special education services.  Plaintiffs Cristopher R., Isaias R., and Esmeralda V. have been denied access to literacy by being deprived of evidence-based literacy instruction and by being subject to school conditions that prevent them from learning.  As a direct result of the State's failure to ensure that Experiencia had the capacity to deliver access to literacy, Cristopher R., Isaias R., and Esmeralda V. were functionally excluded from Michigan's statewide system of public education.  The parents of Plaintiffs Isaias R., Cristopher R., and Esmeralda V. , Escarle R. and Laura V., have concurrently

filed petitions with the Court to act as Plaintiffs' guardians ad litem in connection with this litigation.

25.     **Plaintiff Paul M.** resides in Wayne County in the City of Detroit, Michigan, within the boundaries of the Detroit Public Schools.  Plaintiff Paul M. lawfully attends school at Osborn MST.  Plaintiff Paul M. is eighteen years old and is a senior in high school.  He is African-American.  He has attended Osborn MST since his sophomore year.  His freshman year of high school, Paul M. attended Osborn College Preparatory Academy.  Plaintiff Paul M. does not qualify for special education services.  Paul M. has been denied access to literacy by being deprived of evidence-based literacy instruction and by being subject to school conditions that prevent him from learning.  As a direct result of the State's failure to ensure that Osborn MST has the capacity to deliver access to literacy, Paul M. is functionally excluded from Michigan's statewide system of public education.

26.     **Plaintiff Gary B.** resides in Wayne County in the City of Detroit, Michigan, within the boundaries of the Detroit Public Schools.  Plaintiff Gary B. lawfully attends school at Osborn Evergreen.  Plaintiff Gary B. is eighteen years old and is a senior in high school.  He is African-American.  Plaintiff Gary B. does not qualify for special education services.  Gary B. has been denied access to literacy by being deprived of evidence-based literacy instruction and by being subject to school conditions that prevent him from learning.  As a direct result of

the State's failure to ensure that Osborn Evergreen has the capacity to deliver access to literacy, Gary B. is functionally excluded from Michigan's statewide system of public education.

27.     **Plaintiff Jaime R.** resides in Wayne County in the City of Detroit, Michigan, within the boundaries of the Detroit Public Schools.  Jaime R. lawfully attends school at the Cody MCH and is legally required to attend school.  Plaintiff Jaime R. is seventeen years old and is in the eleventh grade.  He is African-American.  Jaime R. has attended Cody MCH since he was a freshman.  Plaintiff Jaime R. does not qualify for special education services.  Jaime R. has been denied access to literacy by being deprived of evidence-based literacy instruction and by being subject to school conditions that prevent him from learning.  As a direct result of the State's failure to ensure that the Cody MCH had the capacity to deliver access to literacy, Jaime R. is functionally excluded from Michigan's statewide system of public education.  Plaintiff Jaime R.'s mother, Karen H., has concurrently filed a petition with the Court to act as Plaintiff's guardian ad litem in connection with this litigation.

## *Defendants*

28.     **Defendant Richard D. Snyder**, sued here in his official capacity, is the Governor of the State of Michigan.  As Governor, Defendant Snyder is the chief executive officer of the State of Michigan, the legal and political entity with

plenary responsibility for educating all Michigan public school students, including the responsibility to establish and maintain the system of common schools and a free education, under the Michigan Constitution, Article 8, §§ 1, 2, and 3.  As chief executive officer of the State of Michigan, Defendant Snyder has the ultimate obligation to ensure that all Michigan public school students receive their fundamental right to literacy under the Fourteenth Amendment of the U.S. Constitution.  The Governor is responsible for appointing the Transition Manager charged with administering and overseeing the DPS.

29.  **Defendants John C. Austin, Michelle Fecteau, Lupe Ramos-Montigny, Pamela Pugh, Kathleen N. Straus, Casandra E. Ulbrich, Eileen Weiser, and Richard Zeile**, sued here in their official capacities, are members of the State Board of Education.  The members of the State Board of Education are responsible for determining and enforcing the policies governing Michigan's public schools, including those necessary to carry out constitutional and statutory mandates, and for adopting rules and regulations for the supervision and administration of all local school districts.  The State Constitution provides that the State Board of Education retains "[l]eadership and general supervision over all public education" and is the "planning and coordinating body for all public education."  Const. 1963, art. 8, § 3; *see also* Michigan Compiled Laws ("Mich. Comp. Laws") § 388.1009 *et seq.*

30.     **Defendant Brian J. Whiston**, sued here in his official capacity, is the Superintendent of Public Instruction for the State of Michigan.  The Superintendent is appointed by and responsible to the State Board of Education. Const. 1963, art 8, § 3; Mich. Comp. Laws § 388.1014.  He is the principal executive officer of the Michigan Department of Education, the department of the State of Michigan government responsible for administering and enforcing laws related to public education.  Mich. Comp. Laws § 16.400-16.402.  The Superintendent sits on the Governor's Cabinet, the State Administrative Board, and acts as chair and a non-voting member of the State Board of Education.  The Superintendent is responsible for the implementation of bills passed by the Legislature and policies established by the State Board of Education.  He is also the primary liaison to the United States Department of Education and other federal agencies.

31.     **Defendant David B. Behen**, sued here in his official capacity, is the Director of the Michigan Department of Technology, Management and Budget ("DTMB").  The Director of the DTMB has the authority to appoint the State School Reform/Redesign Officer responsible for implementing the provisions of Mich. Comp. Laws § 380.1280c, which concerns schools designated as Priority Schools.  Priority schools are those schools in the bottom 5% of a complete top-to-bottom list of schools published annually.  The ranking is based on a

number of factors, including minimal students outcomes in a number of subject areas, low achievement coupled with declining performance or large achievement gaps, or a combination of multiple of these factors.[4]  All of Plaintiffs' schools that are currently operating have been designated as Priority Schools.[5]

32.    **Defendant Natasha Baker**, sued here in her official capacity, is the State School Reform/Redesign Officer responsible for carrying out the powers, duties, functions, and responsibilities of Mich. Comp. Laws § 380.1280c, which concerns schools designated as Priority Schools

33.    Defendants Richard Snyder, John C. Austin, Michelle Fecteau, Lupe Ramos-Montigny, Pamela Pugh, Kathleen N. Straus, Casandra E. Ulbrich, Eileen Weiser, Richard Zeile, Brian J. Whiston, David B. Behen, and Natasha Baker are herein referred to collectively as "Defendants."

## FACTUAL ALLEGATIONS

34.    Literacy plays a unique role in our democracy, enabling people to access the rights and discharge the obligations of citizenship and participation in public and private life.  Literacy is so important that every state commits to teach it to all children, and indeed requires children to attend school so it can do so.  Yet the State of Michigan, which directly oversees public education in Detroit, has

---

[4] *See* FAQ Michigan's Priority Schools, available at https://www.michigan.gov/documents/mde/Priority_FAQ_427729_7.pdf.
[5] Experiencia was closed before the 2016-2017 school year.

functionally excluded Plaintiffs from its statewide system of public education, denying them the opportunity to attain literacy. Achievement data generated and collected by the State documents the near-universal failure to meet proficiency standards in Plaintiffs' schools and the consequent high drop-out and low college attainment rates. These dramatic proficiency shortfalls result predictably and inevitably from the deplorable conditions in Plaintiffs' schools that are antithetical to learning and teaching. Despite its awareness of this education crisis, the State has failed to take measures to ensure that effective literacy instruction is available to all students.

## I.      <u>Literacy Is a Fundamental Right</u>

35.    Literacy is central to the American tradition of education; in fact, it is the basic unit of education. Literacy is necessary for success not only in English/Language Arts, but also for subject-matter competency in other core subject areas like history, science, and math. As the U.S. Supreme Court has repeatedly emphasized and decades of social science confirm, literacy is essential to succeed in higher education and the workplace, to be an informed citizen capable of participating in a democracy, and to secure personal well-being. This is why Michigan—and every state—makes public education available to every child and even compels children to attend school full time and mandates testing to determine whether students are benefitting from the required instruction. The

unique importance of literacy to civic, political, and economic participation means that effectively excluding a discrete class of children from the right to an opportunity to attain literacy stamps them with a badge of indignity that will profoundly affect them for the rest of their lives.  This stigma places a debilitating burden on these children's morale, psyche, and life chances and creates a caste system that perpetuates the social, economic, and political subordination of low-income communities of color.

### A.    The Meaning of Literacy and Literacy Instruction

36.    Every schoolchild in America grows up learning the "The Three Rs"—reading, writing, and arithmetic.  Since the time of Thomas Jefferson, "[T]he [T]hree R's" have made up the basic, skills-oriented work of schools.  *Wisconsin v. Yoder*, 406 U.S. 205, 226 n.14 (1972).  Education experts agree that to succeed as adults in the twenty-first century, children must learn not just the skill to decode letters and words, but the ability to read and write well enough to access knowledge and communicate with the world.  These essential knowledge capabilities—which include the ability to compose, comprehend, synthesize, reflect upon, and critique—require conscious and sustained development throughout primary and secondary schooling.[6]

---

[6] *See generally* Catherine Snow et al., Preventing Reading Difficulties in Young Children (1998).

37.     The United States Department of Education ("DOE") has operationalized and ratified these concepts in its What Works Clearinghouse Institute of Education Sciences ("IES") Practice Guides, which are prepared by a DOE-appointed and sponsored panel of national literacy experts to provide evidence-based recommendations for improving literacy instruction and have been endorsed and adopted by Michigan's Early Literacy Initiative, a major activity of the Michigan Department of Education.[7]  The panel defines reading comprehension[8] as "***the process of simultaneously extracting and constructing meaning through interaction and involvement with written language***."[9]  The panel explains that "[e]xtracting meaning is to understand what an author has stated, explicitly or implicitly.  Constructing meaning is to interpret what an author

---

[7] *See* Early Literacy Task Force, Mich. Ass'n of Intermediate Sch. Adm'rs, Gen. Educ. Leadership Network, Essential Instructional Practices in Early Literacy 1, 5 (2016) (setting forth state task force's conclusions regarding research-supported instructional practices that could "make a measurable positive difference in the State's literacy achievement"); *see also Early Literacy Initiative Overview*, Mich. Dep't of Educ., http://www.michigan.gov/mde/0,4615,7-140-28753_74161---,00.html#acc2 (last visited Sept. 9, 2016).

[8] Reading comprehension is also the measure of literacy used to assess whether students are meeting standards in many nationally-administered achievement tests, including the National Assessment of Education Progress (NAEP), the SAT, and the ACT, as well as Michigan's state achievement examinations, including the Michigan Student Test of Educational Progress (M-STEP) and the Michigan Merit Examination (MME).

[9] T. Shanahan et al., Improving Reading Comprehension in Kindergarten Through 3rd Grade: A Practice Guide 5 (2010). The panel noted that this definition of reading comprehension is consistent with the common and widely used definitions of reading comprehension. *Id.*; *see also* M. Kamil, et al., Improving Adolescent Literacy: Effective Classroom and Intervention Practices (2008).

26

has said by bringing one's 'capacities, abilities, knowledge, and experiences' to bear on what he or she is reading."[10]

38.    Functional adult literacy requires both elementary literacy—the letter-and word-recognition abilities and phonetics taught in kindergarten through third grade—and adolescent literacy—the knowledge capabilities that build on primary literacy skills and develop the ability to compose, comprehend, reflect upon, and critique.  Because literacy development is progressive and cumulative, evidence-based instruction is required throughout the primary and secondary years.

39.    Elementary literacy acquisition—taught in kindergarten through third grade—requires instruction in the foundational areas of alphabetics (phonemic awareness and phonics), fluency, and comprehension (basic vocabulary and text comprehension).  Early literacy instruction is designed to develop a child's basic ability to recognize letters and words, understand spelling-sound relationships, and obtain meaning from print.  As students progress through elementary school, they must develop a working understanding of how sounds are represented alphabetically, practice reading to achieve fluency with different kinds of texts, attain sufficient background knowledge and vocabulary to render texts meaningful and interesting, learn strategies for monitoring comprehension and repairing misunderstandings, and maintain interest and motivation to read.

---

[10] T. Shanahan et al., *supra* note 9, at 5.

40.     When students reach middle and high school without basic literacy skills, they cannot build on these skills to attain more sophisticated and grade-level appropriate comprehension and fluency in the higher grades.  But even for students who reach middle school with adequately developed primary literacy skills, direct literacy instruction cannot end in the elementary years.  The basic literacy skills that students develop in early elementary school do not automatically evolve into the higher-level literacy skills needed to succeed in middle school, high school, and ultimately the adult workplace.  Rather, dedicated instruction in adolescent literacy (grades four through twelve) must continue throughout secondary school in the areas of comprehension, motivation, word study, fluency, and vocabulary, and literacy instruction must be integrated into content area classes.

41.     Because literacy development is cumulative and sequentially dependent, students who have been denied early the opportunity to learn fall further behind with each year of schooling as pre-existing gaps are compounded and expanded.  For example, students with low reading comprehension skills have trouble progressing further in school because they cannot read age-appropriate texts.  There are very few books written at a third-grade reading level that are cognitively appropriate for high school-aged students, so students who are behind in their literacy development often cannot read texts that can engage and educate them with high school content.  Failure to engage students with interesting and

developmentally appropriate content relevant to their lives then deters students from investing in further development of their literacy skills, causing these students to fall even further behind.

42.     Attaining proficiency in literacy is necessary to achieve mastery of content in all other core subject areas.  Without the levels of literacy that the curriculum assumes, students are denied meaningful access to not only content and skills in English Language Arts, but also to mathematics, history/social studies, science, technical subjects, and the visual and performing arts.  Students who lack literacy are unable to access word problems in mathematics class, do not sufficiently understand grammatical concepts in English to be able to apply them in foreign language class, lack the vocabulary to express their thoughts in laboratory reports in science class, and lack the reading comprehension skills to access textbooks that deliver high-school level content in history class.  As a result, schools that fail to deliver to students the opportunity to attain literacy deprive students of the ability to satisfy national and state standards in any content area and leave students unable to compete with their peers elsewhere in the state and nationally.

43.     The essential role of literacy, and its role as a gateway to other subject matter content, is nationally recognized in the development and adoption of Common Core State Standards in English Language Arts & Literacy in

History/Social Studies, Science, and Technical Subjects.  The Common Core standards were developed by education leaders in 48 states with the purpose of establishing a set of uniform and clear standards that ensure "all students have the skills and knowledge necessary to succeed in college, career, and life upon graduation from high school, regardless of where they live."[11]  The Common Core English Language Arts/Literacy standards lay out what students should know and be able to do by the end of each grade to ensure they graduate from high school prepared for college and career.  Michigan adopted the Common Core standards in June 2010.[12]

### B.    *Literacy Is the Foundation of Citizenship and Well-Being in a Democratic Society*

44.    Literacy is, and always has been, uniquely significant to American civic life because it is essential to the maintenance of a robust and well-functioning democracy and plays a determinative role in the economic participation, well-being, and life chances of individuals.  The U.S. Supreme Court has repeatedly recognized that literacy lies at the foundation of citizenship and participation in democratic society.  In *Brown v. Board of Education of Topeka*, for example, the

---

[11] Frequently Asked Questions, Common Core State Standards Initiative, http://www.corestandards.org/wp-content/uploads/FAQs.pdf (last visited Sept. 8, 2016).

[12] Common Core Standards Fact Sheet: Frequently Asked Questions, Michigan Department of Education, *available at* https://www.michigan.gov/documents/mde/FAQ_4.10.13_418299_7.pdf.

Court eloquently expressed the "importance of education to our democratic society":

> It is required in the performance of our most basic public responsibilities, even service in the armed forces.  It is the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.

*Brown v. Bd. of Ed. of Topeka*, 347 U.S. 483, 493 (1954).  In *Plyler*, the Court likewise stressed education's "fundamental role in maintaining the fabric of our society" and the "significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests."  457 U.S. at 221.  The *Plyler* Court went on to explain, "[b]y denying . . . children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation."  Id. at 223.

45.   *Participation in the Political Process:*  Literacy is a prerequisite to constitutionally protected participation in the political process.  As the Supreme Court recognized in *Yoder*, "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence."  406 U.S. at 221.  Without access

to basic literacy skills, citizens cannot engage in knowledgeable and informed voting for the candidates of their choice, much less read and comprehend the complicated ballot initiatives that populate state and municipal ballots. Nor can citizens effectively exercise their right to engage in political speech and public discourse regarding the important civil and political issues of the day.

46. *Participation in Activities of Citizenship:* Literacy skills are also necessary to engage in many other activities of citizenship. Applicants seeking to enlist in military service must pass the Armed Services Vocational Aptitude Battery, a multiple-choice test administered on a wide range of subjects including word knowledge and paragraph comprehension. Individuals without basic literacy skills cannot complete written application forms necessary to obtain government entitlements such as Medicare, Medicaid, Social Security Disability Insurance, or General Relief benefits. Nor can they comply with mandatory government requirements such as filing tax forms or selective service registration. As many scholars and commentators have noted, as activities become digitized in the twenty-first century economy, literacy has become even more essential for carrying out these citizenship activities. [13]

---

[13] *See, e.g.*, Caitrin Blake, "The Changing Landscape of 21st-Century Literacy," Concordia University Nebraska (Aug. 21, 2014), http://online.cune.edu/the-changing-landscape-21st-century-literacy/; *Preparing 21st Century Students for a Global Society*, National Education Association 5 (2011); Timothy Shanahan, Introduction, in *Developing Early Literacy: Report of*

47.  *Access to Justice*:  Individuals denied the opportunity to attain literacy are also effectively precluded from constitutionally protected access to the judicial system.  In practice, literacy skills are a functional prerequisite to a number of activities that are not only essential to access the courts but are constitutionally protected in their own right, including the retention of an attorney and the receipt of notice sufficient to satisfy due process.  Likewise, lack of literacy also precludes meaningful participation in the judicial process, including serving as a member of a jury.

48.  *Educational Attainment and Economic Participation*:  Individuals who have been denied access to literacy experience significant barriers to participating in the workforce and securing economic self-sufficiency.  The Supreme Court has recognized that "education prepares individuals to be self-reliant and self-sufficient participants in society."  *Yoder*, 406 U.S. at 221.  National data backs up what is readily apparent:  individuals with low literacy are often unable to earn wages adequate to support themselves and their families, and they are less likely to be employed at all.  These trends begin with educational attainment:  students who lack literacy skills are less likely to graduate from high school, and those who do are unprepared for admittance and success in post-secondary education.  Data from the National Association of Adult Literacy

---

*the National Early Literacy Panel*, National Institute for Literacy xii (2008), *available at* http://lincs.ed.gov/publications/pdf/NELPReport09.pdf.

("NAAL"), which is sponsored by the U.S. Department of Education's National Center for Education Statistics reflects that individuals with the lowest levels of literacy are less likely than their peers to graduate from high school and succeed in post-secondary education.

49.     Data from the Bureau of Labor statistics shows that greater educational attainment is positively correlated with higher median weekly earnings and negatively correlated with unemployment.[14]  The chances of children in the lowest income quintile making it to the highest quintile nearly quadruples with a college degree,[15] but a low-income individual without a college degree will very likely remain in the lower part of the national earnings distribution.[16]  Sadly, if denial of access to literacy is left to continue, this means that the 74.4% of Cody MCH students and 80.5% of Osborn MST students who qualify for free or reduced priced meals are unlikely to escape from poverty in their lifetimes.

50.     Adults with low literacy face a significant economic disadvantage, earning lower wages and experiencing higher unemployment rates.  NAAL data reveals that 43% of adults with the lowest levels of literacy live in poverty, as

---

[14] U.S. Bureau of Labor Statistics, Employment Projections, http://www.bls.gov/emp/ep_chart_001.htm (last updated March 15, 2016).

[15] Exec. Office of the President, Increasing College Opportunity for Low-Income Students: Promising Models and a Call to Action (2014), *available at* https://www.whitehouse.gov/sites/default/files/docs/white_house_report_on_increasing_college_opportunity_for_low-income_students_1-16-2014_final.pdf.

[16] Michael Greenstone et al., The Hamilton Project, Thirteen Economic Facts About Social Mobility and the Role of Education (2013).

compared to only 4% of those with the highest levels of literacy.  Adults with lowest levels of literacy who work full time are more likely to be low-wage workers, earning less than $300 per week.  Even controlling for educational attainment and all other personal characteristics, adults who had difficulty filling out forms were more likely to be low-wage workers.  And low-literacy adults are less likely to be employed at all.  Those with the lowest literacy levels were 16.5 times more likely than those in the highest literacy group to receive public assistance in the past year.[17]

51.     The damage lack of literacy does to employment prospects can be seen in the numbers of applicants from Detroit who cannot pass the entrance exams for the plumbing and electric unions, written exams that also require basic mathematical skills.  This in turn affects Detroit as a whole, which cannot find sufficient local labor to rebuild areas that have remained burnt out for decades, or build new housing, or do other work necessary to restore the city center to life.

52.     *Incarceration and Crime*:  "Illiteracy is perhaps the strongest common denominator among individuals in correctional facilities."[18]  Research shows a strong association between low levels of educational attainment and the onset,

---

[17] *See* William C. Wood, Literacy and the Entry-Level Workforce: The Role of Literacy and Policy in Labor Market Success (2010) (analyzing NAAL data).

[18] William Drakeford, *The Impact of an Intensive Program to Increase the Literacy Skills of Youth Confined to Juvenile Corrections*, 53 J. of Correctional Educ. 139, 139 (2002).

frequency, persistence, and severity of delinquency.[19]  One study found that

reading failure was more predictive of aggression in confined delinquent

adolescents than any other factor considered, including age, family size, number of

parents present in the home, rural versus urban environment, socioeconomic status,

minority group membership, or religious preference.[20]  A report sponsored by the

U.S. Department of Education asserts that "literacy and criminality are umbilically

joined;"[21] another sponsored by the U.S. Department of Justice argues that "the

link between academic failure and delinquency, violence, and crime is welded to

reading failure."[22]  Youth with pronounced reading difficulties are vulnerable to

marginalization in their schools and lifelong risk of involvement in the juvenile

and criminal justice systems.[23]  One of the first national studies of the link between

reading failure and delinquency found that the average reading ability of

---

[19] *See, e.g.*, Center on Crime, Communities, and Culture, *Education as Crime Prevention: Providing Education to Prisoners*, Research Brief (1997); Denise C. Gottfredson, *School-based Crime Prevention*, *in* Preventing Crime: What Works, What Doesn't, What's Promising (1995); Eugene Maguin & Rolf Loeber, *Academic Performance and Delinquency*, *in* Crime and Justice: A Review of the Research (1996).

[20] Dennis L. Hogenson, *Reading Failure and Juvenile Delinquency*, 24 Bull. of the Orton Soc. 164 (1974).

[21] Anabel P. Newman et al., National Center on Adult Literacy, *Prison Literacy: Implications for Program and Assessment Policy* (1993).

[22] Michael S. Brunner, Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, *Reduced Recidivism and Increased Employment Opportunity Through Research-Based Reading Instruction* (1993)

[23] Peter E. Leone et al., *Organizing and Delivering Empirically Based Literacy Instruction to Incarcerated Youth*, 13 Exceptionality 89 (2005).

incarcerated adolescents was at the fourth-grade level and that more than one third of the youth were illiterate.[24]  A more recent study examining reading comprehension of detained and committed youth found that the average reading ability of incarcerated adolescents has since decreased.[25]  According to the National Assessment of Adult Literacy Prison Survey, at least half of all incarcerated adults surveyed scored "basic" or "below basic" in each of three literacy categories:  prose, document, and quantitative.[26]  This means the adults lacked the literacy skills to perform such everyday tasks as following directions using a clearly labeled map, or determining what time medicine can be taken based on a prescription drug label.[27]  Only 5% of incarcerated adults had literacy skills that were "proficient."[28]

53.    *Health Outcomes*:  The link between literacy and health outcomes has likewise been extensively documented in social science and medical literature.  In fact, literacy skills are more predictive of an individual's health status than are

---

[24] Brunner, *supra* n. 22.

[25] Leone, *supra* n. 23, at 95.

[26] Elizabeth Greenberg et al., *Literacy Behind Bars: Results from the 2003 National Assessment of Adult Literacy Prison Survey* 13 (2007). According to the survey, 56% of incarcerated adults scored "basic" or below in prose literacy; 50% in document literacy; and 80% in quantitative literacy.

[27] *Id.* at 6-7.

[28] *Id.* at 13.

race, income, employment status, education level, or age.[29]  At least two studies

have shown that health disparities in both race and educational attainment were

attenuated and in some cases eliminated after accounting for literacy.[30]  Literacy

plays an essential role in child and adolescent health in particular:  research has

repeatedly shown that children with low literacy experience worse health outcomes

and behavior.[31]  One study of adolescents from low-income neighborhoods found

that youth who read two years or more below grade level were more likely to

engage in risky behaviors and be in a physical fight that required medical treatment

than youth who were reading at grade level.[32]  In addition, multiple studies have

demonstrated the link between literacy and health outcomes in the management of

chronic diseases such as diabetes,[33] asthma,[34] and HIV.[35]  Death rates for chronic

---

[29] Jennifer F. Wilson, *The Crucial Link Between Literacy and Health*, 139 Ann. of Internal Med. 875 (2003).

[30] Somnath Saha, *Improving Literacy as a Means to Reducing Health Disparities*, 21 J. of Gen. Internal Med. 893 (2006); *see also* Barry D. Weiss et al., *Health Status of Illiterate Adults: Relation Between Literacy and Health Status Among Persons with Low Literacy Skills*, 5 J. of the Am. Bd. of Family Practice 257 (1992).

[31] Darren DeWalt & Ashley Hink, *Health Literacy and Child Health Outcomes: A Systematic Review of the Literature*, 124 Pediatrics S265 (2009).

[32] Terry C. Davis et al., *Low Literacy and Violence Among Adolescents in a Summer Sports Program*, 24 J. of Adolescent Health 401–11 (1999).

[33] Dean Schillinger et al., *Does Literacy Mediate the Relationship Between Education and Health Outcomes? A Study of a Low-Income Population with Diabetes*, 121 Pub. Health Reps. 245–54 (2006).

[34] Carol A. Mancuso & Melina Rincon, *Impact of Health Literacy on Longitudinal Asthma Outcomes*, 21 J. of Gen. Internal Med. 813–17 (2006).

disease, communicable diseases, and injuries have been shown to be inversely related to literacy.[36]  Lack of literacy impedes the ability to make appropriate health decisions and according to Proliteracy, "an excess of $230 billion a year in health care costs is linked to low adult literacy."[37]

### C.   *The Tradition of Compulsory Education in the United States*

54.    Literacy's essential role in the maintenance of democracy is reflected in education's unique status as not only a public good that we have committed to make available to all children since the earliest days of our republic, but also an activity in which participation is mandatory and coerced through compulsory education laws.  That is, access to literacy is not only guaranteed to every child, it is *required* of every child, creating a special relationship between the state and children between the ages of 6 and 18.

55.    The universal provision of public education has deep roots in U.S. history and laws.  Every state constitution includes a provision establishing a state duty to provide public education.  Indeed, as early as the Articles of Confederation in 1781 the Continental Congress imposed the development of

---

[35] Seth C. Kalichman et al., *Adherence to Combination Antiretroviral Therapies in HIV Patients of Low Health Literacy*, 14 J. of Gen. Internal Med. 267–73 (1999).

[36] Rima Rudd et al., *Literacy and Health in America,* Educ. Testing Service, 5 (2004).

[37] *See* "Adult Literacy Facts," ProLiteracy, https://proliteracy.org/Resources/Adult-Literacy-Facts (last visited Sept. 8, 2016).

public schools as a condition for admitting states into the union.  The Supreme Court has recognized that "providing public schools ranks at the very apex of the function of a State."  *Yoder*, 406 U.S. at 213.  States have actualized this duty by investing significantly in schools.  2013 Census Bureau data shows that states collectively spend almost 30% of their budgets on education.

56.     The *compulsory* nature of education is likewise an essential feature of the American political system.  Schooling is compulsory for all children in the United States; every state in the union has had a compulsory education law since at least 1918.  Michigan's law, for example, dates to 1871 and now requires every child from ages six to eighteen to attend school full-time.  Mich. Comp. Laws § 380.1561.  These compulsory attendance laws reflect a national judgment that education is so essential to the maintenance of democracy and the ability to participate in public and private life that compelling it is justified.

### D.     *Exclusion from Access to Literacy Creates an Enduring Stigma*

57.     Given the universal provision of literacy and its supreme importance to civic, political, and economic participation, excluding children from the opportunity to become literate marks them with a badge of shame and indignity that profoundly affects them for the rest of their lives.  The *Plyler* Court's finding that the "stigma of illiteracy" takes an "inestimable toll" on the "social economic, intellectual, and psychological well-being of the individual," 457 U.S. at 222-23, is

borne out by decades of social science research. Severe literacy deficits inflict immeasurable damage to the mental health and self-esteem of students and require greater resilience to remediate with each passing year. Studies have demonstrated a significant relationship between reading level and mental health, with one finding that the psychological health of subjects with extremely low reading levels was comparable to that of populations with severe psychosocial disabilities.[38] Students with low literacy may act in ways too frequently labeled as disruptive or defiant in the classroom, in order to deflect being seen by others as a student who cannot read.

58.     The denial of access to literacy also creates a discrete underclass in our society, which "presents most difficult problems for a Nation that prides itself on adherence to principles of equality under law." *Plyler*, 457 U.S. at 219. The denial of literacy has long been used as a tool to subordinate marginalized groups. Indeed, the denial of access to literacy was employed as a badge of slavery—a tactic, as the Court has recognized, used to subordinate and dehumanize slaves, and to deprive them of legal and human rights.[39] Later, literacy requirements were

---

[38] Weiss, *supra* n. 30 at 257.

[39] *Regents of Univ. of California v. Bakke*, 438 U.S. 265, 387-88 (1978) ("Three hundred and fifty years ago, the Negro was dragged to this country in chains to be sold into slavery. Uprooted from his homeland and thrust into bondage for forced labor, the slave was deprived of all legal rights. *It was unlawful to teach him to read*; he could be sold away from his family and friends at the whim of his

used as tools to discriminate against subordinated populations by barring them from voting.[40]

59.     Reacting against such stigma, and acknowledging the power of literacy, African-Americans have placed a special value on acquiring literacy since the time of slavery.  Even under the yoke of slavery, when learning to read was prohibited, some slaves devised creative and subversive means to do so.  When slavery ended, those who had acquired literacy became the first teachers of their fellow freed people, called on society to assist in teaching, building schools, and supporting teachers, and claimed education as a right.[41]  During this period, the literacy rate among African-Americans rose sharply from 5% at the end of the Civil War to 50% by 1900.  This commitment to education persists within the African-American community to this day.

60.     The denial of access to literacy to a discrete group of students demeans and excludes them, resulting in separate and unequal schooling that "generates a feeling of inferiority as to their status in the community that may

_____

master; and killing or maiming him was not a crime. The system of slavery brutalized and dehumanized both master and slave.") (emphasis added).

[40] *See, e.g.*, *Katzenbach v. Morgan*, 384 U.S. 641, 653-54 (1966); *see also Oregon v. Mitchell*, 400 U.S. 112, 147 (1970) (Douglas, J., partial concurrence) ("[Literacy tests] have been used at times as a discriminatory weapon against some minorities, not only Negroes but Americans of Mexican ancestry, and American Indians").

[41] Heather Williams, Self-Taught: African American Education in Slavery and Freedom (2007); James D. Anderson, The Education of Blacks in the South, 1860-1935 (1988).

affect their hearts and minds in a way unlikely ever to be undone." *Brown*, 347
U.S. at 494 (1954).

## II.     The State of Michigan's Role in Securing Education Rights

61.     The State of Michigan is ultimately responsible for complying with all
constitutional mandates regarding public education.  But it has particular
responsibility for the schools in Detroit, as it has controlled the DPS (and now,
DPSCD) schools since 1999.  During this period of State management and control,
the Detroit schools have been decimated through disinvestment and deliberate
indifference.  Today, they waver in a precarious condition characterized by
indefensibly low achievement scores, precipitously declining enrollment, the threat
of additional school closures, and financial collapse.  Governor Richard Snyder has
acknowledged that "[a] good education is the bedrock of success and kids in
chronically failing schools are at significant risk for lifelong struggles."[42]  Yet the
Governor has also recently admitted that many of Michigan's most vulnerable
students are being deprived of this opportunity, acknowledging that many of the
State's schools have not "achiev[ed] satisfactory outcomes" and "continue to
perform at levels that hamper the ability of students to receive an education that
prepares them for career and college readiness and success."[43]

---

[42] Gov. Snyder's office, Press Release, March 12, 2015, *available at*
http://www.michigan.gov/snyder/0,4668,7-277-57577_57657-349746--,00.html.
[43] State of Michigan, Executive Order No. 2015-9 (Mar. 12, 2015).

62.     According to the recently released National Assessment of Education Progress examination results for 2015, Michigan is ranked last—43 out of 43 reported jurisdictions—in reading proficiency for fourth grade African-American students.[44]   In fourth grade reading and math, about 91% of African-American students are below proficiency.[45]   In eighth grade reading, 91% of black students are below proficiency in reading and 95% are below proficiency in math.[46]   DPS students ranked last in reading and math proficiency among all big-city school districts.[47]

## A.     *The State's Authority Over Public Education in Detroit*

63.     In Michigan, the ultimate legal obligation for providing education and for protecting legal rights with respect to education rests with the State. Michigan's State Constitution was derived from the Northwest Ordinance of 1787, which conditioned Michigan's statehood on its setting aside land to be used for

---

[44] *See* Nat'l Ctr for Educ. Stats., 2015 Reading Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results (2016), *available at* http://www.nationsreportcard.gov/reading_math_2015/#?grade=4.

[45] *See id.*; Nat'l Ctr for Educ. Stats., 2015 Mathematics Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results (2016), *available at* http://www.nationsreportcard.gov/reading_math_2015/#?grade=4.

[46] *Id.*

[47] *See* Nat'l Ctr. for Educ. Stats., 2015 Mathematics TUDA Assessment Report Card (2016), *available at* http://www.nationsreportcard.gov/reading_math_2015/#?grade=4; Nat'l Ctr for Educ. Stats., 2015 Reading TUDA Assessment Report Card (2016), *available at* http://www.nationsreportcard.gov/reading_math_2015/#?grade=4.

funding public schools.  Article III of the Northwest Ordinance provided:

"Religion, morality and knowledge being necessary to good government and the

happiness of mankind, *schools and the means of education shall forever be*

*encouraged*."  (Emphasis added.)

64.     The State's founding Constitution—as well as its three successive

Constitutions—retained language and added additional language defining the

State's role in providing for public schools.  Michigan's current State Constitution

mandates that "[t]he Legislature shall maintain and support a system of free public

elementary and secondary schools as defined by law," Mich. Const., art.  VIII, § 2,

and vests "leadership and general supervision over all public education" in the

State Board of Education, *id.* art.  VIII § 3.  Throughout its history, the Michigan

Supreme Court has interpreted these provisions to establish the State's ultimate

decision-making authority over and legal obligation to supervise the Michigan

public school system.  In 1917, for example, the Michigan Supreme Court

declared, "We have repeatedly held that education in this State is not a matter of

local concern, but belongs to the State at large."  *Bd. of Educ. of City of Grand*

*Rapids v. Bacon*, 196 Mich. 15, 17 (1917).  Under Michigan's constitutional

structure, local school districts are creations and agents of the State.  The

Legislature created local school districts for the administrative purpose of

effectively delivering public education, and these districts possess only those

powers that the State has delegated to them, either expressly by statute or otherwise.

65.    Similarly, Michigan's public school academies, commonly known as charter schools, are subject to the same constitutional provisions as the local school districts.  Mich. Comp. Laws § 380.501(1) ("A public school academy is a public school under section 2 of article VIII of the state constitution of 1963, is a school district for the purposes of section 11 of article IX of the state constitution of 1963 . . . and is subject to the leadership and general supervision of the state board over all public education under section 3 of article VIII of the state constitution of 1963.").  Charter schools are thus "under the ultimate and immediate control of the state and its agents."  *Council of Organizations & Others for Educ. About Parochiaid, Inc. v. Governor*, 455 Mich. 557, 573 (1997).  Like traditional public schools, charter schoolss are subject to the leadership and supervision of the State Board of Education to the same extent as are all other public schools.  Id. at 583-84.  The Board has powers of supervision over all public education, Mich. Comp. Laws § 388.1009, and has the same constitutional authority over charter schools as it does over traditional public school districts.  *Council of Organizations & Others for Educ.  About Parochiaid, Inc.*, 455 Mich. at 584.

66.    The State's role in overseeing Michigan's schools has only increased with time.  In 1994, the passage of Proposal A shifted responsibility for school

funding and authority to determine funding levels from local municipalities to the State.  Proposal A expressly eliminated the ability of local taxpayers to approve new taxes to contribute to the schools' general funds.  And, in 2013, the legislature passed Public Act 96, which granted Michigan's Treasurer and State Superintendent, in consultation with the school district, the power to dissolve school districts.

67.    While the State of Michigan has ultimate obligation for ensuring access to literacy in all Michigan schools, the State has an additional, even greater responsibility with respect to the DPS because the State has been the de facto administrator of the school district for most of the past fifteen years.  This period has been characterized by primary or exclusive State control over all aspects of the DPS, with little to no local role in decision-making.

68.    Beginning in the 1990s, in part in response to DPS's fiscal deficit and failing student achievement outcomes, the State of Michigan began to introduce new governance systems that placed the DPS system under increasing State control.  In 1999, the Michigan legislature enacted Public Act 10, replacing Detroit's elected school board and superintendent with a seven member "reform board" whose only power was to hire, monitor, and evaluate a Chief Executive Officer for DPS.  Six members of the reform board were appointed by the Mayor of Detroit, and the seventh was appointed by the Governor.  Because the reform

board required unanimity to act, in practice this structure gave the Governor's appointee veto power over the selection of the CEO as well as every other decision.

69.     While control of DPS returned briefly to a locally elected school board from 2006-2008 as a result of a Detroit voter referendum, in December 2008, Governor Jennifer Granholm declared a fiscal emergency and invoked Public Act 72 to appoint an Emergency Financial Manager for DPS.  Although the locally elected school board shared power with the State-appointed Emergency Financial Manager until 2011, the Emergency Financial Manager exercised authority not only over financial decision-making, but some educational decision-making as well.  In 2011, the Michigan legislature transferred all decisionmaking authority over DPS to a State-appointed "Emergency Manager." This remains the case; the emergency manager may unilaterally exercise any authority typically residing in a school board of school superintendent.  *See* Mich. Comp. Laws § 141.1554(f).  Although elections will be held to fill seats on the Board of Education for the Detroit Community School Board in January 2017, the State's Financial Review Commission will remain involved in the oversight of the Detroit schools, and has not yet revealed the scope of authority or direction that will be granted to the elected board.

70.     Since 2010 the State also has assumed a special responsibility over what it calls Priority Schools, or the most poorly performing five percent of schools in the State.  This includes all of Plaintiffs' schools currently open.  Mich. Comp. Laws § 380.1280c.  The Priority Schools are supervised by the State School Reform/Redesign Office ("SRO"), which was transferred in May 2015 from the Department of Education to the Department of Technology, Management and Budget.  Mich. Exec.  Order No. 2015-9.  The SRO is charged with "creat[ing] the necessary conditions for sustainable and positive student outcomes."[48]  Yet Plaintiffs' schools continue to be deprived of even the most basic resources and conditions necessary for meaningful learning and teaching to occur.

### B.     *The Decimation of the Detroit Public Schools Under State Control*

71.     The Detroit Public Schools have been under the direct authority of the State of Michigan for 11 of the past 15 years, and remain so today.  During this period, the State's disinvestment and deliberate indifference has contributed to a precipitous decline in the school system that has left the approximately 100,000 children of Detroit, overwhelmingly low-income students of color, without the ability to meet their basic educational needs.  Although aware of the State's failure to educate children, the State has taken no effective steps to remedy the massive educational deprivation.

---

[48] Gov. Snyder's office, Press Release, March 12, 2015, available at http://www.michigan.gov/snyder/0,4668,7-277-57577_57657-349746--,00.html.

72.     The State's administration and management of the Detroit schools has ushered in and hastened a period of dramatic decline.  Achievement scores have remained abysmal— for example, between 2010 and 2013, DPS's overall proficiency scores for seventh grade reading ranged from 23.9% to 33% proficient, compared to a statewide range of 55.6% to 62%.  The State's period of control has been marked by decisions affecting the education of minority children that would never be permitted in predominantly white school districts.  District administration is not guided by pedagogical decisions made by educators familiar with the unique needs facing the struggling district, but rather by political decisions made by lawmakers and bureaucrats in Lansing, most of whom are not from the community and lack any expertise in education or familiarity with the Detroit schools' needs.

73.     For example, the State has appointed four emergency managers and one transition manager since 2009 without regard to whether any of these individuals possessed professional competence or experience in the area of K-12 education.  Darnell Early was appointed emergency manager of the DPS by Defendant Governor Snyder in January 2015.  Earley, who had no prior experience in education, had just been the emergency manager in Flint, Michigan who carried out the infamous decision to use the Flint River as a drinking water source for the city, resulting in dangerous levels of lead in Flint's drinking water.  After Earley

resigned in February 2016, the State replaced him with Transition Manager Judge
Steven Rhodes, a former federal bankruptcy judge.

### C.    The State's Failed Interventions in Detroit Schools

74.    The State's only response to the literacy crisis in Detroit has been
superficial, ill-considered, and counterproductive, driven by Lansing bureaucracy
and political considerations instead of the students' educational well-being.
Indeed, the State's recent interventions in the Detroit education system can best be
summarized as reactive efforts to apply a band-aid over the acute and obvious
symptoms of the devastating effects of the State's long-term disinvestment and
deliberate indifference.  The State has not addressed the root causes of its failures
in any systematic or meaningful way.

75.    _Establishment and Dissolution of EAA School District_:  In 2011, the
Governor created a new, state-controlled reform school district made up of 15 of
the state's lowest-performing schools, to be governed by the Education
Achievement Authority ("EAA").  Although the EAA is a statewide district, for
the first two years of the program all of the schools under EAA's authority were
former DPS schools.  Currently, 15 former DPS schools are administered by the
EAA.  The State, in conjunction with Eastern Michigan University, administers
EAA and has responsibility for EAA's accountability.  Seven of the eleven
members of the EAA's board of directors are appointed by the Governor, and the

Governor also appoints the executive committee from among the board members. The executive committee then appoints the EAA chancellor, who has great autonomy and control over the administration of the EAA schools.

76.     The EAA schools have not improved on the State's watch.  In fact, the most recent Michigan state achievement test results reflect that fewer than 5% of EAA students are proficient in core subject areas.  And despite the fact that EAA continues to actively recruit students and hire teachers, the State has announced that the district will dissolve at the end of the 2016-2017 school year, and that EAA schools will thereafter transition back into the Detroit school system.

77.     Marion Law Academy ("Law") is a prime example of the current deplorable state of EAA schools.  The school serves over 99% African-American students.  In its 2013-2014 ranking, the State assigned Law a 1 percentile rank, and in the most recent report card rankings, Excellent Schools Detroit assigned the school an F.

78.     From the outset of State control, the State failed to provide Law appropriate teaching support, staffing, resources, and school conditions that would permit the teachers to deliver literacy to students.  During its first year as an EAA school, Law had an instructional coach and academic dean to support the predominantly new teaching staff—approximately 70-80% were TFA teachers, and many of the rest were also new to teaching— but the instructional coach was

quickly re-designated and given other responsibilities, and the academic dean was unable to focus on curriculum development or literacy interventions due to the unpredictable and extensive obligations that fell on her.  Lacking a consistent and planned curricular approach, teachers used Google to search the Internet for lesson plans the night before class, and many paid out of their own pockets to obtain lesson plans on teacherspayteachers.com. To the extent there was curricular guidance in other years, the school rotated through approaches, and administrators would give teachers directives, at one point informing them, for instance, not to teach spelling or basic reading comprehension.

79.    This has translated into an inability of teachers to impart literacy to their students.  In 2013, the administration ignored specific requests by teachers for support in providing literacy instruction to struggling first-graders.  Many classrooms at Law are mixed-grade, with some students performing as much as four years below reading level, making proficiency levels even more varied and contributing to the challenge of effectively delivering literacy instruction.  The teaching resources at Law are woefully deficient; textbooks, library books, and other curricular materials were thrown away into a dumpster at the beginning of the 2012-2013 school year when the school opened as an EAA school; the intent was to switch to digital learning.  But the new digital platform was ineffective, lacked existing instructional materials, and was abandoned in the 2015-16 school

year.  Administrators told teachers at Law that they were expected to buy their own supplies.

80.     Since it opened, Law has experienced an enormous amount of turnover.  The school has had four principals in three years, and a number of teachers left the school in the middle of the school year.  Three out of the 20 classrooms were taught by long-term substitute teachers in the 2013-2014 school year.  Classrooms become so crowded that a teacher who managed to obtain chairs for all 42 students had to pack them together so tightly that a left-handed student could not sit next to a right-handed student.  One year, upper-level math and English were both taught by long-term substitute teachers.  When a teacher is absent and no short-term substitute is available, classes are frequently combined so one teacher may have up to 60 students in a single classroom.

81.     The State has also abdicated its responsibility to keep Law safe and hygienic.  While the City recently reported that it has brought buildings up to code and exterminated rodents and mold on the Osborn and some other Detroit campuses, the City's website does not report any inspection of Law at all.  Law has experienced a serious mouse infestation, and mice and their droppings are frequently seen by students, including during class.  The air conditioning and heating systems are frequently broken; on some days students can see their breath inside their classrooms, and, on other days, the rooms reach 90 degrees or more.

Several classrooms have flooded.  In one fourth-grade classroom, a leaking hole in the ceiling created what students called "the lake," and the teacher surrounded the area with yellow caution tape after multiple requests for repairs were ignored.

82.     *Proliferation of Unregulated Charter Schools*:  During this same time period, the number of charter schools operating in Detroit has grown dramatically.  In 1994, the State of Michigan passed legislation authorizing the creation and operation of charter schools—privately run schools that are eligible for state funding.  Fourteen charter programs initially opened in 1995, and, by 2014, 96 charter school programs operated in Detroit, as compared to 103 public school programs.  By 2013, more Detroit students enrolled in charter schools than in the DPS schools.

83.     Although the State legislatively encouraged the rise of charter schools, it failed to implement the necessary oversight mechanisms to hold charter schools accountable for their achievement or to protect students' legal rights with respect to literacy and educational equity.  Despite the fact that the approximately 40 entities permitted to approve new charter schools have a financial incentive to open new charter schools—they can reap up to 3% of the funds that go to the charter school—the State has failed to regulate those authorizers via guidelines for when to grant, renew, expand, or revoke a charter.  Nor has the State ever used its power to suspend charter authorizers that consistently fail to maintain quality

control over their charter schools or otherwise to hold authorizers accountable based on their students' learning outcomes.  The State has also failed to demand full transparency from charter schools, around 80% of which are operated by for-profit companies, as to how they spend the taxpayer money that funds them.

84.    _Transfer of the State School Reform Office from the Department of Education to the Department of Technology, Management and Budget_: Acknowledging that the SRO had not achieved "satisfactory outcomes" or "implemented the rigorous supports and processes needed to create positive academic outcomes,"[49] Governor Snyder transferred the SRO from the Department of Education to the DTMB in May 2015.  Yet this bureaucratic shuffle has not resulted in improved outcomes or improved learning conditions for students in Plaintiffs' schools.

85.    _Hiring of Non-Credentialed Teachers_:  In June 2016, the Michigan legislature passed legislation providing that a "noncertificated, nonendorsed teacher" may serve as a teacher in the new DPS district.  Nowhere else in Michigan may children in public school be taught by teachers who lack appropriate state-mandated credentials and qualifications.  This legislation sends a clear message that the State of Michigan regards the children of Detroit—the vast majority of whom are children of color—as second-class citizens and imposes a

---

[49] Mich. E.R.O. No. 2015-2, Sec. 18.445 (May 12, 2015).

"special disability upon those persons alone." *Romer v. Evans*, 517 U.S. 620, 631 (1996).  The State would never tolerate children in the districts of Ann Arbor or Grosse Pointe being taught by persons without the credentials and experience necessary to be an effective teacher, and yet the State has determined that teachers with such inferior qualifications are good enough for the children of Detroit.

86.   *School Closures*:  The State recently responded to persistently low academic performance among DPS schools by irresponsibly and counterproductively threatening to close failing schools.  In 2009, the Michigan legislature passed a law permitting the State School Reform Office to close chronically underperforming schools.  Mich. Comp. Laws § 380.391.  On August 15, 2016, only weeks before the start of school, the School Reform Office announced plans to close up to 100 Michigan schools that have been in the bottom five percent of schools statewide for at least three years—a list that includes all of Plaintiffs' schools that are currently operating and 47 schools in Detroit—at the end of the 2016-17 school year.  A few days later, the State announced that it would close fewer than 100 schools, but it did not clarify how many or which schools.  And just two weeks later, on September 1, 2016, the State reversed course and announced that no Detroit schools would be closed until 2019 at the earliest.

87.    This ill-conceived plan to close schools that were never given the resources and support necessary to succeed would only further harm students already suffering from the State's failings.  Through its own disinvestment, the State has created conditions under which schools are failing, but instead of implementing effective and meaningful remedies to ensure that Detroit students receive the access to literacy they are due, the State has chosen to shut the schools down at even greater costs to students, dedicated teachers, and the community. School closures can have a profoundly negative impact on individual children and the community—raising logistical problems for families and disrupting children's educational and emotional development by introducing instability and uncertainty.

88.    The haphazard and chaotic timing and method by which the State announced these potential closures further illustrates the State's indifference to the well-being of Detroit schoolchildren.  Plaintiffs' schools have been in the bottom 5% of schools in Michigan for years.  But there was no discussion of closures until August 2016, when the State revealed this plan through the media just weeks before the start of school.  This sent students and teachers scrambling, leaving them worried and confused when they should have instead been preparing to start the new school year.  Moreover, the State has offered no plan to ensure that any contemplated school closing will not disrupt students' educations, further entrenching denials of access to literacy.  It has said nothing about where displaced

students would go were their schools to be closed, or about what efforts must be undertaken to remediate past denials of access to literacy and address the impact of the school closure on students' social-emotional health.

### III.   The Failure to Provide Access to Literacy in Plaintiffs' Schools

89.   The State's deliberate disinvestment in and indifference to the needs of Detroit schoolchildren has had catastrophic consequences for Plaintiffs' access to literacy.  Plaintiffs attend, or attended, five schools—DPSCD and charter—that are among the lowest performing schools in the City of Detroit.  As data collected and maintained by the State shows, the literacy instruction provided in Plaintiffs' schools is so wholly insufficient that ninety percent or more of the students are unable to meet state proficiency standards.  Many students are multiple grade levels below their peers in other schools throughout the State.  This abysmal achievement data reflects a statewide system of education that has functionally excluded Plaintiffs from its reach.

### A.   *Demographic Data*

90.   Figures 1 and 2 demonstrate that students in DPS schools are overwhelmingly African-American and socioeconomically disadvantaged.  Like most Detroit schools, Plaintiffs' schools serve predominantly low-income students of color:

a. <u>Hamilton Academy</u>, a charter school, served 254 students in grades K-8 in the 2015-16 school year, of whom 99.6% were African-American and 89.0% were eligible for free or reduced price lunch.

b. <u>Experiencia Preparatory Academy</u>, a charter school, served 338 students in grades K-11 in the 2015-16 school year, of whom 31.1% were African-American, 64.2% were Latino and 99.7% were eligible for free or reduced price lunch.

c. <u>Osborn MST</u>, a DPSCD school, served 266 students in grades 9-12 in the 2015-16 school year, of whom 97.7% were African-American and 80.5% were eligible for free or reduced priced lunch.

d. <u>Osborn Evergreen</u>, a DPSCD school, served 327 students in grades 9-12 in the 2015-16 school year, of whom 97.2% were African-American and 78% were eligible for free or reduced priced lunch.

e. <u>Cody MCH</u>, a DPSCD school, served 407 students in grades 9-12 in the 2015-16 school year, of whom 97% were African-American and 74.4% were eligible for free or reduced priced lunch.

**Figure 1:  District Achievement across Michigan in relation to percentage of black students**



**Figure 2:  District achievement across Michigan in relation to socioeconomic status**



### B.      State Achievement Data

91.      Student performance data collected by the State has long established that students at Plaintiffs' schools are effectively denied the opportunity to achieve proficiency in literacy, particularly as compared to schools elsewhere throughout the State.  The Michigan Student Test of Educational Progress ("M-STEP") measures students' progress toward achieving state-mandated academic content standards.  Beginning in 2014-15, the State has required the administration of the M-STEP in the following grades and subjects:  English and Math in grades 3-8 and 11; science in grades 4, 7, and 11; social studies in grades 5, 8, and 11.  The

Michigan Educational Assessment Program ("MEAP") measured the previous

state standards prior to the adoption of Common Core in 2014-15.  For years,

students in Plaintiffs' schools have disproportionately failed to meet the

proficiency standards established by the State in all content areas.  The 2015-16

elementary M-STEP and 2014-15 high school M-STEP[50] results are representative:

**Figure 3:  2016 Elementary M-STEP Results for English Language Arts**



---

[50] Full results for the high school M-STEP are not yet available, but the partial data suggests that for Plaintiffs' high schools, the proficiency levels for 2015-16 are as low as or worse than the scores in 2014-15.

**Figure 4:  2016 Elementary M-STEP Results for Mathematics**



**Figure 5:  2016 Elementary M-STEP Results for English Language Arts and Mathematics (data)**

| | 2015-16 M-STEP Percentage of Students Scoring Proficient or Above | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Grade 3 | | Grade 4 | | Grade 5 | | Grade 6 | | Grade 7 | | Grade 8 | |
| *Eng/Math* | E | M | E | M | E | M | E | M | E | M | E | M |
| Hamilton | 4.2 | 4.2 | 2.9 | 3.1 | 10.5 | 5.0 | 0.0 | 0.0 | 10.0 | 3.4 | 6.5 | 3.2 |
| Experiencia | 9.5 | 4.8 | 13.8 | 13.3 | 3.1 | 5.7 | 3.7 | 0.0 | 10.7 | 3.8 | 14.3 | 0.0 |

| State of Michigan | 46.0 | 45.2 | 46.30 | 43.9 | 50.6 | 33.8 | 45 | 32.8 | 47.1 | 35.3 | 48.8 | 32.7 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Figure 6:  2014-15 M-STEP Results for Plaintiffs' High Schools**

| School | M-STEP Grade 11 English Percentage of Students Scoring Proficient or Above 2014-15 | M-STEP Grade 11 Math Percentage of Students Scoring Proficient or Above 2014-15 | M-STEP Grade 11 Science Percentage of Students Scoring Proficient or Above 2014-15 | M-STEP Grade 11 Social Studies Percentage of Students Scoring Proficient or Above 2014-15 |
|---|---|---|---|---|
| Osborn MST | 1.9 | 3.7 | 0.0 | 1.9 |
| Osborn Evergreen | 4.2 | 0.0 | 0.0 | 0.0 |
| Cody MCH | 12.5 | 1.8 | 0.0 | 1.8 |
| **State of Michigan** | **49.2** | **28.4** | **29.4** | **43.9** |

92.    In addition to the M-STEP, the State has used the Michigan Merit Examination ("MME") to assess students in grade 11 based on state high school standards.  The 2013-2014 MME results similarly reflect the longstanding failure of students in Plaintiffs' high schools to meet the proficiency standards established by the State in all content areas:

**Figure 7:  2013-14 MME Results for Plaintiffs' High Schools**

| School | MME Reading Percentage of Students Scoring Proficient or Above | MME Math Percentage of Students Scoring Proficient or Above | MME Writing Percentage of Students Scoring Proficient or Above | MME Science Percentage of Students Scoring Proficient or Above | MME Social Studies Percentage of Students Scoring Proficient or Above |
|---|---|---|---|---|---|
| Osborn MST | 10 | 0 | 1 | 0 | 1 |
| Osborn Evergreen | 11 | 0 | 4 | 0 | 0 |
| Cody MCH | 13 | 0 | 2 | 0 | 0 |
| **State of Michigan** | **58.7** | **28.8** | **51** | **28.4** | **43.9** |

93.    Michigan's school accountability system uses this state assessment data to create a "Top-to-Bottom" School Rankings of the Michigan public schools based on their student performance and graduation rate data.  All Michigan schools are included in the ranking if they have over two years of assessment data for 30 or more students in two or more tested subjects.  A school's percentile rank reflects how the school ranks against all other schools in the State.  For example, a score of 70 means that the school performed better than 70% of Michigan's ranked schools. The State then categorizes schools based on their percentile rank.  "Priority Schools" are the lowest performing 5% of schools in the State.

94.    Plaintiffs' schools are among the very lowest-performing schools in the State.  For the most recent ranking, the 2013-2014 school year, the State

assigned Hamilton a 4 percentile rank; Osborn MST a 1 percentile rank; Osborn Evergreen a 2 percentile rank; and Cody MCH a 6 percentile rank.  All of Plaintiffs' schools that are currently operating have been designated by the State of Michigan as Priority Schools.

95.     In addition, Excellent Schools Detroit, a non-profit coalition of Detroit's education, government, community, and philanthropic leaders, assigns letter grades to every school in Detroit based on proficiency/college-readiness, academic growth, graduation and post-secondary matriculation rates, and school climate.  In the most recent report card rankings, Excellent Schools Detroit assigned an F to Hamilton and a D to Osborn MST, Osborn Evergreen, and Cody MCH.

**Figure 8:  District achievement across all districts in Michigan in grade equivalent units**



## C.    *National Achievement Data*

96.    State and national achievement test results likewise show that students in Plaintiffs' schools are trailing far behind their peers across the nation.  All Michigan public high school students have traditionally taken the ACT college admissions test as part of the Michigan Merit Examination ("MME"), and Michigan assesses students in grade 11 and eligible students in grade 12 based on college-readiness standards.  (Michigan is currently transitioning to the SAT.)  The ACT achievement scores in Plaintiffs' high schools show that these schools have

utterly failed to deliver literacy instruction sufficient to achieve college-readiness,

particularly as compared to students elsewhere in the State:

**Figure 9:  2014-15 ACT Results for Plaintiffs' High Schools**

| School | ACT English (2014-15) Percentage of Students Scoring College-Ready | ACT Math (2014-15) Percentage of Students Scoring College-Ready | ACT Reading (2014-15) Percentage of Students Scoring College-Ready | ACT Science Reasoning (2014-15) Percentage of Students Scoring College-Ready |
|---|---|---|---|---|
| Osborn MST | 12.5 | 0 | 5.4 | 1.8 |
| Osborn Evergreen | 2.2 | 0 | 2.2 | 0 |
| Cody MCH | 10.2 | 0 | 1.7 | 0 |
| **State of Michigan** | **58.4** | **33.5** | **36.1** | **32.4** |

97.     In addition, national data show that students in Plaintiffs' schools are

lagging far behind their peers in the rest of the country.  Professor Sean Reardon

and a team of researchers in the Stanford Graduate School of Education have

analyzed state assessment data for grades three through eight for each of the

12,000 school districts in the country, data generated and collected pursuant to the

No Child Left Behind Act in order to make state-by-state comparisons.  The data

show that students in the DPS schools district are, ***on average***, **2.3 grade levels**

**below** their actual grade level in basic reading proficiency.  Because Plaintiffs'

schools are among the poorest performing schools in Detroit, this means that

students in Plaintiffs' schools are performing far lower.  The data further reveal

that, even when taking socioeconomic status into account, Detroit performs lower than almost all large urban districts that serve a similar demographic of students.

**Figure 10:  District achievement of the 100 largest districts across the United States in relation to socioeconomic status**



### D.    *Graduation and College Attendance Rates*

98.    The low proficiency rates in Plaintiffs' schools have devastating consequences for educational attainment and college and career preparedness.  As social science research demonstrates, low academic achievement and a personal perception of incompetency negatively impact student motivation, engagement, and mental health, which frequently lead to dropping out.[51]  Among high school

_____

[51] *See, e.g.*, NAT'L RESEARCH COUNCIL, INST. OF MED., ENGAGING SCHOOLS: FOSTERING HIGH SCHOOL STUDENTS' MOTIVATION TO LEARN 13-44 (2004); Fred

graduates, students with very low proficiency may lack the credentials, including standardized tests scores and grades, necessary for admission to many colleges and universities. And unfortunately, many low-skilled students who do matriculate to a college or university find that they are many years behind their peers and unprepared for college-level work. Most students who attend a community or four-year college must take remedial classes, reducing the likelihood of graduation. Of students who continued from the Osborn schools to higher education in 2013-14, 76% and 80% from Osborn MST and Osborn Evergreen respectively had to take remedial coursework. Of students who went on from the Cody MCH to higher education in 2013-14, 82% had to take remedial coursework.

99.     These patterns are reflected in drop-out and college matriculation data. There were 124,279 students in Michigan's 2014 senior cohort. In 2013-14, 103,002 students graduated and 71,861 enrolled in an institute of higher education within a year. Of those students, 40,549 successfully completed at least one year of higher education in 12 months. This means that about 32.6% of Michigan's senior cohort went on to timely complete at least a year of higher education. By contrast, in Plaintiffs' schools:

---

M. Newmann et al., *The Significance and Sources of Student Engagement*, *in* STUDENT ENGAGEMENT AND ACHIEVEMENT IN AMERICAN SECONDARY SCHOOLS 11-39 (Fred M. Newmann ed., 1992).

a.  There were 93 students in Osborn MST's 2014 senior cohort, yet in 2013-14, only 89 students graduated from Osborn MST and only 44 enrolled in an institute of higher education within a year.  Of those 44 students, only 9 students successfully completed at least one year of higher education coursework within 12 months.  This means that less than 10% of Osborn MST's senior cohort went on to timely complete at least a year of higher education.

b.  There were 63 students in Osborn Evergreen's 2014 senior cohort, yet in 2013-14, only 53 students graduated from Osborn Evergreen and only 22 enrolled in an institute of higher education within a year.  Of those 22 students, only 4 students successfully completed at least one year of higher education coursework within 12 months.  This means that less than 7% of Osborn Evergreen's senior cohort went on to timely complete at least a year of higher education.

c.  There were 94 students in Cody MCH's 2013-14 senior cohort, yet in 2013-14, only 82 students graduated from Cody MCH and only 40 enrolled in an institute of higher education within a year.  Of those 40 students, only 4 students successfully completed at least one year of higher education coursework within a year of enrollment.  This means that less than 4.3% of

Cody MCH's senior cohort went on to timely complete at least a year of higher education.

## IV.   Failure to Deliver Evidence-Based Literacy Instruction and Intervention Programs in Plaintiffs' Schools

100.   These universally abysmal achievement outcomes are the inevitable consequence of the complete lack of any system for literacy instruction and remediation in Plaintiffs' schools.  Experts agree that meaningful access to literacy can be delivered, including in schools serving demographics of students similar to Plaintiffs' schools, through a high-quality literacy-focused program and curriculum.  Yet Plaintiffs' schools lack the capacity to provide effective literacy instruction at the elementary or adolescent levels or to intervene with appropriate remediation for students who have fallen behind.  At all of Plaintiffs' schools, there is no evidence-based program for delivering access to literacy and for remediating past and ongoing deprivations.  This includes lack of qualified staff, necessary training, instructional materials and tools, protocols for regular assessment and follow up interventions, and identification and elimination of conditions impeding access.

101.   *Elementary Literacy Instruction*:  There is no consistent literacy instruction program in Plaintiffs' elementary schools, and the schools lack the staffing and capacity required to effectively implement such a program.  Moreover,

73

none of Plaintiffs' elementary schools have a system of regular assessment to determine individual reading levels and tailor lessons to student needs.

102.   *Adolescent Literacy Instruction*:  Plaintiffs' high schools likewise lack the capacity to effectively implement an evidence-based, consistent program of literacy instruction to develop essential adolescent literacy capabilities, including dedicated literacy instruction in content area classes.  At the Osborn schools, for example, teachers receive no support or training in literacy instruction.  At all the Osborn schools and Cody MCH, teachers lack access to curricular materials such as lesson plans, pacing guides, and teacher editions of textbooks and are forced to rely on unreliable, independent research to prepare for class.

103.   Osborn MST has attempted to address literacy by organizing optional reading groups.  Teachers leading the reading groups have not been properly trained to provide literacy instruction or support, and an optional literacy professional development training scheduled for two weeks before the start of the 2016-17 school year was cancelled at the last minute.  Regardless of proficiency level, none of the general education students are provided one-on-one literacy instruction.  The most advanced of the reading groups read books at a fourth- and fifth-grade reading level, even though the students are in high school.

104.   In the upper level English Language Arts classes at Experiencia, teachers dedicated significant class time to reading aloud from books with reading

levels multiple grades below the chronological age of the class, yet students struggled to sound out simple words.  In 2015, the school attempted to implement a literacy program wherein students were assigned to a reading group based on skill level rather than grade level.  As a result, an individual reading group would contain students ranging in age from eight to twelve, significantly damaging the self-esteem of the older students and making effective instruction nearly impossible.  Moreover, only the lowest-proficiency group was supported by a trained reading specialist, and the teachers leading the other groups never received meaningful training on how to effectively provide literacy instruction.  After one semester, the program was abandoned.

105.   *Intervention and Remediation*:  Furthermore, none of Plaintiffs' schools can deliver effective intervention or remediation for students who have failed to achieve basic literacy skills in the early elementary years or to develop adolescent knowledge capabilities.  Intervening with students who are far behind, in particular, requires one-on-one and small group time that is not feasible when a single teacher is serving a classroom.

106.   At Hamilton, many students entered the fourth grade in the 2015-16 school year with a kindergarten-level vocabulary, yet staff were not trained to deliver literacy intervention or remediation, and no additional classroom support was provided.  As a result, the teacher had to choose between leading the entire

class in an exercise that disregarded the extreme range of skillsets, and working with each student one-on-one while the other thirty-nine students worked on their own.

107.   At Cody MCH, many of the students struggle when called upon to read aloud, with some stumbling over even monosyllabic words.  Yet the few instructors originally designated as reading interventionists, already insufficient in number, must cover teacher vacancies in other classrooms, and there is no meaningful training in literacy intervention available, even when requested by teachers.  English Language Arts classes are often limited to reading aloud from a book, but the books used are far below grade level.  For example, Plaintiff Jaime R. was in an English Language Arts course in ninth grade during which the class spent a large part of the year going paragraph by paragraph through a single novel, which has a third grade reading level.

108.   In addition, many secondary school teachers lack appropriate training to support students who are performing far below grade level, as many students are in Plaintiffs' schools.  For example, high school teachers in Plaintiffs' schools must work with students reading at an elementary school level, but most have not received the training in teaching reading fundamentals that a typical elementary school teacher would have.  In particular, many classrooms in Plaintiffs' high schools serve students of widely varying levels of proficiency.  Yet teachers in

Plaintiffs' schools receive no training in the skills necessary to deliver differentiated instruction to students performing a wide range of proficiency levels. At Osborn MST, for example, teachers who have students in the classroom ranging from fifth grade to twelfth grade reading levels receive no guidance on how to teach to widely varying proficiencies.  The skeletal curricula provided are not tailored to the students' needs, and even an experienced teacher who was new to the Detroit school system had to spend several hours a day independently researching out how to adapt lesson plans to the wide range of proficiency levels in one classroom.

## V.    Failure to Ensure Educational Conditions Necessary to Attain Literacy

109.    The State has failed to ensure a basic environment for teaching and learning that is the necessary prerequisite for the acquisition and transmission of literacy.  Plaintiffs may physically enter their school buildings, but they sit in facilities that are functionally incapable of delivering literacy access.

110.    Plaintiffs' schools have inadequate instructional materials.  The physical conditions of the school are unsafe and include vermin infestation, extreme temperatures, insufficient or inappropriate facilities, and overcrowding. The schools lack the capacity to meet students' social-emotional needs and the learning needs of English Learners.  As a result of the incredible challenge of teaching at these school sites, Plaintiffs' schools predictably lack sufficient

qualified teachers—meaning teachers who are certificated, properly trained, and assigned to a class within the area of their qualifications and expertise—necessary to implement the required literacy instruction and intervention.  Instead, Plaintiffs' schools are characterized by illogical or inadequate allocation of resources, and the complete lack of any considered policy or system for the delivery of education.

111.   The presence in a school of any one of these conditions antithetical to learning may be enough to deny students meaningful access to literacy, but in Plaintiffs' schools, all of these challenges overlap, interact, and conspire to defeat the opportunity to access literacy.  Effective literacy instruction simply cannot take place in a learning environment characterized by these unpredictable, unsafe, and reprehensible conditions.

### A.    *Insufficient Course Offerings and Instructional Materials*

112.   Plaintiffs' schools lack the course offerings and instructional materials necessary to implement effective, appropriate literacy instruction and intervention programs.

113.   *Insufficient and Outdated Books, Instructional Materials and Technology*:  Many classes in Plaintiffs' schools do not have books, and the books that are available are decades out of date, defaced, and missing pages.  Not one of the Plaintiffs' schools has textbooks for students to bring home, and therefore teachers, despite their best efforts, cannot assign meaningful regular homework.

114.   At Hamilton, there are so few textbooks that even small classes have to break up into groups of three to five students to do classwork.  One second-grade class did not have any English Language Arts books, and the books they did have were age-inappropriate picture books.  Plaintiff Jessie K., a third-grade student at Hamilton, struggles to learn to read because the books that were available to her in her second-grade class were mostly picture books.  Her second-grade teacher sometimes directed her to use the computer for educational purposes, but the computers are frequently unable to connect to the Internet and Jessie K. often spends her computer time staring at a scratched screen.

115.   Textbooks at Experiencia were damaged and many years out of date, with taped spines and ripped and missing pages.  The computers at the school were frequently broken, and when they did work, the Internet connectivity was so poor that they were nearly unusable.  The third floor of the building technically had a library, but there was no librarian and students were not permitted to access the library or check out books without a teacher escort.  Most of the time, the library remained locked.

116.   At Osborn Evergreen, an ELA teacher told her twelfth-grade students that she didn't have their literature books yet because she was still taping them back together.  At Osborn MST, a U.S. History class had only 5 textbooks for a class of 28 students, and an economics teacher had 25 textbooks for 118 students.

Another set of history textbooks at Osborn MST is from 1998. In 2015, an outside non-profit threw away the books in the Osborn library because they were deemed too old. The books have not been replaced. There are no textbooks for the Earth Science, Physics, or Research and Development science classes at Osborn MST, so the teachers in each of those classes rely on a section of the Biology textbook most closely related to the subject they are teaching. Because students periodically have to share textbooks for classwork, they are often unable to complete the day's assignment, especially when the books being shared are defaced and have missing pages. Thus, a student like Plaintiff Paul M. does not have enough time to complete his work in class, but he also cannot take the book home with him, because there are not enough for all students. In fact, Plaintiff Paul M. has never had a book that he could take home from school. Many teachers seek to make up for the lack of books by photocopying assignments, but the copy machine at Osborn is frequently broken and teachers generally have to provide their own printer paper. One Teach for America ("TFA") teacher would regularly purchase her own printer paper and leave her house at 4:30 a.m. most mornings to utilize the copy machines at the TFA central office.

**Figures 11 and 12:  Textbooks at Osborn MST, August 2016**





117.   At Cody MCH, teachers periodically turn to the charity website donorschoose.com to solicit donations in order to purchase novels for English classes.  The textbooks that are available are defaced, missing pages, and more than ten years out of date.  A single classroom set of chemistry textbooks is used

by the approximately 200 students enrolled in chemistry each year at Cody MCH. As a result, students cannot take textbooks home to study or for homework. There are no computer classes at Cody MCH, and the limited computers available are years out of date and frequently broken. Computers may be broken for over a year before repairs are made.

118. To make up for the shortfall in instructional materials and other basic supplies, including books, pens, pencils, notepaper, and printer paper, teachers in all of Plaintiffs' schools frequently pay out of their own pockets or privately raise money online. It is not uncommon for a teacher to spend more than a thousand dollars on school supplies in a single year, and some spend as much as $5000, roughly one-sixth of their annual salary. At all of Plaintiffs' schools, teachers applied for grants, requested donations on donorschoose.com to obtain textbooks and classroom supplies, scavenged yard sales, or solicited donations from friends and families. Many teachers attempt to utilize technology to compensate for these shortcomings, but there are insufficient computers at the school sites, and the Internet connections are often too weak to accommodate more than one class at a time. Moreover, many of the students lack access to the Internet outside of school; a 2015 article in the Detroit Free Press found that 70% of Detroit students have no Internet access at home.

### B.      Decrepit and Unsafe Physical Conditions

119.    Plaintiffs face unsafe and unsanitary physical conditions that make learning nearly impossible.  Overcrowding, failure to regulate temperature, dangerous or missing equipment, pervasive rodents, and the other conditions described here mean that sustained, consistent instruction of the sort necessary to lay a foundation for and build up literacy through the years simply cannot occur in Plaintiffs' schools.  The City of Detroit admitted that during the 2015-16 academic year, *none* of the school district's buildings were in compliance with city health and safety codes.[52]  While the City recently reported that it has brought buildings up to code and exterminated rodents and mold on the Osborn and some other Detroit campuses, the City's website admits that Cody schools and Hamilton are not currently in compliance.[53]  On each of these campuses, students returned to school on September 6, 2016, in buildings that the State knows to be unsafe. Moreover, no entity has taken steps to address other learning-prohibitive physical conditions in Plaintiffs' schools, including extreme temperatures and excessive

---

[52] Dana Afana, *86 of 94 Detroit Public Schools Now Up To Code After Rodent, Mold Crisis*, MLIVE (Aug. 29, 2016), *available at* http://www.mlive.com/news/detroit/index.ssf/2016/08/91_percent_of_detroit_public_s.html.

[53] *School Inspection Reports*, CITY OF DETROIT http://www.detroitmi.gov/How-Do-I/Find/School-Inspection-Reports (last visited Sept. 11, 2016).

overcrowding.  The unsafe conditions that have plagued Plaintiffs' schools include the following:

120.   _Vermin_:  All of Plaintiffs' schools that are currently operating have been infested by vermin.  Students and teachers have frequently encountered mice, mice droppings, rats, bedbugs, and/or cockroaches.

**Figure 13:  Cockroaches at Hamilton, September 2016**





121.   At Hamilton, teachers keep canisters of Raid on their desks to address the many cockroaches throughout the school.  Plaintiff Jessie K.'s classes are interrupted by students calling the teacher over to kill a cockroach or screaming as a mouse runs across the floor.  As in the beginning of the 2014-15 and 2015-16 school years, in the first week of the 2016-17 school year, Hamilton was filled with yellow-jackets and multiple students and teachers were stung.

122.   At Cody MCH, teachers find mouse droppings on desktops and bookshelves in the mornings, and students periodically see mice scurrying in the cafeteria.  A rat in a science classroom used by 100 students a day interrupted class and caused students to run into the hallway.  One teacher was forced to work on a computer next to a decomposing mouse that produced a horrible smell.

123.   *Extreme Temperatures*:  Absent or malfunctioning heating and air-conditioning systems subject students and teachers to extreme temperatures, sometimes necessitating school closings or early dismissal and thereby frequently preventing effective instruction and meaningful learning.  All of the Plaintiffs' schools periodically experience classroom temperatures that range from so cold the students can see their breath to above 90 degrees, depending on the time of the year.

124.   During the summer months, there is no air conditioning at Hamilton, and one west-facing classroom has reached 110 degrees during the school year. The windows open only a few inches.  On the first day of the 2016-17 school year, the temperatures in the school grew so extreme that multiple students fainted, both students and teachers got so sick they threw up, and multiple teachers developed heat rashes.  While teachers bring in their own fans, they do little to combat the summer heat, and a number of students spend class time asleep resting their heads on the tables.  In contrast, the heat did not come on for several days after the students returned from winter break in the 2015-16 school year, and the students and teachers had to wear winter coats, hats, and scarves and could see their breath. Third-grader Plaintiff Jessie K.'s classroom was sometimes so cold that she felt like she had to go to sleep and was unable to concentrate on learning.  Those students who do not have sufficiently warm winter coats visibly shiver throughout

the day.  Even when the heat is functioning, the radiators are turned on only between 7:30 a.m. and 9:00 a.m. when the part-time "morning custodian" is in the building.  In order to keep the classroom sufficiently warm throughout the day, classrooms must become suffocatingly hot by 9:00 a.m., but the classrooms are still uncomfortably cold by the end of the day when the early-morning heat has dispersed.

125.   In the 2015-16 school year, Experiencia contracted with a boiler operator only through March in order to save money, despite the fact that temperatures remained below freezing well into April and students were periodically sent home when the classrooms were too cold.  In the summer, the air conditioners rarely worked and the windows either couldn't open or had to remain closed because they were unstable and would crash down unpredictably.  The students and teachers were left sweating in class.

126.   At the Osborn schools, the classrooms are not air-conditioned.  The teachers often turn off the lights and bring in fans from home in an attempt to cool their classrooms, but the darkness and loud noise from the fans make it difficult to teach and learn.  The Osborn gym also lacks air conditioning, and the temperatures during sporting events frequently exceed 90 degrees.  In the first week of the 2016-17 school year, students from all of the Osborn schools were already sent home early due to heat.  During winter 2015-16, one of the boilers necessary to

deliver heat to the school was broken.  The remaining boiler was turned on maximum to heat the entire school.  As a result, some classrooms were so cold that students needed to wear coats and hats, and others reached 90 degrees despite the windows being open to the snow.  Students were periodically sent home if their classrooms were too cold.

127.   Cody MCH's temperatures are similarly extreme.  The boilers are not up to code and the windows are damaged, periodically requiring students to wear their coats in the classrooms in the winter while they can see their breath in class. One teacher turned to the charity website donorschoose.com in order to solicit donation of a space heater for his classroom, remarking that "student success tends to drop with the temperature."  In the summer months, the Cody schools periodically shut down due to the heat.  In both the winter and the summer Plaintiff Jaime R. sometimes feels his head spinning because of the heat, forcing him to put his head down on his desk.  At other times of the year, his classroom is so cold that he can see his breath, making it difficult to focus on learning.

128.   *Insufficient or Inappropriate Facilities*:  The physical conditions of school buildings are decrepit and unsafe.  Broken windows, doors, and fire alarms go unaddressed for months or years.  Drinking water is often unsafe.

129.   At Hamilton, the playground equipment—which is designed for 2-5 year olds, although the school serves children ages 5-14—is frequently broken.

One of the playground slides is disconnected at the base so it shifts around, and the other has cracks with sharp pieces of plastic sticking out.  Multiple students have sliced or otherwise injured themselves while playing.  Students also find bullets, used condoms, sex toys, and dead vermin on the playground, although teachers try to arrive early to clean the playground themselves.  The hallway floors are littered with fallen ceiling tiles.  They are also frequently covered in water from leaks, causing students to slip and fall and generating moldy smells.  Although the school provides breakfast and lunch for a number of students, it is not uncommon for meals to feature moldy bread and expired milk.  The students know not to drink out of the water fountains, which are frequently infested with cockroaches and maggots, and the teachers and principal bring in bottled water they purchase themselves.  The seats in the auditorium are broken, and the entrance to the school is riddled with potholes, causing students and parents to twist their ankles on the way into the building.  Although a bullet hole was discovered in one of the classroom windows when teachers returned before the start of the 2016-17 school year, it was not repaired before the students returned to class.

130.   At Experiencia, pipes leaked during all three years the school was open and burst throughout the 2013-14 school year.  Ceilings buckled or collapsed in several classrooms, raining plaster onto the floor.  One of the classrooms had a repugnant odor all year, similar to rotten fish.  The only outside area for the

students to play was a small, fenced-in rectangle in front of the school, so the school held recess across the street in an open field where it could not control access from individuals who might pose a threat to the children.

131.    At the Osborn schools, the roof leaked for two years. Every time it rained or snowed, buckets were put out to catch dripping water. The walls were covered in water stains. The roof was not repaired until the principal obtained an outside grant through a private foundation to cover the costs. In one classroom, a window that fell out was not fixed for over a year. During the winter of 2015-16, the teacher covered the gaping hole with corrugated cardboard, duct tape, and a bookcase. In another classroom, a window was broken for over a year; the window, which was stuck slightly ajar, could not be opened fully in the summer or closed in the winter to address the extreme temperatures. An Osborn MST teacher and students became temporarily trapped in a classroom when the doorknob broke.

132.    The water fountains, toilets, urinals, sinks, and locker room showers at Osborn are frequently out of order, and the bathrooms are frequently out of toilet paper and soap. Even when he feels like his head is spinning from the heat, Plaintiff Jaime R. cannot get a drink of water to help with the heat because the water fountains are filthy or sealed off with plastic or unusable because they are contaminated with lead. Walking through the halls and bathrooms, students see broken water fountains and toilets covered in black garbage bags. Teachers use

their own money to purchase paper towels, toilet paper, hand sanitizer, and soap. At Osborn MST, urine frequently leaks out of the men's room and soaks the carpet in the hallway, causing the hallway to smell for days.  Although there is a swimming pool at Osborn, it has been empty for over 6 years.  Plaintiff Jaime R. used to be on the swim team, which he loved, but he can no longer use the facility.

**Figure 14:  Water Fountain at Osborn, August 2016**



133.   At the Osborn schools, fire exits are frequently locked and chained to prevent unauthorized individuals from entering from the street.  During the

2015-16 school year, a fire broke out in the school and students were given no notice to evacuate because the Osborn fire alarm system failed.  One teacher became aware of the fire only after a student opened the door and thick smoke poured inside.  The alarm system was not fixed until teachers called the fire marshal, and there continue to be missing fire extinguishers.  At Osborn Evergreen, bullet holes in a window went unrepaired for over a year.

134.   At Cody MCH, the roof leaked in many classrooms, requiring teachers to place trashcans on desks and on the floor to catch rainwater and melting snow.  The walls in corner classrooms are water-stained, and water-soaked tiles periodically fall from the ceiling, sometimes hitting students in the middle of class. To shelter the students from these conditions as best possible, teachers spend a great deal of their own money on cleaning supplies and arrive early in an attempt to get rid of mouse droppings, dead cockroaches, and fallen plaster and tiles.  In the 2015-16 school year, a large piece of plaster fell onto the auditorium stage during a school-wide assembly, requiring early dismissal from school.  Despite promises of repairs, Cody was recently notified that it will not be receiving a new roof this year.  The sewage at Cody MCH periodically backs up, leading to waterlogged carpets and mold.  One room with black mold walls has been sealed off.  Many of the school's water fountains and restrooms are inoperable.

**Figure 15:  Buckets Collecting Leaks in the Hallway at Cody MCH, August 2016**



135.   _Extreme Overcrowding_:  Declining student enrollment in Detroit means that many former school buildings are sitting empty.  But the remaining classrooms are overcrowded; students outnumber desks and students are squeezed together so tightly that teachers cannot walk through the room.

136.   At Hamilton, up to 40 students have to cram into one small classroom designed for many fewer students.  Due to insufficient space and seating, four students must sit together at tables designed to hold two.  The seventh- and eighth-grade classes are often so full that the desks are crammed wall-to-wall, with no room for aisles.  This year's third-grade class has started every year since kindergarten in one classroom with over forty students, only for the school to split

the class in half several months into the school year, forcing half of the class to adjust to a new teacher and classroom.

137.   One Osborn MST class had 42 students but only 32 desks.  Another classroom had 52 students but only 37 chairs and fewer desks.  The overcrowding also significantly exacerbated the extreme heat at many points during the year.

### C.   *Failure to Meet Student Learning Needs*

138.   Plaintiffs' schools also lack the capacity to meet the specific learning needs of the students they serve, which is necessary to create conditions under which children attain literacy.

139.   *Absence of Support to Address Trauma and Social-Emotional Health*: Plaintiffs' schools serve high numbers of low-income students, foster youth, homeless youth, and students who have experienced or witnessed violence.  At Osborn Evergreen, for example, one of the walls has visible and unrepaired bullet holes from a drive-by shooting.  Unaddressed exposure to trauma and adversity impedes a child's ability to learn, and students impacted by trauma require social-emotional and trauma-informed support.  But in Plaintiffs' schools, teachers and staff are not trained to recognize or respond to childhood trauma, and counseling is not available to support children with mental health needs.  For example, after a Hamilton student was kidnapped and murdered, his classmates were not provided any opportunity to grieve.  No additional counselors were

brought in, and the teachers were not offered any support or training on how to speak with the students about the tragedy.  Instead, on the day the police found the boy's body, the only school-wide reaction was an announcement by loudspeaker to remind the students, who were using their phones to share details about what happened and to communicate their grief, that cell phones were not allowed at school.

140.   When children act in ways motivated by the trauma they have experienced, or act out due to embarrassment over their inability to perform basic academic tasks successfully, the schools' response is to punish and exclude them from the classroom, rather than to implement restorative practices for support and healing.

141.   *Failure to Provide Instruction to English Learners* ("*ELs*"):  Plaintiffs schools also serve a number of students whose first language is not English.  But despite representations to the contrary, Plaintiffs' schools employ no teachers trained in the delivery of EL instruction and provide no dedicated EL instruction whatsoever.

142.   Experiencia advertised itself as a dual language immersion school and recruited monolingual families through door-to-door solicitations, but EL students like Plaintiffs Isaias R., Cristopher R., and Esmeralda V. were largely left to fend for themselves.  There were no certificated EL teachers for long stretches of

Experiencia's three years of operation.  In the upper grades, about 20 of the approximately 80 students were English learners, but the English language class available to them covered the same elementary phrases for two years, regardless of the skill level of the individual students.  As a result, multiple students, including Plaintiffs Isaias R. and Cristopher R., never obtained even basic English proficiency and were unable to follow any of the material covered in core classes unless a teacher happened to speak conversational Spanish and was willing to take time away from class to translate the lesson.  Instead of being given the support that she needed in English language instruction, Plaintiff Esmeralda V.—who was more comfortable in Spanish than in English—was frequently called upon to assist her Spanish-speaking classmates by summarizing the material for them in Spanish. Some students relied on Google Translate in order to teach themselves English, although many EL students did not have access to the Internet outside of school. One student stole his history textbook so that he could translate it at home using his phone.  The school made no meaningful attempts to communicate with or engage the significant number of parents who did not speak English, with the consequence that monolingual parents were frequently unable to participate actively in their children's education.  Report cards were not translated into Spanish, and where teachers did not speak Spanish, no parent-teacher meetings with monolingual parents took place.  Thus, Escarle R., the mother of Plaintiffs Cristopher R. and

Isaias R., was unaware until recently that her sons were so far behind because she received English-only report cards for them.

143.   At Cody MCH, there are multiple students who do not speak or write fluently in English, yet there are no EL teachers at the school.  When a family of Iraqi refugees sought to register their daughter at Cody MCH, their community school, DPS attempted to transfer the child to a school over 25 miles away because it could not support her EL needs.  The teachers ultimately relied on other students who spoke Arabic to assist the EL students.

### D.   *Unsupported and Unstable Teaching Staff*

144.   Plaintiffs' schools lack a sufficient, and sufficiently stable, set of qualified and properly trained teaching staff.

145.   *Vacancies and Lack of Qualified, Full-Time Teachers*:  Given the challenging teaching and learning conditions in Plaintiffs' schools, unsurprisingly these schools are historically difficult to staff with permanent teachers and administrators and experience high teacher turnover.  Teachers in DPS are frequently subject to salary freezes, and many feel they must spend their own meager salaries to make up for shortfalls in classroom supplies and instructional materials.  Heavy reliance on TFA instructors, who typically stay for only two to three years, also contributes to high turnover.  Failure to provide adequate support to students who have experienced adversity also results in burnout and vicarious

trauma among teachers.  The frequent teacher turnover on Plaintiffs' campuses predictably creates teaching vacancies, some of which occur during the school year because teachers cannot continue working in these conditions or they are forced to take medical leaves.

146.   In the 2015-16 school year, there were approximately 170 teacher vacancies in the nearly 100 schools that made up the DPS school system.[54]  In the 2016-2017 school year, there were up to 200 vacancies just before the start of the school year.[55]  Filling these vacancies with new teachers who possess the necessary background to achieve success in teaching literacy proves difficult or impossible. Instead, these classes are covered by non-certificated paraprofessionals, substitutes, or misassigned teachers who lack any expertise or knowledge in the course content.

147.   At Hamilton, the majority of teachers have been at the school for less than two years.  Approximately 9 of the 15 teachers are new for the 2016-17 school year.  The middle school science classes at Hamilton are currently taught by

---

[54] *See* Ann Zaniewski, *DPS Facing Surge of Midyear Teacher Departures*, DETROIT FREE PRESS (Nov. 26, 2015), *available at* http://www.freep.com/story/news/local/michigan/detroit/2015/11/26/dps-teachers-leaving/76311802/.

[55] *See* Josh Sanburn, *Inside Detroit's Radical Experiment to Save Its Public Schools*, TIME (Sept. 6, 2016), *available at* http://time.com/4390000/detroit-public-schools-charters-debt/; Ann Zaniewski, *Detroit Schools to Hold Teacher Job Fair to Fill 200 Open Positions*, DETROIT FREE PRESS (Aug. 17, 2016), *available at* http://www.freep.com/story/news/education/2016/08/17/detroit-teacher-job-fair/88888604/.

a paraprofessional who states that she does not understand the material and cannot lead classroom experiments.  In the 2015-16 school year, the seventh- and eighth-grade math teacher left several weeks after the start of school due to frustration with large class sizes and lack of support.  He was temporarily replaced by a paraprofessional and then a special education teacher.  Eventually, the highest performing eighth grade student was asked to take over teaching both seventh and eighth grade math, while the paraprofessional remained in the room to assist with classroom management.  This student taught both math classes for a month.  Due to overcrowding, the kindergarten and second grade classrooms were split in half early in the 2015-16 school year, but the school was unable to find additional teachers so the new classes were covered by long-term substitutes for the remainder of the school year.

148.   Approximately half of the 25 teachers who started at Experiencia in the fall of 2012, including the two English-Language Arts teachers, quit by the end of the second semester.  By the end of the second year, the high school science teacher had changed seven times, the high school history teacher three times, the high school math teacher more than five times, and the high school English teacher six times.  After the Spanish teacher quit, teachers who were not certificated to teach Spanish but who happened to know some Spanish took over teaching the Spanish classes on a rotating schedule.  After the physical education teacher quit,

the homeroom teachers surrendered their prep periods to cover gym class until it was eliminated altogether.

149.   At Osborn MST, the Chemistry and Biology classes were both taught by long-term substitutes for an entire year.  When the Physics teacher was pulled out to teach another class three weeks into the 2015-16 school year, the students were redistributed into classes that were pedagogically inappropriate.  For example, one student who wants to be a nurse was transferred into a French class, despite the fact that she was already taking Spanish and had requested another science class.

150.   At Cody MCH, approximately 30-40% of the teachers were uncertified TFA teachers.  In the 2015-16 school year, 5 of the approximately 35 teachers quit before the end of the year.  As a result, a number of classes, including Science and Health, were taught by uncertified long-term substitutes.  Even when students were fortunate enough to avoid long-term substitutes, they still frequently saw a rotating list of certificated teachers.  For example, one English class had three different teachers in a single year.

151.   *Teacher Absences and Lack of Short-Term Substitutes*:  Plaintiffs' schools also experience teacher absences of shorter duration.  Teachers in these schools face appalling conditions, an almost total lack of teaching materials, and support woefully inadequate to the needs of the schools.  Although many teachers

perform heroically under these stressful and demanding conditions, others are understandably less able to cope. As a result of these stressful conditions, some teachers in Plaintiffs' schools miss classes. Some teachers are absent as many as 50 days in one year.

152. In addition, due to the appalling school conditions, short-term substitute teachers often cannot be obtained.

153. At Hamilton, when a teacher is absent and no short-term substitute is available, classes are frequently combined so one teacher may have up to 60 students in a single classroom. The budget for short-term substitute teachers is generally exhausted by January. After this date, classes are typically covered by paraprofessionals or by teachers from other classes who have a preparation ("prep") period. If no teacher or paraprofessional is available, the students are split up and sent to sit in other classrooms with no regard to age group or subject matter. In addition, because of the substitute shortage, teachers were told that they would be able to use only 5 of their 10 allotted sick days and would be docked pay for any additional days they took off.

154. In Plaintiffs' high schools, other teachers must sacrifice their prep periods to cover classes for absent teachers. Students at Osborn MST, for example, estimate that they have a substitute teacher or no teacher at all during at least one, and often two, class periods a day. Osborn MST teachers estimate they

are asked to cover for an absent teacher approximately twice per week.  If no teacher is available, two classes are often combined, resulting in upwards of 60 students in a single classroom.  When a teacher is asked to substitute or classrooms are combined, that teacher's qualifications to teach the relevant subject matter are not considered.  In other circumstances, classes may be covered by administrators, security guards, paraprofessionals, or no one at all.  When there is no adult available to staff a classroom, sometimes students are permitted to sit in classrooms or the gym unsupervised.  At Cody MCH, Jaime R. and his classmates were frequently sent to other classrooms that could accommodate all the students. They would then be shown a movie, such as Kung Fu Panda 3 or Frozen.  At one point in the 2015-16 school year, so many teachers were absent and so few substitutes were available that over 80 students gathered in the gym despite no physical education class being scheduled for that time.

155.  *Legislation Permitting Non-Certificated Teachers*:  In June 2016, the State further perpetuated the shortage of qualified teachers in Plaintiffs' schools by passing legislation permitting non-certificated instructors to teach in DPS schools. This legislation does not apply to any school elsewhere in the State.  Rather, it singles out the children of Detroit for separate and inferior treatment.

### E.    Lack of Accountability for Charter Schools and School Closures

156.    The State's booming number of charter schools has not addressed and cannot address the lack of access to literacy.  Michigan's charter schools are notoriously poorly performing.  For African American students, two-thirds of Michigan charter districts perform below the low-performing DPS.[56]  The U.S. Department of Education found Michigan's charter sector to have an "unreasonably high" representation among the state's "priority" schools list, meaning the state's worst performing five percent of public schools.[57]

157.    Yet charter school authorizers and operators have significant financial incentives to open new charter schools, and almost no accountability.  Under Michigan law, around 40 charter authorizing institutions—more than in any other state—are permitted to open and authorize charter schools.  For each school they open, these authorizers receive up to 3% of the taxpayer funded money that goes to the charter school, regardless of how well the school performs.  Mich. Comp. Laws § 380.502(6).  In 2011, the cap on the number of charter schools that could be opened by certain authorizers was lifted by the State, permitting a proliferation of new charter schools, without imposing any requirements for quality control.

---

[56] THE EDUCATION TRUST MIDWEST, ACCOUNTABILITY FOR ALL: 2016. THE BROKEN PROMISE OF MICHIGAN'S CHARTER SECTOR 8 (2016).

[57] *Id.* at 9 (citing U.S. DEP'T OF EDUC., EDCAPS-G5 TECHNICAL REVIEW FORM (NEW) (2015), *available at* https://www2.ed.gov/programs/charter-rehqcs/2015/republictrf.pdf).

158.   Even as all the financial incentives encourage authorizers to open more and more charter schools, charter authorizers have little or no accountability. There are no statewide standards for how an authorizer should monitor a charter's performance or decide when it should close a charter.  Nor are there academic performance standards for openings, renewals, or expansions of charter schools. Authorizers can allow for-profit companies to open and operate new schools even if other schools they already run are low-performing.  By the terms of the statute, the State apparently has no power to revoke the ability of an authorizer to open or expand charter schools; it may only suspend an authorizer.  Mich. Comp. Laws § 380.502(5).  Yet the State has failed to use even this power to hold charter authorizers accountable.  Despite the dismal track record of a number of authorizers—a report by Education Trust-Midwest rated roughly 20% of charter operators D or F, and another 20% C or "mediocre"[58]—none has been suspended to date.

159.   The lack of standards for opening, closing, or maintaining charter schools produces an unstable educational landscape in which new charter schools pop up or disappear from one year, or week, to the next, at great cost to the students.[59]  School closures have a devastating impact on both individual children

---

[58] THE EDUCATION TRUST MIDWEST, *supra* note 56, at 18-19.
[59] For example, two weeks before the school year was set to begin, University YES Academy in Detroit abruptly announced the closure of its high

and the community. As a practical matter, a school closure raises a host of logistical and educational problems for parents and children. Parents must find a new school, often without any help from the closing institution, that has space for their child and is accessible to the family. Parents must then start from scratch in organizing the child's transportation to and from the school and adapting to the new school's schedule, policies, and after school programs. For the child, a school closure means being abruptly removed from a known environment and placed into a new physical space with an unfamiliar set of teachers, students, pedagogical practices, and school disciplinary policies. Studies show that students affected by school closure are more likely to change schools again in the future, which may be due to the receiving school not being a good fit for the student. Changing schools can be particularly difficult for a student when the receiving school is underfunded, underresourced, and unable to provide the transferring student with the individualized attention necessary to integrate her into a new environment.

---

school program, leaving hundreds of students stranded. Students and their parents received no meaningful assistance in finding a replacement school. Rather, students were simply handed a list of schools prepared by the management company; the first listed school was run by the same management company and located 13 miles (approximately an hour and forty minutes by public transportation) from University YES. As a consequence of the late notice, dozens of students missed the opportunity to enroll in a large number of Detroit schools, whether because of missed enrollment deadlines or the fact that higher performing and/or geographically convenient schools had already reached capacity.

160.   Moreover, school closures often negatively affect the community. They are often perceived as a symbol of disinvestment and disrespect for poor communities of color, increasing those communities' sense of discrimination and marginalization.  Decrepit or abandoned buildings are thus not only symbolic harms.  They also can materially hurt neighborhoods by making the area less attractive to businesses and workers, lowering property values, and detracting from the vitality of the neighborhood.

161.   At Experiencia, the board voted to close the school in December 2015, although families were not notified until several months after this decision. In fact, at the same board meeting in which the board voted to close the school, the agenda included "recruitment" as an agenda discussion item, and the school continued to recruit students for months after the decision to close was made. Once students and their parents were notified of the closing, Experiencia provided them little assistance in finding a new school.  Students and parents, including Plaintiffs Cristopher R. and Isaias R. and their mother Escarle R., were provided no individualized assistance in identifying a new school appropriate for English Learners.  The building that formerly housed Experiencia is currently vacant, although the school sign is still standing and plastic refuse remain strewn across the grass in front of the former school.

162.   Nor is there accountability for the performance or management of charter schools themselves.  Defendant Casandra Ulbrich, Vice President of the State Board of Education, stated that there are "a lot of issues, primarily . . . financial oversight and transparency," concerning the Michigan charter school system.[60]  Around eighty percent of Michigan's charter schools are run by for-profit companies, compared to about one-third in states like Florida, Ohio, and Missouri.  Yet such schools are often not held to account for the way they use taxpayer dollars that fund their schools.  Teacher salaries, executive compensation, vendor payments, and other expenses are often not disclosed, sometimes even to the charter school board members.  In some cases, school boards let management companies handle the money and make the decisions.  According to Defendant John Austin, president of the Michigan State Board of Education, "with many schools, we don't know where the money we're spending now is going, who's getting rich, and at what price to the taxpayer."[61]

163.   This lack of transparency and accountability has led, predictably, to the mismanagement of money intended to fund the education of Detroit's children. This is a particular problem in the for-profit charter sector, where management

---

[60] Jennifer Dixon, *Michigan Spends $1B on Charter Schools but Fails to Hold Them Accountable*, DETROIT FREE PRESS (June 22, 2014), *available at* http://www.freep.com/story/news/local/michigan/2014/06/22/michigan-spends-1b-on-charter-schools-but-fails-to-hold/77155074/.

[61] *Id.*

companies can steer lucrative deals to the friends and relatives of board members and school founders, and charter boards can give contracts to friends and relatives of school officials, both of which create multiple levels of conflict of interest.  As former State Schools Superintendent Tom Watkins said of charter schools, "in a number of cases, people are making a boatload of money, and the kids aren't getting educated."[62]  Yet in recent years, the State has demanded less, not more, accountability from charter school operators; the longstanding requirement that the State Department of Education issue yearly reports monitoring charter school performance, Mont. Comp. Laws section 380.501a, was repealed in 2011.

## VI.   The State's Failure to Implement Evidence-Based Reforms to Address Literacy

164.   Defendants are aware of the disproportionate literacy deficits in Plaintiffs' schools and the destructive consequences for Plaintiffs' futures.  Data generated and collected by the State reveals that hardly a single student has reached proficiency in Plaintiffs' schools, and the State's own accountability system ranks Plaintiffs' schools in the *zero to sixth* percentile of the State's schools.  Moreover, recent teacher sick-outs and widespread social media campaigns have published photographs of the deplorable and unsafe conditions in Plaintiffs' schools.  In fact, the State has justified its intervention in DPS by citing declining academic achievement.  Yet despite this knowledge, the State has failed

---

[62] *Id.*

to require implementation of literacy intervention programs that have proved effective in high-poverty communities, and failed to ensure that teachers with appropriate training and credentials and a track record of serving low-performing students are assigned to deliver literacy intervention services to all students performing below grade level.  The State has likewise failed to ensure that Plaintiffs' schools have safe and stable teaching and learning conditions necessary to facilitate effective literacy instruction.

165.   The nation's leading experts in literacy and urban schools agree that there are concrete, evidence-based steps that the State can and must take to ensure the students in Plaintiffs' schools have the opportunity to attain literacy.  Since 2002, the DOE's IES has made such programs publicly available through the What Works Clearinghouse, which presents and reviews the effectiveness of literacy programs using a consistent and transparent set of standards.  These programs, practices, and policies have been shown to be effective in districts serving low-income youth with demographics very similar to those in Plaintiffs' schools.

### A.   Establish an Evidence-based, Systemic Approach to Literacy Instruction and Intervention, with Appropriate Accountability Measures

166.   Under the right conditions, schools can systemically implement effective evidence-based literacy programs and practices to ensure that every student learns to read in the first instance and to intervene and remediate when students fall behind.  Research validating the effectiveness of these programs and

practices shows that the quality of a school's program, not its enrollment demographics, determines its academic performance. And interventions have been proven to effectively remediate literacy deficiencies at all grade levels.

167.   Effective evidence-based literacy programs share the following components:

    i.      Elementary Literacy (Kindergarten to Third Grade)

168.   Reading instruction in the primary grades K-3 must include instruction in three areas:  the alphabetic principle, fluency, and comprehension.

169.   The alphabetic principle (or alphabetics) is the idea that written spellings systematically represent spoken words.  To grasp this principle, children must acquire phonemic awareness, or the ability to focus on and manipulate phonemes, which are the smallest units of spoken language.  Phonemic awareness instruction benefits normally developing readers as well as children at risk for future reading problems, children with disability, and English Learners.  Studies have documented that students who receive phonemic awareness training are able to learn to read more quickly than children of similar backgrounds who do not receive such training.

170.   Children must also receive phonics instruction.  Phonics is the use of correspondences between written and spoken language to decode or spell words.  Phonics instruction helps children decode words with both regular and irregular

spellings, helps children learn to spell, and improves reading comprehension. Systemic phonics instruction helps children at all socio-economic levels, and children with disabilities and those at risk of developing reading problems make significantly greater gains in reading with than without phonics instruction.

171.   Fluency is the ability to read text with speed, accuracy, and proper expression.  It depends on well-developed word-recognition skills, the ability to group words into meaningful grammatical units for interpretation, the use of punctuation, and the determination of where to place emphasis.  Guided repeated oral reading procedures are effective in improving reading fluency and overall reading achievement.  Such procedures have a consistent positive impact on word recognition and comprehension at a range of grade levels and for students with varying reading problems.

172.   Reading comprehension is a complex cognitive process in which vocabulary learning, instruction, and development plays a critical role.  In addition to using a variety of methods for vocabulary learning, students should receive direct instruction about comprehension strategies, specific procedures that guide students to develop awareness of how they are comprehending as they attempt to read and write.  Research shows that students who are taught a variety of comprehension strategies experience increased ability to use such strategies, increased retention and understanding of new texts, and improved comprehension.

ii.   Adolescent Literacy (Grades 4-12)

173.   Direct literacy instruction cannot end with third grade.  The basic literacy skills that students should develop in early elementary school do not automatically evolve into the higher-level literacy skills needed to achieve in middle school, high school, and beyond.  Literacy instruction should be embedded in content, both in language arts and in the content areas.  Language arts teachers should teach strategies not as abstract concepts but as applied to content-area materials, and they should help students transfer key literacy skills to other areas. Content-area teachers should reinforce key skills by providing literacy instruction and practice in their respective subject areas, emphasizing the reading and writing practices that are specific to their subjects.

174.   Research shows conclusively that older readers require literacy instruction in five areas:  comprehension, motivation, word study, fluency, and vocabulary.

175.   For adolescent reading instruction, comprehension is the most important component.  Students must receive direct and explicit instruction in comprehension strategies.  Because comprehension strategies improve students' ability to engage in all disciplines, it should be a classroom activity for both language-arts and content-area teachers.

176.   Motivation is also essential in adolescent literacy instruction. Students require motivation and engagement in order to develop their literacy at the secondary level.  Research shows that reading motivation and engagement can be improved by providing goals for reading, supporting student autonomy, providing interesting texts, and increasing reading-related social interactions among students.

177.   Word study is particularly important for older students who struggle with reading at the word level.  Many readers who struggle in the adolescent years are proficient at reading single-syllable words but lack strategies to decode the multi-syllable words that populate higher-level reading materials.  Instruction in advanced word study teaches students to be flexible decoders who can access and employ strategies of word analysis and recognition.

178.   Fluency instruction for older struggling readers can also be appropriate when combined with word-learning instruction, frequent and varied exposure to newly learned words, and supervised practice.

179.   Adolescent learners need to understand the words they encounter in increasingly difficult texts and need strategies to figure out unknown words. Teachers in both language-arts classes and content-area classes should provide explicit vocabulary instruction.

       iii.    Assessments and Interventions

180.   In the primary grades, all students should be screened for potential reading problems at the beginning of the year and again in the middle of the year. Universal screening is a critical first step in identifying students who are at risk for experiencing reading difficulties and who might need more instruction.

181.   Older readers must be screened as well.  Struggling readers can be identified through initial screening assessments and specific diagnostic tests, as well as by consistently low scores on annual reading tests.

182.   Research supports the use of multi-tiered intervention strategies, such as Response to Intervention, to provide the appropriate level of support to prevent or remediate reading difficulties.  Under the multi-tier approach, the first tier is general instruction.  Tier 2 interventions are provided to students who demonstrate problems based on screenings or show weak progress in regular classroom instruction.  Tier 2 interventions involve three to four students using curricula that address alphabetics, fluency, and comprehension for 20 to 40 minute sessions, three to five times per week for at least five weeks.

183.   Students who do not progress after a reasonable amount of time are provided Tier 3 interventions, which typically involve one-on-one tutoring with in-depth modeling and extensive feedback.

184.   Ongoing summative assessments are necessary for accountability. Summative assessment systems allow teachers to track a student throughout a

school year and over an entire academic career, so student progress can be monitored individually, by class, by cohort, and by school.

185.   Research shows that professional development for teachers has consistent positive effects on student achievement.  Ongoing, evidence-based, long-term professional development promotes lasting positive changes in teacher knowledge and practice.  Professional development opportunities should be built into the regular school schedule.  Effective professional development will help school personnel develop a team-oriented approach to improving the instruction and institutional structures that promote student literacy.

iv.   Examples of Successful Evidence-Based Programs

186.   The DOE's IES is the nation's leading source for rigorous and independent education research, evaluation, and statistics.  The IES maintains the What Works Clearinghouse ("WWC"), which identifies studies that provide credible and reliable evidence of the effectiveness of a given program, policy, or practice using a scientific, systematic, and comprehensive review process.[63]  The WWC reviews a wide range of education topics including literacy.  Specifically, the WWC has reviewed studies that examine the impact of interventions on the following outcomes:  alphabetics, general literacy achievement, reading

---

[63] *See generally WWC Procedures and Standards Handbook*, WHAT WORKS CLEARINGHOUSE, INST. OF EDUC. STUDIES, http://ies.ed.gov/ncee/wwc/DocumentSum.aspx?sid=19 (last visited Sept. 12, 2016).

achievement, reading fluency, early reading/writing, print knowledge, reading comprehension, and writing achievement.[64]  The WWC has determined numerous literacy interventions to be effective.[65]  For example, the "Literacy Express" intervention in early childhood education, the "Sound Partners" intervention in beginning reading, the "Success for All" intervention in beginning reading, and the "Project CRISS" intervention have all received strong positive effectiveness ratings with a medium to large amount of evidence.

187.   Some of the most effective interventions are culturally appropriate, inquiry-based approaches that engage struggling young people with meaningful questions and interesting content.  For example, Professor Catherine Snow at the Harvard Graduate School of Education has developed an intervention called "Word Generation," which motivates young people to develop vocabulary and comprehension skills by asking questions that are relevant to their own experiences.

### B.     *Increase Teacher Capacity and Stability*

188.   In order to effectively implement literacy instruction and intervention programs, teaching staffs must be supported, well-trained, and highly qualified.

---

[64] *Literacy*, WHAT WORKS CLEARINGHOUSE, INST. OF EDUC. STUDIES, http://ies.ed.gov/ncee/wwc/topic.aspx?sid=8 (last visited Sept. 12, 2016).
[65] *Find What Works!*, WHAT WORKS CLEARINGHOUSE, INST. OF EDUC. STUDIES, http://ies.ed.gov/ncee/wwc/findwhatworks.aspx (last visited Sept. 12, 2016).

The State can implement a number of practices and policies to stabilize and professionalize the teaching force to enable the delivery of consistent, high-quality literacy instruction and intervention, including:  implementing systemic, coordinated, and high-quality professional development; implementing programs designed to address secondary/vicarious trauma among educators; and providing support and incentivizing teaching in Plaintiffs' schools.

### C.    *Monitor and Eliminate Deplorable School Conditions that are Barriers to Learning*

189.    The State must implement an accountability system to ensure that Plaintiffs' schools have the necessary teaching and learning conditions to provide access to literacy, including adequate instructional materials and course offerings, and safe, clean, and functional facilities, including the absence of vermin, extreme temperatures, and overcrowding.  Dedicated instruction to meet the needs of English Learners must be provided by appropriately trained teaching staff.

### D.    *Implement Practices to Promote Learning Readiness*

190.    As social science and public health research has conclusively established, exposure to trauma is a key predictor of academic failure.  It is unsurprising, then, that schools that serve disproportionate numbers of young people who have been exposed to trauma are often marked by the greatest literacy shortfalls.  When schools fail to meet the social-emotional and mental health needs of their students, they compromise the effectiveness of even the most faithfully

implemented literacy programs.  Therefore, a first step to ensuring that every child has a meaningful opportunity to attain literacy, particularly in school districts in which many children have been exposed to the destabilizing consequences of poverty and violence, is to promote learning readiness by implementing school- and district-wide trauma-informed practices.  These practices include:  training educators to understand, proactively recognize, and address the effects of complex trauma; incorporating social-emotional learning into curricula; developing restorative justice programs to build healthy relationships; resolving conflicts peacefully; avoiding re-traumatizing students through the use of punitive discipline; and providing access to mental health support.

## CLASS ACTION ALLEGATIONS

191.   This action is maintainable as a class action under Federal Rule of Civil Procedure 23.

192.   Plaintiffs bring this class action on behalf of current and future students enrolled in Hamilton Academy, Osborn Academy of Mathematics, Science and Technology, and Osborn Evergreen Academy of Design and Alternative Energy, The Medicine and Community Health Academy at Cody, and students who attended Experiencia Preparatory Academy (collectively, "Plaintiffs' schools"), and on behalf of the following subclasses:

a.  A subclass of current and future students enrolled in Hamilton Academy;

b. A subclass of current and future students enrolled in Osborn Academy of Mathematics, Science and Technology;

c. A subclass of current and future students enrolled in Osborn Evergreen Academy of Design and Alternative Energy;

d. A subclass of current and future students enrolled in The Medicine and Community Health Academy at Cody; and

e. A subclass of past students enrolled in Experiencia Preparatory Academy.

193.   Questions of law and/or fact common to the entire class and to each subclass exist.  Common questions of law and/or fact include, without limitation:

- Whether Plaintiffs have a fundamental right of access to literacy guaranteed by the Fourteenth Amendment to the United States Constitution;

- Whether Defendants' policies and practices violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution by depriving Plaintiffs of their right to access to literacy and by failing to provide Plaintiffs access to literacy equal to that of other students in the Michigan Public Schools;

- Whether Defendants' system of public schools functionally excludes Plaintiffs from the public education to which they are entitled;

- Whether Defendants' policies and practices violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution by discriminating against Plaintiffs on the basis of race;

- Whether Defendants violated the Substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution by knowingly placing Plaintiffs at risk of danger through their acts and omissions concerning the maintenance of the system of public schools; and

- Whether Defendants' practices violate Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and 34 C.F.R. § 100.3(b)(2), by maintaining a federally funded system of public schools in a manner that intentionally discriminates on the basis of race, color, or national origin.

194.   The named Plaintiffs have claims that are typical of the claims of the class and of their subclasses.  Each Plaintiff is a member of the class and/or subclass he or she seeks to represent.  The named Plaintiffs and the unnamed class members all attend, will attend, or attended schools that are functionally excluded from Michigan's statewide system of education.  Moreover, as a result of Defendants' acts, omissions, policies, and procedures that apply to named Plaintiffs and all class and subclass members, named Plaintiffs and the unnamed class members are denied the opportunity to attain basic literacy.

195.    The class is so numerous that joinder of individual actions by each class member is impracticable.  The class includes all students at Hamilton Academy, Osborn Academy of Mathematics, Science, and Technology, and Osborn Evergreen Academy of Design and Alternative Energy, The Medicine and Community Health Academy at Cody, and the students who attended Experiencia Academy.  The size of the class exceeds 1,254 students, which was the approximate number of students enrolled in the schools attended by Plaintiffs for the 2015-16 academic year.  Moreover, the inclusion in the class of future members and the dispersal of the class at nine school sites make joinder impracticable.

196.    The subclasses are also so numerous that joinder of all members of individual actions by each subclass member is impracticable, and the inclusion in the subclass of future members also makes joinder impracticable.

a.  The size of the Hamilton Academy subclass is at least 254 students;

b.  The size of the Osborn Academy of Mathematics, Science and Technology subclass is at least 266 students;

c.  The size of the Osborn Evergreen Academy of Design and Alternative Energy subclass is at least 327 students;

d.  The size of the Medicine and Community Health Academy at Cody subclass is at least 407 students; and

e.  The size of the Experiencia Preparatory Academy subclass is at least 338 students.

197.   The named Plaintiffs will fairly and adequately protect the interests of the class and of the subclasses.  Plaintiffs are represented by experienced counsel who will adequately represent the interests of the class and subclasses.

198.   Defendants have acted and refused to act on grounds generally applicable to the class and to the subclasses, thereby making appropriate final injunctive relief and/or corresponding declarative relief with respect to the class and subclasses as a whole.

## CAUSES OF ACTION

**FIRST CAUSE OF ACTION—Violation of 42 U.S.C. § 1983**

**(All Plaintiffs Against All Defendants for Violation of the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution)**

199.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

200.   Defendants, who are responsible for the education of all Michigan public school students and for the system of Michigan public schools, have denied and continue to deny Plaintiffs the fundamental right of access to literacy and fundamental interest in access to literacy, as compared to other students in the

State of Michigan receiving an education in Michigan Public Schools, by

functionally excluding Plaintiffs from Michigan's statewide system of public

education, as described above, in violation of their substantive right to due process

of law, their liberty interest, and their right to equal protection under law protected

by the Fourteenth Amendment to the United States Constitution.

201.   Defendants were acting under color of state law, thereby violating

section 1983.

**SECOND CAUSE OF ACTION—Violation of 42 U.S.C. § 1983**

**(All Plaintiffs Against All Defendants for Violation of the Due Process Clause**

**of the Fourteenth Amendment to the United States Constitution – State-**

**Created Danger)**

202.   Plaintiffs incorporate by reference the foregoing paragraphs of this

Complaint as though fully set forth herein.

203.   By the acts and omissions described above, Defendants affirmatively

created or increased the risk that Plaintiffs would be exposed to dangerous

conditions, which placed Plaintiffs specifically at risk, and Plaintiffs were harmed

as a result.

204.   Defendants knew or should have known that their acts or omissions

specifically endangered Plaintiffs.

205.   Defendants were acting under color of state law, thereby violating section 1983.

**THIRD CAUSE OF ACTION—Violation of 42 U.S.C. § 1983**

**(All Plaintiffs Against All Defendants for Violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution – Discrimination on the Basis of Race)**

206.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

207.   Defendants, who are responsible for the education of all Michigan public school students and for the system of Michigan public schools, have denied and continue to deny Plaintiffs the fundamental right of access to literacy and fundamental interest in access to literacy, pursuant to the Fourteenth Amendment to the United States Constitution, by intentionally discriminating against them on the basis of race.

208.   Defendants have functionally excluded Plaintiffs from Michigan's statewide system of public education on the basis of their race, denied Plaintiffs access to literacy equal to the access provided to students in other schools in the State on the basis of their race, and responded with deliberate indifference to such exclusion and such denial, as described above.

## FOURTH CAUSE OF ACTION

**(All Plaintiffs Against All Defendants for Maintaining Schools in a Manner that Discriminates on the Basis of Race in Violation of Title VI of the Civil Rights Act of 1964, 42, U.S.C. § 2000d and 34 C.F.R. § 100.3(b)(2))**

209.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

210.   Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

211.   The federal regulations implementing Title VI prohibit a recipient of federal financial assistance from utiliz[ing] criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program as respect individuals of a particular race, color, or national origin.  34 C.F.R. § 100.3(b)(2).

212.   As stated above, by its actions and inactions, Defendants have maintained a public school system without establishing standards sufficient to deliver access to literacy to Plaintiffs.  Plaintiffs' schools serve more than 97%

African-American and Latino students.  Even when violations have become known to the State, Defendants have taken no effective steps to remedy known violations. Defendants' conduct intentionally discriminates against Plaintiffs on the basis of their race, color, or national origin in violation of Title VI and its implementing regulations.

## FIFTH CAUSE OF ACTION

### (All Plaintiffs Against All Defendants for Declaratory Relief)

213.   Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

214.   An actual and existing controversy exists between the Plaintiffs and the Defendants because Plaintiffs contend, and Defendants dispute, that Defendants' actions and inactions as described above have violated the Fourteenth Amendment of the United States Constitution and Title VI of the Civil Rights Act of 1964, 42, U.S.C. § 2000d and 34 C.F.R. § 100.3(b)(2).

215.   Plaintiffs seek a judicial declaration that the Defendants have violated this constitutional provision.

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request the following relief:

1.      A determination by this Court that this action may be maintained as a class action;

2.      Injunctive relief requiring Defendants and their officers, agents, and employees to ensure that Plaintiffs' and class members have the opportunity to attain literacy, including, but not limited, to:

     a.  Implementation of evidence-based programs for literacy instruction and intervention, such as:

     i.  appropriate literacy instruction at all grade levels, including instruction in the alphabetic principle, fluency, and comprehension in grades K-3, and instruction in comprehension, motivation, word study, fluency, and vocabulary in grades 4-12;

     ii.  universal screening for literacy problems, including screening at the beginning and middle of the year for all students in primary grades and appropriate periodic screening of older students;

     iii. timely and appropriate intervention with individual students to prevent or remediate reading difficulties;

     b.  Establishment of a system of statewide accountability whereby the State:

     i.   monitors conditions that deny access to literacy, taking into account the identified conditions antithetical to literacy instruction in Plaintiffs' schools, such as insufficient teacher capacity, deplorable school conditions, and failure to promote learning readiness through trauma-informed practices; and

    ii.   intervenes in a timely manner to address identified conditions that deny access to literacy.

   c.   Provision of compensatory and remedial education for all class members—including students who previously attended but no longer attend Experiencia—including, but not limited to, assessing the literacy proficiency of each student and developing an individualized plan to bring each student up to grade level;

3.    The issuance of a declaratory judgment that Defendants' actions and inaction complained of herein violate Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution and Title VI of the Civil Rights Act of 1964, 42, U.S.C. § 2000d and 34 C.F.R. § 100.3(b)(2);

4.    An award of costs, disbursements, and reasonable attorneys' fees and expenses pursuant to 42 U.S.C. § 1988 and any other applicable provisions of law; and

5.    Such other relief as this Court deems just and proper.

Respectfully submitted,

Dated:  September 13, 2016          PUBLIC COUNSEL


By: _MARK ROSENBAUM_____
MARK D. ROSENBAUM


By: _KATHRYN EIDMANN_____
KATHRYN A. EIDMANN


MARK D. ROSENBAUM (*admission pending*)
KATHRYN A. EIDMAN (*admission pending*)
ALISA L. HARTZ (*admission pending*)
ANNE M. HUDSON-PRICE (*admission pending*)
610 South Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089
mrosenbaum@publiccounsel.org
keidmann@publiccounsel.org
ahartz@publiccounsel.org
aprice@publiccounsel.org

*Attorneys for Plaintiffs*

Dated:  September 13, 2016          SIDLEY AUSTIN LLP


By: _____
    MICHAEL C. KELLEY


MICHAEL C. KELLEY (*admission pending*)
MARK E. HADDAD (*admission pending*)
JOSHUA E. ANDERSON (*admission pending*)
555 West Fifth Street, Suite 4000
Los Angeles, California 90013
Telephone: (213) 896-6000
Facsimile: (213) 896-6600
mkelley@sidley.com
janderson@sidley.com


By: _____
    JENNIFER M. WHEELER


CARTER G. PHILLIPS (*admission pending*)
SCOTT R. LASSAR (*admission pending*)
TACY F. FLINT (*admission pending*)
JENNIFER M. WHEELER (#6316898)
One South Dearborn Street, #900
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
cphillips@sidley.com
slassar@sidley.com
tflint@sidley.com
jwheeler@sidley.com


*Attorneys for Plaintiffs*

Dated: September 13, 2016          MILLER COHEN PLC


By: *s/ with consent of B. Miller*
      BRUCE A. MILLER


BRUCE A. MILLER (P17746)
600 West Lafayette Blvd., 4th Floor
Detroit, Michigan 49226
Telephone: (313) 566-4454
Facsimile: (313) 964-4490
brucemiller@millercohen.com

*Attorneys for Plaintiffs*


Dated: September 13, 2016          EVAN H. CAMINKER


By: *Evan Caminker*
      EVAN H. CAMINKER


EVAN H.CAMINKER (P65672)
University of Michigan Law School
*for identification purposes only
625 South State Street
3250 South Hall
Ann Arbor, Michigan 48109
Telephone: (734) 763-5221
caminker@umich.edu

*Attorneys for Plaintiffs*

Dated:  September 13, 2016          ERWIN CHEMERINSKY


By: _s/ with consent of E. Chemerinsky_
     ERWIN CHEMERINSKY


ERWIN CHEMERINSKY(*admission pending*)
University of California, Irvine School of Law
*for identification purposes only*
401 East Peltason Drive
Educ 1095
Irvine, California 92697
Telephone: (949) 824-7722
echemerinsky@law.uci.edu

*Attorneys for Plaintiffs*