# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| GARY B.; JESSIE K., a minor, by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated, | Civil Action No.: 16-CV-13292<br><br>**CLASS ACTION**<br><br>**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Plaintiffs, | |
| v. | |
| RICHARD D. SNYDER, in his official capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH; KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHISTON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and NATASHA BAKER, in her official capacity as the State School Reform/Redesign Officer, | |
| Defendants. | |

# TABLE OF CONTENTS

STATEMENT OF FACTS ..............................................................................4

    I.     Plaintiffs' Exclusion from Michigan's Statewide
         System of Education..............................................................4

    II.    The Meaning and Significance of Literacy ...........................6

ARGUMENT ............................................................................................8

    I.     The Court Has Jurisdiction over Plaintiffs' Claims ............................8

         A.     Plaintiffs have standing to assert their claims...........................8

         B.     Because Plaintiffs seek prospective relief against
              state officials, their claims are not barred by the
              Eleventh Amendment..................................................13

         C.     An unrelated case in Michigan state court is not
              an impediment to this Court's jurisdiction. ..............................15

    II.    The Equal Protection Clause of the U.S. Constitution
         Prohibits the State from Denying Plaintiffs Access to
         Literacy.............................................................................17

         A.     *Brown*, *Rodriguez*, and *Plyler* forbid excluding
              a discrete group of children from access to basic
              minimal skills................................................................17

         B.     *Plyler* controls this case. ........................................21

         C.     Michigan's actions fail any level of scrutiny
              because there can be no state interest sufficient
              to deny a discrete group of students access to literacy. ...........28

              1.     Defendants' actions do not satisfy heightened
                    scrutiny. .......................................................28

               2.     Defendants' actions do not satisfy rational basis
                    review. .........................................................29

III.    Denial of Access to Literacy Violates Plaintiffs' Substantive
        Right to Liberty ....................................................................... 32

IV.     Defendants Caused Plaintiffs' Deprivation of Access to
        Literacy ................................................................................... 37

        A.      State officials—not local officials—control the
                statewide system of education. ................................... 37

        B.      Defendants exercised direct control over Plaintiffs'
                schools. ........................................................................ 41

CONCLUSION ........................................................................................ 49

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Aarti Hosp., LLC v. City of Grove City, Ohio*,
    350 F. App'x 1 (6th Cir. 2009) .........................................................................16

*Bd. of Ed. v. Pico*,
    457 U.S. 853 (1982)..........................................................................................35

*Bennett v. Spear*,
    520 U.S. 154 (1997)..........................................................................................13

*Boddie v. Connecticut*,
    401 U.S. 371 (1971)..........................................................................................35

*Bradley v. Milliken*,
    484 F.2d 215 (6th Cir. 1973) ......................................................................37, 38

*Brown v. Bd. of Ed.*,
    347 U.S. 483 (1954)....................................................................................17, 18

*Citizens United v. FEC*,
    558 U.S. 310 (2010)..........................................................................................35

*Edelman v. Jordan*,
    415 U.S. 651 (1974)....................................................................................14, 15

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*,
    544 U.S. 280 (2005)....................................................................................16, 17

*Griffin v. Illinois*,
    351 U.S. 12 (1956)............................................................................................35

*Harkless v. Brunner*,
    545 F.3d 445 (6th Cir. 2008) ...........................................................................40

*Hutto v. Finney*,
    437 U.S. 678 (1978)..........................................................................................14

*Johnston by Johnston v. Ann Arbor Pub. Sch.*,
    569 F. Supp. 1502 (E.D. Mich. 1983) ........................................................20, 21

*Kadrmas v. Dickinson Pub. Sch.*,
  487 U.S. 450 (1988)........................................................................32

*L.M. v. State*,
  862 N.W.2d 246 (Mich. Ct. App. 2014)..........................................40

*Lance v. Dennis*,
  546 U.S. 459 (2006).................................................................16, 17

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).....................................................................8, 11

*Massachusetts v. EPA*,
  549 U.S. 497 (2007)........................................................................13

*Milliken v. Bradley*,
  418 U.S. 717 (1974)........................................................................38

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)...............................................................*passim*

*Papasan v. Allain*,
  478 U.S. 265 (1986)...........................................13, 14, 24, 25, 32

*Phillips v. Snyder*,
  836 F.3d 707 (6th Cir. 2016) .............................................10, 44, 47

*Plyler v. Doe*,
  457 U.S. 202 (1982)...................................................................*passim*

*Regents of Univ. of Cal. v. Bakke*,
  438 U.S. 265 (1978)........................................................................27

*Robertson v. Jackson*,
  972 F.2d 529 (4th Cir. 1992) .........................................................40

*Romer v. Evans*,
  517 U.S. 620 (1996)........................................................................30

*San Antonio Independent School District v. Rodriguez*,
  411 U.S. 1 (1973)........................................................................*passim*

*Skinner v. Switzer*,
    562 U.S. 521 (2011)................................................................................16, 17

*South Carolina v. Katzenbach*,
    383 U.S. 301 (1966)................................................................................27

*United States v. Hays*,
    515 U.S. 737 (1995)................................................................................11

*United States v. Missouri*,
    535 F.3d 844 (8th Cir. 2008) ................................................................40

*Washington v. Sinai Hosp. of Greater Detroit*,
    733 N.W.2d 755 (Mich. 2007)................................................................16

*Wayne v. Shadowen*,
    15 F. App'x 271 (6th Cir. 2001) ............................................................11, 18

*Welling v. Livonia Bd. of Ed.*,
    171 N.W.2d 545 (Mich. 1969)................................................................38

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972)................................................................................34, 35, 37

*Woods v. United States*,
    724 F.2d 1444 (9th Cir. 1984) ..............................................................40

*Ex parte Young*,
    209 U.S. 123 (1908)................................................................................14

**Statutes**

Mich. Comp. Laws § 124.510................................................................................48

Mich. Comp. Laws § 141.1546................................................................................45

Mich. Comp. Laws § 141.1549................................................................................44, 45, 46

Mich. Comp. Laws § 141.1551................................................................................44

Mich. Comp. Laws § 141.1554................................................................................44

Mich. Comp. Laws § 141.1574................................................................................45

Mich. Comp. Laws § 380.501 ................................................................10

Mich. Comp. Laws § 380.1280c ...............................................10, 41, 42

Mich. Comp. Laws § 380.1561 ......................................................26, 35

Mich. Comp. Laws § 380.1599 ................................................................35

Mich. Comp. Laws § 388.1009 .....................................................10, 38, 39

Mich. Comp. Laws § 388.1014 ......................................................10, 39

**Constitutional Provisions**

Mich. Const., art VIII § 3 ...............................................................10, 38

**Court Rules**

Mich. Ct. R. 3.501(D)(2) ..........................................................................16

**Other Authorities**

Barry Friedman & Sara Solow, *The Federal Right to an Adequate
   Education*, 81 Geo. Wash. L. Rev. 92, 127 (2013) .............................36

Steven G. Calabresi & Sarah E. Agudo, *Individual Rights under State
   Constitutions when the Fourteenth Amendment Was Ratified in
   1868: What Rights Are Deeply Rooted in American History and
   Tradition?*, 87 Tex. L. Rev. 7, 108 (2008) .........................................36

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.   If Plaintiffs have standing to pursue claims that they personally suffered a concrete injury due to Defendants' conduct in managing the statewide system of education.

2.   If Plaintiffs' request for prospective relief to compel Defendants' compliance with the Constitution falls outside of Eleventh Amendment immunity as articulated in *Ex parte Young*.

3.   If a narrow state-court challenge to a Michigan statute brought by unrelated plaintiffs bars Plaintiffs' claims under the *Rooker-Feldman* doctrine.

4.   If Defendants' system of education, which denies a discrete minority the opportunity to acquire literacy necessary for the enjoyment of the rights of speech and of full participation in the political process, violates the Equal Protection Clause of the Fourteenth Amendment.

5.   If Defendants' exclusion of Plaintiffs from access to literacy violates their substantive right to liberty under the Due Process Clause of the Fourteenth Amendment.

## <u>KEY AUTHORITY</u>

*Plyler v. Doe*, 457 U.S. 202 (1982)

**PLAINTIFFS' RESPONSE IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

In *Plyler v. Doe*, 457 U.S. 202 (1982), the United States Supreme Court struck down a Texas statute that resulted in the "denial of education to some isolated group" of children, because such a denial "pose[d] an affront to one of the goals of the Equal Protection Clause:  the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit."  *Id.* at 221–22.  Under *Plyler*, "education has a fundamental role in maintaining the fabric of our society.  We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests."  *Id.* at 221.  *Plyler* recognized that illiteracy in particular "is an enduring disability.  The inability to read and write will handicap the individual deprived of a basic education each and every day of his life."  *Id.* at 222.

This case is about bringing an end to the stigma of illiteracy imposed upon children who are compelled by Michigan law to attend school, but whose schools do not, and functionally cannot, provide them the same opportunity to acquire literacy that children across Michigan and throughout the nation receive as a matter of course.  Plaintiffs' "schools" contain classrooms that have no teachers, no textbooks, or where no homework can be assigned from books that students do not have.  The buildings where Plaintiffs are, for all intents and purposes, warehoused

1

for seven hours a day impose their own grotesque barriers to learning and teaching, including classroom temperatures ranging from freezing to over 90 degrees, vermin, and unworkable toilets.  The academic outcome at these schools is both predictable and heartbreaking, with near zero percent of students achieving proficiency in State-mandated subjects.

Defendants have no legally sound defenses to justify the grave constitutional injuries suffered by Plaintiffs, but instead seek to evade responsibility by any means possible.  They argue first that the Court lacks power to hear Plaintiffs' claims, pointing to plainly inapplicable doctrines such as *Rooker-Feldman* and Eleventh Amendment immunity.  Perhaps most troubling, Defendants attempt to blame the students and their parents for the students' lack of proficiency, citing supposed "intellectual limitations," lack of "parental involvement," and "domestic violence," contending that Plaintiffs lack standing.  Dkt. 60, Mot. Dismiss at 14 (hereinafter, "Mot.").  Not only does this claim fuel the offensive stereotype that these students are uninterested in and incapable of learning, but the suggestion that the State may renege on its constitutional obligation to provide access to literacy because it assumes some students may benefit less than others is offensive to constitutional values.

Yet Defendants barely pay lip service to the controlling *Plyler* decision, failing to address its obvious applicability to the facts alleged in Plaintiffs'

2

Complaint.  Instead, they confine their constitutional argument to rebutting a straw man that mischaracterizes both Plaintiffs' claim and the applicable law.  Contrary to Defendants' suggestion, Plaintiffs' claim does not require overruling *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1 (1973).  *Rodriguez* expressly left open the claim asserted here, noting that the education finance scheme it was examining "was designed to provide an adequate minimum educational offering in every school in the State" such that no "charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and full participation in the political process."  *Id.* at 37, 45.

Finally, after seeking to "pass the buck" to students and parents, Defendants try to pass it again, asserting that, in any event, the problem belongs to local officials, as if the State has played no role in Plaintiffs' education.  Despite having established a statewide system of education, the State claims that it bears no responsibility for ensuring that the system be open on equal terms to all students.  Even putting aside that duty, the State has, as a factual matter, controlled the operation of Plaintiffs' schools for most of the past fifteen years, officially stepping in for the local board of education.  The motion to dismiss should be denied.

## STATEMENT OF FACTS

This action is brought by seven Plaintiffs on behalf of a class of schoolchildren from five of the lowest performing traditional public and charter schools in Detroit.[1]  The Complaint alleges that Plaintiffs' elementary and secondary schools, which serve almost exclusively low-income children of color, Dkt. 1, Compl. ¶¶ 2, 90, figs. 1–2, are schools "in name only", *id.* ¶¶ 1, 9–13, buildings that warehouse students instead of educating them, and subject them to an unsafe, degrading, and chaotic environment, *id.* ¶¶ 1, 8–14, 81, 109, 119–37, figs. 13–15.  Plaintiffs, functionally excluded from Michigan's statewide system of education, are denied what students attending many other schools in the State take for granted:  access to literacy—the fundamental building block integral to meaningful participation in our constitutional democracy.

## I.    Plaintiffs' Exclusion from Michigan's Statewide System of Education

The 136-page Complaint exhaustively details the absence of basic learning tools in Plaintiffs' schools, including trained and qualified teachers and course material required by the State.  *Id.* ¶¶ 100–18, 144–55.  The Complaint also details

---

[1] The class includes students from three Detroit Public Schools Community District ("DPSCD") schools—Osborn Academy of Mathematics, Science and Technology ("Osborn MST"), the Osborn Evergreen Academy of Design and Alternative Energy ("Osborn Evergreen"), and the Medicine and Community Health Academy at Cody ("Cody Health")—and two charter schools—Hamilton Academy ("Hamilton") and Experiencia Preparatory Academy ("Experiencia"). Compl. ¶ 192.

the pervasive, deplorable physical conditions of those schools, including freezing and sweltering classroom temperatures, rats and other vermin infestations, unsafe drinking water, and buildings that are literally falling apart. *Id.* ¶¶ 119–37. Individually and together, these conditions deny any semblance of access to literacy in Plaintiffs' schools.

Students in Plaintiffs' schools read many grade levels below their peers statewide and nationally. *Id.* ¶¶ 89, 97. Students "cannot read, write, or comprehend," *id.* ¶ 5, "have a vocabulary of only a couple hundred words," *id.* ¶ 6, struggle to spell simple words, *id.* ¶ 7, and stumble over monosyllabic words when reading aloud, *id.* ¶ 107. High school students spend months struggling to read books designed for third- and fourth-grade reading levels. *Id.* ¶ 7.

These dramatic achievement deficits are the predictable result of the State's failure to deliver evidence-based literacy instruction and intervention in Plaintiffs' schools. *Id.* ¶¶ 100–18. They are also a direct consequence of the deplorable conditions in Plaintiffs' schools that serve as barriers to achieving literacy. *Id.* ¶¶ 100–63. Among the adverse conditions described in the Complaint are:

- **Inadequate Instructional Materials:** Plaintiffs' classrooms have grossly insufficient numbers of textbooks or no textbooks, and the books available are "decades out of date, defaced, and missing pages." *Id.* ¶¶ 113–17, figs. 11–12. A textbook used in a high school history class, for example, refers to the current "President Bill Clinton." *Id.* ¶ 10. Because textbooks are in such short supply, Plaintiffs are not assigned their own books and do not receive homework that requires them to use texts. *Id.* ¶¶ 10, 113. Schools lack not only books, but also basic supplies such as chairs, desks, pens, pencils, and

5

toilet paper, and teachers either purchase these items themselves or depend on affluent schools to donate materials. *Id.* ¶¶ 11, 118.

- **Dangerous and Unsanitary School Conditions:** Plaintiffs' schools subject students to unsafe and unsanitary physical conditions that can make learning impossible. *Id.* ¶¶ 119–37. The school buildings are decrepit and unsafe, subjecting students to leaking roofs, broken windows, falling ceiling tiles, black mold, contaminated drinking water, vermin, and dangerously overcrowded classrooms, *id.* ¶¶ 12–13, 128–37, figs. 14–15. Extreme and unsafe temperatures in the classroom—students frequently can see their breath in the winter and are subjected to 90-degree heat in the summer— disrupt or preclude learning and often require school closures and early dismissals. *Id.* ¶¶ 13, 14, 123–27.

- **Insufficient or Unqualified Staff:** Plaintiffs' schools lack sufficient certificated, properly trained, and appropriately assigned teachers; vacancies are covered by adults lacking teaching credentials, by students, or, in some cases, by no one at all. *Id.* ¶¶ 17, 144–54. In the 2015-16 school year, there were about 170 teaching vacancies in DPSCD, *id.* ¶ 146, and large numbers of teacher vacancies have persisted for years, *id.* ¶ 145. An eighth grade Hamilton student "taught" a seventh and eighth grade math class for a month because no teacher was available. *Id.* ¶¶ 17, 145. In June 2016, the State passed a law allowing non-certificated teachers to teach in DPSCD schools, singling out the children of Detroit for inferior treatment. *Id.* ¶¶ 18, 155.

## II.   The Meaning and Significance of Literacy

Literacy means "the ability to encode and decode language so as to access knowledge and communicate . . . not only the ability to recognize or pronounce a written word, but the ability to use language to engage with the world—to understand, analyze, synthesize, reflect, and critique." *Id.* ¶ 3; *see also id.* ¶¶ 36–43. Literacy development is progressive and cumulative, and thus it must continue throughout K-12 education. *Id.* ¶¶ 3, 36, 38. It is the "foundation" or "basic unit" of education, "necessary to achieve mastery of content in all other core subject

areas." *Id.* ¶¶ 3, 35–43.  For example, students who lack literacy skills are unable to solve word problems in mathematics, read a history textbook, or draft laboratory reports in science class.  *Id.* ¶ 42.

Beyond its importance to education, literacy is the prerequisite to civic participation in our democratic society.  *Id.* ¶¶ 35, 45–47.  Without literacy, one cannot meaningfully participate in the political process, including informed voting, reading and comprehending ballot initiatives, and engaging in political speech and public discourse.  *Id.* ¶ 45.  One cannot meaningfully participate in the activities of citizenship, including through the justice system, military service, accessing government entitlements, and complying with government requirements such as tax returns and selective service registration.  *Id.* ¶ 46.  Literacy similarly determines access to economic self-sufficiency and higher education, *id.* ¶¶ 48–51; delinquency, criminal arrests, and incarceration, *id.* ¶ 52, and health outcomes, *id.* ¶ 53.  Denial of access to literacy has historically been used as a primary "tool to subordinate marginalized groups," *id.* ¶ 58, particularly low-income communities of color, *id.* ¶ 35; *see also id.* ¶¶ 58–60.

Experts have developed and validated evidence-based literacy programs that teach students to read in the first instance and intervene when students fall behind. These programs can provide access to literacy in schools like Plaintiffs' at both the

elementary and secondary levels.[2]  *Id.* ¶¶ 168–85 (describing components of such

programs); *id.* ¶¶ 186–87 (providing examples of successful programs).  But access

to literacy also requires a stable, supported, and appropriately trained teaching

staff, adequate instructional materials and safe physical conditions that do not

impede learning, and support for students' mental health and social-emotional

needs.  *Id.* ¶¶ 188–90.

<u>**ARGUMENT**</u>

**I.    The Court Has Jurisdiction over Plaintiffs' Claims**

    **A.    Plaintiffs have standing to assert their claims.**

Plaintiffs have Article III standing.  *See Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560–61 (1992) (holding that the requirements for standing are injury,

traceability, and redressability).  They have alleged a concrete injury in the form of

the lifelong adverse effects that they will experience from being denied their right

of access to literacy.  That injury is traceable to Defendants' conduct in managing

the statewide system of education so as to grant others in Michigan access to

literacy, while compelling Plaintiffs to attend buildings that are "schools" in name

---

[2] Contrary to Defendants' repeated mischaracterizations, *see* Mot. at 38, Plaintiffs
do not seek implementation of a "particular literacy program."  Rather, they ask the
State to ensure that Detroit students are receiving evidence-based literacy
instruction, which experts agree shares certain key elements, but without seeking
any particular literacy instruction program.

only.  And granting the relief that Plaintiffs seek will redress their injury by establishing access to literacy in the schools they are compelled to attend.

Defendants' arguments to the contrary ignore the allegations of the Complaint and instead seek to shift the blame to Plaintiffs and their families. Defendants, the State officials responsible for public education in Michigan, assert that Plaintiffs may not "point[] the finger" at Defendants' failures because there exist "other factors that contribute to illiteracy," such as supposed lack of "parental involvement" and "intellectual limitations."  Mot. at 14.  This attempted dodge rests on speculation that stigmatizes the entire class without basis.  It finds no support in the law of standing, and Defendants' arguments with respect to each element of standing fail.

*Injury.*  Defendants first state that Plaintiffs have not alleged an invasion of any legally protected interest because "federal courts have never deemed literacy to be a legally protected interest," and because Plaintiffs supposedly "fail to identify anything Defendants are affirmatively doing to violate their alleged right to literacy."  Mot. at 13–14.  Defendants' argument mischaracterizes Plaintiffs' claims.  Plaintiffs do not assert a right to literacy, but a right to *access* to literacy— that is, an opportunity, like that Defendants provide to other children in Michigan, to obtain "the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process."  *Rodriguez*, 411 U.S. at

9

37.  This is not a "generalized grievance against the State of Michigan's education system," Mot. at 14, but a claim of concrete injury to the Plaintiffs themselves because the schools that they attend do not provide Plaintiffs access to literacy equal to that provided to other Michigan children, *see Phillips v. Snyder*, 836 F.3d 707, 714 (6th Cir. 2016) (injury requirement for standing satisfied where plaintiffs "allegedly suffered constitutional deprivations and other harms that residents and elected officials of cities without emergency managers did not suffer").[3]

Moreover, contrary to Defendants' Motion, Plaintiffs have alleged that "Defendants are affirmatively" depriving Plaintiffs of their right to equal access to literacy.  Mot. at 14.  As detailed below, Defendants, as a matter of State law, control and supervise all public and charter schools throughout the State.  *See* Mich. Const., art VIII § 3; Mich. Comp. Laws §§ 388.1009, 388.1014, 380.501(1), 380.1280c.  And they have grasped and exercised unique control over the schools that Plaintiffs attend, through, *inter alia*, appointment and direction of the emergency manager, governance of schools designated as Priority Schools, and operation of EAA schools.  Through this hands-on control of Plaintiffs' schools,

---

[3] With respect to the three Plaintiffs who attended Experiencia, Defendants argue that they do not allege actual or imminent injury because Experiencia was recently closed.  Mot. at 13–14.  But these Plaintiffs experienced the same injury due to lack of access to literacy prior to the closure of Experiencia, and their lingering injury will be redressed by the relief requested through remedial literacy education. *See* Compl. at Req. for Relief 2(c).

10

Defendants' own actions have determined whether Plaintiffs will be provided with access to literacy—and caused them not to be.

Where, as here, a plaintiff alleges that he is "himself an object of the action (or forgone action) at issue," there is "ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561–62. This is not a case in which Plaintiffs are alleging some harm to a third party for which they seek redress. *See, e.g.*, *United States v. Hays*, 515 U.S. 737, 742–43 (1995) (holding that, in an equal protection claim, a plaintiff cannot assert a "generalized grievance" that the government is discriminating on the basis of race; he must actually have personally been denied equal treatment). Plaintiffs *themselves* have been denied their legally cognizable right to access literacy and equal protection of the laws. *See Wayne v. Shadowen*, 15 F. App'x 271, 283 (6th Cir. 2001) ("[I]f a state elects to furnish free compulsory public education to any of its citizens . . . it must do so in a manner, respecting *all* of its residents, which comports with basic Fourteenth Amendment equal protection and due process strictures."). This harm is not conjectural or speculative; it has actually occurred and will continue to occur unless Defendants are required to change their conduct. *See* Compl. ¶¶ 74–88, 100–90 (explaining how Defendants' acts and omissions operated to deny Plaintiffs their fundamental

11

rights); *id.* ¶¶ 89–99 (describing the actual effects of Defendants' conduct on Plaintiffs).

***Traceability.*** Defendants argue that "Plaintiffs cannot show that their illiteracy is 'fairly traceable' to Defendants' conduct," because "many other factors . . . contribute to illiteracy, such as poverty, parental involvement (or lack thereof), medical problems, intellectual limitations, domestic violence, trauma, and other numerous influences." Mot. at 14. Again, this time in a particularly offensive manner, Defendants misstate Plaintiffs' claim as advancing a right to literacy, rather than *access* to literacy. Plaintiffs' claimed injury—loss of equal access to literacy—is directly traceable to Defendants' conduct in supervising and operating the statewide educational system in general and Plaintiffs' schools in particular. Having ensured that other children in Michigan are furnished with access to literacy, Defendants must ensure that access is likewise furnished to Plaintiffs.

Even if Defendants believe, as their motion suggests, that Plaintiffs are too poor, too sick, or too stupid to attain literacy, that unsupported and stigmatizing view does not obviate Defendants' obligations under the Constitution to provide Plaintiffs with access to literacy. To be sure, factors outside Defendants' control may affect the degree of literacy that an individual student ultimately attains—just as factors outside the control of an elections board affect whether any individual voter will exercise her right to vote. But Defendants are nonetheless obligated to

provide Plaintiffs equal *access* to literacy, just as equal *access* to the voting booth is constitutionally imperative.  Defendants' speculation that other factors, beyond Defendants' failure to provide meaningful literacy education, might further hinder Plaintiffs' ability to read cannot defeat traceability.  *See, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 524 (2007) (traceability established where challenged action had "incremental" effect contributing to ultimate injury); *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997) (defendants' action need not be "the very last step in the chain of causation" for injury to be "fairly traceable").

*Redressability.*  Finally, Defendants argue that the claimed injury is not redressable, because "there is no guarantee that the children will become literate." Mot. at 15.  Plaintiffs, of course, seek no such particular outcome for individual students.  Plaintiffs instead demand that Defendants provide them with adequate resources and instruction such that Plaintiffs have a meaningful opportunity to become literate.  Compl. ¶¶ 164–90.  Indeed, Plaintiffs have specifically alleged that educational resources and instruction successfully foster literacy, and the efficacy of the relief they seek in furnishing access to literacy is far from speculative.  *Id*.  Plaintiffs have standing to present their claims.

### B.    Because Plaintiffs seek prospective relief against state officials, their claims are not barred by the Eleventh Amendment.

Defendants are also incorrect in arguing that they are shielded by the protections of the Eleventh Amendment.  It is axiomatic that "a suit to enjoin as

unconstitutional a state official's action," like this suit against the State Defendants, is "not barred by the Amendment."  *Papasan v. Allain*, 478 U.S. 265, 276 (1986) (citing *Ex parte Young*, 209 U.S. 123, 159–60 (1908)).  As the Supreme Court has made clear since *Ex parte Young*, the Eleventh Amendment does not bar relief designed to compel a state official's compliance with federal law in the future, even when the cost of compliance will be paid using State funds.  *See Hutto v. Finney*, 437 U.S. 678, 690 (1978); *Papasan*, 478 U.S. at 278 ("[R]elief that serves directly to bring an end to a present violation of federal law is not barred by the Eleventh Amendment even though accompanied by a substantial ancillary effect on the state treasury.").

Seeking to evade *Ex parte Young*, Defendants contend that the relief Plaintiffs seek is "an expensive attempt to procure an improper remedy for an alleged past breach."  Mot. at 17 (citing *Edelman v. Jordan*, 415 U.S. 651, 668 (1974)).  This is incorrect.  While Plaintiffs have pointed out the extensive harm caused by Defendants' past wrongful actions to demonstrate the unconstitutionality of those actions, the only remedy Plaintiffs seek is injunctive and declaratory relief compelling Michigan officials' prospective compliance with the Constitution and federal law—precisely the type of relief contemplated by the Supreme Court in *Ex parte Young*.  *See* Compl. at Req. for Relief (seeking "[i]mplementation of evidence-based programs for literacy instruction" to ensure that students are not

14

denied their fundamental rights; "appropriate literacy instruction" for students; and

an establishment of "a system of statewide accountability" to ensure that

Defendants do not continue to violate Plaintiffs' fundamental rights, among

others).  This stands in stark contrast with *Edelman*, the sole case Defendants cite

in support of their argument, Mot. at 17, in which plaintiffs sought payment of

benefits previously denied, 415 U.S. at 668 (reversing an order requiring "payment

of state funds, not as a necessary consequence of compliance in the future with

[federal law], but as a form of compensation to" plaintiffs).  The Eleventh

Amendment does not absolve Defendants from complying with their federal

constitutional obligations.

### C.   An unrelated case in Michigan state court is not an impediment to this Court's jurisdiction.

Defendants also seek to evade responsibility by means of the *Rooker-*

*Feldman* doctrine.  Mot. at 17–18.  Defendants argue that *Moore v. Snyder*, an

unrelated suit by different plaintiffs in Michigan state court mounting a narrow

challenge to a Michigan state law affecting the hiring of uncertified teachers in the

Detroit public school system, somehow prevents this action.[4]  *See* Ex. 8 to Mot. at

24–28.  But *Rooker-Feldman* has no application here—for multiple reasons.

---

[4] The *Moore* complaint alleged that acts P.A. 192 through 197, which took effect on July 1, 2016, violated the Michigan and United States Constitution.  Ex. 8 to Mot. at 24–28.

The *Rooker-Feldman* doctrine occupies "narrow ground." *Skinner v. Switzer*, 562 U.S. 521, 532 (2011). It prohibits "state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). As a matter of law, "*Rooker-Feldman* [is] inapplicable where the party against whom the doctrine is invoked was not a party to the underlying state-court proceeding." *Lance v. Dennis*, 546 U.S. 459, 464–66 (2006).

That is one reason why *Rooker-Feldman* is inapplicable here: There is no overlap between the plaintiffs in *Moore* and Plaintiffs in this case. *Compare* Dkt. 36, Sealed Unredacted Decl. of Kathryn Eidmann at 3–4 *with* Ex. 8 to Mot. at 24–28.[5] Defendants describe *Moore* as a "class action" that "sought to include all children of the Detroit Public Schools (including Plaintiffs named here)." Mot. at 17. But the *Moore* complaint does not identify any putative class, *see* Ex. 8 to Mot. at 25–26 (listing plaintiffs), and in any event, no class was ever certified in *Moore*. *Moore*, therefore, does not, as a matter of law, bind the Plaintiffs in this case. *See* Mich. Ct. R. 3.501(D)(2) ("A judgment entered before certification of a

---

[5] Defendants also state in one sentence that *Moore* has preclusive effect here. Mot. at 19. This argument is waived. *See Aarti Hosp., LLC v. City of Grove City, Ohio*, 350 F. App'x 1, 11 (6th Cir. 2009). To the extent Defendants intend seriously to advance a res judicata argument, it fails because Plaintiffs were not parties to or in privity with the parties in *Moore*. *See, e.g.*, *Washington v. Sinai Hosp. of Greater Detroit*, 733 N.W.2d 755, 759 (Mich. 2007).

class binds only the named parties.").  Because Plaintiffs were not parties to the *Moore* action, they are not "state-court losers," and *Rooker-Feldman* does not apply.  *Lance*, 546 U.S. at 464–66.

*Rooker-Feldman* is also inapplicable because Plaintiffs' Complaint does not assert injury from the result in *Moore*, but rather advances a different claim independent from that presented by the *Moore* plaintiffs.  The *Rooker-Feldman* doctrine works only to prevent a federal court from hearing a claim based on "an injury *caused by* the state-court judgment" itself, *Skinner*, 562 U.S. at 531 (emphasis added)—it does not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court."  *Exxon*, 544 U.S. at 293.  Because Plaintiffs' claims focus on *Defendants*' conduct, not any injurious effect of the decision in *Moore*, *Rooker-Feldman* has no effect.

## II.    The Equal Protection Clause of the U.S. Constitution Prohibits the State from Denying Plaintiffs Access to Literacy

### A.    *Brown*, *Rodriguez*, and *Plyler* forbid excluding a discrete group of children from access to basic minimal skills.

In a consistent line of cases, the Supreme Court has instructed that a state may not deprive a discrete class of children of an education that provides access to literacy.  More than 50 years ago, the Supreme Court recognized that "education is [ ] the most important function of state and local governments," as demonstrated

17

by our "[c]ompulsory school attendance laws and the great expenditures for education." *Brown v. Bd. of Ed.*, 347 U.S. 483, 493 (1954). This is in large part because "of the importance of education to our democratic society"—"[i]t is required in the performance of our most basic public responsibilities" and "is the very foundation of good citizenship." *Id.* Given the importance of "the opportunity of an education," *Brown* held that "[s]uch an opportunity, where the state has undertaken to provide it, *is a right which must be made available to all on equal terms.*" *Id.* (emphasis added); *see also Wayne*, 15 F. App'x at 283.

Twenty years later, in *Rodriguez*, the Court concluded that this essential holding of *Brown* did not support a challenge to Texas's system of school finance. 411 U.S. at 49. The Court stated that "relative differences in spending levels" among Texas's school districts did not amount to "an interference with fundamental rights," and was thus subject to rational basis review—which was satisfied by the state's interest in promoting local control of education. *Id.* at 36–37, 49. In reaching this conclusion, however, the Court emphasized that it had not been presented with a record revealing "absolute denial of educational opportunities to any of [Texas's] children." *Id.* at 37. To the contrary, the Texas funding system provided for adequate teachers, other supportive personnel, student transportation, and free textbooks in every district—facts that the Court said "bear directly upon the demands of the Equal Protection Clause." *Id.* at 44–45. Thus, as

18

the Court made clear, there was no allegation that Texas's funding system deprived any discrete group of children access to literacy:   "[N]o charge fairly could be made that the [Texas funding] system fails to provide each child with an opportunity to acquire the *basic minimal skills* necessary for the enjoyment of the rights of speech and of full participation in the political process."   *Id*. at 37 (emphasis added).

Nine years after *Rodriguez*, the Court confronted a different Texas statute, this time one that did effect a "denial of education to some isolated group of children."   *Plyler*, 457 U.S. at 221.   The challenged policy "den[ied] to undocumented school-age children the free public education that [the state] provide[d] to children who" were citizens or otherwise in the United States lawfully.   *Id.* at 205.   This, the Court held, required a more searching inquiry. While "undocumented status is not irrelevant to any proper legislative goal," the "discriminatory burden" of the state's policy came at a great cost.   *Id.* at 220–21. Public education is not "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation."   *Id.* at 221.   Because "education has a fundamental role in maintaining the fabric of our society, . . . [w]e cannot ignore the significant social costs borne by our Nation when *select groups are denied the means to absorb the values and skills upon which our social order rests*."   *Id.* (emphasis added).

*Plyler* placed great emphasis on literacy, recognizing that Texas's failure to provide undocumented children with access to literacy was antithetical to "one of the goals of the Equal Protection Clause:  the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit."  457 U.S. at 221–22.  "Illiteracy is an enduring disability.  The inability to read and write will handicap the individual deprived of a basic education each and every day of his life."  *Id.* at 222.  The State's withholding of access to literacy would "impose[] a lifetime hardship" on these children, and thereby "foreclose the means by which that group might raise the level of esteem in which it is held by the majority," resigning them to a permanent underclass.  *Id.* at 222–23.  In the Court's words:

> The *stigma of illiteracy* will mark them for the rest of their lives. By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation.

*Id.* at 223 (emphasis added).  This result, the Court held, could not be reconciled "with the framework of equality embodied in the Equal Protection Clause."  *Id.* at 222.  The Court thus held that the legislation could not be upheld "unless it furthers some substantial goal of the State"—which the Court held it did not.  *Id.* at 224.

*See also Johnston by Johnston v. Ann Arbor Pub. Sch.*, 569 F. Supp. 1502, 1505

(E.D. Mich. 1983) (citing *Plyler* for the proposition that "a complete deprivation of a public education from a particular class . . . will be closely scrutinized").

**B.    *Plyler* controls this case.**

Like the Texas system at issue in *Plyler*, the education system that Defendants control excludes Plaintiffs—a group of almost entirely low-income children of color—from the opportunity to attain literacy. The most basic tools of learning necessary to give Plaintiffs' access to literacy are absent in Plaintiffs' schools. Compl. ¶¶ 8, 78–79, 100, 102, 108 (curriculum); *id.* ¶¶ 14, 17, 106–08, 145–46 (teachers); *id.* ¶¶ 6, 7, 10, 11, 79, 113–18, figs. 11–12 (books and instructional materials); *id.* ¶¶ 86–88, 156–63 (school closures); *id.* ¶¶ 15, 139–40, 145 (unaddressed trauma); *id.* ¶¶ 16, 110, 141–43 (lack of English Learner instruction). Moreover, the unsafe conditions of Plaintiffs' schools create further substantial obstacles to the acquisition of literacy. *Id.* ¶¶ 13, 14, 110, 119, 123–27 (extreme temperatures); *id.* ¶¶ 13, 110, 120, 129, fig. 13 (vermin); *id.* ¶¶ 13, 81, 119, 128–34, figs. 14–15 (dangerous building conditions).

State and national achievement data consistently reveal that Detroit students are the least literate in the nation. Proficiency rates in Plaintiffs' schools hover near *zero*. *Id.* ¶¶ 5, 89, 91–95, figs. 3–8. In 2015-16, for example, not a single sixth-grader at Hamilton scored proficient on Michigan's state achievement tests in English. *Id.* at fig. 5. At Experiencia, the sixth-grade English proficiency rate was

only 3.7%.  *Id.*  By comparison, the average sixth-grade English proficiency rate statewide—an average that is pulled down by the results from Plaintiffs' schools—was 45%.  *Id.*  Similarly, for eleventh-graders, the English proficiency rate at Osborn MST was only 1.8%, while statewide the average English proficiency rate was 49.2%.  *Id.* ¶ 7, fig. 6.  As the statewide average numbers show, Defendants have the capacity to ensure that students have access to literacy, and do so in schools across the State.  But in Plaintiffs' schools, essentially the entire student body fails to achieve proficiency—which confirms that these are "schools" in name only.

The students in Plaintiffs' schools do not have the opportunity to achieve literacy.  By denying Plaintiffs access to schools that offer an opportunity to attain literacy, Defendants have effectively consigned Plaintiffs and others at their schools to life in a permanent underclass.  Like the students in *Plyler*, Plaintiffs are subject to the "enduring disability" of "illiteracy," and "[t]he inestimable toll of that deprivation on [their] social[,] economic, intellectual, and psychological well-being" will affect them "each and every day" of their lives.  457 U.S. at 221–22; *see also, e.g.*, Compl. ¶¶ 35, 45–47 (denial of access to literacy forecloses political and civic participation); *id.* ¶¶ 48–51 (economic self-sufficiency and higher education); *id.* ¶ 52 (criminal justice involvement); *id.* ¶ 53 (health outcomes).  Plaintiffs have likewise been "singled out for a lifelong penalty and stigma,"

*Plyler*, 457 U.S. at 238–39 (Powell, J., concurring).  Denial of access to literacy and its attendant consequences mark Plaintiffs "with a badge of shame and indignity that profoundly affects them for the rest of their lives."  Compl. ¶¶ 57, 60.

Instead of grappling with *Plyler*, Defendants argue that "Plaintiffs' claim is not substantially different from the argument raised in *Rodriguez*."  Mot. at 28–29. But that is incorrect, as *Rodriguez* itself makes clear.  Defendants ignore the *Rodriguez* Court's careful distinction between, on the one hand, funding inequality within a system that provides *some* meaningful education to all, and the situation presented here:  a system that denies a discrete minority the "opportunity to acquire the *basic minimal skills* necessary for the enjoyment of the rights of speech and of full participation in the political process."  411 U.S. at 37 (emphasis added).  This distinction drawn by *Rodriguez* points to a real difference.  There is room for reasonable disagreement as to whether a school whose math curriculum stops at trigonometry is fundamentally unequal to one that also teaches calculus, or whether a school that has little technology is fundamentally unequal to one that gives every student a laptop.  But no one can reasonably deny that a school without minimally adequate teachers, books, and materials—a school that does not even offer its students an opportunity to learn basic minimal skills—is fundamentally unequal to the vast majority of schools in which students enjoy access to literacy.

This latter situation, the *Rodriguez* Court made clear, was not encompassed in the case before it, "where only relative differences in spending levels [were] involved." *Id.* By contrast, in *Plyler*, confronted with a claim from children who had been denied the opportunity to obtain basic minimal skills and were thus "mark[ed]" by the "stigma of illiteracy," the Court held that "whatever savings might be achieved by denying these children an education, they are wholly insubstantial in light of the costs involved to these children, the State, and the Nation." 457 U.S. at 223, 230.

The Court reiterated this key distinction in *Papasan v. Allain*, 478 U.S. 265 (1986)—a case that Defendants fail even to acknowledge. *Papasan* explained that *Rodriguez* did not "foreclose the possibility 'that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either [the right to speak or the right to vote],'" and noted that the outcome of *Rodriguez* turned on "the absence of [a] radical denial of educational opportunity." *Id.* at 284 (citing *Rodriguez*, 411 U.S. at 36, 44) (first alteration in original). *Papasan* went on to explain that in *Plyler*, the result was different because of the "costs involved to these children" in denying them an education. *Id.* at 285 (quoting *Plyler*, 457 U.S. at 230). And when the *Papasan* Court considered the claim before it, it took care to note that the plaintiffs did not state a claim under even a heightened level of scrutiny, because they did not "allege that

24

schoolchildren in the Chickasaw Counties are not taught to read or write" or that

"they receive no instruction on even the educational basics." *Id.* at 286. Thus, as

*Papasan* makes clear, Defendants' contention that Plaintiffs' claim "has long been

rejected" based on *Rodriguez,* Mot. at 21, is wrong: *Rodriguez*, *Plyler*, and

*Papasan* all recognize the difference between a claim of "relative difference" in

education spending, on the one hand, and an outright denial of the opportunity to

attain literacy, on the other.[6]

Nor can *Plyler* be distinguished from this case on the ground that it involved

a categorical exclusion from the Texas system of education rather than, as here, a

functional one. Both *Rodriguez* and *Plyler* emphasize the practical effect of

depriving children of the "opportunity to acquire the basic minimal skills necessary

for the enjoyment of the rights of speech and of full participation in the political

process," *Rodriguez*, 411 U.S. at 37—namely, the creation of a permanent

underclass that is deprived of "the means by which that group might raise the level

of esteem in which it is held by the majority," *Plyler*, 457 U.S. at 222. These

statements apply equally to the scenario experienced by Plaintiffs here: the State

has ostensibly opened the doors to the schoolhouse, but nonetheless denied

---

[6] Defendants also mischaracterize Plaintiffs' claim as seeking to "guarantee an educational outcome." Mot. at 21, 24–26. This is not the case. *Rodriguez* contemplated a statewide system of education that failed to deliver "*an opportunity to acquire* . . . basic minimal skills." 411 U.S. at 37 (emphasis added). That is precisely Plaintiffs' claim: due to the abysmal conditions in their schools, they have been denied *an opportunity to acquire* literacy.

Plaintiffs any meaningful opportunity to acquire basic skills.  *See Rodriguez*, 411

U.S. at 37.  Simply put, permitting students to enter a school building, but failing

to educate them once they are inside, is no different from barring their entry.[7]

Nor does *Plyler* turn on the nature of the group that is excluded from access

to basic minimal skills.  While *Plyler* arose in the context of a statute that excluded

undocumented students from Texas public schools, the Court noted that children

without legal immigration status are not a suspect class.  457 U.S. at 223.  The

Court's analysis hinged not on the undocumented status of the affected children,

but rather on the state's "impos[ition] [of] a lifetime hardship on a discrete class of

children not accountable for their disabling status."  *Id.*  As Justice Blackmun

explained, "when the State provides an education to some and denies it to others, it

immediately and inevitably creates class distinctions of a type fundamentally

inconsistent with those purposes . . . of the Equal Protection Clause."  *Id.* at 234

(Blackmun, J., concurring).  In other words, by administering a system of

education that consigns a discrete group of students to buildings where they have

no meaningful opportunity to acquire basic skills such as literacy, the State creates

an invidious classification:  it divides society into those individuals who have the

opportunity to participate and to achieve, and those who do not.  Here, Plaintiffs

---

[7] Indeed, because Michigan law compels children to attend school from age six to sixteen, Mich. Comp. Laws § 380.1561, the students at Plaintiffs' schools are unable to use mandatory school days in other productive ways.

have clearly been denied any opportunity to participate.  As Plaintiffs allege, "Defendants have functionally excluded Plaintiffs from Michigan's statewide system of public education" by "den[ying] [them] access to literacy equal to [that] provided to students in other schools in the State."  Compl. ¶ 208.

Moreover, even if *Plyler* could be read to apply only to children who are already members of a "disfavored group," *id.* at 222, Plaintiffs meet this standard. Plaintiffs' schools serve nearly exclusively low-income children of color.  Compl. ¶¶ 2, 90, figs. 1–2.  This historically marginalized group is surely entitled to no less protection than the undocumented immigrants that were the subject of *Plyler*.  In fact, the Court's repeated recognition that a "basic education" is the foundation for civic participation and exercise of core rights of speech in the political process along with voting applies, if anything, with even greater force and urgency to the disfavored group of young American citizens of color in this case than to the undocumented immigrant children excluded in *Plyler*.  Denial of access to literacy has long and shameful roots in our nation's history as a means for subjugating people of color.  Compl. ¶¶ 35, 58–60; *see also, e.g.*, *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 371–72 (1978) (Brennan, J., concurring in part and dissenting in part) (describing laws that criminalized teaching enslaved African-Americans to read); *South Carolina v. Katzenbach*, 383 U.S. 301, 310–12 (1966) (noting that, because of these prior criminal laws, a huge gap in literacy rates between African-

27

Americans and Caucasians persisted long after the Thirteenth and Fourteenth Amendments were ratified).[8]

For these reasons, the "heightened" level of scrutiny applied in *Plyler*, 457 U.S. at 238, governs this case. In order to pass constitutional muster, therefore, Defendants must identify a "substantial goal" that will outweigh the costs that their exclusionary policy imposes on the "innocent children who are its victims." *Id.* at 223–24. This Defendants cannot do.

### C. Michigan's actions fail any level of scrutiny because there can be no state interest sufficient to deny a discrete group of students access to literacy.

#### 1. Defendants' actions do not satisfy heightened scrutiny.

*Plyler* holds that there can be no legitimate governmental interest served by the stigmatic denial to any disfavored group of access to literacy within a State's public school system. 457 U.S. at 223 ("The stigma of illiteracy will mark them for the rest of their lives."). Rather than attempt to identify a substantial State goal, Defendants simply assert that their "system of school financing" has the same "rational basis" that was asserted in *Rodriguez*: "adequate funding without over-

---

[8] Defendants emphasize that at least some Caucasian, non-Hispanic students attend each of Plaintiffs' schools, and Plaintiffs have not alleged that those students received more favorable treatment. Mot. at 35–36. Defendants miss the point. That Defendants are content to consign the relatively smaller number of Caucasian non-Hispanic children in these schools to the lifelong stigma of illiteracy provides no justification for also denying access to literacy to the overwhelming majority of the students who are in historically marginalized racial groups.

reliance on local funding sources." Mot. at 29–30. But this is entirely non-responsive to the discrimination alleged here: Michigan's failure to provide the curriculum, teachers, and books that comprise the basic tools of learning, Compl. ¶¶ 1, 10–11, 17, 101–04, 113–18, figs. 11–12, and to eliminate the deplorable and unsafe conditions that deny access to literacy in Plaintiffs' schools, *id.* ¶¶ 1, 12–14, 119–37, figs. 14, 15. Whatever benefits Defendants may enjoy from implementing their desired funding scheme cannot justify their failure to provide access to the basic, minimal skill of literacy in Plaintiffs' schools. The State's purported "rational basis" is, in the words of *Plyler*, "wholly insubstantial in light of the costs involved to these children, the State, and the Nation." 457 U.S. at 230.

### 2. Defendants' actions do not satisfy rational basis review.

Even if rational basis review were applied here, Defendants' conduct would not withstand scrutiny. Defendants do not claim to have a direct interest in depriving children attending certain schools within the statewide education system of access to literacy, and for good reason: there is no interest they could conceivably articulate that would justify the conditions present in Plaintiffs' schools. Because other children throughout the State have extensive educational opportunities and achieve proficiency in substantial numbers, the functional exclusion of Plaintiffs from these opportunities—and the relegation of Plaintiffs to a permanent underclass—is unjustifiable. Defendants place "a special disability

upon [Plaintiffs] alone," defying the principle "[c]entral" to equal protection that "government and each of its parts remain open on impartial terms to all who seek its assistance." *Romer v. Evans*, 517 U.S. 620, 631, 633 (1996). "[T]he necessary consequence" of Defendants' actions in depriving Plaintiffs of access to literacy "is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes" the children affected. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2602 (2015). Defendants cite no case—and Plaintiffs are aware of none—in which any court has rejected a constitutional challenge to State action causing any comparable stigma. *See Romer*, 517 U.S. at 633 (stating, in striking down a Colorado law for failure to satisfy rational basis review, that "[t]he absence of precedent . . . is itself instructive").

Rather than claim any direct interest in restricting access to literacy in Plaintiffs' schools, Defendants argue that "similar to [the school funding system] upheld in *Rodriguez*," Michigan's system has a rational basis in the form of "adequate funding without over-reliance on local funding sources." Mot. at 29–30. This argument fails. First, contrary to Defendants' argument, *Rodriguez* does not support finding any rational basis here. *Rodriguez* held that Texas had a legitimate interest in "establish[ing] a means of guaranteeing a minimum statewide educational program without sacrificing . . . local participation." 411 U.S. at 48–

49.  Defendants' failure to provide even basic access to literacy in Plaintiffs' schools plainly does not "guarantee" any minimum educational program.

Second, to the extent Defendants' "funding system" argument is a smokescreen for a desire to save money, that argument equally fails.  As the Supreme Court has recognized, depriving a discrete group of children access to literacy will only *increase* societal costs in the long run.  *Plyler*, 457 U.S. at 230. And in any event, even if the State could save money in this way, that does not provide any rational basis for providing so little to this discrete group of children that they have no access to literacy.  *Id.* at 229 ("[I]t is apparent that a State may 'not . . . reduce expenditures for education by barring [some arbitrarily chosen class of] children from its schools.'" (quoting *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969)) (alterations in original)).  A desire to save money may explain why not every school can achieve the highest levels of proficiency, but it cannot rationally justify providing essentially nothing to a subset of students.

Finally, to the extent Defendants assert any rational basis in the form of promoting "local control," *see Rodriguez*, 411 U.S. at 49–50, no such argument holds on the facts here.  As detailed in Section III, *infra*, the State has run Plaintiffs' schools without any significant local autonomy for most of the past 15 years.  *Id.* ¶¶ 19, 61, 67–70.  Moreover, local control provides a rational basis where it permits "[e]ach locality . . . to tailor local programs to local needs."

*Rodriguez*, 411 U.S. at 450.  Purported "local control" does not justify a decision to leave the basic needs of children in one location entirely unmet.

## III. Denial of Access to Literacy Violates Plaintiffs' Substantive Right to Liberty

In addition to violating equal protection, the exclusion of Plaintiff schoolchildren from access to literacy violates their substantive right to liberty. The Supreme Court has repeatedly stated—contrary to Defendants' motion, Mot. at 22—that "whether a minimally adequate education is a fundamental right" has not been "definitively settled."  *Papasan*, 478 U.S. at 285; *accord Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 466 n.1 (1988) (Marshall, J., dissenting) (noting that the issue "remains open today").  In *Rodriguez*, which Defendants falsely assert "squarely addressed" Plaintiffs' claim, Mot. at 22, the Court left open the question of whether there is a right to "some identifiable quantum of education" sufficient to provide children with the "basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process."  411 U.S. at 36–37.  Under the Court's most recent Fourteenth Amendment decisions, Plaintiffs clearly *do* have a liberty interest in access to literacy.

The Supreme Court addressed whether an asserted right is "part of the liberty guaranteed by the Fourteenth Amendment" in *Obergefell*, where the Court held that the right to marry "is a fundamental right inherent in the liberty of the

person" such that the Due Process and Equal Protection Clauses prohibit depriving same-sex couples of that right.[9]  *Id.* at 2602, 2604.  The Court explained that, when addressing the assertion of a fundamental right, courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect, and that "[h]istory and tradition guide and discipline this inquiry but do not set its outer boundary."  *Id.* at 2598 (*quoting Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting)).  In addition, a principal consideration is whether the State puts "[its] imprimatur . . . on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied."  *Id.* at 2602.  Citing the "interlocking nature" of liberty and equality, the Court explained that stigmatization or exclusion of subordinated groups implicates important liberty interests.  *Id.* at 2604.  In *Obergefell*, the Court stressed that "denial to same-sex couples of the right to marry works a grave and continuing harm," such that "[t]he imposition of this disability on gays and lesbians serves to disrespect and subordinate them."  *Id*. at 2604; *see also id.* at 2602 (noting that "laws excluding same-sex couples from the marriage right impose stigma and injury of the kind prohibited by our basic charter").

---

[9] Defendants assert that Plaintiffs' claim is foreclosed because "the Constitution does not provide Plaintiffs an affirmative right to governmental aid."  Mot. at 27.  But this argument cannot be reconciled with *Obergefell*, in which the Court held that states had an obligation to affirmatively provide marriage licenses and their attendant legal benefits to same-sex couples as part of the liberty guaranteed by the Due Process Clause.  135 S. Ct. at 2602.

Under the framework established by *Obergefell*, Plaintiffs' asserted right of access to literacy is "part of the liberty promised by the Fourteenth Amendment," *Id.* at 2602, and the stigmatic exclusion of children from access to literacy lacks any non-discriminatory justification. The denial of access to literacy in their schools effectively bars Plaintiffs from meaningfully participating in the future in our democratic institutions or exercising their freedom of speech, thus depriving Plaintiffs of the "constellation of benefits" that follows from achieving literacy. *Id.* at 2601; *see also Wisconsin v. Yoder*, 406 U.S. 205, 221 (1972) ("[A]s Thomas Jefferson pointed out early in our history . . . some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence."). Defendants' denial of Plaintiffs' access to literacy likewise renders Plaintiffs "consigned to . . . instability" in both social and economic terms, and "demeans" Plaintiffs by "lock[ing] them out" of valuable social and political institutions, from State academies of higher learning, to the marketplace of ideas, to the very texts that undergird our constitutional democracy. *Obergefell*, 135 S. Ct. at 2601–02.

Indeed, basic literacy is a prerequisite for the activities that form the basis of citizenship in our democracy. For example, literacy is critical to participation in the political process, including "knowledgeable and informed voting," comprehending ballot initiatives, and engaging in political speech and discourse.

Compl. ¶ 45; *see also Citizens United v. FEC*, 558 U.S. 310, 339–40 (2010); *Bd. of Ed. v. Pico*, 457 U.S. 853, 866 (1982) ("[T]he Constitution protects the right to receive information and ideas.").  Literacy skills are also necessary to engage in activities of citizenship, such as enlisting in military service, obtaining government entitlements, and "complying with mandatory government requirements such as filing tax forms or selective service registration."  Compl. ¶ 46.  In addition, lack of literacy, in practice, precludes individuals from constitutionally protected access to the justice system.  *Id.*; *see also, e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 19–20 (1956); *Boddie v. Connecticut*, 401 U.S. 371, 382–83 (1971).  Plaintiffs' exclusion from the democratic process carries with it the State's unmistakable imprimatur of disrespect and subordination.  *See Obergefell*, 135 S. Ct. at 2602.

Michigan law constrains Plaintiffs' liberty in yet another way beyond any constraints that state law placed on the right to marriage, because Michigan requires all children from age six to sixteen to attend school full time (or be home-schooled), under penalty of fines and jail time.  Mich. Comp. Laws §§ 380.1561, 380.1599; *see also* Compl. ¶¶ 1, 56.  For most Michigan children, this State-mandated deprivation of personal liberty is amply justified, because in return for school attendance the State delivers them access to literacy.  *See Yoder*, 406 U.S. at 221 (recognizing the substantial governmental interests in the maintenance of a system of compulsory education).  Plaintiffs' detention in schools, however, lacks

this justification.  By detaining Plaintiffs daily in schools while denying them the opportunity to achieve literacy, Michigan directly and arbitrarily infringes a fundamental liberty interest.

Finally, the recognition of marriage as a fundamental right in *Obergefell* rested in substantial part on the entrenched history and tradition of state-provided marriage contracts.  *See Obergefell*, 135 S. Ct. at 2599–601.  The fundamental role of basic literacy is similarly rooted in our nation's traditions and history.  In 1868, when the Fourteenth Amendment was ratified, 36 out of 37 states "imposed a duty in their constitutions on state government to provide a public-school education." Steven G. Calabresi & Sarah E. Agudo, *Individual Rights under State Constitutions when the Fourteenth Amendment Was Ratified in 1868:  What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 108 (2008) ("A right to a public-school education is thus arguably deeply rooted in American history and tradition and is implicit in the concept of ordered liberty."). Similarly, compulsory education is an essential feature of the American political system, and since 1918, every state has mandated school attendance.  Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 127 (2013).  Consistent with this longstanding tradition, Michigan has made public education available to every child in the state since the earliest days of its entry into the union.  Compl. ¶¶ 63–64.  Literacy is—and always

has been—the foundation of our nation's education system. *See Yoder*, 406 U.S. at

226 n.14 (since the time of Thomas Jefferson, "a basic education in the 'three R's'

would sufficiently meet the interests of the State").

## IV.    Defendants Caused Plaintiffs' Deprivation of Access to Literacy

### A.    State officials—not local officials—control the statewide system of education.

After years of failed policies, disinvestment, and mismanagement,

Defendants now argue they are not responsible for the state of education in

Plaintiffs' schools.  According to Defendants, responsibility lies with "local

officials" and not with Defendants, because they do not operate or run the schools,

and because the Michigan State Constitution does not support a state-law claim

based on their failings.  *See, e.g.*, Mot. at 2, 6, 9–10.  The State's argument fails as

a matter of both fact and law.

The gravamen of Plaintiffs' claim is that they have been denied access to

literacy equal to that provided elsewhere in the statewide system of education, in

violation of the Fourteenth Amendment of the federal Constitution.  Defendants—

not local officials—are responsible for the statewide system of education and that

system's compliance with federal obligations.  In the words of the Sixth Circuit, "it

is well established under the Constitution and laws of Michigan that the public

school system is a State function and that local school districts are instrumentalities

of the State created for administrative convenience."  *Bradley v. Milliken*, 484 F.2d

215, 246 (6th Cir. 1973), *rev'd on other grounds*, 418 U.S. 717 (1974).[10]

"Michigan always has regarded education as the fundamental business of the State as a whole. Local school districts are creatures of the State and act as instrumentalities of the State under State control." *Id.* at 247. From Michigan's founding under the Northwest Ordinance, through each of Michigan's four State constitutions, the State has accepted the obligation to furnish public education. *Id.* at 246–47 (collecting authorities).

Defendants have exercised authority with respect to Plaintiffs' schools that is specifically and expressly conferred on them by state law. The Michigan Constitution provides that "[l]eadership and general supervision over all public education . . . is vested in a state board of education," Mich. Const. Art. VIII § 3, of which Defendants Austin, Fecteau, Ramos-Montigny, Pugh, Straus, Ulbrich, Weiser, and Zeile are members. Compl. ¶ 29. Interpreting that provision, the Michigan Supreme Court reaffirmed that it is "the responsibility of the state board of education to supervise the system of free public schools set up by the legislature and, as a part of that responsibility . . . to determine the curricula and, in general, to exercise leadership and supervision over the public school system." *Welling v. Livonia Bd. of Ed.*, 171 N.W.2d 545, 546 (Mich. 1969); *see also* Mich. Comp.

---

[10] Though it reversed the Sixth Circuit's decision, the Supreme Court in *Milliken v. Bradley* did not question the Sixth Circuit's conclusion that the State was responsible for ensuring that the statewide system of education complies with federal constitutional requirements. *See Milliken,* 418 U.S. at 748–49.

Laws § 388.1009.  Defendant Whiston is the Superintendent of Public Instruction for the State of Michigan.  Compl. ¶ 30.  He is the principal executive officer of the Michigan Department of Education and a non-voting member of the Board of Education, and he is responsible by statute for administering and enforcing state laws related to public education.  Mich. Comp. Laws § 388.1014.

Defendant Behen is the Director of the Michigan Department of Technology, Management and Budget ("DTMB").  Compl. ¶ 31.  He is responsible for appointing the State School Reform/Redesign Officer ("SRO"), Defendant Baker, *id*. ¶ 32, who is in turn responsible for implementing the provisions of Mich. Comp. Laws § 380.1280c.  That statute calls for Defendant Whiston to identify Priority Schools, whose administration are then subject to the control of the SRO and DTMB.  *Id.*; Compl. ¶¶ 31–32.  Defendant Snyder, Governor of the State of Michigan, has ultimate responsibility for and control over administration of all state laws and regulations concerning education.  Compl. ¶ 28.

Federal courts agree that when a state takes on a role such as provider of education, the State and its executive officers cannot immunize themselves from liability under federal law by purporting to delegate responsibilities to local entities.  For instance, the Sixth Circuit held that when Ohio undertook obligations to implement the federal National Voter Registration Act, the Ohio Secretary of State could not be " insulated from any enforcement burdens" under the statute

merely by "delegating NVRA responsibilities to local authorities."  *Harkless v. Brunner*, 545 F.3d 445, 452 (6th Cir. 2008); *accord United States v. Missouri*, 535 F.3d 844, 850 (8th Cir. 2008).  Similarly, both the Fourth and Ninth Circuits held that state officials implementing the federal Food Stamp Act were liable for a local entity's failure to comply with the Act, because ultimate responsibility for operation of the plan remained with the State.  *See Robertson v. Jackson*, 972 F.2d 529, 534 (4th Cir. 1992) ("A state that chooses to operate its program through local . . . agencies cannot thereby diminish the obligation to which the state, as a state, has committed itself, namely, compliance with federal requirements."); *Woods v. United States*, 724 F.2d 1444, 1447–48 (9th Cir. 1984) (same).

Defendants' reference to *L.M. v. State*, 862 N.W.2d 246 (Mich. Ct. App. 2014), does not support their assertion that they are not "ultimately responsible for public education" in Michigan.  Mot. at 9–10.  *L.M.* holds only that there is no "direct cause of action" against the members of the Michigan school board "arising under the Michigan Constitution."  862 N.W.2d at 253.  *L.M.* says nothing about Defendants' liability under 42 U.S.C. § 1983 for failure to satisfy the State's federal constitutional obligations with respect to education.[11]

---

[11] Plaintiffs do not oppose dismissal of the Title VI and State-created danger claims, the Second and Fourth Causes of Action in the Complaint.

40

**B.    Defendants exercised direct control over Plaintiffs' schools.**

Defendants control public and charter schools in Detroit.  The harms

Plaintiffs allege are directly traceable to them.

*State School Reform/Redesign Office.*  In its effort to disclaim

responsibility for Plaintiffs' schools, Defendants ignore altogether the role of the

SRO.  Since 2010, the State has assumed special control over what it calls Priority

Schools—*i.e.*, those schools (DPSCD and charter schools alike) that the

Superintendent of Public Education has determined to be the most poorly

performing five percent of schools in the State.  *See* Compl. ¶ 70.  Pursuant to

Mich. Comp. Laws § 380.1280c, each of these schools is placed "under the

supervision" of the SRO currently led by Defendant Baker.  Thus, by statute, the

SRO supervises each of the Priority Schools—a list that includes all of Plaintiffs'

schools currently open.[12]

Under the statute, Priority Schools, except those operated by emergency

managers, are required to submit a "Redesign Plan"—which provides for

wholesale changes up to school closure—to the SRO, which then approves,

disapproves, or modifies the plan.  Mich. Comp. Laws § 380.1280c(2), (16).  If the

SRO rejects a Priority School's redesign plan or otherwise concludes that the

---

[12] *See* State School Reform/Redesign Office, Historical List of Low Performing
Schools (Sept. 20, 2016), available at
http://www.michigan.gov/documents/sro/SRO_Historical_List_of_Low_Performin
g_Schools_v20160919_534845_7.pdf (last visited Jan. 12, 2017).

school's redesign plan has not achieved satisfactory results, the SRO may place the school into the School Reform/Redesign School District and take over operational control of the school. *See id.* § 380.1280c(6).[13]   Hamilton, a charter school within Detroit and one of Plaintiffs' schools, submitted such a redesign plan to the SRO for review and approval.[14]   There can be no dispute that this process amounts to State control:  the State itself, in a filing signed by the then-Governor, President of the State Board of Education, and Defendant Straus, attested that "[t]he State of Michigan has far-reaching authority to intervene in the lowest-achieving schools . . . that are in improvement or corrective action status . . . . [N]ew legislation [the SRO statute] provides strong authority for the superintendent of public instruction over the lowest performing 5 percent of all public schools."[15]

Governor Snyder's actions further serve to show that he and the SRO have direct responsibility for the education provided in Priority Schools.  From 2010

---

[13] The SRO may also recommend to the Superintendent of Public Instruction that a Chief Executive Officer be appointed to take control of Priority Schools. *See* Mich. Comp. Laws § 380.1280c(7).  The Superintendent of Public Instruction may release a school from the Reform District or CEO supervision. *See id.* § 380.1280c(13).

[14] *See* Redesign Plan, EMAN Hamilton Academy (Jan. 31, 2014), available at http://www.michigan.gov/documents/sro/EMAN_Hamilton_Academy.APPROVED_PLAN.03.27.14_540054_7.pdf (last visited Jan. 12, 2017).

[15] Race to the Top Application Assurances at 16 (Jan. 15, 2010), available at https://www2.ed.gov/programs/racetothetop/phase1-applications/michigan.pdf (last visited Jan. 12, 2017).

through early 2015, the SRO was housed within the Board of Education. During

that time, the SRO approved redesign plans for 212 schools (including Hamilton),

with 54 of these schools operating under a redesign plan for more than 3 years.

*See* Mich. Exec. Order No. 2015-9. [16] However, as explained by Governor Snyder

in a 2015 Executive Order transferring the SRO to the DTMB, the SRO had

undeniably failed in its supervision of the Priority Schools: "despite not achieving

satisfactory outcomes, the current structure has neither implemented the rigorous

supports and processes needed to create positive academic outcomes nor placed

any of the identified low achieving schools in the State School Reform/Redesign

School District[.]" *Id.* at 2; *see also* Compl. ¶ 70. In an acknowledgment that his

own actions, as well as those of the SRO, would directly impact the education

provided in Priority Schools, the Governor took this step in recognition that "many

schools continue to perform at levels that hamper the ability of students to receive

an education that prepares them for career and college readiness and success[.]"

Mich. Exec. Order No. 2015-9 at 2. In fact, transferring the SRO from the

Department of Education (a department over which Governor Snyder has no direct

control) to the DTMB (a State office directly under his control) only served to

enhance the Governor's control over Priority Schools.

---

[16] Available at http://www.michigan.gov/documents/snyder/EO_2015-9_483962_7.pdf (last visited Jan. 12, 2017).

***Emergency Managers.***  Defendants' control over Detroit schools is further demonstrated by the State's long-standing emergency manager system.[17]  Under this system, the State has now appointed five different emergency managers for DPSCD over nearly ten years, all tasked with the responsibility of addressing the emergency conditions within DPSCD—and vested with great authority to do so. Michigan's emergency manager law grants emergency managers "broad powers . . . to rectify the financial emergency and to assure the fiscal accountability of the local government."  Mich. Comp. Laws § 141.1549(2).  For emergency managers over DPSCD, this includes conducting all aspects of the operations of the District and establishing and implementing an academic and educational plan.  *See id.* §§ 141.1549(2), 141.1551(1)(e), 141.1554.  These powers come at the expense of the local school officials who, following the appointment of emergency managers,

---

[17] Michigan's original emergency manager statute, Public Act 101 (P.A. 101), passed in 1988, allowed for the appointment of emergency financial managers over cities, but did not extend to school districts.  Two years later, P.A. 101 was replaced by Public Act 72 (P.A. 72), the Local Government Fiscal Responsibility Act, which, among other changes, extended the statute to school districts.  The third iteration of the emergency manager statute was enacted in 2011 when Michigan passed Public Act 4 (P.A. 4), the Local Government and School District Fiscal Accountability Act.  P.A. 4 changed the title of emergency financial managers to emergency managers and expanded the scope of their powers to cover all the conduct of local government.  P.A. 4 was soon thereafter rejected by Michigan voters in November 2012 and replaced by Public Act 436 (P.A. 436), the Local Financial Stability and Choice Act.  Like P.A. 4, P.A. 436 authorizes the appointment of emergency managers.  *See Phillips*, 836 F.3d at 712.  For present purposes, Plaintiffs use the term "emergency managers" to refer to emergency managers and emergency financial managers, collectively.

are not to "exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manger" and remain subject to any conditions required by the emergency manager. *Id.* § 141.1549(2); *see also* Compl. ¶ 69.

Given the State's power to wrest operative control of DPSCD from local officials—which power the State has in fact been exercising for several years—the State's responsibility for those schools is undeniable. In their Motion, Defendants admit, as they must, that the State has appointed emergency managers and that they "supplant local authority" over DPSCD. Mot. at 6 (emphasis omitted). Defendants argue, however, that emergency managers are actually "local officials," and accuse Plaintiffs of "conflat[ing] appointment of local officials with state control of local schools." *Id.* at 2; *see also id*. at 6–9. But even a cursory review of the underlying legislative acts refutes the State's argument.

To begin, emergency managers derive their authority directly from the Governor: they are appointed by the Governor only after the Governor determines that a financial emergency exists, and "serve at the pleasure of the governor." *See* Mich. Comp. Laws §§ 141.1546(1)(b), 141.1549(d). In addition, the emergency manager's compensation is paid by the State and set forth in a contract approved by the State treasurer. *Id*. § 141.1549(3)(e); *see also id.* § 141.1574 (appropriating money from general fund to the treasurer to pay emergency manager salaries).

And emergency managers, unlike local officials, are subject to statutory provisions

that limit the conduct of State officers.  *Id.* § 141.1549(9)(c).

The contracts entered into between the various emergency managers and the

State similarly demonstrate an emergency manager's accountability to the State.

The 2016 contract (signed by Governor Snyder) appointing Steven Rhodes as

Emergency Manager for DPSCD, requires Mr. Rhodes to "work[] cooperatively

with the Governor and the State Treasurer and keep[] both informed of any major

initiative undertaken under this agreement."  *See* Contract for Emergency Manager

Services (Feb. 29, 2016) § 2(a)(2).[18]  The contract for another Emergency

Manager, Roy Roberts, recited that "[s]tudents being educated within the School

District are entitled to an education that enables them to learn at high levels."  *See*

Contract for Emergency Manager Services (Mar. 7, 2012) at 1.[19]  Like Mr. Rhodes,

Mr. Roberts was required to "work cooperatively with the Office of the Governor,

the State Treasurer, and the Superintendent of Public Instruction as part of an

education reform leadership team."  *Id.* § 1.3.  Mr. Roberts was not permitted to

enter into a collective bargaining agreement without the "approval of the State

---

[18] Available at
https://www.michigan.gov/documents/treasury/Contract_for_EM_Services_-_Rhodes_515929_7.pdf (last visited Jan. 12, 2017).

[19] Available at
http://www.michigan.gov/documents/treasury/Roy_Roberts_Contrac_3-7-12t_378862_7.pdf (last visited Jan. 12, 2017).

Treasurer." *Id*.  And the contract provided that "[t]he attorney general shall defend any claim, demand, or lawsuit brought against the Emergency Manager and any other state official or officer acting under the Act." *Id.* § 7.2.

Defendants erroneously assert that their "characterization" of "emergency managers as appointed *local* officials was affirmed" by the Sixth Circuit in *Phillips v. Snyder*, 836 F.3d 707 (6th Cir. 2016).  Mot. at 6 (emphasis in original).  The Court's holding, however, did not concern whether emergency managers exercise State or local power, but whether it was constitutional for the State to appoint emergency managers in some political subdivisions while others elected their own local officials.  *See Phillips*, 836 F.3d at 715–16.   In fact, the Court elsewhere notes that emergency managers derive their authority from and are accountable to the State.  *See e.g., id.* at 710 (appointed by the state), 711 (state treasurer oversees the activities of emergency managers at governor's choosing), 714 (noting that the emergency manager law "limit[ed] the powers of [plaintiffs'] local officials"), 716 (likening emergency managers to appointed heads of State and federal agencies).  Accordingly, the State's hollow attempt to portray emergency managers as merely local officials is unfounded.

*The Education Achievement Authority.*  Yet another example of the State exercising control over Detroit schools is through the Governor's creation in 2011 of an entirely new statewide school system known as the Education Achievement

System ("EAS")—a plan, as described by the Governor's office, that would "dramatically redesign public education" in Michigan's lowest performing schools. Compl. ¶ 75.[20]  Under Governor Snyder's new school system, the EAS would "restructure" and "operate" the lowest performing 5 percent of schools in Michigan not achieving satisfactory results on a SRO redesign plan or that are under an emergency manager.  *Id.*  The EAS would be governed by the Educational Achievement Authority ("EAA"), an entity that, notably, was established outside of the normal legislative process[21] through an Interlocal Agreement between the then-emergency manager for DPSCD, Roy Roberts, and Eastern Michigan University.  In the fall of 2012, Roberts transferred fifteen Detroit schools into the EAA, including Marion Law Academy, which the Complaint describes as a prime example of the "deplorable state of EAA schools."  Compl. ¶¶ 77–91.  In fact, Michigan state achievement test results reflect that fewer than 5% of Marion Law Academy and other EAA school students are proficient in core subject areas.  *Id.* ¶ 76.  Despite original intentions to expand statewide, the EAA never grew beyond

---

[20] *See also Governor, Detroit Public Schools Emergency Manager jointly unveil dramatic education reform plan to restructure failing Michigan schools*, Press Release (June 20, 2011), available at http://www.michigan.gov/snyder/0,1607,7-277-57577-258186--,00.html (last visited Jan. 12, 2017).

[21] Specifically, Governor Snyder relied on the Michigan Urban Cooperation Act of 1967, a statute that provides government entities an avenue to create a new, separate entity through interlocal agreements.  *See* Mich. Comp. Laws § 124.510.

these original fifteen schools, and, only a few years removed from its creation, is in the process of being disbanded.  *Id.*

* * * * *

As both the allegations in the Complaint and State law make clear, the State Defendants not only have the responsibility under Michigan law to ensure that the statewide system of education complies with constitutional requirements, but have also exercised day-to-day control in Plaintiffs' schools.  The failure to provide equal access to literacy in the schools that Plaintiffs attend is therefore directly traceable to the actions of the State Defendants.[22]

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiffs respectfully request that Defendants' motion to dismiss be denied.

Dated: January 12, 2017

Respectfully submitted,

*/s/ Michael C. Kelley*
Michael C. Kelley (90062)
Mark E. Haddad (205945)
SIDLEY AUSTIN LLP
555 West Fifth Street, Suite 4000
Los Angeles, CA 90013
mkelley@sidley.com
mhaddad@sidley.com

---

[22] As of January 11, 2017, a newly elected Board of Education for DPSCD was sworn in.  Compl. ¶ 69.  To the extent the Court concludes that local school officials are necessary defendants in this lawsuit, Plaintiffs request an opportunity to amend the Complaint to name those officials.

*/s/ Carter G. Phillips*
Carter G. Phillips (2198894)
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
cphillips@sidley.com

*/s/ Tacy F. Flint*
Tacy F. Flint (6284806)
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
tflint@sidley.com

*/s/ Mark D. Rosenbaum*
Mark D. Rosenbaum (59940)
Kathryn A. Eidmann (268053)
PUBLIC COUNSEL
610 South Ardmore Avenue
Los Angeles, CA 90005
mrosenbaum@publiccounsel.org
keidmann@publiccounsel.org

*/s/ Bruce A. Miller*
Bruce A. Miller (P417746)
600 West Lafayette Blvd., 4th Floor
Detroit, MI 49226
brucemiller@millercohen.com

*/s/ Evan H. Caminker*
Evan H. Caminker (P65672)
University of Michigan Law School
625 South State Street
3250 South Hall
Ann Arbor, MI 48109
caminker@umich.edu

*Attorneys for Plaintiffs*

50

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 12, 2017, I electronically filed the foregoing

paper with the Clerk of the Court using the ECF system, which will send notice of

such filing to the following counsel of record for Defendants:

Katherine J. Bennett
Michigan Department of Attorney
General
525 W. Ottawa St.
P.O. Box 30758
Lansing, MI 48933
517-373-7700
Fax: 517-335-1152
BennettK1@michigan.gov

Timothy J. Haynes
Michigan Department of Attorney
General
525 Ottawa Street
P.O. Box 30758
Lansing, MI 48933
517-373-7700
Fax: 517-335-1152
haynest3@michigan.gov

Joshua S. Smith
MI Department of Attorney General
Health Education and Family Services
P.O. Box 30758
Lansing, MI 48909
517-335-1238
smithj46@michigan.gov

*/s/ Tacy F. Flint*
Tacy F. Flint