# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | | |
|---|---|---|
| GARY B.; JESSIE K., a minor by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated, | § § § § § § § § | **CLASS ACTION**<br><br>No. 16-CV-13292<br><br>Hon. Stephen J. Murphy III<br>Mag. Anthony P. Patti |
| *Plaintiffs*, | § § § | |
| v. | § § | **BRIEF OF THE CITY OF** |
| RICHARD D. SNYDER, in his Official Capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH, KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHITSON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and NATASHA BAKER, in her official capacity as the State School Reform/Redesign Officer, | § § § § § § § § § § § § § § § § § § § § | **DETROIT AS** *AMICUS CURIAE* **IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| *Defendants*. | § § § | |

Melvin Hollowell, Jr. (P37834)
Eli Savit (P76528)
(Counsel of Record)
2 Woodward Avenue
Detroit, MI 48226
(313) 237-1737
hollowellm@detroitmi.gov
savite@detroitmi.gov

Anton Metlitsky
O'MELVENY & MYERS LLP
Times Square Tower, 7 Times Square
New York, NY 10036
(212) 326-2000
ametlitsky@omm.com

Bradley N. Garcia
James W. Crooks†
Samantha M. Goldstein
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, DC 20006
(202) 383-5300
bgarcia@omm.com
jcrooks@omm.com
sgoldstein2@omm.com

*Attorneys for* Amicus Curiae *The City of Detroit*

† *Admitted only in California; supervised by principals of the firm.*

# TABLE OF CONTENTS

**Page**

ARGUMENT ...................................................................................2

I.      ACCESS TO LITERACY IS A FUNDAMENTAL RIGHT........................3

      a.      The Supreme Court repeatedly has recognized the paramount importance of a basic education, including access to literacy. ............4

      b.      The right to access literacy is deeply rooted in our nation's history and tradition. .........................................................................10

      c.      Modern developments confirm that access to literacy is fundamental. .......................................................................................12

II.     PLAINTIFFS HAVE ADEQUATELY ALLEGED DENIAL OF ACCESS TO LITERACY ...........................................................................14

      a.      Plaintiffs have plausibly alleged the exact facts the Supreme Court has suggested would support a "minimal education" claim. ..................................................................................................14

      b.      The City's experience with illiteracy only bolsters the conclusion that the right to access to literacy is "fundamental." .......16

CONCLUSION .................................................................................20

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abington Sch. Dist. v. Schempp*,
  374 U.S. 203 (1963)............................................................................4

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)...........................................................................16

*Bd. of Educ. v. Allen*,
  392 U.S. 236 (1968)............................................................................5

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................15

*Brown v. Board of Education*
  347 U.S. 483 (1954)...................................................................5, 12, 13

*Griswold v. Connecticut*,
  381 U.S. 479 (1965)............................................................................7

*Grutter v. Bollinger*,
  539 U.S. 306 (2003)............................................................................5

*Harper v. Va. Bd. of Elections*,
  383 U.S. 663 (1966)............................................................................7

*McDonald v. City of Chicago*,
  561 U.S. 742 (2010)...........................................................................12

*Meyer v. Nebraska*,
  262 U.S. 390 (1923).........................................................................5, 10

*Nat'l Endowment for the Arts v. Finley*,
  524 U.S. 569 (1998)............................................................................8

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015)..................................................................*passim*

*Papasan v. Allain*,
  478 U.S. 265 (1986)....................................................................9, 14, 15

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Plyler v. Doe*,
   457 U.S. 202 (1982)......................................................................*passim*

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973)............................................................7, 8, 9, 15

*Skinner v. State of Okla. ex rel. Williamson*,
   316 U.S. 535 (1942)...........................................................................5

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)......................................................................3, 10

*Wisconsin v. Yoder*,
   406 U.S. 205 (1972)......................................................................4, 5

**Other Authorities**

Ann Zaniewski, *Free Tuition for Detroiters to Add 4-year
   Universities*, Detroit Free Press (Nov. 28, 2016) ..................................2

Barry C. Burden, *The Dynamic Effects of Education on Voter
   Turnout*, 28 Electoral Studies 540 (2009)............................................7

Barry Friedman & Sara Solow, *The Federal Right to An Adequate
   Education*, 81 Geo. Wash. L. Rev. 92 (2013) ....................................14

*Big Cities Battle Dismal Graduation Rates*, CBS News (Apr. 1, 2008),
   https://goo.gl/vmXjPz ......................................................................18

Bryony Hoskins, *et al.*, *Does Formal Education Have an Impact on
   Active Citizenship Behavior?*, 7 Euro. Ed. Res. J. 386 (2008) ............8

Candice Williams & James Dickson, *Crime Stats: Detroit marks 302
   homicides in 2016*, Detroit News (Jan. 4, 2017),
   https://goo.gl/2v7MSM/.....................................................................19

City of Detroit, *Detroit Demolition Program*, https://goo.gl/QFt17V ....................2

*City Launches New Initiative to Ensure More Detroiters Have Access
   to Skilled Trades Apprenticeships and Careers* (Dec. 16, 2016),
   https://goo.gl/f5cvjq.............................................................................2

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Derek Black, *Unlocking the Power of State Constitutions With Equal Protection: The First Step Toward Education as a Federally Protected Right*, 51 Wm. & Mary L. Rev. 1343 (2010).................................13, 14

Detroit Regional Workforce Fund, *Addressing Detroit's Basic Skills Crisis* 2 (May 2011), https://goo.gl/x9qeny.........................................16

1 *Diary and Autobiography of John Adams, 1755-1770*, at 220 (L.H. Butterfield ed. 1961) (Aug. 1, 1761 entry), https://goo.gl/X5EXJv.............11, 12

Donald P. Green & Rachel Sondheimer, *Using Experiments to Estimate the Effects of Education on Voter Turnout*, 54 Am. J. Pol. Sci. 174 (2010).......................................................................................7

Goodwin Liu, *Education, Equality, and National Citizenship*, 116 Yale L.J. 330 (2006) ............................................................13

Grover J. Whitehurst & Christopher J. Lonigan, *Child Development and Emergent Literacy*, 69 Child Development 848 (1998) ..............19

J.P. Morgan Chase, *Detroit's Untapped Talent: Jobs and On-Ramps Needed* 2, 6, https://goo.gl/ySZGQR....................................................18

Kavitha Cardoza, *Adding Up the Cost of Low Literacy Among Adults*, NPR (Nov. 4, 2013), https://goo.gl/6EfO4V ....................................13

Kevin Milligan, *et al.*, *Does Education Improve Citizenship? Evidence from the U.S. and the U.K.*, 88 J. Pub. Econ. 1667 (2004)..................7

Mich. Comm'n on L. Enforcement Stds., *Information on Law Enforcement Reading and Writing Test*, https://goo.gl/4u2k7s (last visited Jan. 19, 2017) ............................................................19

Michael Winerip, *Are Schools Passing or Failing? Now There's a Third Choice . . . Both*, N.Y. Times (Nov. 2, 2005), https://goo.gl/QioBXi ............................................................17

Nat'l Ctr. for Educ. Statistics, *2015 Mathematics Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results* (2016), https://goo.gl/DvVUPS .......................................................17

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Nat'l Ctr. for Educ. Statistics, *2015 Reading Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results* (2016), https://goo.gl/YBNvOq ........................................................................17

Nat'l Ctr. for Educ. Statistics, *Literacy in the Labor Force: Results from the National Adult Literacy Survey*, xv (1999) .........................................13

Nat'l Inst. for Literacy, *The State of Literacy in America*: *Estimates at the Local, State, and National Levels* 141 (1998) (commissioned by U.S. Dep't of Educ.), https://goo.gl/BlhLE4 ..........................................16, 17

Paul W. Kingston, *et al.*, *Why Education Matters*, 76 Sociology of Ed. 53 (2003) ...................................................................................................8

Raymond Wolfinger & Steven Rosenstone, *Who Votes?* (Yale Univ. Press 1980) ...............................................................................................7

Ryan Beene, *Detroit's Public Schools Post Worst Scores on Record in National Assessment*, Crain's (Dec. 8, 2009), https://goo.gl/Zcrx1a ................17

Shawn Lewis, *Detroit Worst in Math, Reading Scores Among Big Cities*, Detroit News (Oct. 28, 2015), https://goo.gl/Zpncso.............................17

Sidney Verba, *et al.*, *Race, Ethnicity and Political Resources: Participation in the United States*, 23 Brit. J. Pol. Sci. 453 (1993) ....................7

The Skillman Foundation, *State of the Detroit Child: 2012 Report* 13 (2012), https://goo.gl/PjLLlx ..............................................................................20

Steven Calabresi & Michael Perl, *Originalism and* Brown v. Board of Education, 2014 Mich. St. L. Rev. 429 ..................................................10, 11, 12

Steven Calabresi & Sarah Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7 (2008) .........................................................11, 12

Susan H. Bitensky, *Theoretical Foundations for a Right to Education Under the U.S. Constitution: A Beginning to the End of the National Education Crisis*, 86 Nw. U.L. Rev. 550 (1992)..................................11

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

Thomas S. Dee, *Are There Civic Returns to Education?*, 88 J. of Pub.
Econ. 1697 (2004).....................................................................................8

U.S. Census Bureau, *QuickFacts: Detroit City, Michigan*,
https://goo.gl/4s1L2T (last visited Jan. 13, 2017) ............................................19

William C. Wood, *Literacy and the Entry-Level Workforce: The Role
of Literacy and Policy in Labor Market Success* 3 (June 2010),
https://goo.gl/bVLrG1...........................................................................19

## INTEREST OF AMICUS CURIAE

When a child is denied a fair opportunity to learn how to read and write, the adverse effects radiate throughout the community.  "Illiteracy," after all, "is an *enduring* disability": a child "deprived of a basic education" will be "handicap[ped]" by the "inability to read and write . . . each and every day of his life."  *Plyler v. Doe*, 457 U.S. 202, 222 (1982) (emphasis added).  Denying children access to literacy today inevitably impedes tomorrow's jobseekers and taxpayers; fathers and mothers; citizens and voters.  That is why the Supreme Court has stressed the "significant social costs borne by our Nation" when children suffer the "stigma of illiteracy"—and are thereby denied "the basic tools by which [to] lead economically productive lives to the benefit of us all."  *Id.* at 221-23.

The City of Detroit (though it does not control Detroit's schools) is all too familiar with illiteracy's far-reaching effects.  Widespread illiteracy has hampered the City's efforts to connect Detroiters with good-paying jobs; to fill vacancies on its police force; and to grow its tax base.  Illiteracy, moreover, has greatly exacerbated the effects of intergenerational poverty in Detroit.

The City is charged with "insur[ing] equality of opportunity for all persons," and with providing "for the public peace, health, and safety of persons and properties within its jurisdictional limits."  Declaration of Rights, Detroit City Charter (2012).  The City takes those mandates seriously.  And over the past

1

several years, it has made significant strides in fulfilling them. Businesses are

returning to Detroit's downtown. The City's long darkened streets have been relit

by over 65,000 new LED lights. More than 10,000 blighted homes have been

demolished since 2014.[1] Every Detroit student meeting minimum academic

standards is now entitled to a scholarship to a four-year college or university.[2] The

City, moreover, has recently launched major efforts to connect Detroiters with the

skills training needed for successful careers.[3]

Ultimately, however, Detroit's renaissance will lag if its children are not

afforded a fair opportunity to learn how to read and write. Perhaps more than any

other municipal entity, the City of Detroit understands how fundamental literacy is

to a stable, vibrant community. The City thus files this brief in support of the

Detroiters who are plaintiffs to this suit—specifically, their contention that literacy

is a fundamental right that the United States Constitution protects.

### ARGUMENT

The ability to read and write is the foundation for meaningful participation

in America's democracy, and in the American economy. The Supreme Court has

---

[1] City of Detroit, *Detroit Demolition Program*, https://goo.gl/QFt17V.

[2] Ann Zaniewski, *Free Tuition for Detroiters to Add 4-year Universities*, Detroit Free Press (Nov. 28, 2016), https://goo.gl/FnN2Lb.

[3] *E.g.*, *City Launches New Initiative to Ensure More Detroiters Have Access to Skilled Trades Apprenticeships and Careers* (Dec. 16, 2016), https://goo.gl/f5cvjq.

repeatedly recognized as much—emphasizing, in multiple cases, that selectively denying children access to literacy is presumptively unconstitutional. The import of those cases is plain: Access to literacy is a fundamental right. Longstanding constitutional tradition and modern realities confirm that the right is fundamental. And the City of Detroit's experience underscores that literacy is fundamental not just to an *individual*, but also to the community to which he or she belongs.

The City urges this Court to hold that the right of access to literacy is fundamental, and that Plaintiffs have alleged sufficient facts to show that they are being denied that right here.

## I.   ACCESS TO LITERACY IS A FUNDAMENTAL RIGHT

At bottom, the question before this Court is whether access to literacy is a fundamental right, such that its selective denial is presumptively unconstitutional. *See Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (courts must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect"). Access to literacy is indeed fundamental, for at least three reasons. *First* is precedent: the U.S. Supreme Court has expressly recognized that the opportunity to obtain a minimally adequate education—including the ability to read and write—has heightened constitutional significance. *See, e.g.*, *Plyler*, 457 U.S. at 221. *Second*, access to literacy is a right that is "objectively, 'deeply rooted in this Nation's history and tradition,'" *Washington v.*

*Glucksberg*, 521 U.S. 702, 720-21 (1997), and therefore must be accorded heightened protection under both the Equal Protection and Due Process Clauses of the Fourteenth Amendment, *see also Obergefell*, 135 S. Ct. at 2603 ("Clauses may converge in the identification and definition of the right"). *Third*, courts presented with a claim sounding in fundamental rights must not blind themselves to "new insights and societal understandings." *Id*. Although literacy has long been recognized as a vital competency, the importance of reading and writing has only grown in the modern era. Under any constitutional analysis, access to literacy is a fundamental right.

### a.   The Supreme Court repeatedly has recognized the paramount importance of a basic education, including access to literacy.

Over and over and over again, the Supreme Court has emphasized the critical importance of education. Education, the Court has stressed, is "'a most vital civic institution for the preservation of a democratic system of government.'" *Plyler*, 457 U.S. at 221 (quoting *Abington Sch. Dist. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring)). It is "a bulwark of a free people against tyranny." *Wisconsin v. Yoder*, 406 U.S. 205, 225 (1972). And a *minimally adequate* education is a prerequisite to effective participation in American life. "[S]ome degree of education," the Court has cautioned, "is necessary . . . to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." *Plyler*, 457 U.S. at 221 (quotation omitted).

4

As the Court explained in *Brown v. Board of Education*:

> [E]ducation is perhaps the most important function of state and local governments . . . .  It is required in the performance of our most basic public responsibilities, even service in the armed forces.  It is the very foundation of good citizenship.  Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment.  In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.[4]

Given the paramount importance of education, the Supreme Court has held that access to a basic education must be afforded heightened constitutional protection.  In *Plyler v. Doe*, the Court struck down a law allowing local districts to bar undocumented immigrant children from attending public school.   Along the way, the Court expressly rejected the argument that education is "merely some governmental 'benefit' indistinguishable from other forms of social welfare legislation."  457 U.S. at 221.  Instead, the Court held, state action denying some children the opportunity to acquire a "basic education"—like state action denying people other fundamental rights—is presumptively invalid.  *Id.* at 222.[5]

Crucially for purposes of this case, *Plyler* also makes clear that the

---

[4] 347 U.S. 483, 493 (1954); *see also Grutter v. Bollinger*, 539 U.S. 306, 331 (2003); *Bd. of Educ. v. Allen*, 392 U.S. 236, 247 (1968); *Yoder*, 406 U.S. at 221; *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).

[5] *E.g.*, *Skinner v. State of Okla. ex rel. Williamson*, 316 U.S. 535, 541 (1942) (law selectively denying "fundamental" right to procreate presumed unconstitutional).

constitutionally protected opportunity to obtain a "basic education" necessarily includes the opportunity to learn how to read and write. To be sure, the *Plyler* Court had no occasion to flesh out the precise contours of what qualifies as a "basic education." After all, the children in *Plyler* were barred from school *entirely*, so it was beyond question they were denied access to a "basic education." But *Plyler* reasoned that access to a "basic education" is fundamental largely *because* it affords children the opportunity to learn how to read and write. In striking down the Texas statute, the Court warned that children who are denied a "basic education" will be marked "for the rest of their lives" by the "stigma of *illiteracy*." *Id.* at 222-23 (emphasis added). "The inability to read and write," the Court stressed, "will handicap the individual deprived of a basic education each and every day of his life." *Id.* at 222. It was principally because "[i]lliteracy is an enduring disability" that the *Plyler* Court concluded the "denial of basic education" is "most difficult to reconcile . . . with the framework of equality embodied in the Equal Protection Clause." *Id.*

The *Plyler* Court saw literacy as crucial, in part, because reading and writing is the gateway to civic participation. Those who are deprived of access to literacy, the Court explained, are denied "the ability to live within the structure of our civic institutions," and foreclosed from "any realistic possibility that they will contribute in even the smallest way to the progress of our Nation." *Id.* at 223. Access to

literacy, therefore, is more than just an end to itself.  Rather, like other fundamental rights, the Constitution protects it because it is "preservative of other basic civil and political rights." *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 667 (1966).[6]

Literacy, for example, helps to safeguard the right to vote.  As the Court has recognized, "a voter cannot cast his ballot intelligently unless his reading skills and thought processes have been adequately developed." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 36 (1973).  Consistent with that observation, studies consistently show that higher levels of education result in higher voter turnout.[7]

Literacy is also a virtual prerequisite to effective participation in other civic endeavors.  *See, e.g.*, *Plyler*, 457 U.S. at 221 ("[S]ome degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system." (quotation omitted)).  After all, an individual who cannot read or write will be unable to make sense of a newspaper article concerning issues of the

---

[6] *Cf. Griswold v. Connecticut*, 381 U.S. 479, 482-83 (1965) ("The right of freedom of speech and press includes . . . the right to distribute, the right to receive, the right to read and freedom of inquiry, freedom of thought, and freedom to teach . . . .  Without those peripheral rights the specific rights would be less secure.").

[7] *See, e.g.*, Raymond Wolfinger & Steven Rosenstone, *Who Votes?* (Yale Univ. Press 1980); Donald P. Green & Rachel Sondheimer, *Using Experiments to Estimate the Effects of Education on Voter Turnout*, 54 Am. J. Pol. Sci. 174, 174 (2010); Barry C. Burden, *The Dynamic Effects of Education on Voter Turnout*, 28 Electoral Studies 540, 540-49 (2009); Kevin Milligan, *et al.*, *Does Education Improve Citizenship? Evidence from the U.S. and the U.K.*, 88 J. Pub. Econ. 1667, 1667-95 (2004); Sidney Verba, *et al.*, *Race, Ethnicity and Political Resources: Participation in the United States*, 23 Brit. J. Pol. Sci. 453, 453-97 (1993).

day.  She will be unable to effectively research a political candidate's positions on topics of local or national importance.  She will be unable to express or develop her views in online fora.  All of these handicaps will severely hamper her ability to effectively engage in political speech, "the primary concern of the First Amendment."  *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 597 (1998).[8]

The opportunity to learn how to read and write, in short, plays "a fundamental role in maintaining the fabric of our society."  *Plyler*, 457 U.S. at 221.  It is a "keystone" of America's social and political order, and thus must be protected as a fundamental right.  *Obergefell*, 135 S. Ct. at 2601.

To be sure, the Supreme Court in *San Antonio v. Rodriguez* held that "education," broadly defined, is not a fundamental right, such that the Constitution does not require "absolute equality" of educational funding or educational outcomes.  411 U.S. at 24.  But *Rodriguez* does not bar Plaintiffs' claims.  Nearly a decade after *Rodriguez*, *Plyler* held that there is a distinction between (1) the question "whether education is a fundamental right" and (2) the constitutional

---

[8] Again, studies have repeatedly confirmed that education is inextricably tied to forms of active citizenship, including membership in a political party and participation in protest movements.  *See, e.g.*, Bryony Hoskins, *et al.*, *Does Formal Education Have an Impact on Active Citizenship Behavior?*, 7 Euro. Ed. Res. J. 386, 386-402 (2008); Thomas S. Dee, *Are There Civic Returns to Education?*, 88 J. of Pub. Econ. 1697, 1697-1720 (2004); Paul W. Kingston, *et al.*, *Why Education Matters*, 76 Sociology of Ed. 53, 53-70 (2003).

significance of "a basic education"—and held that state action selectively denying the latter is presumptively invalid. *Plyler*, 457 U.S. at 223-24. The import of its holding in *Rodriguez*, the Court recognized, was simply that "a State need not justify by compelling necessity *every* variation in the manner in which education is provided in its population." *Id.* at 223 (emphasis added). But nothing in *Rodriguez* suggests that selectively denying some students a "basic education" is a permissible "variation in the manner in which education is provided," or that the opportunity to obtain a "basic education" is anything less than a fundamental right.

Indeed, *Rodriguez* itself expressly reserved the question whether a state could constitutionally deny students the minimal "quantum of education" necessary to the "meaningful exercise" of their First Amendment freedoms and right to vote. 411 U.S. at 36-37. The *Rodriguez* Court went out of its way to note that "no charge fairly could be made" that the State *in that case* "fail[ed] to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id.* at 37. And the Court emphasized that the *Rodriguez* plaintiffs' case would have been "far more compelling" if they were "absolutely precluded from receiving an education." *Id.* at 25 n.60; *see Papasan v. Allain*, 478 U.S. 265, 284 (1986) (confirming *Rodriguez* left open the possibility of a claim based on the "radical denial of educational opportunity"); *see also* Plaintiffs' Opposition (Opp'n) 24-25.

That is precisely Plaintiffs' claim here.  And their claim, lamentably, is amply supported by the allegations in Plaintiffs' complaint.  *See infra* Section II.

In short, the Supreme Court's numerous pronouncements on the constitutional significance of basic education, standing alone, demonstrate that access to literacy is fundamental.

### b.    The right to access literacy is deeply rooted in our nation's history and tradition.

Even setting aside Supreme Court precedent, access to literacy is a right that is "deeply rooted in this Nation's history and tradition," *Glucksberg*, 521 U.S. at 720-21, and must therefore be accorded heightened protection under the Fourteenth Amendment.  "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted."  *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923).  At the dawn of the Republic, at least five states recognized "a state's obligation to provide a free and common public school education."  Steven Calabresi & Michael Perl, *Originalism and* Brown v. Board of Education, 2014 Mich. St. L. Rev. 429, 558. Crucially, that early emphasis on public education stemmed from the Founders' belief that literacy is the lifeblood of liberty.  According to John Adams—the principal architect of the Massachusetts Constitution and its guarantee of public schooling—literacy and democracy are inextricably intertwined:

The very Ground of our Liberties, is the freedom of Elections . . . .

10

[And] how can any Man judge, unless his Mind has been opened and enlarged by Reading. A Man who can read . . . will enlarge his Range of Thought, and enable him the better to judge who has and who has not that Integrity of Heart, and that Compass of Knowledge and Understanding, which form the Statesman.[9]

As the nation grew, more and more states embraced the right to a basic public education. *See id.* at 450-57. By the time the Fourteenth Amendment was ratified in 1868, *thirty-six of the thirty-seven state constitutions included a right to education*, with a staggering "[n]inety-two percent of all Americans in 1868 liv[ing] in states whose constitutions imposed this duty on state government."[10] The historical evidence thus demonstrates that, when the Fourteenth Amendment was ratified, "a public school education was a fundamental, or civil, right." *Id.* at 437. Indeed, so fundamental was the right to a public education that "[a]fter the Civil War, Congress . . . conditioned re-entry of the Confederate states into the Union upon their willingness to guarantee public education to all of the children within their respective borders."[11]

And even in 1868, the right to a public education encompassed more than

---

[9] 1 *Diary and Autobiography of John Adams, 1755-1770*, at 220 (L.H. Butterfield ed. 1961) (Aug. 1, 1761 entry), https://goo.gl/X5EXJv.

[10] Steven Calabresi & Sarah Agudo, *Individual Rights Under State Constitutions When the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 108-09 (2008).

[11] Susan H. Bitensky, *Theoretical Foundations for a Right to Education Under the U.S. Constitution: A Beginning to the End of the National Education Crisis*, 86 Nw. U.L. Rev. 550, 588 (1992) (citations omitted).

the privilege of being shuffled into a building marked "schoolhouse." *Id.* "At a minimum," the concept of a basic education in 1868 included an opportunity to access literacy, because "many of the Framers would have thought [it] fundamental" that children "be taught to read so they can read the laws for themselves." *Id.*; *see also Adams*, *supra* n.9, at 220. The near-ubiquitous presence of education clauses in state constitutions in 1868—coupled with historical evidence that those clauses imposed a duty to teach children how to read and write—demonstrates that access to literacy is a right deeply rooted in our nation's history and tradition. *See McDonald v. City of Chicago*, 561 U.S. 742, 777 (2010) (that twenty-two of thirty-seven state constitutions protected the right to keep and bear arms in 1868 was significant evidence that the right is "among the foundational rights necessary to our system of government" that the Fourteenth Amendment protects (citing Calabresi & Agudo, *supra* n.10, at 50)).

### c. Modern developments confirm that access to literacy is fundamental.

In deciding whether Plaintiffs have a fundamental right to access to literacy, this Court also "must consider public education in the light of its full development and its present place in American life throughout the Nation." *Brown*, 347 U.S. at 492-93. As the Supreme Court recently explained, "new insights and societal understandings" are crucial to understanding what the Fourteenth Amendment protects. *Obergefell*, 135 S. Ct. at 2603. Those insights and understandings

confirm that the right of access to literacy is fundamental.

The importance of literacy is clearer now than ever before.  Unlike the "agrarian and emerging industrial society" of the past, today's "technological and information-based economy requires a much higher level of education."  Goodwin Liu, *Education, Equality, and National Citizenship*, 116 Yale L.J. 330, 396-97 (2006).  Today, people with low literacy levels are "four to seven times" more likely than those with high literacy levels to be unemployed—and illiteracy severely depresses the earnings of those who *can* land jobs.[12]  "[P]eople with low literacy," studies have concluded "are more likely to need unemployment checks, food stamps and subsidized housing.  And they are more likely to end up behind bars."[13]  The Supreme Court's sixty-year-old admonition in *Brown* thus rings truer than ever: "In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."  347 U.S. at 493.

Recognizing these modern realities, all fifty states now have constitutional clauses that guarantee the right to education.  Derek Black, *Unlocking the Power of State Constitutions With Equal Protection: The First Step Toward Education as a Federally Protected Right*, 51 Wm. & Mary L. Rev. 1343, 1398 (2010).  These

---

[12] Nat'l Ctr. for Educ. Statistics, *Literacy in the Labor Force: Results from the National Adult Literacy Survey*, xv (1999).

[13] Kavitha Cardoza, *Adding Up the Cost of Low Literacy Among Adults*, NPR (Nov. 4, 2013), https://goo.gl/6EfO4V.

clauses, by and large, have teeth.  "[S]ome thirty-one state courts, most of them high courts, have held that the state constitutional provision has substantive content: it guarantees a right to a minimally adequate education."  Barry Friedman & Sara Solow, *The Federal Right to An Adequate Education*, 81 Geo. Wash. L. Rev. 92, 129 (2013).  In other states, "extensive statutory schemes have further defined, specified, and regulated this right," demanding that "states . . . deliver a certain qualitative level of education therein."  *Unlocking the Power*, 51 Wm. & Mary L. Rev. at 1398.  "States," in other words, "have contributed to the fundamental character of the [basic education] right by placing [it] at the center of so many facets of the legal and social order."  *Obergefell*, 135 S. Ct. at 2601.  And these modern developments only reinforce what has long been true: access to a "basic education" is fundamental, *Plyler*, 457 U.S. at 221, and a basic education ineluctably includes the opportunity to learn how to read and write.

## II.   PLAINTIFFS HAVE ADEQUATELY ALLEGED DENIAL OF ACCESS TO LITERACY

### a.   Plaintiffs have plausibly alleged the exact facts the Supreme Court has suggested would support a "minimal education" claim.

In their Complaint, Plaintiffs repeatedly allege that they have been denied a fundamental right protected by the U.S. Constitution: the opportunity to access literacy.  *E.g.*, Compl. ¶ 111.  That is *precisely* the type of education-based claim that the Supreme Court has suggested is viable.  In *Papasan*, the plaintiffs claimed

14

they were deprived of their constitutional right to a "minimally adequate education" as recognized in *Plyler* and *Rodriguez*. 478 U.S. at 285-86. The Court concluded, however, that their complaint "allege[d] no actual facts in support of [that] assertion." *Id.* at 286. Specifically, the Court explained, they "d[id] not allege that schoolchildren . . . are not taught to read or write; [and] they d[id] not allege that they receive no instruction on even the educational basics." *Id.*

Plaintiffs here allege all of those things. They allege they have been deprived of the "opportunity to learn to read, write, and comprehend." Compl. ¶ 8. Such competencies are inarguably "educational basics," *Papasan*, 478 U.S. at 286—indeed, at least two plaintiffs allege that because they were denied "basic English proficiency," they were "unable to follow any of the material covered in core classes." Compl. ¶ 142. And far from "a formulaic recitation of the elements of a cause of action," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007), Plaintiffs' Complaint thoroughly—and persuasively—alleges the precise mechanisms through which they have been denied a meaningful opportunity to obtain literacy, *see, e.g.*, Compl. ¶¶ 10-17 (alleging, among other things, lack of textbooks and basic materials; overcrowded classrooms; failure to address students' specific learning needs; lack of English Language Learner instruction; and unqualified staff); *see also* Opp'n 5-6, 21. Because Plaintiffs have averred plausible and "well-pleaded factual allegations" that, if true, demonstrate they have

15

been deprived of their constitutional rights, their case cannot be dismissed at this stage of the litigation. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

### b. The City's experience with illiteracy only bolsters the conclusion that the right to access to literacy is "fundamental."

There is further reason for this Court not to dismiss Plaintiffs' claims. As the Supreme Court has instructed, a "basic education" is fundamental not just because it opens doors for the person who receives it, but because it "provides the basic tools by which individuals might lead economically productive lives *to the benefit of us all*." *Plyler*, 457 U.S. at 221-22 (emphasis added); *see also id.* at 224 ("[W]e may appropriately take into account [the challenged policy's] costs to the Nation . . . ."). In other words: where children are denied the opportunity to learn how to read and write, their community bears the costs as well.

That dynamic is especially pronounced in Detroit, as the adverse effects of illiteracy have long reverberated through the Motor City. Though exact figures vary, Detroit is consistently rated as having the lowest literacy rates of any urban area in the United States. One significant national study found 47% of Detroiters lack basic reading and writing skills.[14] Strikingly, nearly half of that population—

---

[14] *See, e.g.*, Nat'l Inst. for Literacy, *The State of Literacy in America*: *Estimates at the Local, State, and National Levels* 141 (1998) (commissioned by U.S. Dep't of Educ.), https://goo.gl/BlhLE4; *see also* Detroit Regional Workforce Fund, *Addressing Detroit's Basic Skills Crisis* 2 (May 2011), https://goo.gl/x9qeny.

approximately 200,000 people—have a high school diploma or a GED.[15]

School-aged Detroiters over the past several years have fared even worse. The National Assessment of Education Progress (NAEP)—the "gold standard" of national education assessments[16]—determined that in 2015, *93%* of Detroit eighth-graders were not proficient in reading, and *96%* were not proficient in math.[17]

Indeed, Detroit's academic performance lags far behind other large, demographically similar U.S. cities. *See* Opp'n 21-22. In 2009, 2011, 2013, and 2015—the last four times the NAEP was administered—Detroit fourth-graders and eighth-graders had lower math and reading scores than students in *any* other U.S. city.[18] As one urban-education expert put it: "There is no jurisdiction of any kind, at any level, at any time in the 30-year history of NAEP that has ever registered such low numbers."[19] And when students don't learn, they often don't graduate.

---

[15] *See* Nat'l Inst. for Literacy, *State of Literacy in America*, *supra* n.14, at 141.

[16] *See, e.g.*, Michael Winerip, *Are Schools Passing or Failing? Now There's a Third Choice . . . Both*, N.Y. Times (Nov. 2, 2005), https://goo.gl/QioBXi.

[17] *See* Nat'l Ctr. for Educ. Statistics, *2015 Reading Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results* (2016), https://goo.gl/YBNvOq; Nat'l Ctr. for Educ. Statistics, *2015 Mathematics Grades 4 and 8 Assessment Report Cards: Summary Data Tables for National and State Average Scores and Achievement Level Results* (2016), https://goo.gl/DvVUPS.

[18] Shawn Lewis, *Detroit Worst in Math, Reading Scores Among Big Cities*, Detroit News (Oct. 28, 2015), https://goo.gl/Zpncso.

[19] Ryan Beene, *Detroit's Public Schools Post Worst Scores on Record in National Assessment*, Crain's (Dec. 8, 2009), https://goo.gl/Zcrx1a.

Recently, Detroit has maintained one of the lowest high-school graduation rates in America, often landing at the bottom of the rankings.[20]

As the Court warned in *Plyler*, widespread illiteracy in Detroit has imposed "significant social" and "economic" costs on the City.  457 U.S. at 221-22. Unemployment remains high in Detroit, as many Detroiters lack the skills employers demand.[21]  To combat joblessness, the City is committing significant resources to job-training programs in Detroit.  Yet illiteracy remains a roadblock. A large percentage of Detroiters read at or below a sixth grade level, meaning "it can take from 12 to 36 months to bring these adults to a level of proficiency necessary" to "*enter[ ]* many job training programs."[22]  Illiteracy thus stubbornly obstructs the City's efforts to connect Detroiters with good jobs, to attract employers to the City, and to grow Detroit's tax base.

The scourge of illiteracy has also hampered the City's efforts to make Detroit safer.  Committed to combatting violent crime, the City has expended

---

[20] *See, e.g.*, *Big Cities Battle Dismal Graduation Rates*, CBS News (Apr. 1, 2008), https://goo.gl/vmXjPz.

[21] J.P. Morgan Chase, *Detroit's Untapped Talent: Jobs and On-Ramps Needed* 2, 6, https://goo.gl/ySZGQR.

[22] *Id.* (emphasis added).

tremendous efforts to fill vacancies on its police force.[23]  But progress filling those

vacancies has been slowed by a significant number of prospective recruits'

inability to pass the state-mandated reading and writing test.[24]

Perhaps worst of all, illiteracy exacerbates intergenerational poverty in

Detroit.  Poverty and illiteracy travel hand-in-hand.  In modern society, those who

lack the ability to read and write are disproportionately likely to live in poverty.[25]

Yet the flipside is also true: children born into poverty face greater obstacles than

their wealthier peers when learning to read and write.[26]  This vicious feedback loop

between poverty and illiteracy is of major concern in Detroit, where both ills

remain too common.[27]  And until the poverty-illiteracy cycle is disrupted, new

generations of Detroiters will remain at risk of failing to obtain the "basic tools by

_____

[23] Though crime is down, violent crime remains a major issue in Detroit.  *See* Candice Williams & James Dickson, *Crime Stats: Detroit marks 302 homicides in 2016*, Detroit News (Jan. 4, 2017), https://goo.gl/2v7MSM/.

[24] *See* Mich. Comm'n on L. Enforcement Stds., *Information on Law Enforcement Reading and Writing Test*, https://goo.gl/4u2k7s (last visited Jan. 19, 2017).

[25] To take but one data point: adults with the lowest literacy scores are *16.5 times* more likely to have received public financial aid in the past year than those with the highest scores.  *See* William C. Wood, *Literacy and the Entry-Level Workforce: The Role of Literacy and Policy in Labor Market Success* 3, 10 (June 2010), https://goo.gl/bVLrG1.

[26] *See, e.g.*, Grover J. Whitehurst & Christopher J. Lonigan, *Child Development and Emergent Literacy*, 69 Child Development 848, 858 (1998).

[27] According to the most recent U.S. Census data, 40.3% of Detroiters live in poverty.  U.S. Census Bureau, *QuickFacts: Detroit City, Michigan*, https://goo.gl/4s1L2T (last visited Jan. 13, 2017).

which [they] might lead economically productive lives." *Plyler*, 457 U.S. at 221.[28]

The City of Detroit does not want this for its citizens, and parents do not want it for their children. That much is clear from Detroit's population trends. From 2000 to 2010, the City's population fell 25%, but the population under the age of 18 fell by nearly *36%*, with parents citing education as a primary motivator for leaving.[29] To be sure, Detroit has made significant strides since 2010, and the City is confident that Detroit will continue its forward progress. But Detroit's revitalization is unlikely to be complete—and the enduring effects of educational inequity are unlikely to be eradicated—until Detroit's children are given a fair opportunity to learn how to read and write.

Literacy, in short, is fundamental. It is fundamental to Plaintiffs. It is fundamental to their community. And it is fundamental to Detroit's future.

## CONCLUSION

For all of these reasons, the Defendants' motion to dismiss should be denied.

---

[28] It should be self-evident that the fact that children born into poverty face literacy-related obstacles does not diminish their constitutional right to a real *opportunity* to learn to read and write. That much is clear from *Plyler*, in which the plaintiffs were children of undocumented immigrants, many of whom presumably came from non-English speaking families—and many of whom thus presumably had specialized learning needs. Yet nothing in *Plyler* suggested that fact could be used as an excuse to deny them a basic education.

[29] The Skillman Foundation, *State of the Detroit Child: 2012 Report* 13 (2012), https://goo.gl/PjLLlx.

Dated: January 31, 2017                    Respectfully submitted,

                                            /s/ *Anton Metlitsky*
                                            Anton Metlitsky

                                            Melvin Hollowell, Jr. (P37834)
                                            Eli Savit (P76528)
                                            (Counsel of Record)
                                            2 Woodward Avenue
                                            Detroit, MI 48226
                                            (313) 224-1737
                                            hollowellm@detroitmi.gov
                                            savite@detroitmi.gov

                                            Anton Metlitsky
                                            O'MELVENY & MYERS LLP
                                            Times Square Tower, 7 Times Square
                                            New York, NY 10036
                                            (212) 326-2000
                                            ametlitsky@omm.com

                                            Bradley N. Garcia
                                            James W. Crooks†
                                            Samantha M. Goldstein
                                            O'MELVENY & MYERS LLP
                                            1625 Eye Street, N.W.
                                            Washington, DC 20006
                                            (202) 383-5300
                                            bgarcia@omm.com
                                            jcrooks@omm.com
                                            sgoldstein2@omm.com

                                            *Attorneys for* Amicus Curiae *The City
                                            of Detroit*

                                            † *Admitted only in California; supervised by
                                            principals of the firm.*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 31, 2017, I electronically filed the foregoing Brief of the City of Detroit as *Amicus Curiae* in Support of Plaintiffs' Response in Opposition to Defendants' Motion to Dismiss with the Clerk of the Court using the CM/ECF system.  Participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

<u>/s/ *Anton Metlitsky*</u>
Anton Metlitsky

*Attorney for* Amicus Curiae *The City of Detroit*