# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GARY B.; JESSIE K., a minor by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated.

Plaintiffs,

vs.

RICHARD D. SNYDER, in his Official Capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH, KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHITSON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and Natasha Baker, in her official capacity as the State School Reform/Redesign Officers,

Defendants.

Civil Action No.   16-CV-13292

Hon. Stephen J. Murphy III

M.J. Anthony P. Patti

**BRIEF OF *AMICUS CURIAE* 482FORWARD IN SUPPORT OF PLAINTIFFS**

17000 West Ten Mile Road, Second Floor • Southfield, Michigan 48075 • Phone 248.483.5000 • Fax 248.483.3131

GOODMAN ACKER P.C.
Detroit's Trusted Law Firm

i

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE ........................................................................ i

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ......................................................................................................... 2

I.   DENIAL OF ACCESS TO LITERACY HAS LONG BEEN USED TO
     SUBORDINATE MARGINALIZED GROUPS ........................................... 2

II.  MICHIGAN HAS DENIED DETROIT STUDENTS OF COLOR
     ACCESS TO LITERACY, WITH DEVASTATING CONSEQUENCES ...... 7

     A.   The State's Denial of Access to Literacy Continues Today ................. 7

     B.   The Consequences of Denying the Detroit Community Access to
          Literacy ............................................................................................... 11

III. CONTRARY TO THE STATE'S SUGGESTION, ALL KIDS CAN
     LEARN WITH THE RIGHT SUPPORT ................................................... 16

     A.   Neither the Children Nor the Community Are Responsible for
          Detroit's Low Literacy Rate ............................................................... 16

     B.   Because of Literacy's Importance to the Detroit Community, and
          Because the State Has Failed, Community Groups Strive to Fill the
          Gap ....................................................................................................... 18

CONCLUSION ................................................................................................... 21

17000 West Ten Mile Road, Second Floor • Southfield, Michigan 48075 • Phone 248.483.5000 • Fax 248.483.3131

GOODMAN ACKER p.c.
*Detroit's Trusted Law Firm*

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Independent School Dist. v. Salvatierra,*
33 S.W.2d 790 (Tex. Civ. App. 1930)................................................................5

**Statutes**

Local Government Fiscal Responsibility Act, Mich. Comp. Laws §
141.1201129..................................................................................... ii, 1

**Other Authorities**

National Center for Education Statistics, *2015 Reading Trial Urban
District Snapshot Report Detroit Grade* 4 (2015),
https://nces.ed.gov/nationsreportcard/subject/publications/dst201
5/pdf/2016048XR4.pdf; ..............................................................16

National Center for Education Statistics, *2015 Reading Trial Urban
District Snapshot Report: Detroit Grade 8* (2015),
https://nces.ed.gov/nationsreportcard/subject/publications/dst201
5/pdf/2016048XR8.pdf ...............................................................16

Adriana Lieras-Muney, *The Relationship Between Education and
Adult Mortality in the United* States, 72 Rev. of Econ. Stud. 189
(2005) ..........................................................................................13

Ann Zaniewski, *Detroit Public Schools: Teacher Shortage Ends
Literacy Program*, Detroit Free Press (Dec. 15, 2016)......................10

Ann Zaniewski, *Detroit Schools to Hold Teacher Job Fair to Fill
200 Open Positions*, Detroit Free Press (Aug. 17, 2016) ....................9

Anne T. Henderson & Karen L. Mapp, *A New Wave of Evidence:
The Impact of School, Family, and Community Connections on
Student Achievement* (2002),
http://files.eric.ed.gov/fulltext/ED536946.pdf................................18

B. Fuller & P. Clark, *Raising School Effects While Ignoring Culture?
Local Conditions and the Influence of Classroom Tools, Rules,
and* Pedagogy, 64 Rev. of Educ. Res. 119 (1994) ...........................8

i

## TABLE OF AUTHORITIES
### (CONTINUED)

**Page(s)**

Bob Wise, *High Schools at the Tipping* Point, 65 Educ. Leadership 8
(2008) ...............................................................................................12

Brent Staples, *Why Slave Era Barriers to Black Literacy Still Matter*,
N.Y. Times (Jan. 1, 2006)..............................................................4, 13

Bruce J. Biddle et al., *Small Class Size and Its Effect* in *Schools and
Society: A Sociological Effect* 92 (Jeanne H. Ballantine & Joan Z.
Spade eds., 2008) ................................................................................8

Coalition for the Future of Detroit Schoolchildren, *The Choice is
Ours: Road to Excellence for Troubled Schools Begins in Detroit*
(March 2015)...........................................................................................i

Donald J. Hernandez, *Double Jeopardy: How Third-Grade Reading
Skills and Poverty Influence High School Graduation* (April
2011), http://files.eric.ed.gov/fulltext/ED518818.pdf .........................12

Eva Gold & Elaine Simon, *Successful Community Organizing for
School Reform* 31 (2002), http://www.communityschools.org/
assets/1/AssetManager/Gold_E_CCC_Strong_Neighborhoods_St
rong_Schools.pdf ................................................................................17

Excellent Schools Detroit, *Taking Ownership: Our Pledge To
Educate All Of Detroit's Children* (2010) ..................................... 13, 14

Fred Genesee et al., *English Language Learners in U.S. Schools: An
Overview of Research Findings*, 10 J. of Educ. For Students
Placed at Risk 363 (2005) ..................................................................11

Geneva Gay, *Cultural Responsive Teaching in Special Education for
Ethnically Diverse Students: Setting the Stage*, 15 Qual. Studies
in Educ. 613 (2002)..............................................................................10

Heather Andrea Williams, *Self-Taught: African American Education
in Slavery and Freedom* (Chapel Hill: University of North
Carolina Press, 2005)..........................................................................3, 4

Henry M. Levin & Cecilia E. Rousejan, *The True Cost of High
School Drop Outs*, N.Y. Times (Jan. 25, 2012)....................................12

9483452v.1

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

Howard Frumkin, *Introduction* in *Safe and Healthy School Environments* (Frumkin et al. eds., 2006)........................................................................7

Institute of Education Sciences, *Special Features: All Aboard the Literacy Special* (accessed Jan. 1, 2017), https://ies.ed.gov/ncee/ wwc/literacyresources1 ..........................................................................10

James Anderson, *The Education of Blacks in the South, 1860-1935* (Chapel Hill: University of North Carolina Press, 1988) .......................5, 6

Jane Cornelius, *We Slipped and Learned to Read: Slave Accounts of the Literacy Process, 1830-1865*, Phylon 44:3 (1983) ...........................3, 4

Jeannie Oakes & Marisa Saunders, *Access to Textbooks, Instructional Materials, Equipment, and Technology* (October 2002), https://escholarship.org/uc/item/4ht4z71v#page-1 ......................8

Jeffrey Mirel, *The Rise and Fall of an Urban School System: Detroit, 1907-81* (Ann Arbor: University of Michigan Press, 1993)........................6

Kurt Metzger & Jason Booza, *African Americans in the United States, Michigan and Metropolitan Detroit*, Working Paper Series No. 8 (2002): Center for Urban Studies of Wayne State University..........................................................................................................6

Linda Darling-Hammond, *How Teacher Education Matters*, 51 J. of Teacher Educ. 166 (2000) ......................................................................9, 10

Lupe S. Salinas, *Latino Educational Neglect: The Result Bespeaks Discrimination*, 5 U. Md. L.J. Race, Religion, Gender & Class 269 (2005). .................................................................................................5

Matthew Ronfelt et al., *How Teacher Turnover Harms Student Achievement*, 50 Am. Educ. Res. J. 4 (2013) ...........................................9

Michael Hout, *Social and Economic Returns to College Education in the United States*, 38 Ann. Rev. of Sociology 379 (2012) ......................13

17000 WEST TEN MILE ROAD, SECOND FLOOR · SOUTHFIELD, MICHIGAN 48075 · PHONE 248.483.5000 · FAX 248.483.3131

GOODMANACKER P.C.
Detroit's Trusted Law Firm

9483452v.1

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

Michigan Department of Education, *Racial Census Report by School Districts* 2015-2016 (accessed January 2, 2017), https://www. michigan.gov/documents/mde/RacialCensus0506_204440_7.pdf......................3

Nancy E. Hill & Lorraine C. Taylor, *Parental School Involvement & Children's Academic Achievement*, 13 Current Directions in Physc. Sci. 161 (2004)..................................................................................18

Norris M. Haynes, *Addressing Students' Social and Emotional Needs: The Role of Mental Health Teams in Schools, in Disability and Black Community* (Sheila D. Miller ed., 2002) ...........................................11

Peter Irons, *Jim Crow's Schools,* Am. Educator (Summer 2004), http://www.aft.org/periodical/american-educator/summer-2004/jim-crows-schools .............................................................................4, 5

Pew Charitable Trust, Press Release, *31 U.S. Adults are Behind Bars, on Parole, or on Probation* (accessed Jan. 2, 2017), www.pewtrusts.org/en/about/news-room/press-releases/0001/01/01/one-in-31-us-adults-are-behind-bars-on-parole-or-probation ...................................................................................14

Public Broadcasting System, *Why Detroit's Teachers are 'Sick' of Their Inadequate Schools* (Feb. 9, 2016), http://www.pbs.org/ newshour/bb/why-detroits-teachers-are-sick-of-their-inadequate-schools/................................................................................................7

Ronald G. Ehrenberg et al, *Class Size and Student Achievement*, 2 Psychol. Sci. Pub. Int. 1 (2001)..................................................8

United States Census Bureau, *Quick Facts: Detroit City, Michigan* (accessed Jan. 1, 2016), http://www.census.gov/quickfacts/table /PST0452/2622000 ..........................................................................11

United States Census Bureau, *Small Area Income and Poverty Estimates* (2015), http://www.census.gov/did/www/saipe /downloads/sd15/index.html ............................................................17

9483452v.1

# TABLE OF AUTHORITIES
## (CONTINUED)

**Page(s)**

William Drakeford, *The Impact of an Intensive Program to Increase the Literacy Skills of Youth Confined to Juvenile Corrections*, 53 J. of Correctional Educ. 132 (2002) ...................................................................13

9483452v.1

## INTEREST OF AMICUS CURIAE

*Amicus curiae* 482Forward is a network of parents, youth, and neighbor-hood organizations committed to ensuring that all Detroit children have access to an excellent education, regardless of their race or socioeconomic status. It is guided by a belief that families have the right to help define solutions to problems in their schools and in their city and that students' success is the collective responsibility of the entire community. The network's motto, "Nothing about us without us," underscores its philosophy of empowerment in pursuit of education.

482Forward has long believed that all children have a right to literacy as part of a high-quality education. But securing this right takes more than after-school tutoring or college prep classes—it takes system change. To achieve this, 482Forward's members have waged targeted campaigns for citywide school policies that foster success, like teacher training, manageable class sizes, safe schools, accountable governance, culturally relevant curriculums, and parental involvement in education.[1] 482Forward has been especially critical of top-down state policies that stifle community involvement in Detroit's schools, such as those from the state-appointed emergency manager in charge of the City's schools for

---

[1] *See* Coalition for the Future of Detroit Schoolchildren, *The Choice is Ours: Road to Excellence for Troubled Schools Begins in Detroit* (March 2015).

i

9483452v.1

the last 15 years.[2]

Through this work, 482Forward's members have seen and experienced first-hand the devastating results of State disinvestment in and deliberate indifference to Detroit schools. Decades of disregard for the fundamental right of access to literacy have left families disempowered, communities broken, and children's futures irreparably damaged. Accordingly, 482Forward respectfully submits this brief as *amicus curiae* in support of plaintiffs.[3]

---

[2] *See* Local Government Fiscal Responsibility Act, Mich. Comp. Laws § 141.12011291.

[3] *Amicus curiae* certify that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief. No person other than *amicus curiae*, their employees, or their counsel made a monetary contribution to the preparation or submission of this brief.

ii

## PRELIMINARY STATEMENT

Detroit public schools are in crisis. The State of Michigan has created an educational environment in which schools fail to deliver even the most basic educational instruction and tools. Schoolchildren in Detroit lack books, pencils, paper, computers, and even teachers. They spend their days in overcrowded, unsafe, and vermin-infested buildings, with insufficient support for English Learners or children suffering from trauma. As a result, Detroit schoolchildren have the lowest literacy rates in the country.

The State Defendants in this case disavow the role they have played in creating in the crisis facing the Detroit Public Schools Community District. In their motion to dismiss, they insist that Detroit's schools are a product of "parental involvement (or lack thereof), medical problems, intellectual limitations, domestic violence, trauma, and other numerous influences."[4] There are not "*any facts*," say the Defendants, that would support a "causal link" between their "acts and [Detroit schoolchildren's] alleged illiteracy."[5]

Nothing could be further from the truth. Community organizations, educators, parents, and students have worked tirelessly to promote literacy in Detroit. All children want to learn. All children *can* learn, if given the appropriate support, investment, and respect. But few students in the United States face the state-

---

[4] Dkt. No. 60, Defendants Motion to Dismiss ("Defs' Br.") at 14.
[5] *Id.* (emphasis added).

1

erected barriers Detroit school children face—and Detroit's educational outcomes reflect this disparity. The State's actions have denied these children access to a basic building block to education: literacy.

Historical records, education scholarship, and community experience underscore the detriments of concentrating power over education in the hands of a detached authority. Part I below addresses the literacy crisis in the context of the historical struggle for literacy by the country's marginalized groups, highlighting the timeless importance to these groups of literacy as an essential prerequisite for advancement in America. Part II details ways in which the State-created school environment undermines success for Detroit students, and discusses the profound impact that the State's indifference has had on Detroit's children and community. Part III rebuts the State's assertion that Detroit's abysmal literacy rates are a product of "intellectual limitations" of Detroit's students or their parent's "lack of involvement" and details the efforts of the community, including *amicus curiae*, to overcome barriers to literacy in Detroit schools.

## ARGUMENT

## I.  DENIAL OF ACCESS TO LITERACY HAS LONG BEEN USED TO SUBORDINATE MARGINALIZED GROUPS

Because Detroit schools overwhelming serve minority communities, illiteracy here has disproportionately affected historically disadvantaged groups. For the 2015 to 2016 school year, 82.35 percent of Detroit Public School students

2

were African American and 13.43 percent were Hispanic.[6]  The literacy problem in Detroit cannot be viewed in isolation from its historical context.  The State's failure to provide an adequate education continues a long tradition of marginalization.

During Antebellum, whites were nervous that Black literacy "would threaten the social order."[7]  "The presence of literate slaves [would] give lie to the entire system" of bondage upon which southern economies were based.[8]  "Reading indicated to the world that this so-called property had a mind, and writing foretold the ability to construct an alternative narrative about bondage itself."[9]  To justify this fear, whites blamed slave rebellions like Nat Turner's on literate slaves forming educated opinions and disseminating messages about the evils of slavery.[10]

Indeed, literacy contributed to emancipation movements among slaves.  One slave, Lucas Holsey, felt that books were the path to proving his worth as a human being and his equality to "any person here on earth."[11]  And Frederick

---

[6] Michigan Department of Education, *Racial Census Report by School Districts* 2015-2016 (accessed January 2, 2017), https://www.michigan.gov/documents/mde/RacialCensus0506_204440_7.pdf.

[7] Compl. at 41; Jane Cornelius, *We Slipped and Learned to Read: Slave Accounts of the Literacy Process, 1830-1865*, Phylon 44:3, at 171-86 (1983).

[8] Heather Andrea Williams, *Self-Taught: African American Education in Slavery and Freedom*, at 23-24 (Chapel Hill: University of North Carolina Press, 2005).

[9] *Id.*

[10] *Id.*

[11] Cornelius, *supra*, at 323.

3

Douglass credited his own literacy with "giving a larger voice and conceptualization" to previously vague notions of freedom.[12]

As a result, many states passed laws making it illegal for slaves and free Black people to learn to read and write. Alabama, Georgia, Louisiana, Mississippi, North Carolina, South Carolina, and Virginia all had such laws.[13] Even where it was legal, slaves and free Black people were often harshly punished for learning to read or write.[14] Slaves reported that those caught pursuing literacy faced severe beatings.[15] Some had their fingers and hands amputated.[16] Some were even murdered.[17] Because of these brutal efforts to deny literacy to Black people, fewer than 1 in 10 Black Southerners were able to read in 1865.[18]

Barriers to literacy remained after Emancipation. Jim Crow schools taught students only skills needed for agricultural work and domestic service.[19] Reflecting on the plight of Black Americans in 1915, Booker T. Washington said that

---

[12] Williams, *supra*, at 41.

[13] *Id.* at 321.

[14] *See* Compl. at 42.

[15] Cornelius, *supra*, at 171-86.

[16] *Id.*

[17] *Id.*

[18] Brent Staples, *Why Slave Era Barriers to Black Literacy Still Matter*, N.Y. Times (Jan. 1, 2006); *see also* Compl. at 42.

[19] Peter Irons, *Jim Crow's Schools*, Am. Educator (Summer 2004), http://www.aft.org/periodical/american-educator/summer-2004/jim-crows-schools.

4

"white men will vote funds for Negro education just in proportion to their belief in the value of that education."[20] The value to a white landowner in educating Black children, thought Washington, "lay in their ability to pick cotton or wash laundry."[21]

Immigrant communities have faced similar barriers. Latino students were long segregated from white students and forced to attend sub-par schools with little effective literacy instruction.[22] Many school districts were indifferent to whether Latino children complied with basic educational and attendance requirements.[23]

Yet, for as long as these groups have been systematically denied literacy, they have organized themselves to attain it nonetheless. For hundreds of years, communities of color have recognized that literacy allows for economic opportunity, privacy, mobility, leadership, and protection from injustice and con-artists. Because they understood the importance of literacy, many slaves covertly taught their children in the little free time they had.[24] Others expended their meager sav-

---

[20] *Id.*

[21] *Id.*

[22] *See, e.g., Independent School Dist. v. Salvatierra*, 33 S.W.2d 790 (Tex. Civ. App. 1930).

[23] Lupe S. Salinas, *Latino Educational Neglect: The Result Bespeaks Discrimination*, 5 U. Md. L.J. Race, Religion, Gender & Class 269, 290 (2005).

[24] James Anderson, *The Education of Blacks in the South, 1860-1935* (Chapel Hill: University of North Carolina Press, 1988).

5

ings to hire teachers.[25]  After slavery, ex-slaves committed money and labor to creating schools and organizing committees to supervise them.[26]  In fact, one of the country's first major public education initiatives was the result of former slaves organizing to educate their communities.[27]

In the twentieth century, Black southerners and Latinos began moving to Detroit in large numbers.[28]  There, the fight for education and literacy continued. In the 1940s, Detroit's African-American community forged a "crucial political alliance with the United Auto Workers" to ensure equal education for all students.[29]  African-American leaders, in conjunction with organized labor, advanced an agenda of educational equality.[30]  The number of African-American teachers grew and outright educational segregation declined.[31]  Those efforts continued through the civil rights era, as Black and Latino community groups fought against gerrymandered school boundaries that deliberately segregated school children.[32]

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] Kurt Metzger & Jason Booza, *African Americans in the United States, Michigan and Metropolitan Detroit,* Working Paper Series No. 8 (2002): Center for Urban Studies of Wayne State University.

[29] Jeffrey Mirel, *The Rise and Fall of an Urban School System: Detroit, 1907-81* 155 (Ann Arbor: University of Michigan Press, 1993).

[30] *Id.* at 156.

[31] *Id.* at 190, 201.

[32] *Id.* at 258–65.

6

*Amicus curiae*, along with parents, educators, and community organizations, have continued this long struggle. But try as communities might, full access to literacy is impossible without system change. Such change requires acknowledgement that all children have a fundamental right to literacy.

## II. MICHIGAN HAS DENIED DETROIT STUDENTS OF COLOR ACCESS TO LITERACY, WITH DEVASTATING CONSEQUENCES

### A. The State's Denial of Access to Literacy Continues Today

The State has created an environment that all but assures poor outcomes for Detroit students. There is a consensus among scholars that successful educational outcomes require safe environments, small class sizes, readily available textbooks, training for teachers, low teacher turnover, culturally relevant materials, evidence-based instruction, specialized programs for non-native English speakers, and trauma support. *Amicus curiae* 482Forward and its partners work to create these conditions. The State has provided none of these in Detroit schools.

First, many Detroit school sites are physically unsafe. Schools are overcrowded, infested with rodents, and fail to meet basic building code standards[33]. Education scholars universally agree that "high-quality learning environments are

---

[33] *See* Comp. at 9-11, 54-55, 84-95; *see also* Public Broadcasting System, *Why Detroit's Teachers are 'Sick' of Their Inadequate Schools* (Feb. 9, 2016), http://www.pbs.org/newshour/bb/why-detroits-teachers-are-sick-of-their-inadequate-schools/.

7

9483452v.1

crucial to educating children well."[34]

Second, large class sizes in Detroit schools impede learning. The disadvantages of large class sizes include an increase in disruptive behavior, a decrease in the amount of time the teacher can spend working with each student, and a reduction in the material the teacher can cover.[35] And while a "host of different studies" demonstrate that "all types of students gain from small classes," gains are even greater "for students who have traditionally been disadvantaged in education"—such as those Detroit schools serve.[36]

Third, Detroit students receive textbooks that are out of date and in poor condition. Those students that receive textbooks cannot take books home, making homework impossible.[37] An overwhelming number of studies have found that textbook availability has a substantially positive effect on student achievement.[38]

---

[34] Howard Frumkin, *Introduction*, in *Safe and Healthy School Environments* 4 (Frumkin et al. eds., 2006).

[35] Ronald G. Ehrenberg et al, *Class Size and Student Achievement*, 2 Psychol. Sci. Pub. Int. 1 (2001).

[36] Bruce J. Biddle et al., *Small Class Size and Its Effect*, in *Schools and Society: A Sociological Effect* 92 (Jeanne H. Ballantine & Joan Z. Spade eds., 2008).

[37] *See* Compl. at 8, 53, 73, 78–83.

[38] *See* B. Fuller & P. Clark, *Raising School Effects While Ignoring Culture? Local Conditions and the Influence of Classroom Tools, Rules, and Pedagogy*, 64 Rev. of Educ. Res. 119 (1994); *see also* Jeannie Oakes & Marisa Saunders, *Access to Textbooks, Instructional Materials, Equipment, and Technology* 4–8 (October 2002), https://escholarship.org/uc/item/4ht4z71v#page-1 (collecting studies and concluding that "[c]onsiderable evidence supports our common sense understanding that textbooks and curriculum materials are fundamental to education.").

9483452v.1

Fourth, the State has ignored the substantial teacher turnover in Detroit schools. For the 2016–2017 school year, there were around two hundred teacher vacancies at the start of the year.[39] The consequences of teacher turnover are well documented. A recent study demonstrates "that teacher turnover has a significant and negative effect on student achievement in both math and [English language arts]."[40] Turnover negatively affects student achievement "even after controlling for different indicators of teacher quality, especially in lower-performing schools."[41] "Across models and measures, there is a consistent pattern—students of stayers perform significantly worse when turnover is greater, and the negative effects are mostly found in lower-performing schools."[42]

Fifth, the State's decision to allow uncertified teacher in Detroit schools disadvantages children.[43] There is "a growing body" evidence that the "extent and quality of teacher education matter for teachers' effectiveness"[44] Indeed, "re-

---

[39] Compl. at 98-101; *see also* Ann Zaniewski, *Detroit Schools to Hold Teacher Job Fair to Fill 200 Open Positions*, Detroit Free Press (Aug. 17, 2016), http://www.freep.com/story/news/education/2016/08/17/detroit-teacher-job-fair/88888604/ (noting that "the 2015-16 school year [also] saw a surge of mid-year departures").

[40] Matthew Ronfelt et al., *How Teacher Turnover Harms Student Achievement*, 50 Am. Educ. Res. J. 4, 30 (2013).

[41] *Id.* at 31.

[42] *Id.* at 29.

[43] Compl. at 103-04.

[44] Linda Darling-Hammond, *How Teacher Education Matters*, 51 J. of Teacher Educ. 166, 166 (2000).

9483452v.1

search over the past 30 years" demonstrates that "certified teachers are generally better rated and more successful with students" than those who are not.[45]

Sixth, the State has failed to implement evidence-based literacy instruction. Scholars agree such instruction improves literacy achievement.[46]  In particular, students need instruction in the alphabetic principle, fluency, comprehension, motivation, word study, and vocabulary, along with universal screening and intervention strategies to identify and support students who are falling behind.[47]

Seventh, the State has failed to provide Detroit children and teachers with culturally relevant materials.  Culturally responsive teaching improves "academic performance, social adjustment, school satisfaction, self-concept," and "confidence and efficacy."[48]  Scholars have identified particularly "strong correlations between culturally responsive teaching and the school achievement of students of color."[49]

---

[45] *Id.* at 167.

[46] *See* Compl. at 73–75); *see also* Ann Zaniewski, *Detroit Public Schools: Teacher Shortage Ends Literacy Program*, Detroit Free Press (Dec. 15, 2016), http://www.freep.com/story/news/education/2016/12/15/detroit-schools-reading-recovery/95167014/.

[47] Compl. at 25-30; *see* Institute of Education Sciences, *Special Features: All Aboard the Literacy Special* (accessed Jan. 1, 2017), https://ies.ed gov/ncee/wwc/literacyresources1.

[48] Geneva Gay, *Cultural Responsive Teaching in Special Education for Ethnically Diverse Students: Setting the Stage*, 15 Qual. Studies in Educ. 613, 627 (2002); *see also* Compl. at 117 .

[49] *Id.*

10

Eighth, many schools in Detroit do not provide proper instruction for English Language Learners.[50]  That failure ignores the needs of the 5.4 percent of Detroit residents who were not born in the United States.[51]  English Language Learners "are more successful when they participate in programs that are designed to meet their needs (ESL, bilingual, etc.) than in a mainstream English classroom and when the program is consistent throughout the student education."[52]

Finally, the State has failed to provide sufficient mental health support and adequately address students that have suffered social and emotional trauma.[53]  Teachers and staff are not trained to identify signs of trauma and children do not have access to counselors.[54]  Unaddressed trauma seriously disrupts learning.[55]

Together, the State's actions—and inactions—with regard to these factors have created a literacy crisis.

**B.    The Consequences of Denying the Detroit Community Access to Literacy**

Detroit's literacy crisis profoundly impacts the communities that *amicus*

---

[50] *See* Compl. at 96–98.

[51] United States Census Bureau, *Quick Facts: Detroit City, Michigan* (accessed Jan. 1, 2016), http://www.census.gov/quickfacts/table/PST045215/2622000.

[52] Fred Genesee et al., *English Language Learners in U.S. Schools: An Overview of Research Findings*, 10 J. of Educ. For Students Placed at Risk 363, 377 (2005).

[53] Compl. at 11, 118-19.

[54] *Id.*

[55] Norris M. Haynes, *Addressing Students' Social and Emotional Needs: The Role of Mental Health Teams in Schools, in Disability and Black Community* 110–11 (Sheila D. Miller ed., 2002).

11

*curiae* 482Forward serves. Poor literacy instruction can have lifelong and community-wide consequences, including unemployment, poverty, and incarceration. It can affect achievement for generations to come. The parents with whom *amicus curiae* works everyday have first-hand experience with the tragedies of illiteracy.

Studies consistently demonstrate that failure to intervene early and remediate reading problems will impact a child's future academic, personal, and professional achievement, as well as her mental health and social/emotional well-being.[56] A child who is not reading proficiently in third grade is four times more likely to fail to graduate from high school on time.[57] A youth who fails to graduate from high school on time or at all earns up to 50 percent less over a lifetime than one who does.[58] Even for students who graduate from high school, the cost of poor reading skills is substantial. Students with poor reading skills are unprepared for entry-level positions. And those who attend college must take remedial classes, making them much more likely to drop out of college than those who do

---

[56] Compl. at 40-41.
[57] Donald J. Hernandez, *Double Jeopardy: How Third-Grade Reading Skills and Poverty Influence High School Graduation* (April 2011), http://files.eric.ed.gov/fulltext/ED518818.pdf.
[58] Henry M. Levin & Cecilia E. Rousejan, *The True Cost of High School Drop Outs*, N.Y. Times (Jan. 25, 2012).

12

9483452v.1

not[59].

High illiteracy rates also have substantial community detriments.  Unsurprisingly, illiteracy is "perhaps the strongest common denominator among individuals in correctional facilities."[60]  In addition, higher education rates are correlated with lower crime, lower use of public assistance, and "higher payback in the form of sales, property, and state income taxes."[61]  Education levels also have a "strong and significant" effect on health, even after controlling for income and race.[62]

There is even evidence that literacy (or lack thereof) can determine a community's success for generations to come.  In the 1940s, for example, the sociologist E. Horace Fitchett found that half of the Black students at the prestigious Howard University traced their roots to that sliver of the Antebellum Black population that was free before Emancipation—which could more easily learn to

---

[59] *See* Bob Wise, *High Schools at the Tipping Point*, 65 Educ. Leadership 8 (2008).

[60] William Drakeford, *The Impact of an Intensive Program to Increase the Literacy Skills of Youth Confined to Juvenile Corrections*, 53 J. of Correctional Educ. 132, 139 (2002).

[61] Michael Hout, *Social and Economic Returns to College Education in the United States*, 38 Ann. Rev. of Sociology 379, 392 (2012).

[62] Adriana Lieras-Muney, *The Relationship Between Education and Adult Mortality in the United States*, 72 Rev. of Econ. Stud. 189 (2005).

13

read.[63]

The consequences of illiteracy plague Detroit schoolchildren and their communities.  Only 58 percent of Detroit Public School students graduate from high school in four years.[64]  Fewer than one in four of those students will enroll in college.[65]  Only two percent of Detroit's high school students are prepared for college-level math and eleven percent for college-level reading.[66]  As a result, poverty rates in Detroit have hovered around 40 percent and as many as one in seven adult men are under correctional control in some Detroit neighborhoods.[67]

This chain of negative consequences is familiar to Arlyssa Heard and Ke'li Coleman, Detroit mothers involved with *amicus curiae* 482Forward.  Arlyssa traces her son CJ's unemployment as a young adult back to his poor elementary schooling.[68]  CJ attended Detroit public schools throughout elementary and middle school, where "he was getting A's and B's"—"[h]is report card showed he

---

[63] Brent Staples, *Why Slave Era Barriers to Black Literacy Still Matter*, N.Y. Times (Jan. 1, 2006).

[64] Excellent Schools Detroit, *Taking Ownership: Our Pledge To Educate All Of Detroit's Children* 3 (2010).

[65] *Id.*

[66] *Id.*

[67] U.S. Census QuickFacts, Detroit, *supra*; Pew Charitable Trust, Press Release, *One in 31 U.S. Adults are Behind Bars, on Parole, or on Probation* (accessed Jan. 2, 2017), www.pewtrusts.org/en/about/news-room/press-releases/0001/01/01/one-in-31-us-adults-are-behind-bars-on-parole-or-probation.

[68] *See* Exhibit 1, Arlyssa Heard Decl.

14

was making the grade."[69]  Unbeknownst to Arlyssa, CJ's high grades did not mean he was learning.  Arlyssa "really found out just how bad of a struggle [her] son was having" when he performed poorly on his ACT.

> I began to reflect on 4th grade and I started having flashbacks to all of those moments that in hindsight . . . were red flags but at the time I missed it because I thought I was just nit picking and he had good grades. . . . And I felt like I was watching the Titanic, because I knew in 11th grade with my son that we were sinking fast, but I had no idea what to do because I had never been here before, didn't know how you turn it around, didn't know who's to blame. . . . And the biggest question I had was how the hell did he make it out of grade school?[70]

As a result, "CJ went to college completely unprepared."[71]  He dropped out of college during his sophomore year.  Arlyssa surmised that "the workload, the speed, the responsibility of the studying, the comprehension level—it was too much."  CJ now lives at home and is unemployed.  Arlyssa says that "six or seven of his friends" have "all gone through the same thing."[72]

Ke'li had a similar experience with her daughter Dasia.  In high school, Dasia had no math teacher and "had one English teacher who was helping sub for the math teacher."[73]  Instead of receiving instruction, "the students were allowed

---

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *See id.*, Ke'li Coleman Decl.

15

9483452v.1

to sit in their math hour and writing hour and just eat and hang out."[74]  Dasia

eventually decided "it was easier for her to stay at home instead of catching a two

hour bus ride to sit in class where she wasn't given any instruction," and she

dropped out.

## III.  CONTRARY TO THE STATE'S SUGGESTION, ALL KIDS CAN LEARN WITH THE RIGHT SUPPORT

### A.  Neither the Children nor the Community Are Responsible for Detroit's Low Literacy Rate

The crisis in Detroit schools cannot be overstated.  Reading scores for stu-

dents in Detroit schools are much lower than Michigan averages and worse than

every school district of similar size in the United States.  Students at Detroit

schools disproportionately fail to meet the English proficiency standards under

the Michigan Student Test of Educational Progress ("M-STEP"), which measures

progress in grades 3-8 and 11 against state standards.  Less than five percent of

students meet the standards in some Detroit schools, while state-wide proficiency

hovers just under fifty percent.[75]  Comparing Detroit with similarly sized districts

across the country yields similar conclusions.  Only five percent of Detroit 4th

graders and seven percent of 8th graders performed at or above the National As-

sessment of Educational Progress's ("NAEP") "Proficient Level," compared with

---

[74] *Id.*

[75] *See* Compl. at 63-64.

9483452v.1

27 percent and 25 percent, respectively, in other large cities.[76]   Detroit students simply cannot read at the same levels as their counterparts elsewhere.

The Defendants suggest these abysmal literacy outcomes are due to "poverty, parental involvement (or lack thereof), medical problems, intellectual limitations, domestic violence, trauma, and other numerous influences."[77]   This position is misguided and offensive.   Baltimore, the District of Columbia, and Atlanta have similar levels of poverty, yet students in those cities have significantly higher reading scores.[78]   As *amicus curiae* can attest from its many programs and campaigns—"parental involvement" in Detroit is robust.   To the extent parents are shut out of decisions about Detroit schools, it is by the State's design.   Nor is there any evidence to suggest that children in Detroit have more medical problems or intellectual limitations than children in other urban areas.   And adequate schools would provide support for students affected by domestic violence or trauma—in fact, such support is necessary to create conditions under which chil-

---

[76] *See* National Center for Education Statistics, *2015 Reading Trial Urban District Snapshot Report Detroit Grade* 4 (2015), https://nces.ed.gov/nationsreportcard/subject/publications/dst2015/pdf/2016048X R4.pdf; National Center for Education Statistics, *2015 Reading Trial Urban District Snapshot Report: Detroit Grade 8* (2015), https://nces.ed.gov/nationsreportcard/subject/publications/dst2015/pdf/2016048X R8.pdf.

[77] Defs.' Br. at 14.

[78] *See* National Center for Education Statistics, Grades 4 and 8; United States Census Bureau, *Small Area Income and Poverty Estimates* (2015), http://www.census.gov/did/www/saipe/downloads/sd15/index.html.

17

dren attain literacy.

**B.    Because of Literacy's Importance to the Detroit Community, and Because the State Has Failed, Community Groups Strive to Fill the Gap**

The State has stifled community and citizen involvement in Detroit school, compounding the negative outcomes described in Part II above.

Many studies show that community and parental involvement in schools increases education achievement.[79]  Local organizations play a unique role in improving school through public accountability.[80]  And it is "well-established" that, "parental school involvement has a positive influence on school-related outcomes for children."[81]  The National Center for Family and Community Connections with Schools determined that community and parent involvement in schooling results in "higher grade point averages and score on standardized tests or rating scales, enrollment in more challenging academic programs, more classes passed and credits earned, improved behavior at home and at school, and better social

---

[79] *See* Eva Gold & Elaine Simon, *Successful Community Organizing for School Reform* 31 (2002), http://www.communityschools.org/assets/1/AssetManager/Gold_E_CCC_Strong_Neighborhoods_Strong_Schools.pdf.

[80] *Id.*

[81] Nancy E. Hill & Lorraine C. Taylor, *Parental School Involvement & Children's Academic Achievement*, 13 Current Directions in Physc. Sci. 161, 161 (2004).

18

skills and adaption to school."[82]  Community groups and parents in Detroit, how-

ever, have been denied a meaningful voice in educational decision- and policy-

making.

Despite the barriers to community involvement erected by the State, *ami-*

*cus curiae* 482Forward has worked tirelessly to ensure access to literacy for De-

troit students.  And 482Forward is not the only community initiative stepping in

to fill the educational void.  Perhaps because of the State's failures, there has been

a groundswell of community action to educate Detroit's children.  Organizations

like Reading Words of Detroit, Developing K.I.D.S., and the Kresge Foundation

have put significant resources toward literacy and other education programs in

Detroit.

In addition, parents seek out extracurricular programs and devote time to

providing the instruction schools do not.  When Michele Phillips realized her

daughter Malacah was reading at a kindergarten level in fourth grade, she "did

everything [she] could to motivate her, telling her not to give up on herself and to

continue to turn in the work."[83]  She enrolled Malacah in a 21st Century Commu-

nity Learning Center Program through the U.S. Department of Education, where

---

[82] Anne T. Henderson & Karen L. Mapp, *A New Wave of Evidence: The Impact of School, Family, and Community Connections on Student Achievement* 24 (2002), http://files.eric.ed.gov/fulltext/ED536946.pdf.

[83] Exhibit 1, Michele Phillips Decl.

19

Malacah is given literacy training after school.[84]  Michele "even went back to school [her]self to show [Malacah] how important education is."[85]

Similarly, Ke'li has actively sought out the best programs and schools for her children.  When she began to suspect that her daughter Quianna might have an intellectual disability, she pushed the school to test her.[86]  After tests showed Quianna was not intellectually disabled, Ke'li enrolled her in a neighborhood tutoring program.[87]  Quianna's grades have been steadily dropping, so Ke'li has pushed the school to retest her for intellectual disabilities.[88]  The school has not done so.[89]

CJ's mom, Arlyssa, threw herself into educating her children once she realized the schools were failing them.  "I was an involved parent," she said.  "I was the leader of the parent group, I was a delegate to the Detroit Public School Title I Parent Advisory Committee, I did workshops and trainings with parents."[90]  She enrolled CJ and his younger brother Judah in tutoring and extra-curricular activi-

---

[84] *Id.*

[85] *Id.*

[86] *See id.*, Coleman Decl.

[87] *Id.*

[88] *Id.*

[89] *Id.*

[90] *Id.*, Heard Decl.

20

ties.[91] She took advantage of specialized services offered by the Detroit Children's Center for children struggling academically. She instituted a nightly story time. When Judah was diagnosed with Attention Deficit Hyperactivity Disorder, she searched for a school that could provide the support he needed, even sitting in on classes to see for herself whether the learning environment was adequate.[92]

Yet heavy community and parental involvement is not a substitute for adequate schools. Despite Michele's efforts, her daughter Malacah had to repeat the seventh grade.[93] Ke'li's daughter Dasia dropped out of school, and her daughter Quianna failed third grade.[94] Arlyssa's son CJ did not finish college and can't find a job; she has higher hopes for her son Judah.[95] These are just a few examples of countless Detroit parents struggling to overcome a broken system. No matter the challenges, however, the community is not going to give up on its children just because the State is unwilling to do its part.

## CONCLUSION

We respectfully ask that the Court deny the State's motion to dismiss Plaintiff's complaint.

Dated: January 19, 2017

_____

[91] *Id.*

[92] *Id.*

[93] *Id.*, Phillips Decl.

[94] *Id.*, Coleman Decl.

[95] *Id.*, Heard Decl.

21

9483452v.1

GOODMAN ACKER P.C.
By: */s/ Mark Brewer*

Mark Brewer (P35661)
17000 W. 10 Mile Rd, 2d Floor
Southfield, MI 48075
(248) 483-5000
mbrewer@goodmanacker.com

*Attorneys of Record for Amicus Curiae*
*482Forward*


PATTERSON BELKNAP WEBB &
TYLER LLP

Craig A. Newman (P36818)
Eugene M. Gelernter
Kathrina Szymborski
Kade N. Olsen
1133 Avenue of the Americas
New York, New York 10036
(212) 336-2000
cnewman@pbwt.com
emgelernter@pbwt.com
kszymborski@pbwt.com
kolsen@pbwt.com

*Attorneys for Amicus Curiae 482 Forward*

9483452v.1

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

GARY B.; JESSIE K., a minor by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated.

Plaintiffs,

vs.

RICHARD D. SNYDER, in his Official Capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH, KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHITSON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and Natasha Baker, in her official capacity as the State School Reform/Redesign Officers,

Defendants.

Civil Action No.   16-CV-13292

HON. STEPHEN J. MURPHY III

M.J. ANTHONY P. PATTI

**DECLARATION OF MICHELE PHILLIPS IN SUPPORT OF BRIEF OF *AMICUS CURIAE* 482FORWARD IN SUPPORT OF PLAINTIFFS**

## DECLARATION OF MICHELE PHILLIPS

I, Michele Phillips, declare under penalty of perjury as follows:

1.    I am a parent with 7 children enrolled or previously enrolled in Detroit's schools. I have been involved with 482Forward as a member of the Northeast Action Team and the Membership Committee.

2.    My daughter Malacah Mason is currently in 7th grade at Fisher Magnet Upper. She is 13 years old.

3.    With Malacah, it was hard when she started school because I was a single parent and it was hard for me to go to the parent teacher conferences. I didn't realize because that her teachers didn't try to contact me to let me know that my child was struggling in elementary in her reading.

4.    When I got married I started going to the parent teacher conferences and that's when they told me that they had her in these class programs and she wasn't improving. By the time I found out—she was, I believe, in the third or fourth grade when I found out that she couldn't read. She couldn't even write. It was like a kindergarten level. I didn't know what to do. I turned to the school for help and I did ask them to test her for dyslexia. They didn't test her but they did put her in some programs.  She was still at the level of the kids who were English Language Learners.

5.    By that time I believe she kind of lost hope in her learning. I did

everything I could to motivate her, telling her not to give up on herself and to continue to turn in the work. We were trying to work with her in reading books. She wasn't participating in class and was saying "no" when she was called on to read, but I didn't teach her to disrespect her teachers like that. You have to almost become a psychologist, not to manipulate them exactly, but to motivate them to do it. You can do this, you're smart. And let them see how important education is. I even went back to school myself to show them how important education is.

6.      I have her in 21st century after-school programs now. In the past I found out about other free programs—I can't afford to put her in extra-curricular programs that cost money—through the school in Hamtramck. Sometimes I find free tutoring, but it's hard to get to if it's not at the school. I have all my kids in the 21st century program, except my youngest Alexander, who's in pre-k.

7.      She had to repeat the 7th grade, but she's a lot better than what she was. So far I've had two children graduate, and I have one more graduating this year. Malacah will be the next in line to graduate, and I'm trying to keep her in line to get there.

8.      I declare under penalty of perjury under the law of the United States that the foregoing facts are true and correct.

Executed this 19th day of January, 2017, in Detroit, Michigan.

DECLARATION IN SUPPORT OF AMICUS CURIAE 482FORWARD

Michele Phillips

DECLARATION IN SUPPORT OF AMICUS CURIAE 482FORWARD

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

| | |
|---|---|
| GARY B.; JESSIE K., a minor by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated.<br><br>  Plaintiffs,<br><br> vs.<br><br>RICHARD D. SNYDER, in his Official Capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH, KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHITSON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and Natasha Baker, in her official capacity as the State School Reform/Redesign Officers,<br><br>  Defendants. | Civil Action No.   16-CV-13292<br><br>HON. STEPHEN J. MURPHY III<br><br>M.J. ANTHONY P. PATTI<br><br>**DECLARATION OF ARLYSSA HEARD IN SUPPORT OF BRIEF OF *AMICUS CURIAE* 482FORWARD IN SUPPORT OF PLAINTIFFS** |

## DECLARATION OF ARLYSSA HEARD

I, Arlyssa Heard, declare under penalty of perjury as follows:

1.      I am a parent with 2 children enrolled or previously enrolled in Detroit's schools. I have been involved with 482Forward as a member and parent organizer in the Hope Village neighborhood of Detroit, where I live.

2.      My son CJ is currently 21 years old. My son Judah is 11 years old.

3.      CJ struggled a bit in elementary school, especially in English and his Reading Comprehension. I enrolled him in after-school tutoring, as well as in extracurricular activities on Saturday mornings that would help to build social skills for him at Marygrove Kids College. It was kind of like fun hands on science courses.

4.      But I didn't realize until CJ graduated from high school just how much of a struggle academically he had. Because in grade school he was getting A's and B's. His report card showed he was making the grade.

5.      When he went to a private school it came out that my son didn't know as much as I thought he did. I had a feeling on the inside because when we would do homework there was stuff he didn't know that I thought he should but I'm not real good with teaching kids stuff—I don't have patience—so I thought it was just me. But when I lost my job we had to go back to public school for high school.

6.      In high school, there were a couple classes that he got D's in and I

was real shocked. I was wondering was it him goofing off or does this child really not know the material. I was faced with that by 10th or 11th grade.

7.     His school closed at the end of his 11th grade year and so some of the teachers that were providing extra help and support were let go. He transitioned to a new school and that's when I really found out just how bad of a struggle my son was having because his ACT was a 15. He took it again and got a 16. It was at that point that I began to reflect on 4th grade and I started having flashbacks to all of those moments that in hindsight I know they were red flags but at the time I missed it because I thought I was just nit picking and he had good grades.

8.     At that point I didn't know what to do. I didn't know, how do you repair this? Whatever the foundational things my child didn't know, it seemed like they weren't just going to appear in 4 months at the end of his senior year. And I felt like I was watching the Titanic, because I knew in 11th grade with my son that we were sinking fast, but I had no idea what to do because I had never been here before, didn't know how you turn it around, didn't know who's to blame. I was dealing with, is my son a clown in class? And the biggest question I had was how the hell did he make it out of grade school? I had a lot of questions.

9.     The end of the story is that CJ went to college completely unprepared. One of the administrators at his high school pulled me in a room and said you know your son is graduating by the skin of his teeth, right? And I said if I

didn't know before, I know now.  We needed a miracle.  But CJ didn't make it.  By the end of his freshman year, he was already on probation, struggling.

10.     I think the workload, the speed, the responsibility of the studying, the comprehension level—I just think it was too much.  He went into his second year already on probation.  He didn't do well and he was no longer in school by the second semester of that year.  He's been home ever since, unemployed, with six or seven of his friends who have all gone through the same thing.

11.     So I was determined with Judah that the story would be different.  However, the nightmares of CJ haunt me.  Judah started off in a very family-oriented school with well-developed leadership.  Most of the staff had been there for 10 years or better.  Good parental support.

12.     And I was an involved parent.  I was the leader of the parent group.  I was a delegate to the DPS Title I Parent Advisory Committee.  I did workshops and trainings with parents.  I think that put me at the other end where people were really friendly about what my son needed.  They would say, 'Yeahhh we're gonna work with him'.  Because he has ADHD and I was in the school 3 times a week, I was always checking in on what he needed, and people were really nice about it.

13.     He had a great resource teacher that was structured and excellent and gave 110% and did everything he needed.  And he was improving.  The problem was when he would go back to the general ed classroom, where he spent the

majority of his time, it was like day and night. It was like pieces of him were just leaving year after year, until by the time he made it to third grade, he would only get as far as writing the first two letters of his name on an assignment. He had completely checked out mentally. He played with pencils, got out of his seat, walked out of classrooms, her was just off the hook.

14.     Often in the general ed classroom he was made to feel not as smart as the other kids because he would be teased when he would read aloud, and so that caused him to not want to participate. And then it had gotten to a point where one of the teachers even asked me if I could increase the dosage on his medicine so he would at least sit down. I was offended because it was at that point that I knew that was not helping to get my son educated. My thing for Judah was, first, he needed to have confidence that he was capable; second, how do you build a passion for learning in a kid whose experience is that learning is not fun, it's not for me, and I'm a dummy.

15.     To increase his interest in reading and help him learn, I would read stories with Judah at night. I let him choose the books, so that it was something he was interested in instead of the stuff they had at school. We would also go to the Children's Center, where we have therapists and counselors, and we'd get recommendations from those counselors. We talked to teachers, resource teachers, to try to build a partnership or network to work together.

16.    But the strategies the resource and general ed teachers were using weren't the same, on top of the fact that there were 42 other kids in the classroom. There just wasn't a whole lot of learning that was taking place because the teacher was bogged down just trying to settle everyone down and focus on the lesson.

17.    I didn't want to leave the school because my son was comfortable there and had friends there but I knew the longer he stayed there it was a slow academic death. It felt like an academic suicide for him. I made phone calls to find out where is the school that will help him. The district made the recommendation and we went to the new school and I sat in the classroom once a week for three weeks and it was more of the same. Super overcrowded. I didn't see in those classrooms—he was in the 4th grade—the appearance of the classroom, the teachers, the plans for the day—it looked and sounded very very boring and I did not see how 40 plus 10-year-old children would find anything interesting about school in the classrooms that I sat in. I sat in those classrooms and I watched my son play with a pencil. I thought to myself I can't do this.

18.    We made another move and went to a private school who told me after multiple interviews that he was the absolute right candidate for their curriculum, this was their specialty. Only to be told 6 weeks later that my son didn't fit the culture, so they pushed us out.

19.     At that point I wanted to give up because I knew that I didn't have the patience and wasn't qualified to homeschool my child.  His spirit was broken.  He did not want to even go to school.  And the saddest thing was there were about 5 other parents that I knew who were in the same boat as me but they didn't have the resources to float their kids around to different schools or have the connections to ask around.  I tried to do what I could because I didn't want my son to be dead on the vine, trapped in a school that he hated.  I'm not even going to say that people didn't want to help him, but the resources were not there to give him what he needed academically, socially, emotionally.  And I didn't know any school in this city that was free that could do that.  Except the school he is in now, which is the only one of its kind in the entire city.

20.     I declare under penalty of perjury under the law of the United States that the foregoing facts are true and correct.

Executed this 19th day of January, 2017, in Detroit, Michigan.

_____
Arlyssa Heard

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

GARY B.; JESSIE K., a minor by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated.

Plaintiffs,

vs.

RICHARD D. SNYDER, in his Official Capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH, KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHITSON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and Natasha Baker, in her official capacity as the State School Reform/Redesign Officers,

Defendants.

Civil Action No.   16-CV-13292

HON. STEPHEN J. MURPHY III

M.J. ANTHONY P. PATTI

**DECLARATION  OF KE'LI COLEMAN IN SUPPORT OF BRIEF OF *AMICUS CURIAE* 482FORWARD IN SUPPORT OF PLAINTIFFS**

## DECLARATION OF KELI COLEMAN

I, Ke'li Coleman, declare under penalty of perjury as follows:

1.      I am a parent with 5 children enrolled or previously enrolled in Detroit's schools.  I have been involved with 482Forward first as a member of Present! in Brightmoor, a community-based initiative to decrease chronic absenteeism in my neighborhood, and now as an organizer.

2.      Dejiza is my eldest daughter.  The decline of her education started in 8th grade.  She graduated from Gompers in their first 8th grade class.  From there, she wanted to attend Detroit Community High School, the only high school in our area—it's a charter school—and she was put on a wait list.

3.      Because I didn't want her to miss any school, I enrolled her in the closest Detroit Public School to me, which was Cody.  She attended Cody.  The first year they split the high school into three small schools, so she attended Cody Medicine Academy.

4.      She was good academically—she had a 3.0 GPA.

5.      But in her 9th grade year she became pregnant, and during her second trimester the school said it was unsafe for her to continue there as a student, but they could refer her to Catherine Ferguson, which was the only DPS school that allowed pregnant students to attend.  During her year there, she had one English teacher who was helping to sub for the math teacher.  They had no math teacher.

6.     She found out the school was closing at the end of the year so none of the training programs or extra classes were available any longer. So, the students were allowed to sit in their math hour and writing hour and just eat and hang out. Sometimes they would go to the nursery and help out with the girls who had just had their babies for something to do other than sit in class and eat. So, Dejiza decided that during her third trimester it was easier for her to stay at home instead of catching a two hour bus ride to sit in class where she wasn't given any instruction. She ended up dropping out of school.

7.     I looked for other avenues of education for her—either GED classes or job corps—but once she turned 18 she decided to give up on that and just try to find a job and try to take care of her child.

8.     Qui-Anna is my youngest child. She is now 14 years old. This story is about her third grade in the school where she is currently enrolled. She was falling behind in her reading and comprehension. The teacher, who was a new teacher at the school, asked me if Qui-Anna had an individualized education program, or IEP, she wasn't aware of. At that time I didn't know what an IEP was. So her teacher explained to me what it was and told me the steps I needed to take in order to have her tested.

9.     The school does not automatically request the IEP testing. The parent has to put it in writing in the form of a letter or email and then I had to fill out

forms to allow them to come into the school and test my daughter. About two months after that, she ended up being tested for IEP. The social worker and the counselors came in and they tested my daughter.

10.     It took about two weeks for the results to come back. They felt that Qui-Anna didn't need an IEP. She was testing below average, but not below enough to need special education. I explained to them that at that time I didn't have a vehicle to get her home from tutoring after school, so I put her in a neighborhood tutoring program at City Mission that provided transportation. She received tutoring once a week. Her reading improved somewhat, but it still wasn't up to level, so she failed the third grade.

11.     When she returned to the school in fourth grade, she had a new teacher. As long as she wasn't causing a problem in school, the teacher never said anything about her being behind. Her grades pretty much stayed the same—low but not failing—so it didn't reflect in her report card that she was behind. I figured the tutoring had helped.

12.     From that I figured it wasn't at a point where she couldn't learn to work, it was just she needed assistance to learn to work. I explained this to each new teacher that she had, but since then I've noticed that her grades have started to progressively drop.

13.     Once she started receiving failing grades again, I requested that she be

DECLARATION IN SUPPORT OF AMICUS CURIAE 482FORWARD

retested, and I asked for what other resources the school had available. I don't want her to continue to repeat the same grade and fall even further behind again.

14.    Once I requested the IEP, I feel that they started a campaign to push her out of the school. The teachers that told me that she was a happy child now tell me that she's a problem child who needs disciplinary action. Within a matter of weeks their opinion of her changed, and it seemed like they were trying to push her out instead of trying to retest her and keep her in the school.

15.    I declare under penalty of perjury under the law of the United States that the foregoing facts are true and correct.

Executed this 19th day of January, 2017, in Detroit, Michigan.

Ke'li Coleman

DECLARATION IN SUPPORT OF AMICUS CURIAE 482FORWARD

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of January, 2017, I filed the

foregoing document with the clerk of the court using the Court's

CM/ECF System, which will serve electronic notice upon all parties of

interest.

/s/ Mark Brewer
Mark Brewer