UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| GARY B.; JESSIE K., a minor, by Yvette K., guardian ad litem; CRISTOPHER R. and ISAIAS R., minors, by Escarle R., guardian ad litem; ESMERALDA V., a minor, by Laura V., guardian ad litem; PAUL M.; JAIME R., a minor, by Karen R., guardian ad litem, on behalf of themselves and all others similarly situated. | ) ) ) ) ) ) ) ) ) ) | |
| | ) | **CLASS ACTION** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 16-CV-13292 |
| RICHARD D. SNYDER, in his Official Capacity as Governor of the State of Michigan; JOHN C. AUSTIN, MICHELLE FECTEAU, LUPE RAMOS-MONTIGNY, PAMELA PUGH, KATHLEEN N. STRAUS, CASANDRA E. ULBRICH, EILEEN WEISER, and RICHARD ZEILE, in their official capacities as members of the Michigan Board of Education; BRIAN J. WHITSON, in his official capacity as Superintendent of Public Instruction for the State of Michigan; DAVID B. BEHEN, in his official capacity as Director of the Michigan Department of Technology, Management, and Budget; and NATASHA BAKER, in her official capacity as the State School Reform/Redesign Officer, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | HON. STEPHEN J. MURPHY III MAG. ANTHONY P. PATTI **BRIEF OF KAPPA DELTA PI, THE INTERNATIONAL LITERACY ASSOCIATION, AND THE NATIONAL ASSOCIATION FOR MULTI-CULTURAL EDUCATION AS *AMICI CURIAE* IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** |
| Defendants. | ) ) | |

# TABLE OF CONTENTS

INTERESTS OF THE *AMICI CURIAE* ...................................................................1

INTRODUCTION ............................................................................................3

1.  The Fundamental Right to Literacy and *Rodriguez*'s
    "Identifiable Quantum"..............................................................................4

2.  The Contemporary Academic Literature Provides Strong
    and Judiciable Tools for Measuring the Education Necessary for
    Citizens to Meaningfully Engage in Various Constitutional Rights ...............7

3.  Application of Flesch-Kincaid and the Lexile Framework Reveals an
    "Identifiable Quantum" of Education Necessary to Exercise Certain
    Constitutional Rights Meaningfully...............................................................10

    A.  Right to Speech and Press ......................................................................11

    B.  Right to Participate in the Political Process ...........................................14

    C.  Other Impacted Constitutional Rights....................................................17

CONCLUSION ...........................................................................................22

# TABLE OF AUTHORITIES

## Cases

*Associated Press v. United States*,
   326 U.S. 1 (1945)................................................................11

*Boykin v. Alabama*,
   395 U.S. 238 (1969)..........................................................18

*Brown v. Board of Ed.*,
   347 U.S. 384 (1954)............................................................4

*Citizens United v. Fed. Election Comm'n*,
   558 U.S. 310 (2010)..........................................................16

*Cruzan by Cruzan v. Dir., Missouri Dep't of Health*,
   497 U.S. 261 (1990)..........................................................19

*Dunn v. Blumstein*,
   405 U.S. 330 (1972)..........................................................14

*Kleindienst v. Mandel*,
   408 U.S. 753 (1972)..........................................................12

*Lamont v. Postmaster General*,
   381 U.S. 301 (1965)..........................................................11

*Memorial Hospital v. Maricopa County*,
   415 U.S. 250 (1974)..........................................................17

*Mills v. State of Ala.*,
   384 U.S. 214 (1966)..........................................................16

*Papasan v. Allain*,
   478 U.S. 265 (1986)............................................................5

*Plyler v. Doe*,
   457 U.S. 202 (1982)..........................................................20

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ........................................................................14

*Roth v. United States*,
    354 U.S. 476 (1957) ........................................................................11

*San Antonio Independent School Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ................................................................... *passim*

*Schuette v. Coal. to Defend Affirmative Action, Integration &*
    *Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*,
    134 S. Ct. 1623 (2014) ............................................................. 14, 15

*Shaw v. Reno*,
    509 U.S. 630 (1993) ........................................................................15

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ........................................................................18

*Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer*
    *Council, Inc.*,
    425 U.S. 748 (1976) ................................................................. 11, 12

*Washington v. Seattle School Dist. No. 1*,
    458 U.S. 457 (1982) ........................................................................15

## Statutes

Fla. Stat. 627.4145 ...........................................................................8

M.C.L. 28.435 .................................................................................19

## Other Authorities

International Center for Leadership in Education, *Achieving Reading*
    *Proficiency for All* (2003) ..............................................................13

National Center for Education Statistics, Working Paper No. 2001-08,
    August 2001 ...................................................................................9

National Commission on Excellence in Education, *A Nation at Risk: The Imperative for Educational Reform* (April 1983)............................................7

Robert P. Strauss and Helen Lin, *The Readability of the US Federal Income Tax System: Some First Results*, IRS/SOI Advisory Panel, June 13, 2014 ........................................................................................20

Willard R. Daggett, International Center for Leadership in Education, *Achieving Reading Proficiency for All* (2003).......................................20

William DuBay, *The Principles of Readability* (August 2004)................................8

World Literacy Foundation, *The Economic & Social Cost of Illiteracy: A Snapshot of Illiteracy in a Global Context* (September 2015)...........................3

## INTERESTS OF THE *AMICI CURIAE*

Kappa Delta Pi, International Honor Society in Education (KDP), was founded in 1911 to foster excellence in education and promote fellowship among those dedicated to teaching. KDP has initiated more than 1.2 million members, including graduate students, teachers, and other education professionals in 34 countries and at more than 650 active institutional and professional chapters. With a mission of inspiring and supporting teachers to prepare all learners for future challenges, KDP encourages quality learning by giving educators the means to implement research-based strategies, to continue professional growth, to develop and exert leadership skills, and to become master teachers.  KDP actively supports literacy initiatives, goals, and programs throughout the United States through its signature service program, Literacy Alive! With a sustained commitment to equity, KDP draws on its rich legacy of high standards and excellence in teaching to advance the goal of ensuring high-quality learning for all.

The International Literacy Association (ILA) is a global advocacy and membership organization dedicated to advancing literacy for all through its network of more than 300,000 literacy educators, researchers, and experts across 75 countries. With 60 years of experience in the field, ILA believes in the transformative power of literacy to create more successful societies, healthy communities, and prosperous economies. ILA collaborates with partners across the

1

world to develop, gather, and disseminate high-quality resources, best practices, and cutting-edge research to empower educators, inspire students, and inform policymakers. The International Literacy Association publishes several peer-reviewed journals, including *The Reading Teacher*, *Journal of Adolescent & Adult Literacy*, and *Reading Research Quarterly*.

The mission of the National Association for Multicultural Education (NAME) since the organization began in 1990 is to advance and advocate for equity and social justice through multicultural education. NAME's membership encompasses the spectrum of professional educators, literacy specialists (including early childhood), classroom and higher education faculty, administrators, psychologists, social workers, counselors, curriculum specialists, librarians, scholars, and researchers. NAME encourages people affiliated with teacher education, literacy, ethnic studies, ESL and bilingual education, social science, anthropology, liberal and fine arts programs, and other departments, colleges, and schools with an emphasis on multiculturalism to become members. In NAME's 27 years, it has worked together with its members and partners to create, improve, and distribute exceptional curricula and other resources to help move toward 100% literacy, educational equity, and social justice. NAME believes literacy is a cornerstone to educational equity.

**INTRODUCTION**

Plaintiffs in this litigation are schoolchildren at select Detroit public schools who allege that Defendants have denied them "access to the most basic building block of education: literacy." By nearly any measure, the schools identified in Plaintiffs' Complaint are dismal failures. The facts detailed therein of woefully inadequate facilities, overcrowded and unsanitary classrooms, and unprepared educational staff represent only the tip of the iceberg. There is widespread agreement within the education community that these schools are unsuccessful in almost every meaningful way. These deficiencies contribute largely to long-term unemployment and low income levels. Consequently, the cycle of poverty in one of our nation's most impoverished and vulnerable populations remains largely unbroken.

Education levels in general, and literacy specifically, are strongly correlated with a wide range of positive outcomes. From higher earnings to better health to decreased crime rates, literacy comes with numerous significant benefits. *See* World Literacy Foundation, *The Economic & Social Cost of Illiteracy: A Snapshot of Illiteracy in a Global Context* (September 2015), *available at* https://worldliteracyfoundation.org/wp-content/uploads/2015/02/WLF-FINAL-ECONOMIC-REPORT.pdf. In pure economic terms, the estimated cost of illiteracy in the United States is $362 billion annually. *Id.* at 4. Literacy is not

merely a public good; it is a prerequisite to the meaningful exercise of other constitutionally protected rights. The United States Supreme Court has recognized that there may be "some identifiable quantum of education [that] is a constitutionally protected prerequisite to the meaningful exercise of [other rights]." *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 36 (1973). As set forth herein, a basic level of access to literacy is one such prerequisite to the meaningful exercise of constitutional rights, including but not limited to voting, freedom of the press, interstate travel, and notice of criminal conduct.

The necessary level of literacy required as a prerequisite to exercise such rights is not an amorphous or unattainable concept. Over the past 40 years, academic research has developed effective, widely accepted literacy assessments, as well as measures of the literacy levels required to engage in certain activities. KDP details these tools herein and their relation to certain constitutionally protected activity in order to demonstrate that access to literacy is a prerequisite to Plaintiffs' meaningful exercise of numerous constitutional rights.

### 1. The Fundamental Right to Literacy and *Rodriguez*'s "Identifiable Quantum"

The Supreme Court has, on several occasions, addressed constitutional challenges to the educational system. In *Brown v. Board of Education*, 347 U.S. 384, 493 (1954), the Court recognized that "education is perhaps the most important function of state and local governments." Education "is required in the

performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship." *Id.*

Since *Brown v. Board of Education*, the Supreme Court has repeatedly returned to the question of when failures in education present a constitutional, and not merely a societal, problem. In *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 36-37 (1973), the Court held that a school funding system that provided schools with unequal resources (resulting, presumptively, in unequal student outcomes) did not invoke strict scrutiny because there was no "fundamental right" to a well-financed education implicated by the facts of that case. And in *Papasan v. Allain*, 478 U.S. 265, 284 (1986), the Court reaffirmed this ruling, noting that education "is not among the rights afforded explicit protection under our Federal Constitution."

Although the Court in both *Rodriguez* and *Papasan* did not recognize a broad-based right to "education" based on the specific allegations in those cases, the Supreme Court noted that there may be "some identifiable quantum of education [that] is a constitutionally protected prerequisite to the meaningful exercise of [other rights]." *Rodriguez*, 411 U.S. at 36. The plaintiffs in *Rodriguez* and *Papasan* did not, however, attempt to identify a specific quantum of education implicated by the defendants' conduct and connected to the exercise of other constitutional rights: "no charge fairly could be made that the system fails to

provide each child with an opportunity to acquire the basic minimum skills necessary for the enjoyment of the rights of speech and of full participation in the political process." *Id.*; *see also Papasan*, 478 U.S. at 284 ("The petitioners do not allege that schoolchildren in the Chickasaw Counties are not taught to read or write; they do not allege that they receive no instruction on even the educational basics; they allege no actual facts in support of their assertion that they have been deprived of a minimally adequate education [necessary for the exercise of their constitutional rights].").

In contrast to *Rodriguez* and *Papasan*, Plaintiffs in this case allege numerous facts supporting the charge that Plaintiffs effectively receive "no instruction on even the educational basics" such that they have been deprived of "a minimally adequate education" necessary for exercising certain constitutional rights. Defendants, through their policies and practices, have failed to provide Plaintiffs with the minimum amount of literacy necessary for full exercise of their First Amendment rights and effective participation in the political process (along with numerous other constitutional rights).

**2. The Contemporary Academic Literature Provides Strong and Judiciable Tools for Measuring the Education Necessary for Citizens to Meaningfully Engage in Various Constitutional Rights**

When *Rodriguez* was decided in 1973, educational assessment was in its infancy. The federal government had only just *begun* focusing on standardized testing, and it would be decades before school testing was widespread or regular (it is now both). *See* National Commission on Excellence in Education, *A Nation at Risk: The Imperative for Educational Reform*, at 28 (April 1983), *available at* http://files.eric.ed.gov/fulltext/ED226006.pdf (p. 35 out of 71) (1983 National Commission on Excellence study advocating for the expansion of standardized testing at the primary and secondary school levels); No Child Left Behind Act of 2001, Pub. L. 107-110 (requiring state-mandated expansion of standardized testing for primary school students); National Education Association, *History of Standardized Testing in the United States*, http://www.nea.org/home/66139.htm (describing standardized testing's now-widespread application).   Moreover, in 1973 there were few reliable methods for discerning how much education was required for students to understand a given piece of writing. As a consequence, the plaintiffs (and the Court) in *Rodriguez* could not identify what specific amount of education was necessary for students to meaningfully exercise their First Amendment rights or to effectively participate in the political process. Nor could

the *Rodriguez* plaintiffs (or the Court) assess whether certain schools or districts were failing to meet that minimum bar. This is no longer the case.

In the mid-1970s, J. Peter Kincaid calibrated the "Flesch-Kincaid" reading grade level *assessment* to measure the grade-level of technical materials for the U.S. Navy. *See* William DuBay, *The Principles of Readability*, at 21 (August 2004). Since then, the Flesch-Kincaid method has been widely employed by legislative and regulatory bodies to ensure that important social documents are sufficiently readable. *See, e.g.*, South Carolina Department of Insurance, Departmental Interpretation of Act No. 66 of 1999, https://online.doi.sc.gov/Eng/Public/Bulletins/Bulletin996.aspx (requiring that life insurance forms "clearly and conspicuously" state language in a manner that achieves a "grade level score of no higher than seventh grade on the Flesch-Kincaid readability test"); Fla. Stat. 627.4145 (prohibiting insurance policies from being written higher than a 12th grade Flesch-Kincaid reading level).

In the decades following the introduction of Flesch-Kincaid, numerous other metrics have arisen for *assessing* the difficulty of text. The most widely used measure today is the Lexile Framework, which, similar to Flesch-Kincaid, is a linguistic-based algorithm that can be applied to any text. Notably, the Common Core Standards rely heavily on the Lexile Framework and, as a consequence, Lexile measures are used today in schools in all 50 states. Lexile, Common Core

Standards, https://www.lexile.com/using-lexile/lexile-measures-and-the-ccssi/. Moreover, 20 states report Lexile measures statewide on their year-end assessments. *Id.* Over half of all U.S. students participate in reading assessments and programs that make use of Lexile measures. *Id.*

Both Flesch-Kincaid and Lexile apply a similar approach to measuring reading difficulty. First, both *metrics* look at sentence length, which indicates the level of syntactic complexity: the shorter the sentences, the easier a passage is to read. National Center for Education Statistics, Working Paper No. 2001-08, at 2-3 (August 2001), *available at* http://nces.ed.gov/pubs2001/200108.pdf. Then, Flesch-Kincaid and Lexile measure semantic complexity. Flesch-Kincaid does this using a syllables-to-word algorithm. Lexile applies a formula focusing on word rarity. Both measures are based on the principle that the more familiar the words in a passage, the easier that passage will be to read.

The academic literature strongly supports the validity of this two-step method for assessing a text's reading difficulty: "sentence length and word frequency [are valuable] measures of semantic and syntactic complexity," both "as proxies [and] as direct measures." *Id.* at 9. The Lexile Framework in particular is empirically supported, valid, efficient, and reliable. In the words of one National Counsel of Education Statistics panel member, the Lexile Framework is "exceptional in the psychometric care with which it has been developed; the extent

9

of its formal validation with different populations of texts, tests, and children; in its automation; and in its developers' continual quest to improve it." *Id.* at 19.

Courts now have multiple strong tools for assessing and quantifying what specific levels of literacy are necessary to be able to understand any given text. With the prevalent use of standardized testing in recent years, courts also have multiple strong tools for determining whether a given student, classroom, or community has those necessary skills. In this regard, the Lexile Framework is noteworthy because it can assess the reading level of a text *and* the reading level of a student, pairing them appropriately to one another. *See* MetaMetrics, The Lexile Framework for Reading, https://www.metametricsinc.com/lexile-framework-reading/ ("The true power of the Lexile Framework is its ability to measure both reading ability and text complexity on the same developmental scale.").

### 3. Application of Flesch-Kincaid and the Lexile Framework Reveals an "Identifiable Quantum" of Education Necessary to Exercise Certain Constitutional Rights Meaningfully

The Flesch-Kincaid and Lexile metrics can be applied to determine the measurable levels of literacy necessary to exercise various constitutional rights meaningfully. As this analysis indicates, the *meaningful* exercise of numerous constitutional rights requires at least a ninth grade reading level.[1]  Based on the

---

[1]  Amici do not believe that a State's obligation to educate its children therefore stops at the ninth grade.  Rather, this represents the *absolute* minimum

allegations in Plaintiffs' complaint, Defendants' conduct results in literacy levels insufficient for the exercise of Plaintiffs' constitutional rights. As a consequence, such conduct should be reviewed with strict scrutiny.

### A.  Right to Speech and Press

The First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 482, (1957). As the First Amendment itself makes clear, the press is essential to the unfettered interchange of ideas. The First Amendment "rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society." *Associated Press v. United States*, 326 U.S. 1, 20 (1945). As a consequence, the Supreme Court has repeatedly reaffirmed the need for unfettered access to newspapers, books, magazines, leaflets, and other manifestations of "press." *See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748 (1976) (right to receive commercial advertising); *Lamont v. Postmaster General*, 381 U.S. 301 (1965) (right to receive foreign political publications).

---

level of literacy that must be made available to students so as not to result in a violation of numerous other constitutional rights.

However, information can only be spread as far as it is understood, and there is no exchange of ideas where there is no shared comprehension. "Freedom of speech presupposes a willing speaker. But where a speaker exists, as is the case here, the protection afforded is to the communication, to its source *and to its recipients both*." *Virginia State Bd. of Pharmacy*, 425 U.S. at 757 (emphasis added); *see also Kleindienst v. Mandel*, 408 U.S. 753, 763-64 (1972) ("It is now well established that the Constitution protects the right to receive information and ideas. This freedom of speech and press necessarily protects the right to receive.").[2]

Some basic level of literacy is therefore a prerequisite to the meaningful exercise of speech and press: "The 'marketplace of ideas' is an empty forum for those lacking basic communicative tools" and "the corollary right to receive information becomes little more than a hollow privilege when the recipient has not been taught to read, assimilate, and utilize available knowledge." *Rodriguez*, 411 U.S. at 35. By adopting policies that leave students without access to a minimum

---

[2] In *Kleindienst*, the Supreme Court also rejected the government's argument that alternative forms of access other than the recipient's preferred form of access (e.g., audiotape or telephone interaction rather than the speaker's physical presence) extinguishes the recipient's First Amendment rights: "While alternative means of access to Mandel's ideas might be a relevant factor were we called upon to balance First Amendment rights against governmental regulatory interests . . . we are loath to hold on this record that existence of other alternatives extinguishes altogether any constitutional interest on the part of the appellees in this particular form of access." *Id.* at 765.

level of literacy, Defendants curtail the First Amendment just as if they had imposed a requirement that press be published in a language not spoken by the general public.

*Rodriguez* recognized as much in noting that there may be "some identifiable quantum of education [that] is a constitutionally protected prerequisite to the meaningful exercise of speech." *Id.* The *Rodriguez* Court, however, did not have the evidence—or even the tools—to show whether "the present levels of educational expenditures in Texas provides an education that falls short." *Id.* This Court now has well-developed and widely accepted tools to do so.

Applying the Lexile Framework to the national press results in an identifiable quantum of literacy necessary to understand that publication. The New York Times has a measured Lexile score of 1380L (corresponding to a high-12th grade reading level). The Washington Post scores 1350L (12th grade reading level), and USA Today scores 1200L (11th-12th grade reading level). *See* Willard R. Daggett, International Center for Leadership in Education, *Achieving Reading Proficiency for All*, at 7 (2003), *available at* http://leadered.com/pdf/Reading%20White%20Paper.pdf. The most readable publication with a nationwide distribution is Time Magazine, with a Lexile score of 1070L (ninth grade level). *Id.* As a consequence, a graduate of the Detroit Public School system who reads on an eighth grade reading level cannot understand fully

the New York Times, Washington Post, Time Magazine, or any other publication with a national distribution.

### B. Right to Participate in the Political Process

The Supreme Court has also recognized that there is "a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. By Any Means Necessary (BAMN)*, 134 S. Ct. 1623, 1652 (2014) (Sotomayor, J., dissenting) ("Although these political restructurings may not have been discriminatory in purpose, the Court reaffirmed the right of minority members of our society to participate meaningfully and equally in the political process."). "The right to vote in federal elections is conferred by Art. I, s 2, and the Seventeenth Amendment of the Constitution, and access to the state franchise has been afforded special protection because it is 'preservative of other basic civil and political rights.'" *Rodriguez*, 411 U.S. at 114 (Brennan, J., dissenting) (quoting *Reynolds v. Sims*, 377 U.S. 533, 562 (1964)).

As Justice Sotomayor explained, "[o]ur cases recognize [two uncontroversial] features of the right to meaningful participation in the political process." *BAMN*, 134 S. Ct. at 1668 (Sotomayor, J., dissenting). "First, every eligible citizen has a right to vote." *Id.*; *see also Shaw v. Reno,* 509 U.S. 630, 639

(1993). Second, "the majority may not make it more difficult for the minority to exercise the right to vote." *BAMN*, 134 S. Ct. at 1668. Thus, the Court must "remove[] certain barriers to the minority's participation in that [political] process," *id.*: "minorities are no less powerless with the vote than without it when a racial criterion is used to assign governmental power in such a way as to exclude particular racial groups 'from effective participation in the political proces[s].'" *Washington v. Seattle School Dist. No. 1*, 458 U.S. 457, 486 (1982). In the past, the Court has "invalidated grandfather clauses, good character requirements, poll taxes, and gerrymandering provisions." *BAMN*, 134 S. Ct. at 1668.

*Rodriguez* specifically contemplated the possibility that "the system [could] fail[] to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process," and thereby trigger strict scrutiny. *Rodriguez*, 411 U.S. at 36-37. In *Rodriguez*, however, the Court concluded that it had no evidence that the spending disparities in question failed in such a manner. That evidence now exists.

Modern tools of textual analysis like the Lexile Framework and the Flesch-Kincaid test provide justiciable measures of the *specific* levels of literacy necessary for full and effective participation in the political process. Literacy impacts participation in the political process in two substantial ways. First and most directly, ballots are written documents. To be able to exercise one's right to

participate in the political process in a meaningful manner, one must first be able to read and understand the ballot. As one of many examples available that illuminate the burden faced by voters with low literacy skills, the Presidential Ballot for Wayne County, Michigan, included a proposition that was written on a 16.2 grade reading level according to the Flesch-Kincaid grade level test.[3] Wayne County Clerk, Elections Division – Election Information, 2016 November 8th General Election Information, Official Proposals List, http://waynecounty.com/clerk/1607.htm.[4]

Second, "it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 341 (2010). "The Constitution specifically selected the press, which includes not only newspapers, books, and magazines, but also humble leaflets and circulars," "to protect the free discussion of governmental affairs." *Mills v. State of Ala.*, 384 U.S. 214, 218–19 (1966). Just as students who cannot read cannot fully engage in their First Amendment rights, they also cannot participate in "the free discussion of

---

[3] Unless otherwise cited, Flesch-Kincaid reading levels provided herein are derived from inputting the plain text into Microsoft Word and using Microsoft Word's Flesch-Kincaid calculator.

[4] The Help America Vote Act of 2002, which requires only *one* ballot machine equipped with the ability to read the ballot aloud in each polling location, is of little benefit to communities served by failing schools—like those described by Plaintiffs' suit—where substandard levels of literacy are the norm.

governmental affairs." As a consequence, an inability to read national publications like the New York Times (12th grade Lexile), Washington Post (12th grade Lexile), USA Today (11th-12th grade Lexile), or Time Magazine (ninth grade Lexile) deprives students of the ability to participate in the political process meaningfully and effectively.

### C. Other Impacted Constitutional Rights

Although *Rodriguez* specifically refers only to the First Amendment and the right to engage in the political process, these are not the only constitutional rights for which literacy is an effective prerequisite. Students who fall significantly behind in their reading levels will also be unable to effectively exercise other constitutional rights as well.

For example, "the right of interstate [and intrastate] travel has repeatedly been recognized as a basic constitutional freedom." *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254-55 (1974); *Bell v. State of Md.*, 378 U.S. 226, 255 (1964). Strict scrutiny is therefore triggered by "any classification which serves to penalize the exercise of that right (to travel)." *Maricopa Cty.*, 415 U.S. at 258. And yet, the Michigan State Driver's Manual—which is titled by the State "What Every Driver Must Know"—is written on a ninth grade Flesch-Kincaid level. The Michigan Driver's Test is based on the content of that very manual.

17

Michigan Secretary of State, What Every Driver Must Know, *available at* http://driving-tests.org/michigan/mi-dmv-drivers-handbook-manual/.

The right to an adequate criminal defense and other constitutional restrictions on criminal laws are also jeopardized by illiteracy. Criminal laws tend to be written at high reading level; even the introduction to Chapter 750 of Michigan's Penal Code reads at a 10th grade Flesch-Kincaid level. The constitutional prohibition against vague criminal laws is itself based on the importance of citizens being able to understand the laws that are published:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing a fair warning.

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  Similarly, an illiterate criminal defendant who cannot read the laws that she is accused of violating may therefore struggle to obtain "a full understanding of what [her guilty] plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 244 (1969)

The right to refuse medical treatment is also jeopardized by illiteracy.  For example, a sample medical release published by the Michigan Department of Community Health tested at a 14.8 grade Flesch-Kincaid level. *See* Michigan Department of Community Health, Sample EMS Refusal Form, *available at*

http://www.michigan.gov/documents/mdch/Refusal_of_Care.form_298393_7.pdf.

Similarly, a patient who cannot read his or her medical chart, medical literature describing a specific course of treatment, or the release he or she is required to sign in order to accept or decline that treatment may not be able to "competent[ly exercise her] constitutionally protected liberty interest in refusing unwanted medical treatment." *Cruzan by Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261, 278 (1990).

Illiteracy also implicates one's ability to exercise Second Amendment rights. For example, the federal government requires a background check in many instances in order to purchase a gun, and that background check reads at a 9.7 grade Flesch-Kincaid level.  U.S. Dep't of Justice, Firearms Transaction Records Part I, *available at* https://www.atf.gov/file/61446/download.[5] Michigan law also requires firearms dealers to provide conspicuous notice that "You may be criminally and civilly liable for any harm caused by a person less than 18 years of age who lawfully gains unsupervised access to your firearm if unlawfully stored," a statement that standing alone suggests an 11th grade Flesch-Kincaid reading level.  M.C.L. 28.435(6).  Thus, a person who does not have access to a ninth grade reading level, at a minimum, will face additional difficulty in fulfilling reasonable

---

[5] If the person is unable to read or write, they may have someone other than the seller complete the form, but only if signed by two witnesses other than the seller to the buyer's answers and signature.

prerequisites to exercising their Second Amendment rights and of being provided notice of additional reasonable restrictions and consequences.

Finally, there are numerous other important documents required of modern citizens that are written at a ninth grade reading level or higher. *See Plyler v. Doe*, 457 U.S. 202, 223 (1982) ("By denying these children a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation."). For example, the W-4 Employee Withholding tax form scores 1260L (corresponding to a 10th-11th grade reading level) and the Arkansas State Employment Application scores 1410L (corresponding to a post-secondary reading level). *See* Willard R. Daggett, International Center for Leadership in Education, *Achieving Reading Proficiency for All* (2003), *available at* http://leadered.com/pdf/Reading%20White%20Paper.pdf. The readability of the U.S. income tax systems tests in a similar range on the Flesch-Kincaid grade level assessment. For example, the IRS Code Title 26 tests at a 9.8 grade level, according to Flesch-Kincaid analysis. *See* Robert P. Strauss and Helen Lin, *The Readability of the US Federal Income Tax System: Some First Results*, IRS/SOI Advisory Panel, June 13, 2014, *available at* https://www.irs.gov/pub/irs-soi/14rpreadabilityfederalincometaxsystem.pdf.

Amici include below two charts excerpted from Daggett's study detailing the Lexile Framework scores of a number of such important documents. A range of 1050L-1250L corresponds roughly to a ninth grade reading level under the Common Core State Standards measures. *See* Lexile, Lexile-to-Grade Correspondence, https://www.lexile.com/about-lexile/grade-equivalent/grade-equivalent-chart/.

**Lexile Measures of Personal Reading**

| Citizen Reading Material | Lexile Measure |
|---|---|
| Form W-4 Employee Withholding | 1260L |
| Employee's Withholding Exemption Certificate [Arkansas Form AR4EC] | 1350L |
| U.S. Dept. of Justice (INS) - Employment Eligibility Verification | 1340L |
| Safety Notice for Spa Owner | 1390L |
| Prospectuses 2002 - College Retirement Equities Fund, TIAA Real Estate Acct. | 1460L |
| Connections – Health Coverage | 1400L |
| Medical Insurance – Proposed Benefit Package [Airtherm] | 1280L |
| Provider Directory [Aetna U.S. Healthcare] | 1520L |
| Vision One Discount Program [Aetna U.S. Healthcare] | 1360L |
| Open Choice PPO [Aetna U.S. Healthcare] | 1280L |
| Pharmacy Directory [Aetna U.S. Healthcare] | 1180L |
| GM Protection Plan/Warranty | 1150L |
| 2002 Cadillac Eldorado Brochure | 1150L |
| Privacy Act Notice to Students [Empire State College] | 1780L |
| Entry to the Teaching Profession - How to Get Certification [Empire State College] | 1270L |
| Academic Policy [Empire State College] | 1250L |
| Empire State College Student Handbook | 1320L |
| Arkansas Driver's Manual | 1020L |
| State Employment Application [Arkansas] | 1410L |

| Lexile Measure | High School Students (middle 50% at midyear) | Classroom Materials (middle 50%) | Personal Use Reading | Newspapers | Career Clusters Entry-level 75th percentile |
|---|---|---|---|---|---|
| 1700L | | | | | Law & Public Safety (1740) |
| 1600L | | | | | |
| 1500L | | | | | Ag./Natural Resources (1510) |
| 1400L | | | Safety Manual for Spa (1390) Aetna Health Discount Form (1360) | Reuters (1440) New York Times (1380) Washington Post (1350) Wall Street Journal (1320) Chicago Tribune (1310) Associated Press (1310) | Education & Training (1370) Transp./Distr./Log. (1350) Arch./Construction (1340) Manufacturing (1310) Business and Admin. (1310) |
| 1300L | Grades 11/12 1100-1300 | Grade 10 1100-1200 | Medical Ins. Benefit Pkg (1280) Application-Student Loan (1270) Federal Tax Form W-4 (1260) | | Health Science (1300) Retail/Wholesale (1270) Hospitality & Tourism (1260) Scientific Res./Engr. (1250) |
| 1200L | Grades 11/12 940-1210 | | | USA Today (1200) | Human Services (1200) Arts/AV Tech/Comm. (1190) |
| 1100L | Grade 10 905-1195 | | G.M. Protection Plan (1150) | | |
| 1000L | | | | | |
| 900L | | | | | |

## CONCLUSION

With modern advancements in assessment measures, this Court now has the tools it needs to determine what "quantum of education" is a necessary prerequisite for the meaningful exercise of other constitutionally protected rights. As Amici's analysis indicates, access to a ninth grade Flesch-Kincaid or Lexile Framework reading level is required, at a very minimum, for the meaningful and effective exercise of First Amendment rights, for full and effective participation in the political process, and for taking advantage of numerous other recognized

constitutional rights (as discussed above). And, as Plaintiffs' allegations show, Defendants' schools fall short in nearly every important respect—including, importantly, in providing students with access to such minimal levels of literacy.

Amici's proposed standard is judiciable and is consistent with the Supreme Court's jurisprudence, and it should therefore be applied by this Court to determine whether strict scrutiny applies, how to assess Plaintiffs' allegations and the results of Defendants' conduct, and how to remedy any constitutional violations.

Dated:  February 2, 2017    Respectfully submitted,

         By: /s/ Dennis J. Clark
         One of the Attorneys for Kappa Delta
         Pi,  International Literacy Association,
         and National Association for
         Multicultural Education as *Amici*
         *Curiae*

          Dennis J. Clark
          CLARK LAW FIRM PLLC
          Ford Building
          615 Griswold St.
          Suite 701
          Detroit, MI 48226
          Office: 313-962-2233
          djclarklaw@gmail.com
          MI Bar Number: P41557

Reginald M. Turner
CLARK HILL PLC
500 Woodward Ave.
Suite 3500
Detroit, MI 48226
Phone: (313) 965-8318
Fax: (313) 309-6818
rturner@clarkhill.com
MI Bar Number: P40543

George A. Zelcs
Randall P. Ewing, Jr.
KOREIN TILLERY LLC
205 North Michigan Avenue
Suite 1950
Chicago, Illinois 60601
Phone: (312) 641-9760
Fax: (312) 641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com

Stephen M. Tillery
Noah Smith-Drelich
KOREIN TILLERY LLC
505 North Seventh Street
Suite 3600
St. Louis, Missouri 63101-1625
Phone: (314) 241-4844
Fax: (314) 241-3525
stillery@koreintillery.com
nsmithdrelich@koreintillery.com

## **CERTIFICATE OF SERVICE**

I certify that on February 2, 2017, I electronically filed the foregoing documents, Brief of Kappa Delta Pi, the International Literacy Association, and National Association for Multicultural Education as *Amici Curiae* in Opposition to Defendants' Motion to Dismiss, with the Clerk of the Court using the ECF system, which will send notification of such filing to all ECF-registered counsel of record.

Respectfully Submitted,

By: /s/ Dennis J. Clark
Dennis J. Clark (P41557)
Clark Law Firm PLLC
615 Griswold, Suite 701
Detroit, MI 48226
Ph: 313-962-2233
djclarklaw@gmail.com

*Attorney for amici curiae Kappa Delta Pi,*
*The International Literacy Association, and*
*National Association for Multicultural*
*Education*