UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY B., et al.,

     Plaintiffs,                         Case No. 2:16-cv-13292

v.                                   HONORABLE STEPHEN J. MURPHY, III

RICHARD SNYDER, et al.,

     Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS [60]

Plaintiffs are minor children who attend, or attended, public schools in Detroit. They have alleged that the conditions of their schools are so poor, and so inadequate, that they have not received even a minimally adequate education. Specifically, they alleged they have been denied access to literacy on account of their races, in violation of their rights under the Due Process and Equal Protection Clauses of the 14th Amendment of the United States Constitution. They brought suit against the Michigan state officials they believe to be responsible. Defendants filed a motion to dismiss the Complaint, principally because they believe Plaintiffs sued the wrong parties. Defendants also contend that Plaintiffs' alleged harm is not cognizable under the Constitution. Many amici weighed in on the matter and the Court held a hearing. For the reasons below, the Court must grant the motion and dismiss the case.

## STANDARD OF REVIEW

The Court may grant a Rule 12(b)(6) motion to dismiss if the complaint fails to allege facts "sufficient 'to raise a right to relief above the speculative level,' and to 'state a

claim to relief that is plausible on its face.'" *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). The Court will view the complaint in the light most favorable to the plaintiff, presume the truth of all well-pled factual assertions, and draw every reasonable inference in favor of the non-moving party. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). If "a cause of action fails as a matter of law, regardless of whether the plaintiff's factual allegations are true or not," then the Court must dismiss it. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009).

## DISCUSSION

The Complaint contains five counts:

Count One is brought under 42 U.S.C. § 1983 and alleges the deprivation of a fundamental right under the Fourteenth Amendment's Due Process Clause.

Count Two is also a § 1983 claim under the Due Process Clause and alleges that Defendants, as state actors, created or increased a danger.

Count Three is also § 1983 action and alleges disparate treatment on the basis of race, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Count Four is brought under Title VI of the Civil Rights Act and related federal regulations and alleges that Defendants used federal funds to intentionally discriminate against Plaintiffs on the basis of race.

Count Five seeks a judicial declaration that Defendants violated the Constitution and federal law.

Plaintiffs voluntarily dismissed Counts Two and Four, *see* ECF 64, PgID 1445, n.11; ECF 109, PgID 2590–91, so two avenues of relief remain: the Due Process Clause and the Equal Protection Clause.

Defendants move to dismiss the Complaint on two grounds. First, they insist that they cannot be sued. According to Defendants, the State of Michigan and its officials never operated Plaintiffs' schools, so they are the wrong parties to enjoin. Moreover, Defendants contend that they are immune from suit under the Eleventh Amendment. Second, Defendants argue that access to literacy is not a constitutionally protected right, so the failure to provide such access cannot constitute a valid claim under 28 U.S.C. § 1983. They also dispute the allegation that Plaintiffs have been treated differently on account of their races.

A description of the background of the matter will help to illuminate the posture of the suit, and the background will in turn help answer whether Defendants are indeed the proper parties to be sued. Thus, the Court will begin with a description of those facts.

I.  Who Controls Detroit Schools?

Plaintiffs assert, "[t]he State of Michigan is ultimately responsible for complying with all constitutional mandates regarding public education. But it has particular responsibility for the schools in Detroit, as it has controlled the [Detroit Public Schools] (and now, [Detroit Public Schools Community District]) schools since 1999." ECF 1, PgID 46, ¶ 61. Accordingly, Plaintiffs hold Defendants "responsible for the education of all Michigan public school students and for the system of Michigan public schools[.]" *Id.* at 126, ¶ 200. Defendants counter that though the State has a supervisory role in education and eventually appointed an emergency manager, the State never had "direct control"

over Detroit schools—at most, one local authority supplanted another. *See* ECF 60, PgID 505–509.

A. Education in Michigan

1. The Structure of Authority in Michigan Schools

In Michigan, educational responsibilities begin at the state level. The Michigan Constitution requires the legislature to "maintain and support a system of free public elementary and secondary schools" and every school district must "provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin." Mich. Const. art. 8, § 2.[1] The constitution further states that "[l]eadership and general supervision over all public education . . . is vested in a state board of education." *Id.* § 3.

Michigan's legislature exercised its constitutional obligations by passing and periodically updating the Revised School Code. The Code governs the various types of school districts in the State, Mich. Comp. Laws §§ 380.1131, 380.11a, and requires the board of each district to "establish and carry on the grades, schools, and departments it considers necessary or desirable for the maintenance and improvement of its schools and determine the courses of study to be pursued," *id.* § 380.1282(1). *See also id.*

_____

[1] Some of the Plaintiffs attend charter schools—technically "public school academies" under the Code. ECF 1, PgID 20, ¶ 23; Mich. Comp. Laws § 380.501. The Code states that a "public school academy is a public school" under the Michigan Constitution and the relevant provisions of the Code. *Id.* § 380.501(1). The Michigan Supreme Court affirmed the constitutionality of the charter-school provision and concluded that public school academies are "public schools." *Council of Orgs. & Others for Educ. About Parochiaid, Inc. v. Governor*, 455 Mich. 557, 576, 587 (1997).

§ 380.1278 (requiring local school boards to establish certain curricula). Still, the Code also reaffirms the state board of education's role in "leadership and general supervision of all public education[.]" *Id.* § 388.1009.

### 2. Michigan's Successive Public Acts

Circumstances sometime require more state involvement—especially when those circumstances involve finances. Over the last few decades, Michigan enacted several statutory schemes permitting state officials to appoint managers in the event of financial crises. *See generally Phillips v. Snyder*, 836 F.3d 707, 711–12. (6th Cir. 2016) (summarizing Michigan's various statutory schemes since 1988). Michigan used those mechanisms to intervene in Detroit public schools more than once.

In 1999, Public Act 10 went into effect. The Act required Detroit's mayor to appoint a "school reform board" charged with appointing a chief executive officer. Act of March 26, 1999, §§ 372(1), 374(1). The reform board was initially composed of seven members: six appointed by Detroit's mayor, and the seventh appointed by "the superintendent of public instruction or his or her designee." *Id.* § 372(2)(b).[2] After five years, the mayor would gain the power to appoint the seventh member as well. *Id.* The arrangement ended in 2004, however, when a voter referendum returned governance of Detroit Schools to a locally elected board. ECF 1, PgID 51, ¶ 69; ECF 60, PgID 506.

In 2008, the state again became involved. Plaintiffs assert that the Governor "invoked Public Act 72 to appoint an Emergency Financial Manager" for Detroit Public Schools. ECF 1, PgID 51, ¶ 69. Public Act 72, also known as the "Local Government

---

[2] Plaintiffs assert that the Governor of Michigan appointed the seventh member. ECF 1, PgID 50, ¶ 68.

Fiscal Responsibility Act," went into effect in 1990 and has since been repealed. But in 2008, it required the Governor to appoint an emergency financial manager for the district if certain financial conditions in a school district occurred. Mich. Comp. Laws § 141.1238(1). By the terms of the Act, the State's superintendent of public instruction prepared a list of potential nominees, the State's board of education narrowed the list down to three candidates, and the Governor made a final selection from them. *Id.* Plaintiffs concede that the emergency financial manager "shared power" with the locally elected school board, but aver the manager nevertheless "exercised authority not only over financial decision-making, but some educational decision-making as well." ECF 1, PgID 51, ¶ 69. Although the Complaint does not go into further detail, the characterization is consistent with the broad powers granted to the manager under the Act. *See generally* Mich. Comp. Laws §§ 141.1240, 141.1242 (repealed 2013).

In 2011, the emergency manger gained more power in governing the affairs of Detroit schools. That year, Michigan repealed Public Act 72 and replaced it with Public Act 4, the "Local Government and School District Fiscal Accountability Act." Public Act 4 did not last long—Michigan voters rejected it by referendum the following year—but the legislature soon replaced it with the very similar Public Act 436, which remains in effect. *See* Mich. Comp. Laws § 141.1541, *et seq.* Just as with the prior Public Acts, 4 and 436 also required the Governor to appoint a review board principally composed of state actors. Mich. Comp. Laws § 141.1512(4) (repealed by Prop. 12-1, Aug. 8, 2012); *Id.* § 141.1544(4). But the Acts also empowered the emergency managers to "[e]xercise solely, for and on behalf of the school district, all other authority and responsibilities affecting the school district that are prescribed by law to the school board and

6

superintendent of the school district." Mich. Comp. Laws § 141.1520(f) (repealed by Prop. 12-1, Aug. 8, 2012); *Id.* § 141.1554(f).

### 3. Priority Schools and the Education Achievement Authority

The State's interventions have not always been finance-driven. Detroit students' academic performance also prompted State intervention through additional measures: the designation of Priority Schools and the creation of the Educational Achievement Authority.

Since 2010, the Code has required the State's Superintendent of Public Instruction to publish a list of the State's lowest-performing schools and place those schools "under the supervision of the state school reform/redesign officer," who is also known as the "SRO." Mich. Comp. Laws § 380.1280c. A school's designation as a "Priority School" triggers steps to devise a plan, including "input from the local teacher bargaining unit and the local superintendent." *Id.* § 380.1280c(2). One outcome of the requirements has been the creation of a "state school reform/redesign school district" over which the SRO acts as the superintendent. *Id.* § 380.1280c(6). The SRO "may exercise all the powers and duties otherwise vested by law in the school board that previously operated [the] school" other than taxation and borrowing. *Id.* § 380.1280c(6)(b). Notably, the SRO "accedes to all the rights, duties, and obligations of the school board with respect to that school." *Id.*

All of the schools attended by Plaintiffs (that have not already closed) have been designated as "Priority Schools" and are supervised by the SRO. ECF 1, PgID 52, ¶ 70.

The State has also intervened in Detroit schools through the Education Achievement Authority (EAA). Michigan law permits school districts and other governmental entities (with the Governor's approval) to enter into "interlocal agreements" to share powers and resources. Mich. Comp. Laws §§ 124.502, 505a, 510(1). Through

those agreements, the government entities can create new legal entities, such as commissions, boards, or councils, which are then given significant powers. *Id.* § 124.507(1)–(2). In 2011, an emergency manager acting in the stead of the Detroit Public Schools' board entered into an interlocal agreement with Eastern Michigan University's Board of Regents that transferred 15 Detroit schools[3] into a new, statewide district. ECF 1, PgID 54, ¶ 75, ECF 64, PgID 1453. Pursuant to the agreement,

> Seven of the eleven members of the EAA's board of directors [were] appointed by the Governor, and the Governor also appoint[ed] the executive committee from among the board members. The executive committee then appoint[ed] the EAA chancellor, who ha[d] great autonomy and control over the administration of the EAA schools.

ECF 1, PgID 54–55, ¶ 75. The EAA has since disbanded.

## B. Supervision or Control?

In light of the foregoing, there is no question that the State has been heavily involved with Detroit schools for some time. Indeed, Public Act 10 went into effect before any of the Plaintiffs were of school age, and in most cases, before they were even born. There likewise is no question that Michigan law imbues the emergency managers—under any of their various legal descriptions—with significant power and authority to conduct the affairs of Detroit schools. The question, then, is whether the State's involvement described here makes its actors the proper parties to sue in the case.

Defendants suggest that the answer is no and direct the Court to *Phillips v. Snyder*, 836 F.3d 707 (6th Cir. 2016). There, voters and elected officials sued Michigan's Governor and Treasurer and argued that Public Act 436 violated the United States

---

[3] The EAA did not govern any of the named Plaintiffs' schools. But the putative class described in the Complaint would include students who attended EAA schools.

Constitution as well as the Voting Rights Act. *Phillips*, 836 F.3d at 710. Specifically, the plaintiffs argued that the appointment of emergency managers "violate[d] their substantive due process right to elect local legislative officials." *Id.* The Court of Appeals affirmed the district court's dismissal of the due-process claims because "given the need for states to structure their political subdivisions in innovative ways, there is no fundamental right to have local officials elected." *Id.* at 715 (relying upon *Sailors v. Bd. of Educ.*, 387 U.S. 105 (1967)). Arguably, the holding implicitly recognized that the emergency managers at issue were in fact local officials, but that question was not before the court and the opinion did not decide the matter.

Defendants also direct the Court to an earlier case, *Moore v. Detroit Sch. Reform Bd.*, 293 F.3d 352 (6th Cir. 2002). There, students and teachers alleged Public Act 10 violated the Voting Rights Act, the United States Constitution, and Michigan's Constitution. Similar to the plaintiffs in *Phillips*, the *Moore* plaintiffs challenged the appointive nature of the School Reform Board created under the Act. *Moore,* 293 F.3d at 356. The Court of Appeals found Public Act 10 to be constitutional and noted that it satisfied rational-basis review because "[t]he Michigan Legislature was entitled to believe that [Public Act 10] would address the problems that the legislators perceived to exist" in Detroit's schools and the schools' sheer size "provide[d] a rational basis for adopting a different approach to governance." *Id.* at 371. But once again, the Court of Appeals did not address whether the appointed board was effectively an arm of the state.

Following the motion hearing in this case, Defendants submitted two supplemental and, as yet, unpublished authorities: *Guertin v. Michigan*, No. 16-cv-12412, 2017 WL 2418007 (E.D. Mich. June 5, 2017), and *Gulla v. Snyder*, No. 16-000298-MZ (Mich. Ct.

Cl. Aug. 16, 2017). ECF 110. Both opinions concern the Flint water crisis and the role and status of emergency managers. Defendants aver that the cases support the proposition "that the State of Michigan does not operate or control schools in the City of Detroit because emergency managers are appointed local officials."  ECF 110, PgID 2600.

Neither case, however, gives the Court particular guidance on the question now before it. In *Guertin*, Flint residents sued the Governor, Flint's emergency manager, and others, alleging that they actively concealed from residents the dangerous lead levels in the water. *Guertin*, 2017 WL 2418007, at *1. The governmental defendants argued that they were acting as an arm of the state and therefore entitled to immunity under the Eleventh Amendment of the Constitution. *Id.* at *14. The district court employed the Sixth Circuit's four-factor test to "determine whether the city defendants [were] an arm of the state," and ultimately concluded that they were not. *Id.* at *14–15 (applying *Kreipke v. Wayne State Univ.*, 807 F.3d 768, 775 (6th Cir. 2015)). After finding that the "near-determinative factor" of whether the state would be liable for any judgment weighed against the defendants, the court also concluded that "under state law, an emergency manager is a municipal agent and thus not subject to the protections of Eleventh Amendment Immunity." *Id.* at *15 (citing *Kincaid v. City of Flint*, 311 Mich. App. 76, 87–88 (2015)). And Defendants rely on that assertion here.

Whether Defendants enjoy Eleventh Amendment immunity is a separate question from the broader inquiry of whether any of them could be said to have controlled Detroit schools[4]. Any persuasive value of *Guertin* at this stage of the litigation is therefore misplaced. And though *Kinkaid* makes clear that emergency managers "act[] only on

---

[4] The Court will undertake that inquiry below.

behalf of numerous *local* officials," it also confirms that they "serve[] at the pleasure of the governor." 311 Mich. App. 76, 88 (2015) (citing Mich. Comp. Laws §§ 141.1515(5)(d), 1549(3)(d)) (emphasis original). Neither case answers the question of whether the Governor and his or her appointees should be held responsible for the conditions in Detroit schools.

*Gulla v. Snyder* is also not helpful. There, the Court of Claims reviewed the text of Public Act 436 to determine whether emergency managers are state actors. ECF 110, PgID 2707–09. But that analysis attempted to ascertain only whether that court had jurisdiction to hear the case under Michigan's Court of Claims Act and concluded only that: "emergency managers are not state officers *for the purpose of MCL 600.6419(1)(a)*." *Id.* at 2709 (emphasis added).

Even so, the Michigan Court of Appeals roundly criticized the *Gulla* opinion in a more recent, published opinion. *See Mays v. Snyder*, No. 335555, 2018 WL 559726, at *14, n.14, — N.W.2d — (Mich. Ct. App. Jan. 25, 2018). And the *Mays* court held precisely the opposite: "an emergency manager operates as an administrative officer of the state. Further, it is beyond dispute that at a minimum, an emergency manager must be characterized as an employee of the state." *Id.* at *14.

Defendants are not emergency managers. Rather, they are principally members of the State's Board of Education. The Governor, the Superintendent of Instruction, the Director of Michigan's Department of Technology, and the SRO are also defendants. As the Court explained above, however, those parties were responsible for the selection and appointment of the emergency managers. Emergency managers "serve[d] at the pleasure" of the Governor and ultimately the Governor decided when the financial

emergency necessitating intervention was complete. *See* Mich. Comp. Laws §§ 141.1549(3)(d), 1562; *but see id.* § 141.1549(6)(c) (permitting the local government to remove the emergency manager after a year and a half with a supermajority). Nevertheless, all of the Defendants had a role in the designation and supervision of Priority Schools. In particular, Defendant Baker, as SRO, exercised significant control over schools.

What *Phillips, Moore*, and other cases[5] suggest is that Detroit residents have repeatedly pushed back against the Public Acts and state actions that supplanted local control. At each step, courts affirmed the legality of the State's interventions. Now, facing the deplorable conditions alleged in the Complaint, Detroit students seek to hold someone responsible. They have adequately pled that state actors effectively control the schools, at least in part, and are therefore proper parties.

II.  Plaintiffs' Argument Defined

Before the Court proceeds further, one point is in order. The parties dispute whether Plaintiffs are asserting a right to literacy or a right of *access* to literacy. Defendants assert that Plaintiffs initially argued that Defendants denied them the right to "literacy" but then changed course and asserted a right to "access to literacy." ECF 96, PgID 1854. Defendants are incorrect: from the beginning of the case, Plaintiffs couched the claim in terms of the right to "access to literacy." *See, e.g.*, ECF 1, ¶¶ 1, 4, 6–9, 19– 20. And that phrasing makes a difference here. Literacy is of course an outcome of

---

[5] *E.g.*, *Martin v. Murray*, 309 Mich. App. 37 (2015), in which the Michigan Court of Appeals affirmed an emergency manager's exclusive authority to fill vacancies on the Detroit Public Schools's board of education over the objections of its other members.

education, whereas "access to literacy" speaks to an opportunity; and an opportunity is precisely what the Plaintiffs describe. *See, e.g.*, *id.* at ¶¶ 34–35, 47, 57, 61, 91; *cf. Access*, Black's Law Dictionary (10th ed. 2014) ("A right, opportunity, or ability to enter, approach, pass to and from, or communicate with"). The proper inquiry is therefore whether Plaintiffs have identified anything Defendants have done or are affirmatively doing to either (1) violate Plaintiffs' alleged substantive right of access to literacy or (2) deny Plaintiffs access to literacy while granting it to others similarly situated.

III. Standing

    The Constitution limits federal courts' jurisdiction to cases and controversies. U.S. Const. Art. III, § 2, cl. 1. A plaintiff's standing "is an essential and unchanging part" of the case-and-controversy requirement and for that reason, the party invoking federal jurisdiction bears the burden of establishing three elements: injury in fact, causal connection, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). An injury in fact is an "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical" *Id.* at 560 (internal citations omitted). The causal-connection, or "traceability" element, requires the complained-of injury to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id.* (alterations and internal citations omitted). Finally, to be redressable means that it is likely (and not merely speculative) that "the injury will be redressed by a favorable decision." *Id.* at 561 (quotation marks omitted). Defendants raise standing arguments based on all three requirements.

A. Injury in Fact

Defendants argue that Plaintiffs lack standing because they have not demonstrated an invasion of any legally protected interest. In support, they suggest that "federal courts have never deemed literacy to be a legally protected interest." ECF 60, PgID 512. In addition, they maintain that Plaintiffs "have not shown an injury that is concrete and particularized, or even actual or imminent." *Id.*

Defendants' first argument is premature. The Court discusses *infra* whether access to literacy is a fundamental right. At the standing stage, however, the Court must consider the more general claim that Defendants violated Plaintiffs' due process rights. *Cf. Initiative & Referendum Inst. v. Walker,* 450 F.3d 1082, 1092 (10th Cir. 2006) (en banc) ("For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing."). Plainly, a plaintiff who alleges a violation of his right to due process states a legally protected interest, and Plaintiffs have done so here.

Still, Defendants posit that the Complaint amounts only to a "generalized grievance" and fails "to identify anything Defendants are affirmatively doing to violate [Plaintiffs'] alleged right to literacy." ECF 60, PgID 513. Accordingly, they conclude that Plaintiffs have not pled a violation that is concrete, particular, actual, or imminent. The Court disagrees. Plaintiffs allege that their school buildings, unlike those of other Michigan students, are replete with conditions "that make learning nearly impossible," and identify them with specific photographic allegations. *See* ECF 1, ¶¶ 119–37. They allege that their schools, unlike other Michigan students', lack enough teachers to hold classes in which they would learn to read. *Id.* at ¶¶ 144–54. They allege that, unlike other Michigan

students, they lack books necessary to attain literacy. *Id.* at ¶¶ 79, 103–04, 107, 113–15.[6]

Those are concrete, particular, actual injuries that satisfy the standing requirement under both the Due Process claim and the Equal Protection claims.

B. Traceability

Traceability is also satisfied. Defendants rightly point out that Plaintiffs must allege "which allegations apply to which defendant," ECF 60, PgID 481, and Plaintiffs have done so. Although the Complaint principally refers to actions (and inactions) of "the State," it also plainly lays out each Defendant's position in the State government and how that position relates to the operation of Detroit schools. *See* ECF 1, ¶¶ 28–32. For example, in paragraph 73, Plaintiffs allege that "the State has appointed four emergency managers and one transition manager since 2009 without regard to whether any of these individuals possessed professional competence or experience in the area of K-12 education." *Id.* at 53. As alleged in the Complaint and further explained *supra*, the Governor selects a school district's emergency manager based upon a list provided by the State's Board of Education and Superintendent of Public Instruction, all of whom are defendants. *See id.* at 48–51. In paragraph 70, Plaintiffs allege that the "SRO is charged with creating the necessary conditions for sustainable and positive student outcomes" and failed to do so. *Id.* at 52 (quotation marks and alteration omitted). The paragraph notes that the SRO (who is a Defendant) has been within the purview of both the Department of Education

---

[6] Paragraph 116 and others implicate an inadequacy of books on subjects such as history and science. Because the alleged right specifically concerns literacy, it is not clear whether shortcomings other than the narrow task of teaching children to read are of consequence in the suit. But because other portions of the Complaint specifically concern access to literacy, the Court need not now address the matter.

and the Department of Technology, Management, and Budget (the directors of both are defendants). *Id.* And paragraph 65 notes that under Michigan law, the State School Board has supervisory powers over public school districts and charter schools. *See id.* at 49. Traceability is therefore satisfied.

C. Causality

The Complaint also provides the necessary description of a causal chain. As pled, Defendants are the parties "responsible for the education of all Michigan public school students and for the system of Michigan public schools" as well as being "particular[ly] responsibl[e] for the schools in Detroit" due to the State's interventions. ECF 1, ¶¶ 200, 207, 61. Michigan law requires students to attend school. Mich. Comp. Laws § 380.1561. If access to literacy is a fundamental right, Defendants would be liable for depriving Plaintiffs of it. *See* ECF 1, ¶ 200. And even if it is not a fundamental right, Defendants would be liable if they "denied Plaintiffs access to literacy equal to the access provided to students in other schools in the State on the basis of their race[.]" *Id.* at ¶¶ 208, 212. The traceability requirement is therefore satisfied.

D. Redressability

Finally, Defendants insist that the relief sought could not redress the alleged injuries. To begin, they note that some of the Plaintiffs no longer attend the schools they have complained about, and the Complaint does not disclose their new schools, so there is no actual or imminent injury to redress.[7] ECF 60, PgID 513. They also note that "[e]ven

---

[7] Plaintiffs actually raised the point when they argued that there was no concrete or particularized injury. As is often the case with standing questions, the issues are tangled up. But the change of school defeats neither the injury-in-fact requirement, nor redressability.

if Plaintiffs receive a favorable decision, it is unclear whether the children's individual injuries will be relieved[.]" *Id.* at 514. Many more factors affect a child's learning and academic success so "there is no guarantee that the children will become literate." *Id.*

Those statements are true, but again misapprehend the Plaintiffs' theory. Plaintiffs do not allege the deprivation of literacy, nor an entitlement to it; they plead only for access to literacy. It may be that some students unfortunately do not become literate—even with the benefit of all the measures Plaintiffs demand. But if they are given access to it, then the injury alleged by Plaintiffs would be redressed.

As for the change-of-schools argument: even if Defendants were correct that changing schools makes redressability impossible, the rest of the Plaintiffs still remain in Detroit schools and more could be included if any one Plaintiff prevails in certifying a class. So at most, Defendants' standing argument would knock out a few of the Plaintiffs, and the case would proceed forward. But redressability is possible even for the Plaintiffs who changed schools or matriculated because the alleged injury is the denial of access to literacy and part of the relief requested is remedial education for former students. ECF 1, PgID 132. Receiving belated access would redress their prior deprivations.

IV.    Immunity Under the Eleventh Amendment

Even an otherwise actionable suit must be halted at the motion to dismiss stage if the defendants are immune under the Eleventh Amendment. *See Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 145 (1993). Under the Amendment, an "unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). Defendants insist that, as state actors sued in their official capacities, they are immune.

Eleventh Amendment immunity is nuanced. Under the doctrine set forth in *Ex parte Young*, 209 U.S. 123 (1908), "a suit challenging the constitutionality of a state official's action is not one against the State," but is instead against the officer who is "stripped of his official or representative character" and "subjected to the consequences of his official conduct." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984). The relief sought, however, must be forward-looking: "[W]hen a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." *Id.* at 102–03 (applying *Edelman v. Jordan*, 415 U.S. 651 (1974)). Courts may nonetheless "enjoin state officials to conform their future conduct to the requirements of federal law, even though such an injunction may have an ancillary effect on the state treasury." *Quern v. Jordan*, 440 U.S. 332, 337 (1979).

Defendants insist that Plaintiffs' requested relief is not "a request for a prospective declaration or rights as much as an expensive attempt to procure an improper remedy for an alleged past breach," similar to the relief sought in *Edelman*. ECF 60, PgID 516. Plaintiffs counter that although the Complaint "point[s] out the extensive harm caused by Defendants' past wrongful actions to demonstrate the unconstitutionality of those actions, the only remedy Plaintiffs seek is injunctive and declaratory relief compelling Michigan officials' prospective compliance with the Constitution and federal law[.]" ECF 64, PgID 1419. They contend that the relief they seek is therefore more in line with the relief contemplated in *Ex parte Young*. *Id.*

The Court agrees with Plaintiffs. The relief they seek is unquestionably sweeping— and undoubtedly costly—but it is prospective and injunctive in nature. *See* ECF 1, PgID

131–32. Plaintiffs ask the Court to issue "a declaratory judgment that Defendants' actions and inaction" violate their rights and an injunction requiring Defendants to ensure that Plaintiffs (and putative class members) "have the opportunity to attain literacy," pursuant to a non-exhaustive list of precise programs. *Id.* As the Court is particularly well aware:

> Reading and speech deficiencies cannot be eliminated by judicial fiat; they will require time, patience, and the skills of specially trained teachers. That the programs are also 'compensatory' in nature does not change the fact that they are part of a plan that operates prospectively to bring about [] delayed benefits[.]

*Milliken v. Bradley*, 433 U.S. 267, 290 (1977). Whether Plaintiffs are entitled to the requested relief is a separate question, but the relief does not run afoul of the Eleventh Amendment. Defendants are not immune from suit.

V.     The *Rooker-Feldman* Doctrine and Res Judicata

One final matter stands between the Court and consideration of the merits. Defendants assert that the *Rooker-Feldman* doctrine bars Plaintiffs' claims because the instant suit essentially seeks to undo the state court ruling in *Moore v. Snyder*, No. 16-000153-MM (Mich. Ct. Cl. Aug. 4, 2016), ECF 60-10.[8] Tangentially, they also assert that the *Moore* decision bars the instant suit under *res judicata*.

The *Rooker-Feldman* doctrine takes its name from two cases with similar fact patterns: *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923) and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). In both cases:

> [t]he losing party in state court filed suit in a U.S. District Court after the state proceedings ended, complaining of an injury caused by the state-court judgment and seeking federal-court review and rejection of that judgment. Alleging federal-question jurisdiction, the plaintiffs in *Rooke*r and *Feldman*

---

[8] For convenience, the Court will cite to the slip copy of the order Defendants included as an exhibit to their motion.

> asked the District Court to overturn the injurious state-court judgment. [The Supreme Court] held, in both cases, that the District Courts lacked subject-matter jurisdiction over such claims, for 28 U.S.C. § 1257 "vests authority to review a state court's judgment solely in [the Supreme Court]"

*Skinner v. Switzer*, 562 U.S. 521, 531–32 (2011). The doctrine has limited scope, and the Supreme Court has emphasized that it is confined to "cases brought by state-court losers inviting district court review and rejection of the state court's judgments." *Id.* (alterations omitted).

The state-court judgment at issue here is the Michigan Court of Claims's dismissal of the complaint in *Moore v. Snyder*. That case revolved around several Michigan laws that split Detroit Public Schools into two entities: the Qualifying School District (which is responsible for collecting taxes and discharging debts) and the Community District (which oversees the day-to-day operations of the schools). The plaintiffs made two principal claims: (1) the procedure used to pass the laws violated the Michigan Constitution so the laws were unenforceable, and (2) the laws violated the Equal Protection Clause of the U.S. Constitution because they permitted uncertified teachers to teach in the Detroit schools while every other Michigan district required certified teachers. *See* ECF 60-10, PgID 1313.

The Court of Claims dismissed both claims, but for different reasons. The court determined that it lacked jurisdiction over the procedural claim because Michigan law requires parties to bring those claims in the Court of Appeals, not the Court of Claims. *Id.* at 1315. And the court dismissed the equal-protection claim because it was not ripe. *Id.* at 1316. Although the law had taken effect, the board empowered to hire uncertified teachers had not yet been elected. Unless and until an uncertified teacher *was* hired, the claim was premature. Moreover, the plaintiffs sued only Governor Snyder, who, the court

pointed out, would not be involved in any future hiring. *Id.* The Court opined, "it would appear that the 'appropriate official' is or will be a local official" of the newly formed school district, but this observation was not part of the court's holding. *See id.*

Despite an overlap of topics, the reasoning and ruling in *Moore* does not implicate *Rooker-Feldman*. The Plaintiffs here were not parties in *Moore* and they have not alleged any harms resulting from the *Moore* judgment. Thus, the *Rooker-Feldman* doctrine is inapplicable. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (recognizing that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments").

Res judicata also does not establish a bar. Res judicata prevents a party from bringing a second suit when "(1) the prior action was decided on the merits, (2) both actions involve the same parties or their privies, and (3) the matter in the second case was, or could have been, resolved in the first." *Adair v. State*, 470 Mich. 105, 121 (2004); *see also Nevada v. United States*, 463 U.S. 110, 129–30 (1983). The constitutional violations alleged in *Moore* are separate from the violations alleged here. Additionally, the *Moore* court failed to reach the merits of any of the arguments; it dismissed the procedural claim on jurisdictional grounds and the equal-protection claim on ripeness grounds. It would seem, then, that the Court's "opinion that Plaintiffs have sued the wrong party" is dicta. ECF 60-10, PgID 1316. But even so, the Governor was the wrong party in *Moore* because the plaintiffs sought to enjoin him from tasks assigned to a community school district official. *Compare* ECF 60-9, PgID 1189 (seeking injunction of Snyder "from taking any executive action toward implementation of" a specific law) *with* ECF 60-10, PgID 1316

(stating that the statute granted executive authority to community school district official). And finally, as Plaintiffs note, they are not in privity with the *Moore* plaintiffs, so the doctrine is inapplicable. ECF 64, PgID 1421, n.5.

Neither the *Rooker-Feldman* doctrine nor res judicata prevent Plaintiffs proceeding in this suit.

VI.    The Constitutional Question

The proposition that persons are constitutionally entitled to some amount of education is not new. In the aftermath of a landmark California Supreme Court case in 1971,[9] the U.S. Supreme Court took up *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1 (1973). *Rodriguez* set in motion a series of Supreme Court cases that shaped how courts evaluate constitutional claims concerning public education. Plaintiffs' theory emerges from those precedents, so the cases merit some description here.

A.  A Short History of the Supreme Court's Right-to-Education Cases

*Rodriguez* concerned a state education funding mechanism. Beginning in the 1940s, Texas took a two-stage approach to funding its public school districts. A statewide fund provided about one-half of each district's budget. Local governments could then choose the taxation methods for raising the rest of the money. Most districts used local

---

[9] In *Serrano v. Priest*, 487 P.2d 1241 (Cal. 1971), a putative class of California schoolchildren alleged that their state's funding scheme violated the Equal Protection Clause of the Fourteenth Amendment. California's Supreme Court agreed that the Plaintiffs had stated a valid claim and concluded that public-school financing systems that result in "wide disparities in school revenue" violate the Equal Protection Clause and recognized that "the right to an education in our public schools is a fundamental interest[.]" *Serrano*, 487 P.2d at 1244; *see also San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 29, 56 (1973) (recognizing the impact of *Serrano*).

property taxes to pay for education, but in districts with higher property values, schools were funded at significantly higher rates than other districts. Students from one of the lowest-funded districts, therefore, claimed the funding scheme violated the Equal Protection clause.

The Supreme Court disagreed. First, the Court determined that rational-basis review—and not strict scrutiny—governed its analysis because education is not a fundamental right and because wealth is not a suspect classification. *Rodriguez*, 411 U.S. at 44. Then, the Court reaffirmed that the state had a legitimate interest in conferring to local governments the power and flexibility to devise their own taxation schemes. *Id.* at 55. The Court therefore concluded that the state's school funding system was rationally related to that interest. *Id.*

The Court also made a few significant distinctions. It explained that "[t]he argument here is not that the children in districts having relatively low assessable property values are receiving no public education; rather, it is that they are receiving a poorer quality education than that available to children in districts having more assessable wealth." *Rodriguez*, 411 U.S. at 23. And it noted that "[n]o scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact." *Id.* at 41. So the Court affirmed Texas's funding scheme and it remained intact.

*Plyler v. Doe*, 457 U.S. 202 (1982) was another case from Texas that the Supreme Court decided nine years later. There, the state required children who were not in the country legally to pay tuition if they wished to attend public schools. Again, the State insisted that the law was rationally related to a legitimate state interest, and was "simply

a financial measure designed to avoid a drain on the State's fisc[.]" *Plyler*, 457 U.S. at 207. The Court again recognized that education is not a fundamental right and also held that undocumented aliens (and their children) are not a suspect class. But the Court nevertheless ruled in favor of the plaintiffs and struck down the law because it concluded the State's justifications for the law were "wholly insubstantial in light of the costs involved to these children, the State, and the Nation." *Id.* at 230.

Four years later, the Court decided *Papasan v. Allain*, 478 U.S. 265, 289 (1986). In 1817, the federal government granted land to the then-new state of Mississippi. The federal government had already divided the land into townships, and a portion of each township was to be set aside for schools. Granted land reserved for the Chickasaw Tribe also contained a portion to be set aside for schools. But the State sold the land for the Chickasaw schools and lost the ensuing funds through a failed investment. From then on, the State paid interest on the money it lost at a statutorily fixed rate. By 1984, Mississippi schools received their funding, in part, based on the revenues from their townships' granted lands or—in the case of the Chickasaw—the State's interest payments. But the revenues from the lands greatly exceeded the interest payments, which meant that the Chickasaw school districts received substantially less funding: $0.63 per Chickasaw pupil versus $75.34 per pupil in the rest of the state. Ultimately, the Court remanded the case and framed the question like this:

> Given that the State has title to assets granted to it by the Federal Government for the use of the State's schools, does the Equal Protection Clause permit it to distribute the benefit of these assets unequally among the school districts as it now does?

*Id.* at 289.

The Court in *Papasan* also made two important observations. It recalled that the *Rodriguez* Court "declined to apply any heightened scrutiny based either on wealth as a suspect classification or on education as a fundamental right," *id.* at 283–84, and that the *Plyler* Court, "reiterated that education is not a fundamental right," *id.* at 285. Nevertheless, the *Papasan* Court still noted that the Court "has not yet definitively settled the questions whether a minimally adequate education is a fundamental right and whether a statute alleged to discriminatorily infringe that right should be accorded heightened equal protection review. . . . Nor does this case require resolution of these issues." *Id.* at 285–86. On remand, however, the parties resolved their dispute with a consent judgment, so no court established further precedent on the matter. *Papasan v. United States*, No. DC 81-90-B-O, 1989 U.S. Dist. LEXIS 17535 (N.D. Miss. Feb. 21, 1989).

Two years after *Papasan*, the Court walked a fine line in *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450 (1988). There, North Dakota permitted some school districts to charge a user fee for bus transportation. A student of modest means refused to pay the fee and claimed the law violated the Equal Protection Clause because it deprived those who could not afford to pay the fee "minimum access to education." *Kadrmas*, 487 U.S. at 458. Because the girl "continued to attend school during the time that she was denied access to the school bus" the Court concluded that she was raising two separate arguments: (1) "the busing fee unconstitutionally places a greater obstacle to education in the path of the poor than it does in the path of wealthier families," or (2) "the Equal Protection Clause affirmatively requires government to provide free transportation to school, at least for some class of students that would include [the plaintiff student]." *Id.*

The Court rejected both arguments. It explained that a statute that affects the wealthy and the poor differently is not "on that account alone" subjected to strict equal protection scrutiny. *Id.* The Court had never "accepted the proposition that education is a 'fundamental right,' like equality of the franchise, which should trigger strict scrutiny when government interferes with an individual's access to it." *Id.* The Court therefore determined that the statute was not subject to strict scrutiny and satisfied rational basis review. Notably, however, Justice Marshall dissented and cited the same cases the Court had relied upon (*Rodriguez*, *Plyler* and *Papsan*) in the following footnote:

> The Court therefore does not address the question whether a State constitutionally could deny a child access to a minimally adequate education. In prior cases, this Court explicitly has left open the question whether such a deprivation of access would violate a fundamental constitutional right. That question remains open today.

*Kadrmas,* 487 U.S. at 466, n.1 (Marshall, J., dissenting) (internal citations omitted).

B. The Applicability of the Education Cases

Defendants contend that the foregoing line of cases compels the Court to grant their motion. In their view, the right to literacy—or the right of *access* to literacy—are foreclosed by the Supreme Court's pronouncements that education is not a fundamental right and that disparate access to it based on wealth does not trigger heightened scrutiny under the Equal Protection Clause.

The questions raised in the instant case, however, are different from the prior cases in two respects. First, the right alleged is "access to literacy"—a distinct concept from the bare right to education or the right to an equally funded education. Second, unlike in *Rodriguez*, *Plyler*, *Papasan*, and *Kadrmas*, Plaintiffs are not challenging the validity of a state law or the State's educational structure or funding scheme. Plaintiffs' suit confronts their perceived dilemma: the laws are valid, the authority of school officials is valid, school

attendance is compulsory, but they are not given any meaningful education at all. Thus, the claims here differ from those in the preceding cases.

In *Rodriguez*, the plaintiff students were accorded "an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process." 411 U.S. at 37. Here, Plaintiffs assert that they have not been given that opportunity. The *Rodriguez* Court specifically avoided ruling on whether the functional deprivation of literacy access would violate the Due Process Clause. *See id.* at 36–37 ("Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short."). Because *Rodriguez* did not reach the argument posed in Plaintiffs' complaint, it is not dispositive.

In *Plyler*, the Court reviewed a statute requiring alien children to pay tuition that effectively barred them from receiving a basic education. The Court weighed the societal cost of the deprivation against the state's justification for the law (state finances), and concluded that, on the evidence before it, the state's justification was irrational. At oral argument in the present case, Plaintiffs' counsel suggested that the Complaint alleges an analogous claim because "having a system that does not provide teachers, books, courses and the conditions conducive to learning fails even a rational basis test." ECF 109, PgID 2592. Although that may be so, the ambiguity of the phrase "having a system" makes this dispute more abstract than *Plyler.* The statutes that compose Michigan's "system" have already been determined to be valid and no statute is specifically challenged in the case. Rather, while Plaintiffs insist that they have not received a basic,

minimal education *at all*, they reach that conclusion by alleging that Defendants have not

done *enough. Plyler* is therefore highly instructive, but not wholly dispositive.

In *Papasan*, the terms of the Court's remand prevented a holding on the equal-

protection claim and the Court never reached the fundamental-right argument because

of its threadbare pleading—a finding that cannot be levied in this case. And even so, the

factual scenario was inapposite to the allegations here:

> The petitioners do not allege that schoolchildren in the Chickasaw Counties
> are not taught to read or write; they do not allege that they receive no
> instruction on even the educational basics; they allege no actual facts in
> support of their assertion that they have been deprived of a minimally
> adequate education.

*Papasan*, 478 U.S. at 286. The case is therefore not dispositive.

*Kadrmas*'s focus on a specific statute sets it apart from this case too, but its facts

make it distinct in another way. The plaintiff student in *Kadrmas* did actually attend school,

even though she was denied access to the bus, and that fact led the Court to expressly

rest its reasoning on the premise that she was not denied access to education, but that

she was merely burdened in securing it. *See* 487 U.S. at 458. Plaintiffs' theory in this case

is that the buildings they attend every day are "schools in name only" that are "functionally

delivering no education at all." ECF 1, PgID 4, 19, ¶¶ 1, 21. Plaintiffs' theory here would

be more similar to the *Kadrmas* plaintiff being permitted to ride the bus for free, only to be

dropped off at an empty building. Thus, *Kadrmas* is also not entirely dispositive to the

issues here.[10]

---

[10] Defendants mention that Michigan parents do have some choice in the schools their
children attend by way of charter schools and the State's "school of choice" option, ECF
60, PgID 511. While true, the mere existence of those options would not necessarily
decide the matter; the alien children in *Plyler* had full access to the public schools—if they
only found a way to pay for it. *See In re Alien Children Educ. Litig.*, 501 F. Supp. 544, 555

The Court is left to conclude that the Supreme Court has neither confirmed nor denied that access to literacy if a fundamental right. The Court must therefore cautiously take up the task.

C. Due Process

The Due Process Clause of the 14th Amendment states that, "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, § 1. Courts have concluded that the clause "has both procedural and substantive components," *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014), and in this case, Plaintiffs raise only a substantive due process argument. Government actions that burden the exercise of a fundamental right or liberty interest "are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000).

Plaintiffs' due-process claim turns on whether access to literacy is a fundamental right. To make that determination the Court must first define what is a "fundamental right." The Supreme Court recently explained:

> The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, has not been reduced to any formula. Rather, it requires courts to exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect. That process is guided by many of the same considerations relevant to analysis of other constitutional provisions that set forth broad principles rather than specific requirements. History and tradition guide and discipline this inquiry but do not set its outer boundaries.

---

(S.D. Tex. 1980) (noting how rare tuition payment was). At this stage of the litigation, the Court simply cannot assume there are meaningful options for Plaintiffs.

*Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015) (internal quotation marks and citation omitted). The Supreme Court has, however, historically employed a formula of sorts: fundamental rights are only those "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997); *see also Snyder v. Mass.*, 291 U.S. 97, 105 (1934) (using the phrase "so rooted in the traditions and conscience of our people as to be ranked as fundamental"); *Obergefell*, 135 S. Ct. at 2618 (Roberts, C.J., dissenting) (collecting cases). In a case like this one, the holding of *Obergefell* does not counsel a departure from that general approach. *See Obergefell,* 135 S. Ct. at 2602 (distinguishing the *Glucksberg* approach only in reference to intimate relationships). The Court will proceed in its analysis, mindful as it is that history and tradition do not set the "outer boundaries" of fundamental rights, *id.* at 2598.

The Supreme Court is historically "reluctant to expand the concept of substantive due process because guideposts for responsible decision making in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). By granting an asserted right the imprimatur of "fundamental" under the due process clause, the court "to a great extent, place[s] the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720. Errantly done, the liberty protected by the Due Process Clause can be "subtly transformed" into a court's policy preferences—however well-intentioned the preferences may be. *Id.* (citing *Moore v. City of E. Cleveland*, 431 U.S. 494, 501 (1977)). For this reason, fundamental rights are spare and courts seldom recognize new ones. *Seal*, 229 F.3d at 575 (noting also that the

Supreme Court has specifically cautioned against "judicial interposition in the operation of the public school system[s]").

Even when the Supreme Court has ventured to recognize a right as fundamental, it has typically limited them to "negative rights"—i.e., the right to be free from restraint or barrier. *See, e.g.*, *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195–96 (1989) (recognizing that the Due Process Clause is "phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security" and thus concluding that "our cases have recognized that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual").

Conceivably, a case like this one could be argued on either positive- or negative-right theories. As a positive right, access to literacy (i.e., a minimally adequate education) is so important that the state is compelled to provide it. As a negative right, access to literacy is so important that the state may not hinder Plaintiffs' attempts to secure it. The Complaint alleges that each Plaintiff was "denied access to literacy" and repeatedly speaks of the "denial of access to literacy." In a sense, the phrasing evokes the notion of a barrier: Defendants have kept Plaintiffs from accessing literacy and but for Defendants' obstruction, Plaintiffs could and would have the access. In other words, the allegations state the violation of a negative right.

But a violation of negative rights is not what the Complaint truly seems to argue. The Complaint explains, in great detail, that the instruction and resources in Plaintiffs' schools are inadequate. Plaintiffs aver the State "is the entity responsible for securing

and ensuring Plaintiffs' opportunity to access literacy" yet have "failed to ensure a basic environment for teaching and learning that is the necessary prerequisite for the acquisition and transmission of literacy." ECF 1, ¶¶ 19, 109. The Complaint notes the compulsory nature of schooling in Michigan, *see id.* at ¶ 56 (citing Mich. Comp. Laws § 380.1561), and the Plaintiffs' response brief mentions, in a footnote, that Michigan's truancy law means "students at Plaintiffs' schools are unable to use mandatory school days in other productive ways," ECF 64, PgID 1431. But the relief sought is exclusively positive in nature: Plaintiffs believe that Defendants must implement "evidence-based programs for literacy instruction and intervention," universally screen students for literacy problems, and establish an accountability system, to name a few. *See* ECF 1, PgID 131–32. In sum, the Complaint points exclusively to a positive-right argument: Plaintiffs are entitled to a minimum level of instruction on learning to read, yet the State, vis-à-vis Defendants, has failed to give it to them. The Court will therefore construe the Complaint in that manner. *Cf. Collins*, 503 U.S. at 125 (recognizing that the "doctrine of judicial self-restraint" urges a court to "focus on the allegations in the complaint to determine how [a plaintiff] describes the constitutional right at stake" and what the state actor allegedly did to deprive plaintiff of the right).

Plainly, literacy—and the opportunity to obtain it—is of incalculable importance. As Plaintiffs point out, voting, participating meaningfully in civic life, and accessing justice require some measure of literacy. Applying for a job, securing a place to live, and applying for government benefits routinely require the completion of written forms. Simply finding one's way through many aspects of ordinary life stands as an obstacle to one who cannot read.

But those points do not necessarily make access to literacy a fundamental right. The Supreme Court has repeatedly emphasized, in *Rodriguez* and elsewhere, that the importance of a good or service "does not determine whether it must be regarded as fundamental[.]" *Rodriguez*, 411 U.S. at 30; *see also Lindsey v. Normet*, 405 U.S. 56, 74 (1972) ("We do not denigrate the importance of decent, safe, and sanitary housing. But the Constitution does not provide judicial remedies for every social and economic ill."); *DeShaney*, 489 U.S. at 197 (rejecting the notion that the Due Process clause compelled a state to protect a child from abuse by his father). Courts of Appeals have done the same. *See, e.g.*, *Ransom v. Marrazzo*, 848 F.2d 398, 413 (3d Cir. 1988) (concluding that there is no fundamental right to receive water and sewer service); *Stiles ex rel. D.S. v. Grainger Cty.,* 819 F.3d 834, 853 (6th Cir. 2016) (rejecting the notion of a due-process right to be free from aggressive and physical bullying in school). In sum, federal courts have demonstrated a reticence to find positive rights to unquestionably important necessities of life.

Plaintiffs, however, argue that access to literacy is different. Relying heavily on *Obergefell v. Hodges*, they suggest that the Court should consider whether the State has put "its imprimatur on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied." ECF 64, PgID 1438 (quoting *Obergefell*, 135 S. Ct. at 2602) (alterations adopted). They aver that by denying Plaintiffs access to literacy, Defendants consign them to "instability in both social and economic terms," and demean them by "locking them out of valuable social and political institutions, from State academies of higher learning, to the marketplace of ideas, to the very texts that undergird our

constitutional democracy." *Id.* at 1439 (quoting *Obergefell*, 135 S. Ct. at 2601–02) (alterations adopted and quotation marks omitted).

How *Obergefell* affects the calculus of substantive due process rights remains unsettled, but Plaintiffs' particular interpretation of the holding would put *Obergefell* in direct and unnecessary tension with much of the jurisprudence that came before it. Under Plaintiffs' reasoning, if the State's failure to provide a good or service to a person results in a limitation of future opportunities and social stigma, the good or service must be a fundamental right. Yet the same could presumably be said for a person who must go without a sanitary place to live, or must live in an abusive home—and neither of those implicate a fundamental right. *See Lindsey*, 405 U.S. at 74; *DeShaney*, 489 U.S. at 197.

Moreover, the Supreme Court's understanding of a "fundamental right," requires finding that neither liberty nor justice would exist absent state-provided literacy access. *See Glucksberg*, 521 U.S. at 720–21. That finding is difficult to square with the fact that "[t]here was no federal or state-run school system anywhere in the United States as late as 1830." Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 117 (2013) (citing Frederick M. Binder, *The Age of the Common School, 1830–1865*, at 20 (1974)). School districts at the time of the Constitution's ratification were formed "when a group of farms came together and decided to construct a public building for schooling, where their children could gather and be taught reading, writing, and moral codes of instruction." *Id.* at 112. The history evinces a deep American commitment to education, but runs counter to the notion that ordered society demands that a state provide one.

The conclusion that education is not a fundamental right is arguably implicit even in *Brown v. Board of Education*. After the Court explained the inestimable importance of education in American life, it couched its holding in the following terms:

> In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, *where the state has undertaken to provide it*, is a right which must be made available to all on equal terms.

*Brown v. Bd. of Educ. of Topeka*, 347 U.S. 483, 493 (1954) (emphasis added). The holding is certainly instructive on Plaintiffs' equal-protection claim, but on the narrow matter of substantive due process, it points the other way: a state could choose not to undertake the provision of education at all.

Finally, to the extent that constitutional rights might be said to expand with time—whether through "better informed understanding" *Obergefell*, 135 S. Ct. at 2602 or "evolving standards of decency," *Trop v. Dulles*, 356 U.S. 86, 101 (1958) (plurality opinion)—the notion that there is a positive right to literacy access is belied by the conclusions of the states themselves. State courts that have found a right to a minimum level of education have not done so based upon the intrinsic necessities of a free society, but rather, on the precise wording of the relevant state constitutions. *See* Friedman & Solow, *supra*, at 129–30. And Michigan has not even found that. *See LM v. State*, 307 Mich. App. 685, 697 (2014).

The conditions and outcomes of Plaintiffs' schools, as alleged, are nothing short of devastating. When a child who could be taught to read goes untaught, the child suffers a lasting injury—and so does society. But the Court is faced with a discrete question: does the Due Process Clause demand that a State affirmatively provide each child with a

defined, minimum level of education by which the child can attain literacy? Based on the foregoing analysis, the answer to the question is no.

### D. Equal Protection

Lastly, the Court arrives at Plaintiffs' Equal Protection claim. This cause of action rests on two theories: (1) Defendants deny Plaintiffs the fundamental right of access to literacy "by intentionally discriminating against them on the basis of race," and (2) Defendants have "functionally excluded Plaintiffs" from Michigan's schools on the basis of their race, and denied them "access to literacy equal to the access provided to students in other schools in the State on the basis of their race, and responded with deliberate indifference to such exclusion and such denial[.]" ECF 1, PgID 128, ¶¶ 207–08.

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler,* 457 U.S. at 216). A plaintiff must therefore adequately plead that the government treated him or her "disparately as compared to similarly situated persons and that such disparate treatment either burdens a fundamental right, targets a suspect class, or has no rational basis." *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011) (quoting *Club Italia Soccer & Sports Org., Inc. v. Charter Twp. of Shelby*, 470 F.3d 286, 299 (6th Cir. 2006)).

Defendants contend that Plaintiffs have not satisfied the threshold requirement of disparate treatment. The Complaint hinges on comparisons to "students in other schools in the State," but according to Defendants, students in non-Detroit schools are not similarly situated, and are therefore not the appropriate comparison group. ECF 60, PgID 533. Rather, the appropriate comparison would be to other students in Plaintiffs' respective school districts, and Plaintiffs have made no argument that any students within

these schools are treated differently from one another. So Defendants insist the Complaint fails to state a claim under the Equal Protection Clause.

The Court agrees that Michigan schools as a whole are not the proper comparator. Plaintiffs have not challenged a statewide funding scheme, a specific statute, or any particular decisions by Defendants applicable to all Michigan schools. Instead, they advance a kind of ambivalence theory: that Defendants *could* treat Plaintiffs schools the way they treat other schools in Michigan, but they have chosen not to. Michigan's laws, however, put the State in a different posture with respect to distressed schools than schools that have not required state intervention. The SRO operates as the school board only in Priority Schools. The Governor and other state actors appoint financial managers only when a district is financially distressed. As described *supra*, sec. III.B., Defendants are the proper parties in this case specifically because of the State's involvement in Detroit schools pursuant to Michigan law. The appropriate comparators for an equal-protection claim are therefore other Michigan schools that have come under the control of emergency managers, been designated a Priority School, or were governed by the EAA. So framed, the Complaint fails to state an equal-protection claim under any of the three recognized theories.

### 1. Burdening a fundamental right

The Court has already concluded that the Due Process Clause does not require a state to provide access to minimally adequate education. In other words, access to literacy is not a fundamental right—at least not in the positive-right sense. Accordingly, the State's alleged failure to provide literacy access to Plaintiffs fails to state an equal-protection claim on the basis of burdening a fundamental right.

### 2. Targeting a suspect class

Although the Complaint clearly establishes that Plaintiffs' schools predominantly serve children of color—four of the five schools are at least 97% African American and the fifth is 31.1% African-American and 64.2% Latino, ECF 1, PgID 62–63, ¶ 90—it makes no claim about the relevant comparator schools. The only specific reference to the racial makeup of other schools is to Grosse Pointe, which has not experienced the relevant state interventions. *Id.* at 6, n.2. The Complaint opines that the conditions in Plaintiffs' schools "would be unthinkable in schools serving predominantly white, affluent student populations," *id.* at 5, ¶ 1, but it does not state any instance where Defendants intervened in a school with a different racial makeup and treated that school disparately. Without this type of comparison, the Complaint fails to state a claim that Defendants have classified or otherwise differently treated Plaintiffs on account of race.

### 3. Lacking a rational basis

When a classification involves neither fundamental rights nor suspect classes, it "is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). In such cases, the classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). For this reason, a plaintiff facing a motion to dismiss "must allege facts sufficient to overcome the presumption of rationality that applies to government classifications." *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016) (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).

Rationality is a forgiving standard. "[A] government action is considered irrational only if it is 'unrelated to the achievement of any combination of the legitimate purposes.'"

*Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 261 (6th Cir. 2006) (quoting *Warren v. City of Athens*, 411 F.3d 697, 710 (6th Cir. 2005)). To prevail, a plaintiff must either "negativ[e] every conceivable basis which might support the government action," or demonstrate "that the challenged government action was motivated by animus or ill-will." *Id.*

Plaintiffs insist that the State's actions, through Defendants, fail to satisfy rational basis review and suggest that "*Plyler* controls this case." ECF 64, PgID 1426. The mechanics of the two cases, however, make a difference in evaluating the equal-protection claim. In *Plyler*, a statute required one specific group to pay tuition, but not another. The statute did not survive rational-basis review, so the defendants were enjoined from enforcing it. Here, the Complaint references Michigan's funding scheme, ECF 1, PgID 49–50, ¶ 66, but does not allege it is irrational. The Complaint discusses Michigan's governance systems, but likewise fails to allege that they are (or were) irrational. *Id.* at 50–52, ¶¶ 68–70. And none of the relief requested implicates particular statutes. *Id.* at 131–32. Plaintiffs must mean, then, that Defendants' actions in implementing the various state laws are irrational—but the Complaint fails to provide a concrete example. Plaintiffs simply assert that "Michigan's failure to provide [] curriculum, teachers, and books" or "to eliminate the deplorable and unsafe conditions that deny access to literacy" does not satisfy rational-basis review. ECF 64, PgID 1434.

Plaintiffs must do more than point to the present conditions as prima facie evidence that the State—and Defendants specifically—have acted irrationally. The Court accepts as true the Complaint's factual allegations, but Plaintiffs must still plead facts that are more than "merely consistent with" Defendants' liability. *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009) (quoting *Twombly*, 550 U.S. at 557). But whether an action is rational depends on the available options. For instance, without allegations that identify the specific decisions Defendants made concerning Plaintiffs' schools that could have been made differently, Plaintiffs have not plausibly pled the irrationality of such decisions. The Complaint therefore fails to state a claim for relief based on the Equal Protection Clause and must be dismissed.

## ORDER

**WHEREFORE**, it is hereby **ORDERED** that Defendants' Motion to Dismiss [60] is **GRANTED** and the case is **DISMISSED WITH PREJUDICE**.

This is a final order and closes the case.

**SO ORDERED**.

s/Stephen J. Murphy, III
STEPHEN J. MURPHY, III
United States District Judge

Dated: June 29, 2018

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on June 29, 2018, by electronic and/or ordinary mail.

s/David P. Parker
Case Manager
