# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: April 23, 2020

Mr. Christopher Mark Allen
Ms. Toni L. Harris
Mr. Raymond O. Howd
Ms. Ann M. Sherman
Michigan Department of Attorney General
P.O. Box 30217
Lansing, MI 48909

Mr. Joshua Eugene Anderson
Sidley Austin, 555 W. Fifth Street, Suite 4000
Los Angeles, CA 90013

Mr. James E Burke Jr.
Ms. Amanda Brooke Stubblefield
Mr. Bryce J. Yoder
Keating, Muething & Klekamp
1 E. Fourth Street, Suite 1400
Cincinnati, OH 45202

Mr. Adam W. Burrowbridge
Wilson, Sonsini, Goodrich & Rosati
1700 K Street, N.W., Fifth Floor
Washington, DC 20006

Mr. Evan Howard Caminker
University of Michigan Law School
Federal Appellate Litigation Clinic, 3250 South Hall
Ann Arbor, MI 48109

Ms. Bria Delaney
Mr. David S. Flugman
Mr. Nicholas Klenow
Mr. Yelena Konanova
Ms. Jessica Underwood
Selendy & Gay, 1290 Avenue of the Americas
New York, NY 10104

Mr. Michael J. Dell
Kramer, Levin, Naftalis & Frankel
1177 Avenue of the Americas
New York, NY 10036

Ms. Kathryn Eidmann
610 S. Ardmore Avenue
Los Angeles, CA 90005

Mr. Randall P. Ewing Jr.
Korein Tillery
205 N. Michigan Avenue, Suite 1950
Chicago, IL 60601

Ms. Tacy Fletcher Flint
Mr. Lawrence Fogel
Sidley Austin, One S. Dearborn Street
Chicago, IL 60603

Mr. Jerome Dale Goldberg
2727 Second Avenue, Suite 111
Detroit, MI 48201

Mr. Steven Guggenheim
Wilson, Sonsini, Goodrich & Rosati
650 Page Mill Road
Palo Alto, CA 94304-1050

Mr. Mark E. Haddad
University of Southern California
USC Gould School of Law
699 Exposition Boulevard
Los Angeles, CA 90085-0021

Mr. Daniel S. Korobkin
American Civil Liberties Union Of Michigan
2966 Woodward Avenue
Detroit, MI 48201

Ms. Cary S. McGehee
Pitt, McGehee, Palmer & Rivers
117 W. Fourth Street, Suite 200
Royal Oak, MI 48067

Mr. Anton Metlitsky
O'Melveny & Myers
7 Times Square
New York, NY 10036

Mr. Bruce A. Miller
Miller Cohen
7700 Second Avenue, Suite 335
Detroit, MI 48226

Julian D Miller
Forman, Watkins & Krutz LLP
210 E. Capitol Street, Suite 2200
Jackson, MS 39201

Ms. Jenice C. Mitchell Ford
Detroit Public Schools
3011 W. Grand Boulevard
Detroit, MI 48202-2710

Jayesh Patel
440 Burroughs Street, Suite 634
Detroit, MI 48202

Ms. Tina M. Patterson
The PuLSE Institute
615 Griswold Street, Suite 700
Detroit, MI 48226

Mr. Carter Glasgow Phillips
Sidley Austin, 1501 K Street, N.W.
Washington, DC 20005

Tara Jordan Plochocki
Lewis Baach Kaufmann Middlemiss PLLC
1101 New York Avenue, N.W., Suite 1000
Washington, DC 20005

Mr. Michael A. Rebell
Michael A. Rebell Associates
475 Riverside Drive, Suite 1373
New York, NY 10027

Mr. Mark D. Rosenbaum
610 S. Ardmore Avenue
Los Angeles, CA 90005

Mr. Scott Burnett Smith
Bradley, Arant, Boult & Cummings
200 Clinton Avenue, W., Suite 900
Huntsville, AL 35801

Mr. Michael Jay Steinberg
701 S. State Street
3145 Jeffries Hall
Ann Arbor, MI 48109

David Strom
American Federation of Teachers
555 New Jersey Avenue, N.W.
Washington, DC 20001

Ms. Jennifer Martin Wheeler
Sidley Austin, One S. Dearborn Street
Chicago, IL 60603

        Re:  Case Nos. 18-1855/18-1871, *Gary B., et al v. Gretchen Whitmer, et al*
             Originating Case No. : 2:16-cv-13292

Dear Counsel,

    The court today announced its decision in the above-styled cases.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                Yours very truly,

                Deborah S. Hunt, Clerk

                Cathryn Lovely
                Deputy Clerk

cc:  Mr. David J. Weaver

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0124p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

GARY B., JESSIE K., CRISTOPHER R., ISAIAS R., ESMERALDA V., PAUL M., and JAIME R., minors,

*Plaintiffs-Appellants*,

*v.*

GRETCHEN WHITMER, et al.,

*Defendants-Appellees.*

Nos. 18-1855/1871

———————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:16-cv-13292—Stephen J. Murphy, III, District Judge.

Argued: October 24, 2019

Decided and Filed: April 23, 2020

Before: CLAY, STRANCH, and MURPHY, Circuit Judges.

———————

## COUNSEL

**ARGUED:** Carter G. Phillips, SIDLEY AUSTIN LLP, Washington, D.C., for Appellants. Raymond O. Howd, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Carter G. Phillips, SIDLEY AUSTIN LLP, Washington, D.C., Mark D. Rosenbaum, Anne Hudson-Price, Kathryn A. Eidmann, PUBLIC COUNSEL, Los Angeles, California, Mark E. Haddad, UNIVERSITY OF SOUTHERN CALIFORNIA, Los Angeles, California, Evan H. Caminker, UNIVERSITY OF MICHIGAN, Ann Arbor, Michigan, Tacy F. Flint, Lawrence P. Fogel, Suzanne Brindise Notton, Jennifer M. Wheeler, SIDLEY AUSTIN LLP, Chicago, Illinois, Joshua E. Anderson, SIDLEY AUSTIN LLP, Los Angeles, California, Bruce A. Miller, MILLER COHEN, PLC, Detroit, Michigan, for Appellants. Raymond O. Howd, Joshua S. Smith, Toni L. Harris, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. James E. Burke, Bryce J. Yoder, Amanda B. Stubblefield, KEATING MUETHING & KLEKAMP PLL, Cincinnati, Ohio, David J. Strom, AMERICAN FEDERATION OF TEACHERS, AFL-CIO, Washington, D.C., Anton Metlitsky, O'MELVENY & MYERS LLP, New York, New York, Tara J. Plochocki, LEWIS

BAACH KAUFMANN MIDDLEMISS PLLC, Washington, D.C., Michael J. Dell, KRAMER LEVIN NAFTALIS & FRANKEL LLP, New York, New York, Scott Burnett Smith, Julian D. Miller, BRADLEY ARANT BOULT CUMMINGS LLP, Huntsville, Alabama, Lena Konanova, David S. Flugman, Jessica Underwood, Bria Delaney, Nicholas J. Klenow, SELENDY & GAY PLLC, New York, New York, Jenice C. Mitchell, DETROIT PUBLIC SCHOOLS COMMUNITY DISTRICT, Detroit, Michigan, Daniel S. Korobkin, Michael J. Steinberg, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, Jerome D. Goldberg, Detroit, Michigan, for Amici Curiae.

CLAY, J., delivered the opinion of the court in which STRANCH, J., joined.  MURPHY, J. (pp. 62–85), delivered a separate dissenting opinion.

————————————

# OPINION

————————————

CLAY, Circuit Judge.  Plaintiffs in this appeal are students at several of Detroit's worst-performing public schools.  They credit this substandard performance to poor conditions within their classrooms, including missing or unqualified teachers, physically dangerous facilities, and inadequate books and materials.  Taken together, Plaintiffs say these conditions deprive them of a basic minimum education, meaning one that provides a chance at foundational literacy.

In 2016, Plaintiffs sued several Michigan state officials, who they say are responsible for these abysmal conditions in their schools.  Plaintiffs allege that state actors are responsible, as opposed to local entities, based on the state's general supervision of all public education, and also on the state's specific interventions in Detroit's public schools.  The state argues that it recently returned control to local officials, and so it is now the wrong party to sue.

Plaintiffs' underlying claims, brought under 42 U.S.C. § 1983,  are all based on the Due Process and Equal Protection Clauses of the Fourteenth Amendment.  Plaintiffs argue that while other Michigan students receive an adequate education, the students in Plaintiffs' schools do not, amounting to a violation of their right to equal protection of the laws.  They also argue that the schools they are forced to attend are schools in name only, and so the state cannot justify the restriction on their liberty imposed by compulsory attendance.  And in their most significant claim, Plaintiffs ask this Court to recognize a fundamental right to a basic minimum education, an issue the Supreme Court has repeatedly discussed but never decided.

While the district court found that Defendants were in fact the proper parties to sue, it dismissed Plaintiffs' complaint on the merits. First, it found that Plaintiffs had not alleged a proper comparator for their equal protection claim, nor had they highlighted any state policy or action that was not supported by a rational basis. Second, it found that Plaintiffs had not sufficiently pleaded their compulsory attendance theory, and so the court only viewed their due process claim as seeking an affirmative fundamental right. Third, the court held that a basic minimum education is not a fundamental right, and so Plaintiffs' due process claim was dismissed. Plaintiffs then appealed.

Though Plaintiffs failed to adequately plead their equal protection and compulsory attendance claims, the same cannot be said for their central theory: that they have been denied a basic minimum education, and thus have been deprived of access to literacy. A review of the Supreme Court's education cases, and an application of their principles to our substantive due process framework, demonstrates that we should recognize a basic minimum education to be a fundamental right. Furthermore, under this circuit's precedents, Defendants are proper parties to sue in this case. Accordingly, we affirm in part and reverse in part the district court's order, and remand this case for further proceedings.

## I. BACKGROUND

### A. History of Detroit's Schools and State Control

Plaintiffs are students at several Detroit public schools that "serve almost exclusively low-income children of color." (Compl., R. 1 at PageID #4.) They filed suit in this case against several Michigan state officers, who they say are proper defendants based both on the state's constitutional and statutory authority to oversee the statewide education program and on the state's specific interventions into the governance of Detroit's schools.

Michigan's constitution provides that the state's legislature "shall maintain and support a system of free public elementary and secondary schools." Mich. Const. art. VIII, § 2. The constitution also vests "[l]eadership and general supervision over all public education" in the state board of education, which serves "as the general planning and coordinating body for all public education." *Id.* art. VIII, § 3. The board also appoints the superintendent of public

instruction, who is responsible for executing the board's policies and serves as head of the state department of education. *Id.*

According to Plaintiffs, education is a state-level concern and school districts are simply "creations and agents of the State." (Compl., R. 1 at PageID #48–50.) The Michigan Supreme Court has "repeatedly held that education in this state is not a matter of local concern, but belongs to the state at large." *Bd. of Educ. v. Bacon*, 162 N.W. 416, 416 (Mich. 1917) (quoting *Collins v. City of Detroit*, 161 N.W. 905, 907 (Mich. 1917)). Under Michigan law, the state board of education has oversight authority over school districts and public schools within the state. *See, e.g.*, Mich. Comp. Laws §§ 380.1281, 388.1007, 388.1009; *see also Council of Orgs. & Others for Educ. About Parochiaid, Inc. v. Engler*, 566 N.W.2d 208, 216 (Mich. 1997) (noting that state funding and oversight provisions place public schools "under the ultimate and immediate control of the state and its agents"). But beneath this oversight and supervisory authority, the day-to-day administration of Michigan schools is usually entrusted to the boards of local school districts and their appointees. *See, e.g.*, Mich. Comp. Laws § 380.1282.

But usually is not always. Beyond the state's general authority with respect to public education, Plaintiffs also allege that the state has repeatedly intervened in the day-to-day management of Detroit's schools, and that it directly oversaw public education in Detroit from 1999 through the time the complaint was filed in this case. *See Gary B. v. Snyder*, 329 F. Supp. 3d 344, 350–54 (E.D. Mich. 2018) (discussing state interventions in Detroit's schools). As stated in the complaint, "the State has directly controlled [the Detroit school system] for most of the past fifteen years through variations of an emergency manager system." (Compl., R. 1 at PageID #16–17.) And while this intervention may have been intended to help address shortcomings in the city's schools, Plaintiffs say that by "placing the Detroit schools largely in the hands of administrators with no backgrounds in education," the state only made the problem worse. (*Id.*)

These interventions began in the 1990s, partially in response to "fiscal deficit and failing student achievement outcomes" in Detroit Public Schools ("DPS"), the former Detroit school district. (*Id.* at #50.) In 1999, the state adopted Public Act 10, which "replac[ed] Detroit's elected school board and superintendent with a seven member 'reform board.'" (*Id.*) The reform board consisted of seven members: six appointed by the mayor, and (at least for five years after

passage) either the state superintendent of public instruction or her designee. 1999 Mich. Pub. Acts 10, § 372(2).[1] The board required unanimous consent to appoint the school district's chief executive, *id.* § 374(1), which Plaintiffs say gave the state an effective "veto power over the selection of the CEO as well as every other decision" (Compl., R. 1 at PageID #50–51).

While in 2006, control of DPS was returned "to a locally elected school board . . . as a result of a Detroit voter referendum," this change was short-lived. (*Id.* at #51.) In December 2008, the governor declared a fiscal emergency and appointed an "Emergency Fiscal Manager for DPS." (*Id.*) This emergency manager shared power with the locally elected school board, but in doing so, the manager "exercised authority not only over financial decision-making, but some educational decision-making as well." (*Id.*)

In 2011, this power-sharing arrangement ended, as the state significantly expanded the authority of the state's emergency manager. The manager was effectively given total control over DPS, and was empowered to "[e]xercise solely, for and on behalf of the school district, all . . . authority and responsibilities affecting the school district that are prescribed by law to the school board and superintendent." Mich. Comp. Laws § 141.1554(f); *see also Gary B.*, 329 F. Supp. 3d at 350–51 (discussing the history and various versions of Michigan's emergency-manager laws).

While a state-appointed transition manager controlled Detroit's schools at the time the complaint was filed, the state also created a new school district, the Detroit Public Schools Community District ("DPSCD"), to run Detroit's schools, while keeping DPS in charge of paying down debt. *See* Ann Zaniewski, *New Detroit School Board Takes Reins of District*, Det. Free Press, Jan. 11, 2017. The first elections for DPSCD's board were held in January 2017, and Defendants claim that "the locally elected DPSCD Board of Education and its superintendent now have direct control over the operation of the schools in the district; there is no longer an emergency manager." (Defs.' Br. at 27.) That said, the complaint notes that "the State's Financial Review Commission will remain involved in the oversight of the Detroit schools, and

---

[1]Plaintiffs instead allege that this seventh member was "appointed by the Governor" (Compl., R. 1 at PageID #50), but this makes no difference to their case, since both the governor and the state superintendent are defendants here.

has not yet revealed the scope of authority or direction that will be granted to the elected board." (Compl., R. 1 at PageID #51.)**2**

Beyond the emergency managers and other interventions into DPS or DPSCD, "the State also has assumed a special responsibility over what it calls Priority Schools, or the most poorly performing five percent of schools in the State." (*Id.* at #52.) At the time the complaint was filed, this included all of Plaintiffs' schools that remained open. These Priority Schools were managed by a state entity called the State School Reform/Redesign Office ("SRO"). *See* 2009 Mich. Pub. Acts 204, § 1280c (repealed 2019). According to Defendants, the SRO and Priority Schools were eliminated as of June 30, 2019.

Plaintiffs also allege that the state intervened in Detroit schools through an entity called the Education Achievement Authority ("EAA"). The EAA was a statewide school district administered by the state in conjunction with Eastern Michigan University, and included fifteen of the state's lowest-performing schools. But according to Plaintiffs, "[t]he EAA schools have not improved on the State's watch. In fact, the most recent Michigan state achievement test results reflect that fewer than 5% of EAA students are proficient in core subject areas." (Compl., R. 1 at PageID #55.) As a result, the state closed the district and transferred Detroit's EAA schools back into DPSCD. *See Gary B.*, 329 F. Supp. 3d at 351–52. However, none of Plaintiffs' individual schools were part of the EAA. *Id.* at 351 n.3.**3**

Finally, Plaintiffs point to state-level policy interventions that affect Detroit schools. For example, Plaintiffs claim that in June 2016, the state adopted legislation allowing "noncertificated, nonendorsed teacher[s]" to work in the new Detroit school district. (Compl., R. 1 at PageID #59.) According to Plaintiffs, "[n]owhere else in Michigan may children in

---

**2**This commission includes the state treasurer, the director of the Department of Technology, Management and Budget (who is one of the defendants here) or her designee, and several appointees of the governor, along with certain officers from DPSCD and the City of Detroit. *See* Mich. Comp. Laws § 141.1635(1)–(2). State officers and appointees constitute a majority of the commission. *Id.*

**3**Plaintiffs also discuss inadequate teachers, decrepit conditions, and a shortage of materials at Marion Law Academy, one of the schools managed by the EAA. While the conditions described at the school seem horrendous (*see, e.g.*, Compl., R. 1 at PageID #58 ("In one fourth-grade classroom, a leaking hole in the ceiling created what students called 'the lake,' and the teacher surrounded the area with yellow caution tape after multiple requests for repairs were ignored.")), none of the named plaintiffs attended Marion Law Academy.

public school be taught by teachers who lack appropriate state-mandated credentials and qualifications." (*Id.*) Plaintiffs also allege that the state has threatened to close and then flip-flopped on closing "all of Plaintiffs' schools that are currently operating and 47 schools in Detroit." (*Id.* at #60–62.) They say that these threatened closures exacerbated their problems by sending "students and teachers scrambling, leaving them worried and confused when they should have instead been preparing to start the new school year. Moreover, the State has offered no plan to ensure that any contemplated school closing will not disrupt students' educations, further entrenching denials of access to literacy." (*Id.* at #61.)

### B. Conditions Alleged in Plaintiffs' Schools

Plaintiffs' schools are "five of the lowest performing schools in Detroit." (*Id.* at #5.) Three of them are traditional public high schools: Osborn Academy of Mathematics ("Osborn MST"), the Osborn Evergreen Academy of Design and Alternative Energy ("Osborn Evergreen"), and the Medicine and Community Health Academy at Cody ("Cody Health"). The other two are charter schools: Hamilton Academy ("Hamilton"), which was an elementary school, and Experiencia Preparatory Academy ("Experiencia"), which taught students at the elementary through high-school levels.[4]

The core of Plaintiffs' complaint is that the conditions in their schools are so bad—due to the absence of qualified teachers, crumbling facilities, and insufficient materials—that those schools fail to provide access to literacy. "Plaintiffs sit in classrooms where not even the pretense of education takes place, in schools that are functionally incapable of delivering access to literacy." (*Id.* at #4.) Because of this, Plaintiffs attend "schools in name only, characterized by slum-like conditions and lacking the most basic educational opportunities that children elsewhere in Michigan and throughout the nation take for granted." (*Id.*) "[T]hey wholly lack the capacity to deliver basic access to literacy, functionally delivering no education at all." (*Id.* at #19; *see also id.* at # 10–11 ("The schools Plaintiffs attend, and attended, are not truly schools by any traditional definition or understanding of the role public schools play in affording access to literacy.").)

---

[4]These charter schools are treated as public schools under Michigan law and are subject to the authority of the state board of education. *E.g.*, Mich. Comp. Laws § 380.501(1); *Parochiaid*, 566 N.W.2d at 215–21.

As noted above, the inadequacies that Plaintiffs point to can be grouped into three main categories: teaching, facilities, and materials. We discuss examples of each of these problems below.

## 1. Teaching

With respect to teaching, Plaintiffs claim that their schools "lack the qualified teaching staff required to bring students to literacy—that is, teachers who are certificated, properly trained, and assigned to a class within the area of their qualifications and expertise." (*Id.* at #15.) This shortfall can be seen in the schools' substantial reliance on Teach for America instructors and through other sources of high teacher turnover, which in many cases lead to midyear vacancies.

"In the 2016–2017 school year, there were up to 200 vacancies [in Detroit's public schools] just before the start of the school year." (*Id.* at #102.) There are also substantial short-term absences, with some teachers "absent as many as 50 days in one year." (*Id.* at #105.) Because of these shortages, Plaintiffs' "classes are covered by non-certificated paraprofessionals, substitutes, or misassigned teachers who lack any expertise or knowledge in the subject-matter of the course." (*Id.* at #15–16.) Other times, classes are combined on short notice, with up to sixty students in a single classroom. In perhaps the most notable case, "an eighth grade student was put in charge of teaching seventh and eighth grade math classes for a month because no math teacher was available." (*Id.* at #16.)

When there are teachers, they also often lack meaningful experience. For example, at Hamilton, a majority of teachers were starting their first year when the complaint was filed. At Experiencia, about half of the teachers who started in 2012 quit by the end of their second semester.

In June 2016, the state adopted legislation "permitting non-certificated instructors to teach in DPSCD schools. This legislation does not apply to any school elsewhere in the State." (*Id.* at #16.) At Hamilton, a paraprofessional who was teaching middle school science said "she does not understand the material and cannot lead classroom experiments." (*Id.* at #102–03.)

In several other cases, long-term substitutes are used, or teachers are changed frequently through the year.

Beyond the teachers themselves, Plaintiffs also complain of their schools' failure to use adequate curricula that could plausibly impart literacy. According to Plaintiffs, "[t]here is no consistent literacy instruction program in Plaintiffs' elementary schools, and the schools lack the staffing and capacity required to effectively implement such a program." (*Id.* at #76.) At Experiencia, "teachers dedicated significant class time to reading aloud from books with reading levels multiple grades below the chronological age of the class, yet students struggled to sound out simple words." (*Id.* at #77–78.) Plaintiffs' high schools fare little better, as teachers receive no support or training in literacy education and "lack access to curricular materials such as lesson plans, pacing guides, and teacher editions of textbooks." (*Id.* at #77.) One of Plaintiffs' high schools attempted to address literacy issues with school reading groups; despite being a high school, "[t]he most advanced of the reading groups read books at a fourth- and fifth-grade reading level." (*Id.*) The problem is also exacerbated as the students advance in grade, since higher-grade teachers "lack appropriate training to support students who are performing far below grade level." (*Id.* at #79–80.)[5]

## 2. Facilities

Turning to the schools themselves, Plaintiffs allege that their classrooms feature decrepit or even unsafe physical conditions, meaning they "have been unable to satisfy minimal state health and safety standards." (*Id.* at #12.) "The City of Detroit admitted that during the 2015–16 academic year, *none* of the school district's buildings were in compliance with city health and safety codes," and that some of Plaintiffs' schools were still not in compliance at the time the complaint was filed. (*Id.* at #87.) Taken together, Plaintiffs claim that these conditions "make learning nearly impossible." (*Id.* at #12.)

"Classroom temperatures in Plaintiffs' schools regularly exceed 90 degrees during both the summer and winter due to malfunctioning furnaces and, at other times during winter, are

---

[5]Plaintiffs also allege that their schools fail to employ adequate instructors for students whose first language is not English. In one case, this failure was despite the school claiming to be "a dual language immersion school." (Compl., R. 1 at PageID #99.)

frequently so cold that students and their teachers can see their breath and must wear layers of winter clothing indoors." (*Id.*) These temperatures sometimes require school closings or early dismissals. For example, "there is no air conditioning at Hamilton, and one west-facing classroom has reached 110 degrees during the school year. . . . On the first day of the 2016–17 school year, the temperatures in the school grew so extreme that multiple students fainted, both students and teachers got so sick they threw up, and multiple teachers developed heat rashes." (*Id.* at #90.) During the winter months, Plaintiffs face extreme cold instead: "students and teachers had to wear winter coats, hats, and scarves" inside their classrooms. (*Id.*) In some cases, temperatures remained below freezing, "and students were periodically sent home when the classrooms were too cold." (*Id.* at #91.)

"Mice, cockroaches, and other vermin regularly inhabit Plaintiffs' classrooms, and the first thing some teachers do each morning is attempt to clean up rodent feces before their students arrive. Hallways and classrooms smell of dead vermin and black mold . . . ." (*Id.* at #13.) "Students and teachers have frequently encountered mice, mice droppings, rats, bedbugs, and/or cockroaches." (*Id.* at #88; *see also id.* at #88–89 (including additional allegations and pictures)).

"The drinking water in some of Plaintiffs' schools is hot, contaminated and undrinkable. Bathrooms are filthy and unkempt; sinks do not work; toilet stalls lack doors and toilet paper. In some classrooms, ceiling tiles and plaster regularly fall during class time." (*Id.* at #13.) At several of Plaintiffs' schools, pipes or roofs leaked as well, and broken windows are covered with cardboard. (*See id.* at #95, #97 (pictures of damaged facilities)).

Plaintiffs also complain of overcrowding within their classrooms, with as many as fifty students in a single classroom and insufficient desks and chairs, requiring students to stand or sit on the floor. Even when students have chairs, "classes are often so full that the desks are crammed wall-to-wall, with no room for aisles." (*Id.* at #97.)

### 3. Materials

Plaintiffs allege that their schools lack the books and materials needed to plausibly provide literacy. "Many classes in Plaintiffs' schools do not have appropriate textbooks.

Where they are provided, they are often long out of date, torn and beyond repair, or marked up to be unreadable in places." (*Id.* at #11; *see also id.* at #84–85 (pictures of Plaintiffs' textbooks).) Plaintiffs also allege there were so few copies that they had to share a single book among four or more students during class, and could not take them home after school, meaning their teachers could not assign meaningful homework. In several cases, the schools' libraries were inaccessible or had no books available either, even outside of textbooks.

In addition to their allegations of outdated, insufficient, or damaged books, Plaintiffs also claim that their schoolbooks were not appropriate to their grade level. For example, "the only books in the third-grade classroom at Hamilton were picture books, until the teacher purchased others with her own money more than halfway through the year." (*Id.* at #8.) "There are no textbooks for the Earth Science, Physics, or Research and Development science classes at Osborn MST, so the teachers in each of those classes rely on a section of the Biology textbook most closely related to the subject they are teaching." (*Id.* at #83.)

Beyond books, Plaintiffs also claim that their classrooms lack other basic school supplies, such as pens, pencils, and paper. Teachers attempt to make up for this shortfall by spending substantial amounts out of pocket or by requesting donations online.

### C. Educational Outcomes from Plaintiffs' Schools

According to Plaintiffs, the school conditions discussed above led to abysmal educational outcomes, which further supports the claim that their schools cannot provide access to literacy. Turning to outcome data, Plaintiffs contend that while outcomes are not dispositive of access, they remain relevant because aggregate results shed light on the degree of opportunity afforded to students. "Achievement data reveal that in Plaintiffs' schools, illiteracy is the norm. The proficiency rates in Plaintiffs' schools hover near zero in nearly all subject areas." (*Id.* at #7 (emphasis omitted); *see also id.* at #62 ("[L]iteracy instruction provided in Plaintiffs' schools is so wholly insufficient that ninety percent or more of the students are unable to meet state proficiency standards.").) And looking beyond Michigan, Detroit's schools "ranked last in reading and math proficiency among all big-city school districts." (*Id.* at #47.)

The numbers from Plaintiffs' individual schools demonstrate significant underperformance compared to state educational standards. Looking first to elementary school students, at Hamilton, just 4.2% of third-graders scored "proficient or above" in the state's English assessment, compared to 46.0% of third-graders statewide. (*Id.* at #8.) Similarly, at Experiencia, only 9.5% of third-graders scored as proficient. Other grade levels have even worse numbers, including zero or near-zero proficiency rates.

Turning to Plaintiffs' high schools, at Cody MCH, 12.5% of eleventh-graders scored as proficient in English, compared to 49.2% statewide. And at Osborn MST, only 1.8% of eleventh-graders were proficient. In other subject areas, proficiency numbers were even lower. Additionally, results from the ACT college-admissions test reveal that students in Plaintiffs' schools dramatically underperform the rest of the state, with between 12.5% and 0% achieving "college ready" scores. (*Id.* at #71–72.)

Plaintiffs argue that these data translate into significantly reduced literacy skills in their schools, in which students "struggle to write proper paragraphs or even complete sentences." (*Id.* at #7.) For example, in their elementary schools, Plaintiffs allege that many third-grade students have a vocabulary of only "a couple hundred words," are still learning handwriting, and that some "cannot even sound out letters." (*Id.* at #8; *accord id.* at #77–79.)

These issues persisted at Plaintiffs' high schools as well:

> At Cody MCH, the ninth-grade English-Language Arts teacher spent a good part of the year reading, paragraph by paragraph, a novel with a third-grade reading level, because no more lexically advanced novel would have been readable by his students. When the class was asked to read the book aloud in class, a number of students experienced enormous difficulty reading monosyllabic words. Similarly, at Experiencia, the ninth and tenth grade class was assigned a book with a fourth-grade reading level, because the students lacked the literacy skills to access more complex texts and because they were the only books available. At Osborn MST, . . . [a] number of the students struggled to sound out basic words when they read aloud in class, and one student asked her classmate how to spell the word "the."

(*Id.* at #9–10; *accord id.* at #79.)

Looking to national-level data, Detroit schools average "2.3 grade levels below their actual grade level in basic reading proficiency. Because Plaintiffs' schools are among the poorest performing schools in Detroit, this means that students in Plaintiffs' schools are performing far lower." (*Id.* at #72 (emphasis omitted).) Plaintiffs allege that these issues also cause "high drop-out and low college attainment rates" within their schools. (*Id.* at # 27; *accord id.* at #73–76.)

While literacy is the crux of Plaintiffs' complaint, they also note that the failure of their schools is uniform across "nearly all subject areas." (*Id.* at #7.) "[B]ecause the rest of the curriculum assumes a level of literacy that the students do not attain, they are also unable to learn State-mandated content in all other subject areas." (*Id.* at #7–8.) Of Plaintiffs' high schools that remain open, each of their eleventh-grade classes scored "0% proficiency in at least one of Math, Science, or Social Studies." (*Id.* at #10 (emphasis omitted).)

### D. The District Court's Opinion and Order

On September 13, 2016, Plaintiffs filed their complaint in the Eastern District of Michigan. They alleged three causes of action at issue in this appeal: (1) denial of their "fundamental right of access to literacy," violating both the substantive due process and equal protection requirements of the Fourteenth Amendment; (2) violation of the Equal Protection Clause due to race-based discrimination; and (3) a claim for declaratory relief based on these other causes of action. (Compl., R. 1 at PageID #126–30.)[6]

Defendants moved to dismiss. First, while not expressly phrased in terms of mootness, Defendants argued that they no longer control Plaintiffs' schools, and so cannot be sued for those schools' conditions. Defendants also claimed that the Eleventh Amendment barred Plaintiffs' requested relief on sovereign-immunity grounds.

Turning to the merits, Defendants argued that there is no fundamental right to access to literacy, calling it "a mere proxy for a right to education, which has long been rejected as a fundamental right." (Mot. to Dismiss, R. 60 at PageID #519–27.) And since there is no such

---

[6]Plaintiffs voluntarily abandoned their other two causes of action.

right, any equal protection claim not based on a protected class must be reviewed under the rational-basis standard, a review that Defendants argued would show that the claim fails under the Supreme Court's prior education cases. Finally, Defendants said that Plaintiffs failed to plead a race-based equal protection claim because the conditions they complain of "equally affect all students within the same schools regardless of race." (*Id.* at #532–35.)

While the district court ultimately granted Defendants' motion, *Gary B.*, 329 F. Supp. 3d at 369, how it came to that conclusion is important on appeal. Before reaching the merits of Plaintiffs' complaint, the district court first addressed Defendants' argument that they did not operate Plaintiffs' schools and so were the wrong parties to sue. *Id.* at 349. The court rejected this view, finding that Plaintiffs had "adequately pled that state actors effectively control the schools, at least in part, and are therefore proper parties." *Id.* at 354. The court also rejected Defendants' Eleventh Amendment argument, finding that Plaintiffs sought prospective injunctive relief, and therefore could sue state officers in their official capacities. *Id.* at 356–57.

Plaintiffs fared worse on the merits. Turning first to their due process claims, the court noted that "a case like this one could be argued on either positive- or negative-right theories." *Id.* at 364. Negative rights, in this view, are freedoms from government intervention or intrusion; positive rights, by contrast, entail affirmative obligations that the state must afford its citizens. "But the relief sought [was] exclusively positive in nature," and so the district court only considered the due process claim in terms of whether access to literacy is a fundamental right. *Id.* at 364–65. And on that point, noting federal courts' "reticence to find positive rights [even] to unquestionably important necessities of life," the court held there was no such fundamental right. *Id.* at 365–66.

On the equal protection claim, the court first found that while Plaintiffs attempted to compare their education to that provided by other schools throughout the State of Michigan, this was not the right comparison. *Id.* at 367. According to the court, because schools like Plaintiffs'—those under emergency management or experiencing other state interventions—were in a different position from other schools, only schools undergoing state interventions could serve as comparators in assessing their equal protection claims. *Id.* Using that framework, the district court rejected Plaintiffs' race-based equal protection claim, finding that the complaint

failed to allege "any instance where Defendants intervened in a school with a different racial makeup and treated that school disparately." *Id.* at 367–68. Left with only rational basis review, the court found that Plaintiffs had failed to allege any specific, irrational actions taken by Defendants, holding that Plaintiffs could not use the conditions in their schools alone to dispel the presumption of rationality. *Id.* at 368. Accordingly, the district court dismissed Plaintiffs' complaint in its entirety with prejudice. *Id.* at 369.

### E. The Parties' Arguments on Appeal

On appeal, both sides argue that the district court erred (though Defendants of course believe the ultimate outcome was correct). Plaintiffs say that the court was wrong in finding there is no fundamental right to access to literacy, and thus the district court should not have dismissed their due process claim. They also argue that the court should have considered a negative-rights version of their due process theory, under which Defendants violated their right to liberty by compelling them to attend "schools in name only" that fail to provide even a minimal education. (Pls.' Br. at 36–43.)

On equal protection, while not addressing their race-based claims, Plaintiffs say that because Defendants control the entire statewide education system, other schools throughout the state are proper comparators. When viewed against these statewide comparators, Plaintiffs say their schools are so much worse that Defendants' actions violate the Equal Protection Clause under any level of scrutiny.

For Defendants' part, they begin by reiterating that they do not control Plaintiffs' schools, and so are not proper defendants in this case. They now raise this argument under the guise of mootness, contending that changes in state law and practice have removed their day-to-day control over education in Detroit. As a result, they also argue that any remaining claims are for retroactive rather than prospective relief, and so are barred by the Eleventh Amendment.

Following this section of their brief, which was styled "Argument for All Defendants" (Defs.' Br. at 26), Defendants seem to part ways. Most of the defendants say that because Plaintiffs' claims are moot, they will not argue against their merits on appeal. (*Id.* at 25.) But two of the defendants proceed in a further section titled "Argument of Michigan Board of

Education Members Tom McMillin and Nikki Snyder Only." (*Id.* at 36; *accord id.* at 25.) This section contains Defendants' arguments on the merits of Plaintiffs' constitutional theories, in which they say the district court correctly dismissed Plaintiffs' claims.[7]

These issues are now before the Court.

## II. DISCUSSION

### A. Standard of Review

We review a district court's grant of a motion to dismiss de novo. *E.g.*, *Majestic Bldg. Maint., Inc. v. Huntington Bancshares, Inc.*, 864 F.3d 455, 458 (6th Cir. 2017). A motion to dismiss is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed R. Civ. P. 12(b)(6).

The reviewing court must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff. *E.g.*, *Hill v. Blue Cross & Blue Shield of Mich.*, 409 F.3d 710, 716 (6th Cir. 2005). But we may affirm the district court's dismissal of the plaintiff's claims on any grounds present in the record, including grounds not relied upon by the district court. *E.g.*, *Long v. Insight Commc'ns of Cent. Ohio, LLC*, 804 F.3d 791, 794 (6th Cir. 2015); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 547–48 (6th Cir. 1999).

To survive a motion to dismiss, the plaintiff must allege facts that are sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[7]It is unclear how McMillin and Snyder have the authority to pursue separate arguments on their own behalf. Both are members of a collegial body—the state board of education—and were sued in their official capacities. In such a case, it is the decision of the body itself, not its individual members, that governs the conduct of litigation. *See, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 543–45 (1986) (holding that a school board member sued in his official capacity was bound by the board's litigation decisions and could not file his own notice of appeal); *Smuck v. Hobson*, 408 F.2d 175, 177–78 (D.C. Cir. 1969) (en banc) (plurality opinion) (finding that because a board of education's "decisions are made by vote as a collective whole," an individual member "has no appealable interest" contrary to a majority vote taken by the board).

But since the remaining defendants have not objected to McMillin's and Snyder's arguments, and indeed have included them in their brief (albeit separately labeled), we consider these arguments to be made on behalf of all defendants and refer to them in this manner below. This seems particularly appropriate because the board as a whole (along with the other state officers) is the master of how this litigation is defended, and thus can decide which arguments to pursue in its briefs and whether and to what extent it should further press this appeal.

Case 2:16-cv-13292-SJM-APP ECF No. 123-8 filed 04/23/20 PageID.2873 Page 21 of 90

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The determination to dismiss with prejudice, as opposed to without, is reviewed under an abuse of discretion standard. *E.g.*, *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 644 (6th Cir. 2003); *Craighead v. E.F. Hutton & Co.*, 899 F.2d 485, 495 (6th Cir. 1990).

### B. Mootness and Sovereign Immunity

At the outset, Defendants say that there is no need to reach the merits of this appeal, because Plaintiffs sued the wrong people. This is because, in the past several years, Defendants have shifted the administration of Plaintiffs' schools back to local officials, and so any complaints about the conditions in these schools must instead be addressed to the local school board. Defendants also argue that since they no longer control the day-to-day events at Plaintiffs' schools, any suit against them would have to be for retroactive monetary relief, and so would run afoul of the Eleventh Amendment's grant of sovereign immunity. The district court found against Defendants on each of these points. *Gary B.*, 329 F. Supp. 3d at 354, 357.

While the Eleventh Amendment generally prohibits lawsuits against states in federal court, under *Ex parte Young*, 209 U.S. 123, 155–56 (1908), a plaintiff can sue state officers to enjoin an unconstitutional state policy. When challenging a state policy, the officer sued must "have some connection" with the policy's enforcement or execution. *Id.* at 157. Even when a function is administered on a day-to-day level by local officials, a state officer's supervisory authority can still make her a proper defendant under *Ex parte Young*. *E.g.*, *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1048–49 (6th Cir. 2015). So long as the named defendants are "actively involved" with the challenged conduct, they can be sued for injunctive relief without implicating the Eleventh Amendment. *Id.*; *accord Doe v. DeWine*, 910 F.3d 842, 848–49 (6th Cir. 2018).

By arguing that the day-to-day management of Plaintiffs' schools has been returned to DPSCD, Defendants misconstrue Plaintiffs' central claim in this case, which is that the state—as the primary authority for public schools in Michigan—has failed to provide them with a basic minimum education. While their complaint also discusses Defendants' prior, more extensive interventions into Detroit's schools, the gravamen of Plaintiffs' argument is that the state, by virtue of its supervisory authority over all public education in Michigan, has a responsibility to ensure that each school it oversees at least provides access to literacy.

> This Court has previously rejected an argument that is analogous to Defendants' here:

> The Secretary [of State] and Governor also maintain that they are not proper parties to this action in that any alleged errors were the fault of local [boards of election] rather than high-level state officials. The district court properly rejected this argument. The Secretary of State of Ohio is the state's chief election officer *ex officio*. The Governor of Ohio is the state's chief executive officer. Both officials have the authority to control the [boards of election] and are proper parties here.

*League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008) (citations omitted); *see also, e.g.*, *Doe v. DeWine*, 910 F.3d at 848–49; *Russell*, 784 F.3d at 1048–49.

This logic applies here too. The state board of education has "[l]eadership and general supervision over all public education." Mich. Const. art. VIII, § 3. The superintendent executes the board's policies and is the chief education officer of Michigan. *Id.* The governor is the chief executive officer. *Id.* art. V, § 1. And while the state has delegated much of the management of individual school districts and schools to local authorities, these remain "under the ultimate and immediate control of the state and its agents." *Parochiaid*, 566 N.W.2d at 216.[8]

---

[8]Although the changes highlighted by Defendants do not alter this general relationship between the state and its subordinate school districts, they may affect whether certain individual defendants should remain in this case. For example, the SRO appears to have been eliminated in June 2019. While the parties did not raise this issue directly with respect to individual officers, they could do so following remand in the district court. *See, e.g.*, *Chisom v. Jindal*, 890 F. Supp. 2d 696, 728 (E.D. La. 2012) (approving the voluntary dismissal of an official-capacity defendant after the office in question was eliminated); *see also, e.g.*, *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.").

Furthermore, any remedy that the district court could order would almost certainly implicate Defendants, who have policymaking and financial responsibility for the statewide education system. The rule advocated by Defendants could create a liability catch-22, in which Plaintiffs are forced to instead seek injunctive relief against local officials, only to be told that the resources they need can only come from the state. In *Futernick v. Sumpter Township*, 78 F.3d 1051, 1055 n.5 (6th Cir. 1996), *abrogated on other grounds by Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) (per curiam), we rejected a similar argument on these grounds:

> The [defendants] also argue that only the officer with immediate control over the challenged act or omission is amenable to § 1983. We find this claim ridiculous. Such a rule would allow a state agency to avoid, or defer, liability merely by transferring the defendant in a particular case, or by changing the scope of the defendant official's authority. The directors of a state agency, no matter how far removed from the actions of agency employees, are proper parties to a suit for an *injunction* under § 1983.

In fact, even if Plaintiffs' claims were limited to the state's direct intervention in Detroit's schools, Defendants' recent transfer of day-to-day management to DPSCD would still not require dismissal. "A defendant's 'voluntary cessation of a challenged practice' does not moot a case. Rather, voluntary conduct moots a case only in the rare instance where 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *League of Women Voters*, 548 F.3d at 473 (citations omitted) (first quoting *Ammex, Inc. v. Cox*, 351 F.3d 697, 704 (6th Cir. 2003); and then quoting *Akers v. McGinnis*, 352 F.3d 1030, 1035 (6th Cir. 2003)). Given Defendants' repeated interventions in and changes to the governance structure of Detroit's education system, there is no assurance that Defendants will not again inject themselves into the administration of Plaintiffs' schools, nor do they attempt to make such a commitment in their brief. Despite the greater consideration afforded to government officials' cessation of allegedly unlawful conduct, *e.g.*, *Ammex*, 351 F.3d at 705; *Mosley v. Hairston*, 920 F.2d 409, 415 (6th Cir. 1990), there is no basis to believe this change is a permanent one.

Finally, Defendants' argument that this lawsuit is really an attempt to seek payment for past harms, and so is barred by the Eleventh Amendment, misstates both Plaintiffs' requested remedy and the law. As Defendants themselves repeatedly argue, Plaintiffs are requesting

affirmative injunctive relief to improve the conditions in their schools. Such an injunction "fits squarely within the prospective-compliance exception" to the Eleventh Amendment, even if funds from the state treasury are needed to carry it out. *Milliken v. Bradley*, 433 U.S. 267, 289 (1977); *see also id.* at 288–90 (affirming an order requiring Michigan state officers to fund remedial education measures). The cases cited by Defendants all involved cash payments to claimants for previously incurred liabilities, *see Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.*, 225 F.3d 1208, 1220 (11th Cir. 2000) ("If the prospective relief sought is 'measured in terms of a monetary loss resulting from a past breach of a legal duty,' it is the functional equivalent of money damages and *Ex parte Young* does not apply." (quoting *Edelman v. Jordan*, 415 U.S. 651, 668 (1974))), and so are completely inapplicable to this case.

In sum, it is evident from the Michigan Constitution and statutes, as well as its prior interventions in the school system, that the state retains significant authority over Detroit's public schools. Accordingly, its officers are proper defendants in this case under *Ex parte Young*, and the transfer of some control back to local officials does not render this lawsuit moot.

## C. Plaintiffs' Equal Protection Claim

Faced now with the merits of Plaintiffs' complaint, we turn first to their equal protection claim. The crux of this claim is that Defendants discriminated against Plaintiffs by failing to provide the same access to literacy they give to other Michigan students. Thus, even if there is no fundamental right to a basic minimum education, Defendants—by choosing to provide a basic education to some students but not to others—have still violated Plaintiffs' constitutional rights. There is some debate over what level of scrutiny applies when a discrete group is denied access to education. Plaintiffs argue that under *Plyler v. Doe*, 457 U.S. 202 (1982), a form of heightened scrutiny applies in such cases, *see id.* at 230 ("If the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest."). They also contend that even if this heightened scrutiny did not apply, there could be no rational justification for denying Plaintiffs an adequate education while providing one to other students throughout the state.

But a review of Plaintiffs' complaint shows they have not adequately pleaded an equal protection claim, regardless of the level of scrutiny. This is because their complaint, while reflecting the awful conditions faced in Plaintiffs' schools, has not alleged any disparity in the state's allocation of resources between their schools and others. Nor do Plaintiffs attack any specific decision or policy implemented by Defendants that treats their schools differently from others in the state. Thus, because Plaintiffs have not identified a governmental action or policy that discriminates against them, the district court was correct to dismiss this claim.

### 1. Equal Protection Framework

"When a state distributes benefits unequally, the distinctions it makes are subject to scrutiny under the Equal Protection Clause of the Fourteenth Amendment." *Zobel v. Williams*, 457 U.S. 55, 60 (1982). At its core, the Clause says that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, plaintiffs alleging an equal protection claim have to make two showings: first, that the defendants treated them differently from other similarly situated persons, and second, that this difference in treatment is not supported by a sufficiently strong governmental interest. *E.g.*, *id.* at 439–40; *Jolivette v. Husted*, 694 F.3d 760, 771 (6th Cir. 2012); *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011); *Scarbrough v. Morgan Cty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006).

Much of the Supreme Court's equal protection case law concerns the second part of this test, and specifically how strong the governmental interest must be. For example, if a government policy discriminates based on race or another immutable, protected characteristic, the Court applies "strict scrutiny" and will uphold the policy only if it furthers a "compelling state interest" and is narrowly tailored in doing so. *Cleburne*, 473 U.S. at 440; *accord, e.g.*, *Grutter v. Bollinger*, 539 U.S. 306, 326 (2003); *see also, e.g.*, *Zablocki v. Redhail*, 434 U.S. 374, 388 (1978) (also applying strict scrutiny "[w]hen a statutory classification significantly interferes with the exercise of a fundamental right").[9]

---

[9]Classifications based on gender are reviewed under "intermediate scrutiny," in which the challenged policy "must serve important governmental objectives and must be substantially related to achievement of those

On the other hand, if the policy does not concern a protected class, "rational basis" review is used, and the policy will be sustained if it "is rationally related to a legitimate state interest." *Cleburne*, 473 U.S. at 440. This rational basis standard is extremely forgiving. The challenged action is presumed to be constitutional, and the burden is on Plaintiffs to negate "every conceivable basis" that might support it. *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). Further, "[w]hen social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude." *Cleburne*, 473 U.S. at 440.

*Plyler v. Doe* throws a wrench in this. In *Plyler*—discussed more extensively later, *see infra* Part II.E.2—the Supreme Court faced a Texas policy that required undocumented children to pay tuition before they could attend public school, 457 U.S. at 205–06, 206 n.2. In assessing the plaintiffs' equal protection challenge, the court noted that "[u]ndocumented aliens cannot be treated as a suspect class," and that education as a general matter is not a fundamental right. *Id.* at 223. And so, rational basis must apply.

But the Court went on:

> [M]ore is involved in these cases than the abstract question whether [the challenged policy] discriminates against a suspect class, or whether education is a fundamental right. [The policy] imposes a lifetime hardship on a discrete class of children not accountable for their disabling status. The stigma of illiteracy will mark them for the rest of their lives. By denying them a basic education, we deny them the ability to live within the structure of our civic institutions, and foreclose any realistic possibility that they will contribute in even the smallest way to the progress of our Nation. In determining the rationality of [the policy], we may appropriately take into account its costs to the Nation and to the innocent children who are its victims. In light of these countervailing costs, the discrimination contained in [Texas's policy] can hardly be considered rational *unless it furthers some substantial goal of the State*.

---

objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976); *see also, e.g.*, *Plyler*, 457 U.S. at 217–18, 218 n.16 (discussing the application of intermediate scrutiny to classifications that, "while not facially invidious, nonetheless give rise to recurring constitutional difficulties").

*Id.* at 223–24 (emphasis added). Thus, while still couched in rational basis review, the *Plyler* court held that when a discrete group of children is denied a basic public education, such a policy can survive only if "if furthers some substantial state interest." *Id.* at 223–24, 230.[10]

### 2. Application to Plaintiffs' Claims

As noted above, to state an equal protection claim, a plaintiff must allege both a difference in treatment from others and that this difference cannot be supported by a sufficiently important governmental interest. *E.g.*, *Ctr. For Bio-Ethical Reform*, 648 F.3d at 379. But the current version of Plaintiffs' complaint fails to demonstrate disparate treatment, because it focuses on school conditions and inadequately alleges state policies or actions that caused those conditions within Plaintiffs' schools and not in others. Plaintiffs' allegations thus fail to highlight any difference in treatment that suggests the state discriminated against them, and so they have failed to adequately allege that "the government treated [Plaintiffs] disparately as compared to similarly situated persons." *Jolivette*, 694 F.3d at 771 (quoting *Ctr. For Bio-Ethical Reform*, 648 F.3d at 379); *see also, e.g.*, *Scarbrough*, 470 F.3d at 260 ("The threshold element of an equal protection claim is disparate treatment . . . .").

The primary comparison Plaintiffs allege between their own schools and others in the state is that Plaintiffs' schools face significantly worse "performance data," which is based on state proficiency tests in several subject matter areas. (Compl., R. 1 at PageID #65–76.) For example, Plaintiffs allege that in their schools, low-single-digit percentages of students are rated as "proficient or above" in English, compared to a state average in the mid-to-high forties. (*Id.* at #8–10, #65–69.) The same is true for several other subject matter areas, with some schools scoring as low as 0% proficient in certain areas.

---

[10]In a later case, the Supreme Court may have attempted to limit this holding. *See Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 459 (1988) ("We have not extended [*Plyler*'s] holding beyond the 'unique circumstances' that provoked its 'unique confluence of theories and rationales.'" (citation omitted) (first quoting *Plyler*, 457 U.S. at 239 (Powell, J., concurring); and then quoting *Plyler*, 457 U.S. at 243 (Burger, C.J., dissenting))); *see also* Justin Driver, *The Schoolhouse Gate: Public Education, the Supreme Court, and the Battle for the American Mind* 360–61 (2018). But it is unclear why the "unique circumstances" of *Plyler* would be limited to the immigration context, as opposed to any case in which a discrete group of children—though not a protected class—is denied a basic education.

But the Constitution cannot guarantee educational outcomes, and while performance outcome data provides some insight into access to education, the differences in these numbers are not supported by additional allegations suggesting, for example, that Defendants provided different levels of financial resources to other schools across the state. Plaintiffs' articulation of the state action being challenged is necessary to assess that action's rationality, *see, e.g.*, *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 44–55 (1973), and to determine whether attendees of Plaintiffs' schools are in fact a "discrete group" being denied a basic education when compared to the rest of the state, *see Plyler*, 457 U.S. at 223–34, 230.

Plaintiffs also suggest that the conditions faced in their schools are different from those in other schools throughout Michigan, particularly those in "schools serving predominantly white, affluent student populations." (Compl., R. 1 at PageID #4–5.) But while Plaintiffs extensively describe the conditions found in their own schools, they include almost no allegations regarding these comparator schools or what Defendants did differently with respect to them. Similarly, while Plaintiffs' brief claims that Defendants "operate a system in which most schools *do* provide access to literacy, and some do not" (Pls.' Br. at 52), their complaint does not adequately allege how the successful schools are operated or how Defendants treated them differently.

Nor do Plaintiffs sufficiently point to policies implemented or enforced by Defendants, other than school assignments, that separate students into discrete groups and deprive one or more of them of a basic minimum education. One policy discussed in the complaint might, standing alone, implicate equal protection—it concerns the provision allowing the hiring of "noncertificated, nonendorsed teacher[s]" only in the Detroit school district. (Compl., R. 1 at PageID #59–60, #106.) But without tying any disparity to a specific policy or action taken by Defendants that caused differences in school resources or conditions, we cannot assess whether that action or policy furthers a sufficient governmental objective.

Plaintiffs largely fault the district court's decision for using the wrong comparator in assessing their claim of disparate treatment. In its opinion, the district court correctly noted that "Plaintiffs have not challenged a statewide funding scheme, a specific statute, or any particular decisions by Defendants applicable to all Michigan schools." *Gary B.*, 329 F. Supp. 3d at 367.

Thus, the district court reasoned that Plaintiffs' complaint had to be based on Defendants' specific interventions in Detroit schools, and so the appropriate comparators were "other Michigan schools that have come under the control of emergency managers" or were otherwise taken over by the state. *Id.* But Plaintiffs argue that this misconstrues their claim, which is based on Defendants' management of the state education system as a whole: "While the State has ensured adequate resources and properly certificated teachers in other schools sufficient to provide students with access to literacy, it has made no such provision for Plaintiffs' schools—instead allowing those schools to deteriorate to the point of providing no meaningful education at all." (Pls.' Br. at 49.)

This point is well taken. If Plaintiffs' argument is that the state has supervisory authority over the Michigan public school system, and that every other school (or almost every other school) in this system is given the resources needed to provide access to literacy, but theirs is not, it is hard to see why only schools that experienced more direct state interventions are the correct comparators.[11] But as discussed above, Plaintiffs have not identified which state policy or action they are challenging as discriminatory, regardless of what comparator is used. Without this threshold allegation, their equal protection claim cannot survive.

While Plaintiffs' complaint also lists a cause of action for race-based discrimination, in their brief on appeal, the only discussion of race in the equal protection context is the statement that Plaintiffs are "a group of almost entirely low-income children of color." (Pls.' Br. at 45.) Nor do Plaintiffs argue in this Court that strict scrutiny should apply due to any race-based classification. Thus, they have abandoned this theory on appeal. *E.g.*, *In re Darvocet, Darvon, and Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 936 n.6 (6th Cir. 2014); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 390 (6th Cir. 2009).

Nor have Plaintiffs adequately pleaded disparate treatment based on race. In their complaint, Plaintiffs claim to be "a discrete class—nearly all children of color and low-income— who have been excluded from the access to literacy that public education provides to other

---

[11]This statewide approach may open itself to statewide justifications by Defendants, though. *See, e.g.*, *Rodriguez*, 411 U.S. at 44–55 (upholding Texas's school-funding regime as justified by local autonomy concerns, despite uneven results). That said, there is no need to address the viability of such a claim in the first instance here.

students in the State of Michigan." (Compl., R. 1 at PageID #18.) Plaintiffs further note that the students at their schools are all over 95% people of color (over 97% African American in four cases, and 64.2% Latino and 31.1% African American in the fifth), and that the vast majority are entitled to free or reduced-price lunch (a proxy for their socioeconomic status). But they fail to make any specific allegations showing Defendants' different treatment of predominantly white schools; conclusory statements that merely allude to race-based discrimination are not sufficient. (*See, e.g.*, *id.* at #53 ("The State's period of control has been marked by decisions affecting the education of minority children that would never be permitted in predominantly white school districts.").)

This is not to say it is impossible for Plaintiffs to allege an equal protection claim in this case. After all, *Plyler* said that, "[i]f the State is to deny a discrete group of innocent children the free public education that it offers to other children residing within its borders, that denial must be justified by a showing that it furthers some substantial state interest." 457 U.S. at 230. It also implied that a "basic education" is the standard at issue, *id.* at 223, and so a state action that results in the provision of a not-even-basic education could be subject to the same increased scrutiny. To state such a claim, Plaintiffs must identify the actions taken or policies implemented by Defendants that treated their schools differently from others in the state and caused the disparities at issue in this case. Since the current version of their complaint fails to do this, the dismissal of Plaintiffs' equal protection claims must be affirmed.

### 3. Leave to Amend

Finally, Plaintiffs argue that even if this Court does not revive their equal protection claim, the district court still erred by dismissing their complaint with prejudice and not giving them leave to amend. This is because, if given the chance, Plaintiffs "could have identified further 'concrete examples'" needed to support their claims, and so an amendment would not have been futile. (Pls.' Br. at 57.)

But in this circuit, at least for represented parties, "a district court does not abuse its discretion in failing to grant a party leave to amend where such leave is not sought." *Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1041–42 (6th Cir. 1991). While Plaintiffs asked for

leave to amend to their complaint if the district court found that "local school officials are necessary defendants in this lawsuit" (Opp'n, R. 64 at PageID #1454 n.22), the district court dismissed Plaintiffs' complaint on other grounds. Nor did Plaintiffs ask to reopen the judgment or otherwise seek leave to amend after the district court's decision. *See, e.g.*, *Benzon v. Morgan Stanley Distribs., Inc.*, 420 F.3d 598, 613 (6th Cir. 2005).

After this case is remanded, however, the district court itself could grant leave to amend following a proper request by Plaintiffs. Under the governing rule, leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also, e.g.*, *Benzon*, 420 F.3d at 613 (discussing the factors considered in deciding motions to amend); *Morse v. McWhorter*, 290 F.3d 795, 799–800 (6th Cir. 2002) (same). And of course, the question of whether any such amendment is proper must be guided by this Court's opinion. *See, e.g.*, *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000) ("A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss.").

### D.  Plaintiffs' Compulsory Attendance Claim

Plaintiffs next argue that the district court erred by considering their due process claim only through the lens of a fundamental right, since their complaint also raises a "negative rights" argument. (Pls.' Br. at 36–43.) Under this theory, Plaintiffs argue that a central element of their due process rights—the right to freedom of movement and freedom from state custody—is restricted by the state's compulsory education law, which forces them to attend their schools. While this restraint would be allowed if the state, in return, provided them with an adequate education, Plaintiffs argue that by detaining them at "schools in name only," the state has failed to meet this burden, rendering the detention arbitrary and violating their substantive due process rights. (*Id.*) The district court declined to address this theory, saying that Plaintiffs' complaint "points exclusively to a positive-right argument." *Gary B.*, 329 F. Supp. 3d at 364.

The legal theory behind this claim appears to have strong support in the law. It seems beyond debate that confining students to a "school" that provides no education at all would be an arbitrary detention, prohibited by the common law's understanding of due process tracing back to the Magna Carta. *See, e.g.*, *Jennings v. Rodriguez*, 138 S. Ct. 830, 861 (2018) (Breyer, J.,

dissenting). But as things presently stand, the district court was correct to dismiss this claim: Plaintiffs' complaint does not provide notice that they were pursuing a claim based on Michigan's compulsory attendance requirement and fails to allege sufficient facts for the Court to address its plausibility. We address both the governing law and Plaintiffs' complaint below.

## 1. Substantive Due Process and Compulsory Attendance

The main case Plaintiffs rely on to support their compulsory attendance theory is *Youngberg v. Romeo*, 457 U.S. 307 (1982). In *Youngberg*, a thirty-three-year-old man with severe intellectual disability was deemed unable to care for himself and involuntarily committed to a state facility. *Id.* at 309–10. After a series of injuries and physical restraints imposed during his commitment, Romeo sued under the Fourteenth Amendment, arguing that that the state failed to protect his liberty interests in "safety, freedom of movement, and training within the institution." *Id.* at 310–11, 314–15.

First discussing his safety claim, the Court "noted that the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause." *Id.* at 315 (quoting *Ingraham v. Wright*, 430 U.S. 651, 673 (1977)). Similarly, the Court found that "[l]iberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Id.* at 316 (alteration in original) (quoting *Greenholtz v. Neb. Penal Inmates*, 442 U.S. 1, 18 (1979) (Powell, J., concurring in part and dissenting in part)).

Romeo's last claim proved to be more complicated. He conceded that, because of the severity of his disability, no amount of training would make it possible for him to be released. *Id.* at 317. That said, Romeo still argued he was entitled to training that would reduce his aggression, thereby increasing his safety and decreasing the need for restraint within the facility. *Id.* at 317–18.

In addressing his claims, the Court noted that while Romeo retained "liberty interests in safety and freedom from bodily restraint," these interests were not absolute. *Id.* at 319–20. For example, the facility would be entitled to restrain the movement of residents to protect their safety and the safety of others. *Id.* at 320. "The question then is not simply whether a liberty

interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process." *Id.* In answering this question, the Court balances "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." *Id.* Applying this principle to Romeo's claim, the Court held that he was entitled to improved safety, lesser restraint, and appropriate training, but that in shaping this remedy on remand, the trial court should afford significant deference to the professionals responsible for Romeo's care. *Id.* at 321–25.

Other cases indicate that this balancing principle is the crux of any due process analysis where the state restrains core liberty interests like freedom of movement. For example, in *Cruzan*—a case about the right to refuse life-saving medical care—the Supreme Court reiterated that "whether [a plaintiff's] constitutional rights have been violated must be determined by balancing his liberty interests against the relevant state interests." *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 279 (1990) (quoting *Youngberg*, 457 U.S. at 321). *United States v. Salerno*, 481 U.S. 739, 750–51 (1987), similarly observed this balancing principle, finding that while individuals have a "strong interest in liberty[,] . . . this right may, in circumstances where the government's interest is sufficiently weighty, be subordinated to the greater needs of society." And in *Foucha v. Louisiana*, 504 U.S. 71 (1992), the Court held that "[d]ue process requires that the nature of [a] commitment bear some reasonable relation to the purpose for which the individual is committed," *id.* at 79; *see also Jackson v. Indiana*, 406 U.S. 715, 738 (1972) ("At the least, due process requires that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed."). While the degree of deprivation is obviously greatest in a case like involuntary commitment, there is no reason why this balancing principle should not apply to less-extensive restraints as well. *See Youngberg*, 457 U.S. at 319–21.

Compulsory school attendance laws are a restraint on Plaintiffs' freedom of movement, and thus implicate the core protections of the Due Process Clause. *See, e.g.*, *Foucha*, 504 U.S. at 80; *Youngberg*, 457 U.S. at 316. If the state required a group of people to sit in a building for several hours a day without any justification, such a restraint would clearly offend their right to liberty. *See, e.g.*, *Ly v. Hansen*, 351 F.3d 263, 276–77 (6th Cir. 2003) (citing *Demore v. Kim*,

538 U.S. 510, 531–33 (2003) (Kennedy, J., concurring)) (noting that the Due Process Clause prohibits arbitrary deprivations of liberty), *abrogated on other grounds by Jennings*, 138 S. Ct. 830; *see also, e.g.*, *Jennings*, 138 S. Ct. at 861 (Breyer, J., dissenting) ("The Due Process Clause—itself reflecting the language of the Magna Carta—prevents arbitrary detention."); *Reno v. Flores*, 507 U.S. 292, 315 (1993) (O'Connor, J., concurring) (same); *cf. Meyer v. Nebraska*, 262 U.S. 390, 402 (1923) ("In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. . . . [But] it hardly will be affirmed that any Legislature [in our country today] could impose such restrictions upon the people of a state without doing violence to both letter and spirit of the Constitution."). And so, if compulsory school attendance is constitutional, it must be because the relevant state interest outweighs any deprivation of liberty.

On the other hand, while never directly addressing this issue, the Supreme Court has recognized that, given the important governmental interest in educating its citizens, the state generally has the power to compel attendance at school. *E.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 213 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944); *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925); *Meyer*, 262 U.S. at 402. Given this repeated dictum, it seems clear that in most cases, a state-provided education will justify the deprivation of liberty caused by compulsory attendance.

Taken together, it is clear from these cases that, at least for compulsory education in a general sense (which is the only type of schooling that the complaint concerns), there is some level of education that justifies whatever deprivation of liberty is caused by a mandatory attendance or schooling requirement. *See, e.g.*, *Pierce*, 268 U.S. at 534; *Meyer*, 262 U.S. at 402. But at the same time, forcing students to attend a "school" in which they are simply warehoused and provided no education at all would run afoul of the Due Process Clause's protections.[12]

---

[12]The dissent suggests that *Youngberg* categorically does not apply to claims based on compulsory attendance laws. But the cases it relies on all concern the state's failure to protect a student within the school environment from private harms like third-party violence or medical conditions, not whether the state's mandatory attendance requirement was itself permissible in the first place. *See Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 840 (6th Cir. 2016); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 910 (6th Cir. 1995). There is a difference between the custody exception to *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 198–200 (1989), which concerns whether the state has a duty to protect an individual in its custody against private

Such a deprivation would bear no reasonable relationship to the state's asserted purpose, *see, e.g.*, *Foucha*, 504 U.S. at 79, and thus would be outweighed by the individual's interest in liberty, *see, e.g.*, *Cruzan*, 497 U.S. at 279; *Salerno*, 481 U.S. at 750–51; *Youngberg*, 457 U.S. at 320. For cases in the middle, the question is whether the state's interest—here, the education it provides—is enough to justify the restraint.

## 2. Application to Plaintiffs' Complaint

While Plaintiffs' negative-rights claim seems to have support in the law and was argued in their brief on appeal, it is noticeably absent from their complaint. The complaint certainly includes the statement that Michigan has compulsory school attendance (*see, e.g.*, Compl., R. 1 at PageID #27 ("Michigan . . . compels children to attend school full time . . . ."); *id.* at #43 (same)), but there is no indication that Plaintiffs are alleging that this deprivation of liberty is unconstitutional. The closest Plaintiffs come to highlighting this claim is by saying that, since education "is *required* of every child," there is "a special relationship between the state and children between the ages of 6 and 18." (*Id.* at #42.) But Plaintiffs never expand this beyond noting the "special relationship," and their only cause of action regarding due process puts it solely in terms of "the fundamental right of access to literacy," and not any right to freedom from restraint. (*Id.* at #126–27.)[13] Other than these two statements, Plaintiffs do not mention compulsory attendance anywhere else in their complaint or otherwise indicate that the requirement could play any role in a violation of their constitutional rights.

To satisfy the federal rules, while a "short and plain statement of the claim" is enough, the complaint must still "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (first quoting Fed. R. Civ. P. 8(a)(2); and then quoting *Twombly*, 550 U.S. at 555). In this case,

---

violence, and the question of whether the state's restriction of a person's liberty—custodial or otherwise—is itself allowed under the Due Process Clause.

[13]In fact, the complaint's discussion of compulsory education suggests it was included to show that education is seen as an essential state function, in support of Plaintiffs' fundamental right theory. (*See* Compl., R. 1 at PageID #43 ("These compulsory attendance laws reflect a national judgment that education is so essential to the maintenance of democracy and the ability to participate in public and private life that compelling it is justified.").)

Plaintiffs' complaint gave no notice of their claim that Defendants violated their right to freedom of movement, or any other right through the compulsory attendance requirement.

Additionally, Plaintiffs' factual allegations are insufficient for us to assess the viability of this claim, because they fail to provide information about the extent or nature of the restraint on their liberty. Other than the broader allegations concerning the conditions of their schools, the only allegation relevant to this theory is that "Michigan's compulsory attendance laws require Plaintiffs to attend [their] schools." (Compl., R. 1 at PageID #4; *accord, e.g.*, *id.* at #27, #42–43.)

By *Youngberg*'s own terms, analyzing this claim requires balancing the extent of the deprivation against the education being provided by the state. *See* 457 U.S. at 320 ("In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' and 'the demands of an organized society.'" (quoting *Poe v. Ullman*, 367 U.S. 497, 542 (1961) (Harlan, J., dissenting))). For such a claim to be viable outside a fundamental right to a basic minimum education, Plaintiffs would have to show that the degree of restraint imposed on them cannot be justified by whatever education, however negligible, they are receiving. While Plaintiffs have alleged sufficient facts to infer the extent of the education they are being provided (or at least the extent it does not exceed), they provide inadequate information about the duration or nature of the restraint faced in their schools, such as the hours per day of compulsory attendance, the number of days per year, or the restrictions on Plaintiffs' liberty throughout the typical school day. Without these allegations, it is impossible for us to conduct *Youngberg* balancing and "draw the reasonable inference that [Defendants are] liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As with their equal protection claim, after this case is remanded, Plaintiffs could seek leave to amend from the district court and attempt to correct these deficiencies. But as their complaint stands now, their allegations fail to provide sufficient notice of their claim, and are insufficient for the Court to assess its viability. Accordingly, Plaintiffs' negative-rights claim was correctly dismissed.

### E.  The Fundamental Right to a Basic Minimum Education

Having addressed Plaintiffs' two alternative claims for relief, we are left with the central issue in this appeal:  whether Plaintiffs have a fundamental right to a basic minimum education, meaning one that provides access to literacy. Plaintiffs contend that access to literary, as opposed to other educational achievements, is a gateway milestone, one that unlocks the basic exercise of other fundamental rights, including the possibility of political participation.  While the Supreme Court has repeatedly discussed this issue, it has never decided it, and the question of whether such a right exists remains open today.  After employing the reasoning of these Supreme Court cases and applying the Court's substantive due process framework, we recognize that the Constitution provides a fundamental right to a basic minimum education.

Access to a foundational level of literacy—provided through public education—has an extensive historical legacy and is so central to our political and social system as to be "implicit in the concept of ordered liberty."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (quoting *Palko v. Connecticut*, 302 U.S. 319, 325–26 (1937), *overruled by Benton v. Maryland*, 395 U.S. 784 (1969)).  In short, without the literacy provided by a basic minimum education, it is impossible to participate in our democracy.

Applying this right to Plaintiffs' allegations, their complaint plausibly alleges that Defendants denied them a basic minimum education.  Accordingly, the district court's dismissal of this claim must be reversed.

#### 1.  Recognition of Fundamental Rights Under Substantive Due Process

The Due Process Clause of the Fourteenth Amendment says that no state shall "deprive any person of life, liberty, or property, without due process of law."  The Clause is most commonly seen as guaranteeing procedural protections whenever the state attempts to deprive someone of their life, liberty, or property interests—so-called procedural due process.  *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).  But the Clause has also been read to recognize that certain interests are so substantial that no process is enough to allow the government to restrict them, at least absent a compelling state interest.  *E.g.*, *Glucksberg*,

521 U.S. at 719–21; *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992); *Collins*, 503 U.S. at 125. This substantive due process is the basis for Plaintiffs' claim.

"The most familiar of the substantive liberties protected by the Fourteenth Amendment are those recognized by the Bill of Rights," which are deemed to be "incorporated" into the Due Process Clause. *Casey*, 505 U.S. at 847. But this is not the end of the Clause's protections, which also extend to other rights and liberties recognized by the courts to be "fundamental." *E.g.*, *Glucksberg*, 521 U.S. at 720–21; *Flores*, 507 U.S. at 301–02. For example, in *Meyer*, the Court stated:

> While [the Supreme Court] has not attempted to define with exactness the liberty thus guaranteed [by the Due Process Clause], the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.

262 U.S. at 399.

Despite the breadth of the Court's statement in *Meyer*, later cases prescribe circumspection when deciding whether an asserted right is fundamental. "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins*, 503 U.S. at 125. But this reluctance is not the end of the matter:

> The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule. That does not mean we are free to invalidate state policy choices with which we disagree; yet neither does it permit us to shrink from the duties of our office.

*Casey*, 505 U.S. at 849.

Faced with this tension, the Supreme Court has developed a two-prong analysis it applies when determining whether an asserted right is fundamental. First, "the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (quoting *Moore v. City of East Cleveland*, 431 U.S. 494, 503 (1977) (plurality opinion)). The Supreme Court has applied a holistic approach to this historical analysis, tracing the evolution of an asserted right through or even beyond the history of our country, *e.g.*, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2593–97 (2015); *Glucksberg*, 521 U.S. at 710–19. A few Justices have instead embraced a narrower version, however, looking to whether the right in question would have been recognized as a protected interest at the time the Fourteenth Amendment was adopted. *E.g.*, *Obergefell*, 135 S. Ct. at 2628 (Scalia, J., dissenting).

Even if a specific iteration of a right lacks substantial historical roots, this alone is not enough to foreclose recognition under the Due Process Clause. As the Court noted in *Casey*, "[i]t is tempting, as a means of curbing the discretion of federal judges, . . . to suppose that the Due Process Clause protects only those practices, defined at the most specific level, that were protected against government interference by other rules of law when the Fourteenth Amendment was ratified. But such a view would be inconsistent with our law." 505 U.S. at 847 (citation omitted); *see also Obergefell*, 135 S. Ct. at 2598 (majority opinion) ("History and tradition guide and discipline this inquiry but do not set its outer boundaries. That method respects our history and learns from it without allowing the past alone to rule the present." (citation omitted)).

Thus, the second prong of the inquiry looks to whether the asserted right is "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325–26). While these prongs are sometimes tied together, *see, e.g.*, *Kerry v. Din*, 135 S. Ct. 2128, 2134 (2015) (plurality opinion), *Obergefell* made clear that this historical inquiry may illuminate even newly recognized injustices that reveal a fundamental right:

> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its

dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we learn its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

135 S. Ct. at 2598.

## 2. The Supreme Court's Education Cases

Beyond the general framework for assessing whether an asserted right is fundamental, the Supreme Court has also, in a series of cases, addressed the extent of constitutional rights with respect to state-provided education. Its education jurisprudence teaches several lessons. First, the Court has found that there is no broad, general right to education. *Rodriguez*, 411 U.S. at 33–39; *see also, e.g.*, *Seal v. Morgan*, 229 F.3d 567, 575 (6th Cir. 2000) (citing *Rodriguez*, 411 U.S. at 33–37). Second, while no general right to education exists, the Supreme Court has specifically distinguished and left open "whether a minimally adequate education is a fundamental right." *Papasan v. Allain*, 478 U.S. 265, 285 (1986); *see also Rodriguez*, 411 U.S. at 36–37. The Sixth Circuit also appears to have been silent on this issue. Third, education is, at minimum, highly important to "maintaining our basic institutions," and so the denial of public education to a discrete group of students "must be justified by a showing that it furthers some substantial state interest." *Plyler*, 457 U.S. at 221–24, 230. And fourth, the Court has addressed the critical link between education and race discrimination in America. We discuss the Court's relevant education cases in turn, beginning chronologically.

First, the history of public education in this country, as with many things, is inextricably tied to race. *See infra* Part II.E.3.a. And so, while it did not directly concern substantive due process, *Brown v. Board of Education*, 347 U.S. 483 (1954), is important in assessing whether any aspect of education amounts to a fundamental right. *Brown* of course examined whether racially segregated schools inherently violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at 487–88. The Court found they did, holding that "in the field of public education the doctrine of 'separate but equal' has no place." *Id.* at 495.

During this equal protection discussion, the Court noted the critical importance of education:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms.

*Id.* at 493.

As argued by the parties, this passage can be read two ways. On the one hand, if "education is perhaps the most important function of state and local governments" and is "required in the performance of our most basic public responsibilities," *id.*, how could it not be "implicit in the concept of ordered liberty" or otherwise fundamental to our social order? *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325). On the other, how could the state be compelled to provide an education if education needs to be equal only "where the state has undertaken to provide it"? *Brown*, 347 U.S. at 493.

Nearly twenty years after *Brown*, this question returned to the Supreme Court. In *San Antonio Independent School District v. Rodriguez*, the plaintiffs challenged the constitutionality of Texas's public-school finance system, arguing that differences in funding across school districts denied them equal protection of the law. 411 U.S. at 4–6, 15–16. Texas employed a "dual approach" to school finance, a system to which both local school districts and the state contributed. *Id.* at 6–7. But local funding (via property taxes) rapidly outpaced what was provided by the state, meaning that variations in property values led to substantial disparities in available funds. *Id.* at 7–15. During the litigation, "Texas virtually concede[d]" that the system could not survive strict scrutiny, and so if the uneven funding of schools interfered with a fundamental constitutional right, it would have to be invalidated by the Court. *Id.* at 16–17.

In assessing whether education was a fundamental right, the Court began by referencing *Brown*, noting the country's "historic dedication to public education" and agreeing that "'the grave significance of education both to the individual and to our society' cannot be doubted." *Id.* at 29–30 (quoting *Rodriguez v. San Antonio Indep. Sch. Dist.*, 337 F. Supp. 280, 283 (W.D. Tex. 1971), *rev'd*, 411 U.S. 1). Despite this, the Supreme Court found that education was not a fundamental right, saying that "the undisputed importance of education will not alone cause this Court to depart from the usual standard for reviewing a State's social and economic legislation." *Id.* at 35.

In denying the plaintiffs' claim, the Court specifically responded to their argument that "education is itself a fundamental personal right because it is essential to the effective exercise of First Amendment freedoms and to intelligent utilization of the right to vote." *Id.* The Court found this argument lacking, as the plaintiffs' claim to "effective" First Amendment speech and "intelligent utilization" of the ballot was tantamount to demanding a guarantee of "the most effective speech or the most informed electoral choice," neither of which were protected by the Constitution. *Id.* at 35–36.

The Court's conclusion regarding this argument is especially notable:

> Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short. Whatever merit appellees' argument might have if a State's financing system occasioned an absolute denial of educational opportunities to any of its children, that argument provides no basis for finding an interference with fundamental rights where only relative differences in spending levels are involved and where—as is true in the present case—no charge fairly could be made that the system fails to provide each child with an opportunity to acquire the basic minimal skills necessary for the enjoyment of the rights of speech and of full participation in the political process.

*Id.* at 36–37. Thus, the Court never ruled on the right to such a basic minimum education, and as shown more explicitly in its later cases, saved the question for another day.

Next is *Plyler v. Doe*. In *Plyler*, the plaintiffs—"undocumented school-age children" also living in Texas—sued to challenge policies that denied state-level funding and charged tuition for students "who could not establish that they had been legally admitted into the United

States."  457 U.S. at 205–06, 206 n.2.  The question was whether these policies violated the Equal Protection Clause, and what level of scrutiny to use in that analysis.  *Id.* at 216–18.

Looking to the interaction between education and the Constitution, the Court reiterated the holding in *Rodriguez*, while also noting the heightened significance of education and the special constitutional considerations that follow:

> Public education is not a "right" granted to individuals by the Constitution. But neither is it merely some governmental "benefit" indistinguishable from other forms of social welfare legislation.  Both the importance of education in maintaining our basic institutions, and the lasting impact of its deprivation on the life of the child, mark the distinction. . . . We have recognized "the public schools as a most vital civic institution for the preservation of a democratic system of government," and as the primary vehicle for transmitting "the values on which our society rests."  "[A]s . . . pointed out early in our history, . . . some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." . . . In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society. We cannot ignore the significant social costs borne by our Nation when select groups are denied the means to absorb the values and skills upon which our social order rests.

*Id.* at 221 (some alterations in original) (citations omitted) (first quoting *School Dist. v. Schempp*, 374 U.S. 203, 230 (1963) (Brennan, J., concurring); then quoting *Ambach v. Norwick*, 441 U.S. 68, 76 (1979); and then quoting *Yoder*, 406 U.S. at 221).

Invoking *Brown*, the *Plyler* Court also noted the distinct role of education as a social equalizer:

> In addition to the pivotal role of education in sustaining our political and cultural heritage, denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit.  Paradoxically, by depriving the children of any disfavored group of an education, we foreclose the means by which that group might raise the level of esteem in which it is held by the majority.

*Id.* at 221–22.

Based on this reasoning, the Court found that the challenged provisions violated the Equal Protection Clause. *Id.* at 223–30. The Court noted that the denial of a "basic education"—framed in the context of literacy—would have a substantial negative impact on both the children in question and society at large, and so any assessment of rationality must also account for these costs. *Id.* at 223–24. Thus, "[i]n light of these countervailing costs," the challenged provisions could only be upheld if they "further[ed] some substantial goal of the State." *Id.* at 224. Since the state's proffered interests failed to meet this standard, the Court invalidated the Texas policy. *Id.* at 224–30.

After *Rodriguez* and *Plyler* comes *Papasan v. Allain.* In *Papasan*, schoolchildren in counties originally held by the Chickasaw Nation received a reduced amount of state educational funding compared to other counties in Mississippi, and so they sued the governor and state officials in federal court. 478 U.S. at 268–74. While this might sound like a repeat of *Rodriguez*, their allegations contained a twist: while the *Rodriguez* plaintiffs did not claim a failure to provide them with "an opportunity to acquire . . . basic minimal skills," 411 U.S. at 36–37, the *Papasan* plaintiffs did exactly that, arguing that the state's funding scheme deprived them of a "minimally adequate level of education" and that their right to such an education was fundamental, 478 U.S. at 274, 285.

In assessing this claim, the Court noted that, "[a]s *Rodriguez* and *Plyler* indicate, [the Supreme Court] has not yet definitively settled the question[] [of] whether a minimally adequate education is a fundamental right." *Id.* at 285. But *Papasan* did not provide an answer. Instead, the Court found that, assuming such a right existed, the plaintiffs had failed to allege sufficient facts in support of their claim. *Id.* at 286. They did not allege that they were "not taught to read or write," or that they did not receive "instruction on even the educational basics." *Id.* In short, "they allege[d] no actual facts in support of their assertion that they have been deprived of a minimally adequate education." *Id.* An answer on pleadings, sure, but not on constitutional law.[14]

---

[14]A similar outcome was reached by the Fifth Circuit in *School Board v. Louisiana State Board of Elementary & Secondary Education*, 830 F.2d 563, 568 (5th Cir. 1987), which employed rational-basis review

Finally, the Court essentially repeated this non-answer in *Kadrmas v. Dickinson Public Schools*, 487 U.S. 450, 452–56 (1988), a case that concerned a fee charged for use of the school bus. While the plaintiff there argued that those who could not afford the bus fee were deprived of "minimum access to education," she still attended the school despite this fee, meaning her claim could not have been for actual deprivation of a basic minimum education, but rather that the fee made it harder for poor families to access the school than rich families. *Id.* at 458. The Court then proceeded to uphold the statute under rational-basis review, since wealth is not a protected class and there were alternative means by which students could still access the school. *Id.* at 458, 460–62, 465.

In his dissent in *Kadrmas*, Justice Marshall noted that the Court had still not decided "whether a State constitutionally could deny a child access to a minimally adequate education." *Id.* at 466 n.1 (Marshall, J., dissenting). This question—whether "a minimally adequate education is a fundamental right," *Papasan*, 478 U.S. at 285—remains unanswered today.

### 3.  Is Access to Literacy a Fundamental Right?

With guidance but no answers from the education cases above, this Court must assess whether a basic minimum education—meaning one that plausibly provides access to literacy—is a fundamental right. Applying the substantive due process framework from *Glucksberg* and *Obergefell*, and looking to the reasoning of *Rodriguez* and *Plyler*, we conclude that the answer is yes.

First, the history of public education in our country reveals a longstanding practice of free state-sponsored schools, which were ubiquitous at the time of the Fourteenth Amendment's adoption. Public schools are now universal in the United States, and Americans take it for granted that state-sponsored education will be provided for their children as of right. But in the face of this progress, the history of education in the United States also demonstrates a substantial relationship between access to education and access to economic and political power, one in which race-based restrictions on education have been used to subjugate African Americans and

---

because "the record contain[ed] no evidence whatever that any Louisiana schoolchild was deprived of a minimally adequate education."

other people of color.  This racial history of education in America—and the efforts subsequently taken to confront it—reveals the importance earlier generations placed on education.  Taken together, this history establishes that education has held paramount importance in American history and tradition, such that the denial of education has long been viewed as a particularly serious injustice.

Second, the role of basic literacy education within our broader constitutional framework suggests it is essential to the exercise of other fundamental rights.  Most significantly, every meaningful interaction between a citizen and the state is predicated on a minimum level of literacy, meaning that access to literacy is necessary to access our political process.  Further, the unique role of public education as a source of opportunity separate from the means of a child's parents creates a heightened social burden to provide at least a minimal education.  Thus, the exclusion of a child from a meaningful education by no fault of her own should be viewed as especially suspect.

In sum, the state provision of a basic minimum education has a longstanding presence in our history and tradition, and is essential to our concept of ordered constitutional liberty.  Under the Supreme Court's substantive due process cases, this suggests it should be recognized as a fundamental right.

### a.  The Historical Prevalence and Significance of Education

"We begin, as we do in all due process cases, by examining our Nation's history, legal traditions, and practices."  *Glucksberg*, 521 U.S. at 710.  This examination reveals that state-provided education is ubiquitous throughout all but the earliest days of the United States, a historical fact that today leads its citizens to expect a basic public education as of right.  Such an expectation demonstrates that the right to a basic minimum education is "deeply rooted in this Nation's history and tradition," *id.* at 720–21 (quoting *Moore*, 431 U.S. at 503), supporting its recognition as a fundamental right under the Due Process Clause.

The Supreme Court's cases on education repeatedly discuss the historical prevalence and importance of state-provided education.  For example, in *Wisconsin v. Yoder*, the state noted that the essential nature of education was touted by Thomas Jefferson in the earliest days of our

history. 406 U.S. at 221. *Meyer v. Nebraska* similarly noted that "[t]he American people have always regarded education and acquisition of knowledge as matters of supreme importance," pointing to the Northwest Ordinance's prescription, in 1787, that "schools and the means of education shall forever be encouraged." 262 U.S. at 400. Similarly, *Papasan* extensively discussed the history of public-school land grants, which "stretche[d] back over 200 years" and predated the Constitution itself. 478 U.S. at 268–69. And outside the education context, when discussing the right to privacy in marriage, the Court compared marriage to other bulwark institutions of American society and democracy, calling it "older than the Bill of Rights—older than our political parties, *older than our school system*." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965) (emphasis added).

This historical prevalence of education supports the view that it is deeply rooted in our history and tradition, even under an originalist view. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2628 (Scalia, J., dissenting) (analyzing the fundamental right to marriage based on state policies "[w]hen the Fourteenth Amendment was ratified in 1868"); *McDonald v. City of Chicago*, 561 U.S. 742, 777 (2010) (same for the right to keep and bear arms). "An astonishing thirty-six out of thirty-seven states in 1868—an Article V, three-quarters consensus [i.e., well over the number of states needed to amend the Constitution]—imposed a duty in their constitutions on state government to provide a public-school education." Steven G. Calabresi & Sarah E. Agudo, *Individual Rights Under State Constitutions when the Fourteenth Amendment Was Ratified in 1868: What Rights Are Deeply Rooted in American History and Tradition?*, 87 Tex. L. Rev. 7, 108 (2008). These states accounted for 92% of the population. *Id.* at 109. And near the time of the Fourteenth Amendment's adoption, Senator Charles Sumner argued that "[t]he New England system of common schools is part of the republican form of government as understood by the framers of the Constitution." (Amicus Br. of ACLU of Mich. at 22 (quoting David Herbert Donald, *Charles Sumner* 426 (1996)).)

Furthermore, this history should not be viewed as only a static point. The continued expansion of education through the adoption of the Fourteenth Amendment resulted in universal compulsory education by 1918, and it has continued to develop since. *See* Barry Friedman & Sara Solow, *The Federal Right to an Adequate Education*, 81 Geo. Wash. L. Rev. 92, 127–32

(2013).  And while state-supported education may have a different cultural significance than marriage, *see Obergefell*, 135 S. Ct. at 2593–94 (majority opinion) (framing the marriage right as the product of "untold references . . . in religious and philosophical texts spanning time, cultures, and faiths"), it is certainly both so longstanding and uniform as to be taken for granted in twenty-first-century America.

Though focused on the equal protection context instead of due process, the words of *Brown v. Board of Education* are still instructive:  "In approaching this problem, we cannot turn the clock back to 1868 when the Amendment was adopted . . . .  We must consider public education in the light of its full development and its present place in American life throughout the Nation."  347 U.S. at 492–93.  Such a view reveals state-sponsored (and even mandated) education as a ubiquitous feature of our country, provided as of right to the people.  Based on this uniform presence, the people have come to expect and rely on this education—second perhaps only to the immediate family—in order to provide the basic skills needed for our children to participate as members of American society and democracy.

Our nation's history of racial discrimination further reveals the historical and lasting importance of education, and the significance of its modern ubiquity.  Education, and particularly access to literacy, has long been viewed as a key to political power.  Withholding that key, slaveholders and segregationists used the deprivation of education as a weapon, preventing African Americans from obtaining the political power needed to achieve liberty and equality.  While most starkly displayed during the time of slavery, this history is one of evolution rather than paradigm shift, and so what began in the slave codes of the antebellum South transformed into separate-and-unequal education policies that persisted well after *Brown v. Board of Education*.

In the beginning of our country's history, teaching slaves to read was a crime.  *E.g.*, *Regents of the Univ. of Cal. v. Bakke*, 438 U.S. 265, 387–88 (1978) (Marshall, J., concurring in part and dissenting in part); *South Carolina v. Katzenbach*, 383 U.S. 301, 311 n.10 (1966).  These laws were widespread among Southern states, driven by a desire to prevent escapes or rebellion. (*See, e.g.*, Amicus Br. of ACLU of Mich. at 18–19); *see also, e.g.*, *United States v. Rhodes*, 27 F. Cas. 785, 793 (C.C.D. Ky. 1866) ("[A law in Louisiana] not only forbids

any person teaching slaves to read or write, but it declares that any person using language in any public discourse from the bar, bench, stage, or pulpit, or any other place, or in any private conversation, or making use of any sign or actions having a tendency to produce discontent among the free colored population or insubordination among the slaves, or who shall be knowingly instrumental in bringing into the state any paper, book, or pamphlet having a like tendency, shall, on conviction, be punishable with imprisonment or death, at the discretion of the court."); *cf.* Frederick Douglass Bicentennial Commission Act, Pub. L. No. 115-77, § 2(3), 131 Stat. 1251, 1251 (2017) ("Douglass continued to teach himself to read and write and taught other slaves to read despite risks including death.").

This trend continued through extrajudicial violence during the Reconstruction era. (*See, e.g.*, Amicus Br. of ACLU of Mich. at 19–22.) During this period, "Klansmen targeted schoolteachers for violent retribution and Black parents who sent their children to school frequently 'received visits from white men eager to reinforce the nuances of the established racial order.'" (*Id.* at 20 (quoting George C. Rable, *But There Was No Peace: The Role of Violence in the Politics of Reconstruction* 97 (2007)).) And while the federal government responded through civil rights legislation and prosecutions, *see, e.g.*, *Rhodes*, 27 F. Cas. at 785–86, 793–94; (Amicus Br. of ACLU of Mich. at 20–21), the end of Reconstruction heralded legislative and policy efforts designed to limit the education of African Americans, *see Katzenbach*, 383 U.S. at 310–13, 311 n.10 (noting that Southern states "rapidly instituted racial segregation in their public schools" following the Civil War, and discussing the interplay between these efforts to restrict literacy and efforts to restrict the vote).

While *Plessy v. Ferguson*, 163 U.S. 537 (1896), *overruled by Brown*, 347 U.S. 483, is perhaps the best-known case of the Supreme Court's "separate but equal" doctrine, several other cases upheld segregation specifically with respect to American schools. For example, in *Cumming v. Board of Education*, 175 U.S. 528, 544 (1899), the Court declined to intervene when a local school board closed a preexisting black high school and "used the funds in its hands to assist in maintaining a high school for white children without providing a similar school for colored children." Similarly, the Court upheld the ability of states to force private schools to segregate themselves based on race. *Berea Coll. v. Kentucky*, 211 U.S. 45, 51–54, 58 (1908),

abrogated by *Brown*, 347 U.S. 483.   And in *Lum v. Rice*, 275 U.S. 78, 85–87 (1927), abrogated by *Brown*, 347 U.S. 483, the Court upheld the state's decision to bar a Chinese American student from attending a white public high school.

While *Brown* was handed down in 1954 and held that "[s]eparate educational facilities are inherently unequal," 347 U.S. at 495, segregation and unequal treatment in schools have persisted long after that decision.   Despite the Supreme Court's instruction for desegregation "with all deliberate speed," *Brown v. Bd. of Educ.* (*Brown II*), 349 U.S. 294, 301 (1955), school segregation cases continued to reach the Court for decades, *see, e.g.*, *Milliken v. Bradley*, 418 U.S. 717 (1974).

There are two main takeaways from this history of racial discrimination in education, as well as from past interventions by the courts.   First, access to literacy was viewed as a prerequisite to the exercise of political power, with a strong correlation between those who were viewed as equal citizens entitled to self-governance and those who were provided access to education by the state.   Second, when faced with exclusion from public education, would-be students have repeatedly been forced to rely on the courts for relief.   The denials of education seen in these cases and beyond are now universally accepted as serious injustices, ones that conflict with our core values as a nation.   Furthermore, the substantial litigation devoted to addressing these exclusions reveals the unparalleled value assigned to literacy, which is viewed by our society as essential for students to obtain even a chance at political and economic opportunity.

For all of these reasons, we find that the right to a basic minimum education—access to literacy—is so "deeply rooted in this Nation's history and tradition" as to meet the historical prong of the Supreme Court's substantive due process test.   *Glucksberg*, 521 U.S. at 720–21 (quoting *Moore*, 431 U.S. at 503).

### b. Whether a Basic Minimum Education Is "Implicit in the Concept of Ordered Liberty"

Beyond this look to our history, we must also assess whether an asserted right is "implicit in the concept of ordered liberty."   *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325).

Put differently, this Court must "exercise reasoned judgment in identifying interests of the person so fundamental that the State must accord them its respect." *Obergefell*, 135 S. Ct. at 2598.

As Plaintiffs note, individuals with low or no literacy are incomparably disadvantaged in their economic and social lives, *see, e.g.*, *Plyler*, 457 U.S. at 222 ("Illiteracy is an enduring disability. The inability to read and write will handicap the individual deprived of a basic education each and every day of his life."). Even *Meyer* indicated that the right "to acquire useful knowledge" was protected by the Due Process Clause. 262 U.S. at 399. But neither of these is enough to transform the right into one that is fundamental and thus guaranteed by the Constitution. *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 479 (1977) ("[T]he Constitution does not provide judicial remedies for every social and economic ill." (quoting *Lindsey v. Normet*, 405 U.S. 56, 74 (1972))). Rather, a basic minimum education—meaning one that plausibly provides access to literacy—is fundamental because it is necessary for even the most limited participation in our country's democracy.

The Supreme Court has recognized that basic literacy is foundational to our political process and society. In *Yoder*, the Court noted that "some degree of education is necessary to prepare citizens to participate effectively and intelligently in our open political system if we are to preserve freedom and independence." 406 U.S. at 221. And while *Rodriguez* rejected a general right to education on the grounds that no one is guaranteed the *most* effective or intelligent political participation, 411 U.S. at 35–36, the right asserted by Plaintiffs in this case is far more fundamental. The degree of education they seek through this lawsuit—namely, access to basic literacy—is necessary for essentially *any* political participation.

Effectively every interaction between a citizen and her government depends on literacy. Voting, taxes, the legal system, jury duty—all of these are predicated on the ability to read and comprehend written thoughts. Without literacy, how can someone understand and complete a voter registration form? Comply with a summons sent to them through the mail? Or afford a defendant due process when sitting as a juror in his case, especially if documents are used as evidence against him?

Even things like road signs and other posted rules, backed by the force of law, are inaccessible without a basic level of literacy. In this sense, access to literacy "is required in the performance of our most basic public responsibilities," *Brown*, 347 U.S. at 493, as our government has placed it "at the center of so many facets of the legal and social order," *Obergefell*, 135 S. Ct. at 2601; *see also* Steven G. Calabresi & Michael W. Perl, *Originalism and* Brown v. Board of Education, 2014 Mich. St. L. Rev. 429, 552 ("At a minimum, children must be taught to read so they can read the laws for themselves—a task that many of the Framers would have thought was fundamental.").

Access to literacy also "draws meaning from related rights," further indicating that it must be protected. *Obergefell*, 135 S. Ct. at 2590. "[T]he right to receive ideas is a necessary predicate to the recipient's meaningful exercise of his own rights of speech, press, and political freedom." *Bd. of Educ. v. Pico*, 457 U.S. 853, 867 (1982) (plurality opinion) (emphasis omitted); *see also Rodriguez*, 411 U.S. at 35 ("The 'marketplace of ideas' is an empty forum for those lacking basic communicative tools."). In this sense, access to literacy is itself fundamental because it is essential to the enjoyment of these other fundamental rights, such as participation in the political process. *See, e.g.*, *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 667 (1966) (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964)). And "the political franchise" is perhaps the most fundamental of all such rights, because it is the central element of our democracy. *Id.* (quoting *Yick Wo*, 118 U.S. at 370).

While the Supreme Court in *Rodriguez* said that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental," 411 U.S. at 30, this principle is stretched past its breaking point when the right in question is important because it is necessary to other, clearly fundamental rights, *cf., e.g, id.* at 35 n.78 (noting that there is a "protected right, implicit in our constitutional system, to participate in state elections on an equal basis with other qualified voters"). And this is not just a right deemed to be important, or even very important; rather, "[p]roviding public schools ranks at the very apex of the function of a State." *Yoder*, 406 U.S. at 213. It is hard to see how this apex function could be fulfilled by a system that does not provide a reasonable opportunity to obtain literacy, the foundation necessary to the exercise of many other fundamental rights.

Defendants argue that "[a]ccess to literacy is not so fundamental to ordered liberty and justice." (Defs.' Br. at 49.) To support this view, they note that "at the time of the adoption of the U.S. Constitution, public education that went beyond rudimentary local cooperation was nonexistent." (*Id.* at 51–52 (citing *Gary B.*, 329 F. Supp. 3d at 365–66).) According to Defendants, since the country existed at that time, how could "ordered society" require a state-provided education? (*Id.*)

Suffice it to say that the practices of the 1700s cannot be the benchmark for what a democratic society requires. "The nature of injustice is that we may not always see it in our own times." *Obergefell*, 135 S. Ct. at 2598. That states uniformly created entitlements to education in the years leading up to and soon after the Fourteenth Amendment's adoption reflects the identification of such an injustice, and demonstrates the people's view that such a right is "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325); *see also Obergefell*, 135 S. Ct. at 2598 (cautioning against "allowing the past alone to rule the present").[15]

Beyond the fact that a basic minimum education is essential to participation in our political system, there is another reason why access to literacy is implicit in the ordered liberty of our nation. "[T]hat education is a means of achieving equality in our society" is a belief "that has persisted in this country since the days of Thomas Jefferson." *Hunnicutt v. Burge*, 356 F. Supp. 1227, 1237 (M.D. Ga. 1973) (citing Godfrey Hodgson, *Do Schools Make a Difference?*, Atlantic, Mar. 1973, at 35). In this sense, education has historically been viewed as a "great equalizer": regardless of the circumstances of a child's birth, a minimum education provides some chance of success according to that child's innate abilities. *See, e.g.*, David Rhode et al., *The Decline of the "Great Equalizer*,*"* Atlantic, Dec. 19, 2012 (quoting Horace Mann, politician and education reformer, in 1848, and Arne Duncan, Secretary of Education, in 2011); Roslin Growe & Paula S. Montgomery, *Educational Equity in America: Is Education the Great*

---

[15]As discussed above, *see supra* Part II.E.3.a, Defendants' argument goes well beyond even the originalist views of Justice Alito in *McDonald* and Justice Scalia in his dissent in *Obergefell*. Defendants essentially propose looking back to the earliest days of our country to determine the maximum scope of the Due Process Clause, ignoring that the Fourteenth Amendment was adopted nearly a century later.

*Equalizer?*, Prof. Educator, Spring 2003, at 23 (discussing Mann and the history of the "great equalizer" concept).

As the *Plyler* Court noted, "education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. . . . [The] denial of education to some isolated group of children poses an affront to one of the goals of the Equal Protection Clause: the abolition of governmental barriers presenting unreasonable obstacles to advancement on the basis of individual merit." 457 U.S. at 221–22. And *Brown* further supports this view, finding that "[i]n these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education." 347 U.S. at 493.

This is especially true considering our history of segregated and unequal education based on race, a history that began for the express purpose of limiting African Americans' political power. *See supra* Part II.E.3.a. The Supreme Court's desegregation cases make clear that state-provided public education is important not just to provide a shot at achievement in the face of inequalities of wealth and power, but specifically as a means of addressing past racial discrimination that restricted educational opportunities, and of course to maintain as best we can whatever equal opportunity has already been achieved.

It may never be that each child born in this country has the same opportunity for success in life, without regard to the circumstances of her birth. But even so, the Constitution cannot permit those circumstances to foreclose *all* opportunity and deny a child literacy without regard to her potential. *See Plyler*, 457 U.S. 219–20 ("[I]mposing disabilities on the . . . child is contrary to the basic concept of our system that legal burdens should bear some relationship to individual responsibility or wrongdoing. Obviously, no child is responsible for his birth . . . ." (second alteration in original) (quoting *Weber v. Aetna Cas. & Sur. Co.*, 406 U.S. 164, 175 (1972))). Providing a basic minimum education is necessary to prevent such an arbitrary denial, and so is essential to our concept of ordered liberty.

We hold, therefore, that the right to a basic minimum education—one that can plausibly impart literacy—is "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (quoting *Palko*, 302 U.S. at 325). When combined with the historical analysis discussed above,

this means that access to such a basic minimum education is a fundamental right protected by the Due Process Clause of the Fourteenth Amendment.

### c. Some Arguments (and Responses) Against Recognizing a Fundamental Right

Beyond Defendants' arguments with respect to the *Glucksberg*/*Obergefell* due process framework, it is worth addressing two additional points they make against recognizing a fundamental right in this appeal. The first—raised in nearly every substantive due process case—is that the recognition of a "new" fundamental right is almost always improper, as it compromises the will of the people by exchanging the policy judgments of unelected judges for those of their elected representatives. The second, which is more specifically applicable here, is that the Constitution is a charter of negative liberties, and so (in most cases) only tells the government what it cannot do rather than what it must do. While neither of these arguments carries the day, they are repeated enough to warrant a separate discussion and response.

### i. Judicial Restraint Suggests Deference to the Political Process

The classic argument against extending substantive due process is that recognition of a right as "fundamental" removes it from and so short-circuits the political process. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2625 (Roberts, C.J., dissenting) ("By deciding this question under the Constitution, the Court removes it from the realm of democratic decision. There will be consequences to shutting down the political process on an issue of such profound public significance."); *see also, e.g.*, *Schuette v. Coal. to Defend Affirmative Action, Integration & Immigrant Rights & Fight for Equal. by Any Means Necessary (BAMN)*, 572 U.S. 291, 313 (2014) (plurality opinion) ("First Amendment dynamics would be disserved if this Court were to say that the question here at issue is beyond the capacity of the voters to debate and then to determine."). Since the political branches are better equipped to address general social wrongs, the argument goes, the courts should not intervene by recognizing calcified and inflexible constitutional rights. *See, e.g.*, *Griswold*, 381 U.S. at 482 ("We do not sit as a super-legislature to determine the wisdom, need, and propriety of laws that touch economic problems, business affairs, or social conditions.").

But it is unsurprising that our political process, one in which participation is effectively predicated on literacy, would fail to address a lack of access to education that is endemic to a discrete population. The affected group—students and families of students without access to literacy—is especially vulnerable and faces a built-in disadvantage at seeking political recourse. The lack of literacy of which they complain is exactly what prevents them from obtaining a basic minimal education through the normal political process. This double bind provides increased justification for heightened judicial scrutiny and the recognition of the right as fundamental. *See, e.g.*, *Rodriguez*, 411 U.S. at 28 (noting that heightened scrutiny is warranted when a class is "saddled with . . . disabilities" or is "relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"); *cf. Schuette*, 572 U.S. at 334–35 (Breyer, J., concurring in the judgment) (discussing the Supreme Court's "political process" equal protection cases).[16]

### ii. The Due Process Clause Provides Only Negative, Not Positive Rights

Another often-repeated argument raised by Defendants and the dissent is that the Fourteenth Amendment—which speaks in terms of deprivation or denial—does not provide positive, affirmative rights. The Due Process Clause says what the government cannot do, not what it must do, and so recognizing an obligation of the state to provide a basic minimum education would turn the language of the Clause "on its head." (Defs.' Br. at 43.)

To be sure, several cases have reflected this view of the Clause. For example, in *Jackson v. City of Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983), Judge Posner said that "the Constitution is a charter of negative rather than positive liberties." And the Supreme Court itself has held "that the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government

---

[16]Though this partakes of both the equal protection and due process inquiries, the Supreme Court endorsed such an approach in *Obergefell*, which discussed the partial convergence of the Fourteenth Amendment's Equal Protection and Due Process Clauses. *See* 135 S. Ct. at 2602–03 ("The Due Process Clause and the Equal Protection Clause are connected in a profound way . . . . Rights implicit in liberty and rights secured by equal protection may rest on different precepts and are not always co-extensive, yet in some instances each may be instructive as to the meaning and reach of the other. In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right.").

itself may not deprive the individual." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

Though not as explicitly described, this negative liberty framing is also imbedded in several of the Supreme Court's key substantive due process cases. For example, in *Casey*, the Court portrayed its decision as defending "a realm of personal liberty which the government may not enter." *Casey*, 505 U.S. at 847. And even *Obergefell* framed substantive due process as protecting "certain personal choices," implicitly a negative-rights construction. 135 S. Ct. at 2597 (majority opinion).

But the Court has recognized affirmative fundamental rights. Aside from specifically enumerated rights incorporated into the Fourteenth Amendment, such as the right to counsel, *see, e.g.*, *Strickland v. Washington*, 466 U.S. 668, 684–86 (1984); *Gideon v. Wainwright*, 372 U.S. 335, 339–43 (1963), one affirmative right repeatedly endorsed by the Court is the right to marry. For example, in *Loving v. Virginia*, 388 U.S. 1 (1967), the Court found that "[m]arriage is one of the 'basic civil rights of man,'" *id.* at 12 (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)). That marriage is a fundamental right and must be provided by the state without undue restriction was further affirmed in *Zablocki v. Redhail*, 434 U.S. at 385–87, and in *Turner v. Safley*, 482 U.S. 78, 94–96 (1987). And in *Obergefell*, despite using the negative-rights frame of "choice" discussed above, 135 S. Ct. at 2597, the Court reiterated that the "right to marry is protected by the Constitution" and "is fundamental under the Due Process Clause," *id.* at 2598.

Since access to marriage was so uniformly provided by the states and expected by the people as of right, it took on a fundamental character under the Due Process Clause, even though the performance of a marriage is an affirmative act by the state. The same could be said for education. *See supra* Part II.E.3.a (discussing the historical evolution and prevalence of state-sponsored education in the United States). And while the burden involved in performing a marriage is substantially less than the burden in providing an education, the marriage cases at least show that the Constitution does not categorically rule out the existence of positive rights.

Further, the Supreme Court's cases expressly left open the possibility of the right to a basic minimum education, which works to negate the argument that its recognition is impossible given its positive or affirmative nature. If Defendants were correct, the Court could easily have disposed of any claim to an education-related fundamental right, instead of taking pains to distinguish and reserve decision on "whether a minimally adequate education is a fundamental right." *Papasan*, 478 U.S. at 285. While the dissent distinguishes these cases by arguing that the Supreme Court was referring to an equal protection fundamental right, and not a substantive due process fundamental right,[17] that distinction finds no support in the Supreme Court's case law and is foreclosed by our own, which holds that a fundamental right is a fundamental right, regardless of which clause the claim is brought under. *See Scarbrough*, 470 F.3d at 260–61 (discussing the merger of equal protection and substantive due process claims based on the deprivation of a fundamental right).[18]

One additional point from the dissent is worth noting. The dissent compares the right to a basic minimum education to a right to state-provided food, housing, or health care, and claims that *DeShaney* foreclosed any affirmative right to these or other benefits. This is because, our colleague says, *DeShaney* stands for the proposition that "[s]ubstantive due process does not regulate a state's failure to provide public services," regardless of the context. (Dissent at 76 (citing *DeShaney*, 489 U.S. at 194–97).)

---

[17]The dissent appears to conflate the equal protection inquiry in *Rodriguez* and its progeny, which assessed whether the state's unequal provision of any level of education violated the Constitution's equality mandate, with the question alluded to in *Rodriguez* but explicitly reserved in *Papasan*: whether access to some basic minimum level of education is a fundamental right.

[18]As we explained in *Scarbrough*, when the state denies an individual one of her fundamental rights, that claim sounds under the Due Process Clause because the state cannot deprive someone of a fundamental right without a compelling governmental reason, regardless of whether that denial is discriminatory. 470 F.3d at 260–61. The dissent mischaracterizes the majority's position on this point, citing *Shapiro v. Thompson*, 394 U.S. 618 (1969), *overruled in part by Edelman*, 415 U.S. 651, to suggest that a basic minimum education is nothing more than "public aid," and so the question is simply whether or not that aid is provided equally. (Dissent at 81.) Unlike in this case, the plaintiffs in *Shapiro* did not allege that they were denied a fundamental right; rather, they claimed that the state discriminated against them by denying welfare benefits on the basis of residency. *See* 394 U.S. at 627–29. Because that discrimination implicated the already-recognized fundamental right to travel between states, the statute was reviewed under strict scrutiny. *Id.* at 630–31, 633–34. Thus, *Shapiro* says nothing about whether the right to a basic minimum education should be classified as fundamental under the Constitution, and so has no bearing on the question faced in this appeal.

But *DeShaney*—a case in which a child sued the state for failing to stop his father from abusing and seriously injuring him—concerned the state's failure to prevent harm caused by a private actor. 489 U.S. at 191–95. The dissent's alternative reading—that *DeShaney* forecloses any affirmative obligation of the state under any circumstance, regardless of whether a private harm is at issue—is divorced from the text of that case. *DeShaney* itself couched its holding in this public-private distinction, saying "[a]s a general matter, then, we conclude that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197; *see also id.* at 195 ("[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."); *Jones v. Reynolds*, 438 F.3d 685, 688, 690 (6th Cir. 2006) ("[W]hen a claimant argues that government officials failed to prevent private individuals from causing another injury, . . . [*DeShaney*] and its progeny rarely permit the claim to go forward.").

Simply put, education is different. As discussed above, *see supra* Part II.D.3.a, universal, state-provided public education was nearly ubiquitous at the time the Fourteenth Amendment was adopted, and has only grown since then to be expected as a given by the public. Through this, the state has come to effectively occupy the field in public education, and so is the only practical source of learning for the vast majority of students. We can think of no other area of day-to-day life that is so directly controlled by the state. And with that control must come responsibility, particularly because some minimal education—enough to provide access to literacy—is a prerequisite to a citizen's participation in our political process. *DeShaney* implied such a responsibility, resting its holding on the fact that the state had played no role in creating or worsening the threat of harm the victim faced. 489 U.S. at 201.**[19]**

---

**[19]**For this reason, the dissent errs when it describes public schooling as merely a subsidy of the private exercise of a fundamental right. The case the dissent relies on for this is *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 541–43 (1983), which addressed whether Congress could exclude donations to organizations that engage in substantial lobbying from tax-deductibility under 26 U.S.C. § 501(c)(3). The Court's finding that "Congress has not violated [an organization's] First Amendment rights by declining to subsidize its First Amendment activities" through tax-deductible status, *id.* at 548, is not analogous to a state's failure to provide a basic minimum education at certain schools when the entire educational system is dominated by the state.

Thus, even if *DeShaney*'s framework were applied here (despite the lack of a private harm), this Court has recognized substantive due process claims under the state-created danger doctrine. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1065–67 (6th Cir. 1998). While the dissent argues against the right to a basic minimum education by comparing it to a constitutional right to food, a better analogy is a world in which the state took charge of the provision of food to the public, to the exclusion of nearly all private competitors. If the state then left the shelves on all the stores in one city bare, with no compelling governmental reason for this choice, such an action would place the residents of that city in heightened danger no less than the actions of the state in other cases where courts have allowed claims under the Due Process Clause. *See, e.g.*, *id.* at 1059–60, 1069–70; *Kneipp v. Tedder*, 95 F.3d 1199, 1201–03, 1213–14 (3d Cir. 1996). Thus, while the dissent's arguments amount to sound advice for us to proceed with special caution when considering any positive fundamental right, the case law on this issue does not foreclose recognizing the right to a basic minimum education.

### d. Contours of the Right to a Basic Minimum Education

Beyond simply recognizing the existence of a right to a basic minimum education, it is also important to define its contours, at least for the purposes of this case. The Supreme Court has "required in substantive-due-process cases a 'careful description' of the asserted fundamental liberty interest." *Glucksberg*, 521 U.S. at 721 (quoting *Flores*, 507 U.S. at 302). This description does not need to circumscribe the outer-most limit of the right, but must at least define the extent of the right needed to resolve the matter at hand. *See, e.g.*, *Obergefell*, 135 S. Ct. at 2602 (noting that rights can be described in a more "comprehensive sense," leaving questions on whether a particular state action or inaction is required by that right for subsequent determination).

Importantly, the right defined in this opinion is narrow in scope. It does not guarantee an education at the quality that most have come to expect in today's America (but that many are nevertheless denied). Rather, the right only guarantees the education needed to provide access to skills that are essential for the basic exercise of other fundamental rights and liberties, most importantly participation in our political system. As described by Plaintiffs, this amounts to an

education sufficient to provide access to a foundational level of literacy—the degree of comprehension needed for participation in our democracy.[20]

At this stage of the litigation—a motion to dismiss in which no evidence has been discovered or presented—it would be difficult to define the exact limits of what constitutes a basic minimum education sufficient to provide such access. This task is best suited for the district court in the first instance. But a few key principles can trace the contours of the right, providing guideposts for the parties as they continue this litigation.

At the outset, Defendants are correct that this Court cannot prescribe a specific educational outcome, such as literacy or proficiency rates. Though these measures may provide some useful evidence of whether the state is in fact providing a basic minimum education,[21] they are not sufficient evidence alone, because a court order cannot guarantee that educational opportunity is translated into student performance. Rather, the requirement to provide a basic minimum education means the state must ensure that students are afforded at least a rudimentary educational infrastructure, such that it is plausible to attain literacy within that system.[22]

While the precise contours of this infrastructure must be defined though the course of further litigation and examination of the parties' evidence, it would seem to include at least three basic components: facilities, teaching, and educational materials (e.g., books). For each of these components, the quality and quantity provided must at least be sufficient for students to plausibly attain literacy within the educational system at issue. This question of fact is entrusted to the trial court, which can assess the sufficiency of these measures in the first instance after hearing

---

[20]This narrow definition of the right also helps dispel the concern that recognizing such a claim could "open the floodgates of litigation" and "overwhelm the federal courts." *United States v. City of Loveland*, 621 F.3d 465, 472 (6th Cir. 2010). Several of these claims have already been rejected not because no such right exists, but because the facts alleged by the plaintiffs were insufficient to allege a deprivation. *E.g.*, *Papasan*, 478 U.S. at 286; *Rodriguez*, 411 U.S. at 36–37; *La. State Bd.*, 830 F.2d at 568; *cf. Kadrmas*, 487 U.S. at 458.

[21]Looking to other schools or school systems, these educational-outcome measures may also be helpful evidence of what specific resources *are* needed to provide access to literacy.

[22]Using Defendants' example of the right to counsel, this approach would not transform the right to counsel into the right to an acquittal. Rather, the right is akin to the promise of *effective* counsel, *e.g.*, *Strickland*, 466 U.S. at 686 (citing *McMann v. Richardson*, 397 U.S 759, 771 n.14 (1970)), from which no outcome is guaranteed, but the lawyer's objective failure cannot be the source of the client's loss.

evidence and likely employing the assistance of expert witnesses as to what resources are necessary.

Our dissenting colleague criticizes this approach, implying that our holding today will create a free-wheeling right that allows federal judges to micromanage the work of local school boards. We do not believe this is a fair description of the limited right embraced in our opinion, which promises only an education sufficient to provide basic access to literacy. And while this right could be impacted by the conditions of a school's facilities, the age of its textbooks, or the number of teachers in its classrooms, this does not mean that any of these things individually has a "constitutionally required" minimum level. (Dissent at 63.) Rather, the question is whether the education the state offers a student—when taken as a whole—can plausibly give her the ability to learn how to read.[23]

Similarly, the dissent suggests that the recognition of this right—requiring that a state's system of public education provide at least a shot at literacy, irrespective of which school district a student is assigned to—would somehow stymie innovation and create a one-size-fits-all, national program of education. But how each state reaches the basic minimum level of education discussed above can vary dramatically, and nothing in our recognition of this right—or even any resulting remedy in this case—could alter the broad powers of the states under our federalist system. The state is free to fashion its own school system in any number of ways, but however it does so, it must give all students at least a fair shot at access to literacy—the minimum level of education required to participate in our nation's democracy.

### 4. Application of the Right to Plaintiffs' Allegations

Beyond the abstract question of whether there is a fundamental right to a basic minimum education, Plaintiffs must also have plausibly alleged that they were deprived of such an education. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Looking to their complaint as a whole, Plaintiffs'

---

[23]Just because "the complaint makes allegations about physics and economics courses too" (Dissent at 77), does not mean we agree that those additional areas of study are required as part of a fundamental right providing access to basic literacy.

allegations—if proven true—would demonstrate that they have been deprived of an education providing access to literacy.

The core of Plaintiffs' complaint is that they are forced to "sit in classrooms where not even the pretense of education takes place, in schools that are functionally incapable of delivering access to literacy." (Compl., R. 1 at PageID #4; *see also id.* at #19 ("[Plaintiffs' schools] wholly lack the capacity to deliver basic access to literacy, functionally delivering no education at all.").) But we cannot simply credit Plaintiffs' legal conclusions. *Iqbal*, 556 U.S. at 677–78 (citing *Twombly*, 550 U.S. at 555–57, 570). To avoid dismissal, Plaintiffs must have pleaded enough factual material to plausibly support this claim. *Id.* at 678–79.

The most important allegations for this point concern the specific conditions in Plaintiffs' schools. Plaintiffs allege significant teacher shortages, coupled with unqualified instructors when they do have someone in the classroom. They allege dangerous and significantly distracting conditions within their school buildings, including extreme temperatures, overcrowding, and a lack of hygiene. They also allege a dearth of textbooks and other school supplies, with those they do have being in an abysmal or near unusable condition. These allegations are supported by specific examples, including several photographs reproduced within the complaint. At the motion-to-dismiss stage, this permits an inference that Plaintiffs' schools cannot provide access to literacy.

Plaintiffs further support their claim by citing data that show a zero or near-zero percentage of subject-matter proficiency among students at their schools. As noted above, these figures alone are not enough to state a claim, because the right to a basic minimum education cannot guarantee a specific educational outcome. *See supra* Part II.E.3.d. Further development of the record will be necessary to determine how these measures—largely put in terms of "grade level" or "proficiency"—are correlated with the type of foundational literacy at issue here. But for now, these data further support the inference that Plaintiffs' schools are woefully insufficient, especially when combined with qualitative descriptions of their classes' literacy shortcomings.

In sum, Plaintiffs allege facts concerning inadequate books and materials, insufficient or unqualified teaching staff, and decrepit and dangerous school conditions (and include photographs within their complaint). They then allege that nearly zero percent of students at these schools were graded as proficient in English or other subject-matter tests administered by the state. Taking the allegations of the complaint as true, and drawing all reasonable inferences in Plaintiffs' favor, *see, e.g.*, *Cahoo v. SAS Analytics, Inc.* 912 F.3d 887, 897 (6th Cir. 2019), Plaintiffs have plausibly been deprived of an education that could provide access to literacy. Defendants have not argued otherwise—they rest on the legal argument that there is no implicated fundamental right—and also have not argued that this deprivation is narrowly tailored to advance a compelling state interest. *E.g.*, *Glucksberg*, 521 U.S. at 721 (citing *Flores*, 507 U.S. at 302). While Plaintiffs still face the burden of proving their factual contentions at trial, under the standards governing a motion to dismiss, this is enough to get them through the courthouse doors. Accordingly, the district court's dismissal of this claim must be reversed.

### III. CONCLUSION

The recognition of a fundamental right is no small matter. This is particularly true when the right in question is something that the state must affirmatively provide. But just as this Court should not supplant the state's policy judgments with its own, neither can we shrink from our obligation to recognize a right when it is foundational to our system of self-governance.

Access to literacy is such a right. Its ubiquitous presence and evolution through our history has led the American people universally to expect it. And education—at least in the minimum form discussed here—is essential to nearly every interaction between a citizen and her government. Education has long been viewed as a great equalizer, giving all children a chance to meet or outperform society's expectations, even when faced with substantial disparities in wealth and with past and ongoing racial inequality.

Where, as Plaintiffs allege here, a group of children is relegated to a school system that does not provide even a plausible chance to attain literacy, we hold that the Constitution provides them with a remedy. Accordingly, while the current versions of Plaintiffs' equal protection and compulsory attendance claims were appropriately dismissed, the district court erred in denying

their central claim: that Plaintiffs have a fundamental right to a basic minimum education, meaning one that can provide them with a foundational level of literacy.  The district court's order is affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.

————————————

## DISSENT

————————————

MURPHY, J., dissenting.  The complaint in this case alleges school conditions that would significantly impair any child's ability to learn.  If I sat in the state legislature or on the local school board, I would work diligently to investigate and remedy the serious problems that the plaintiffs assert.  But I do not serve in those roles.  And I see nothing in the complaint that gives federal judges the power to oversee Detroit's schools in the name of the United States Constitution.  That document does not give federal courts a roving power to redress "every social and economic ill." *Lindsey v. Normet*, 405 U.S. 56, 74 (1972).  It instead gives federal courts a limited power "to say what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).  And the law has long been clear: Unlike the right to free speech in the First Amendment or the right to a jury trial in the Seventh, education "is not among the rights afforded explicit protection under our Federal Constitution." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973).  So, while I agree with the majority that the defendants have not shown that this case is moot, I must respectfully dissent from its view that the complaint alleges a valid "substantive due process" claim.

The plaintiffs argue that the Due Process Clause imposes a one-size-fits-all duty on all 50 states to devote an unspecified level of taxpayer dollars to an unspecified level of education.  Their novel request for a positive right to education will "mark a drastic change in our understanding of the Constitution." *Harris v. McRae*, 448 U.S. 297, 318 (1980).  The Due Process Clause has historically been viewed, consistent with its plain text, as a negative limit on the states' power to "deprive" a person of "liberty" or "property."  U.S. Const. amend. XIV, § 1. It has not been viewed as a positive command for the states to protect liberty or provide property. A state's decision "not to subsidize the exercise of a fundamental right" has never been thought to "infringe the right," even in areas where the states have long provided that assistance. *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983).  While, for example, a party may have a constitutional right against state aggression, the party has no constitutional right to state protection against private violence. *DeShaney v. Winnebago Cty. Dep't of Soc.*

*Servs.*, 489 U.S. 189, 195–96 (1989). This traditional understanding ends today. The states that make up this circuit now must meet the school-quality standards that federal judges find necessary to enforce the plaintiffs' nebulous right to "access literacy." That is now the law of this circuit even though the Supreme Court has repeatedly explained that "[p]ublic education is not a 'right' granted to individuals by the Constitution." *Plyler v. Doe*, 457 U.S. 202, 221 (1982).

This positive right to a minimum education will jumble our separation of powers. It will immerse federal courts in a host of education disputes far outside our constitutionally assigned role to interpret legal texts. *Cf. Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). How should those courts remedy the schools that they conclude are not meeting the constitutionally required quality benchmarks? May they compel states to raise their taxes to generate the needed funds? Or order states to give parents vouchers so that they may choose different schools? How old may textbooks be before they become constitutionally outdated? What minimum amount of training must teachers receive? Which HVAC systems must public schools use? Our judicial commissions give us no special insights into these "difficult questions of educational policy." *Rodriguez*, 411 U.S. at 42. But the states' ability to experiment with diverse solutions to challenging policy problems has long been a cherished aspect of our federalism. *United States v. Lopez*, 514 U.S. 549, 581 (1995) (Kennedy, J., concurring). I would leave the difficult problems of education policy presented by this case where they have traditionally been—with the states and their people.

These legal points are not meant to deny much of what the majority eloquently says. The majority correctly recognizes "the vital role of education in a free society." *Rodriguez*, 411 U.S. at 30. No one disputes the importance of education for children to have a chance at life, just as no one disputes the importance of their having enough food to eat or a sturdy roof over their heads. Yet my view that education is important as a policy matter says nothing about whether I may find it compelled as a constitutional one. *Id.* at 32–34. That is what our Framers meant when they said that judges exercise "neither FORCE nor WILL but merely judgment." The Federalist No. 78, at 464 (A. Hamilton) (Clinton Rossiter ed., 1961). The constitutional question in this case turns on a legal judgment about the meaning of the Constitution's words; it

does not turn on a policy assessment about education's societal value. And I see nothing in the Constitution's language that creates a substantive entitlement to a state-funded education.

The majority also correctly notes that the Fourteenth Amendment does include words designed to remedy our country's sad history of racial discrimination in the public schools. *Brown v. Board of Education*, 347 U.S. 483 (1954), stands out as a bedrock Supreme Court precedent, righting the legal wrong that was *Plessy v. Ferguson*, 163 U.S. 537 (1896). The Equal Protection Clause compels courts to apply the most exacting scrutiny to a state's racially discriminatory decisions. *Johnson v. California*, 543 U.S. 499, 505 (1995). But the plaintiffs' due-process claim here does not implicate this equality mandate. They do not argue that the purported school conditions arose from racial discrimination violating core equal-protection guarantees. And, as the majority explains, their equal-protection claim fails because they merely allege poor school conditions. They do not identify any discrete unequal treatment by the state defendants.

For these reasons and those that follow, I would affirm the district court's judgment.

## I

The plaintiffs allege that they have a fundamental "right to State-provided access to literacy protected by the Due Process Clause." Apt. Br. 25. Both portions of this proposed right—the state-provided portion and the access-to-literacy portion—depart from settled doctrine. The Supreme Court has repeatedly held that education is not a "fundamental right." And even if some minimum education could attain fundamental-right status, the plaintiffs' claim still must fail. Substantive due process has never compelled states to provide their residents with the funds they need to exercise fundamental rights. It has instead barred states from interfering with the exercise of those rights. In short, the plaintiffs seek an unprecedented subsidy for an unprecedented right.

A

At the outset, the plaintiffs' assertion that they have a fundamental right to a minimum education faces stiff precedential headwinds. The Supreme Court has refused to treat education as a fundamental right every time a party has asked it to do so. *Kadrmas v. Dickinson Pub. Sch.*, 487 U.S. 450, 458 (1988); *Papasan v. Allain*, 478 U.S. 265, 284–86 (1986); *Plyler v. Doe*, 457 U.S. 202, 223 (1982); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35, 37 (1973). From a circuit judge's perspective, these decisions should make us think long and hard before adopting the plaintiffs' novel right to a minimally adequate education.

This line of precedent begins with *Rodriguez.* It considered whether Texas's reliance on local taxes to fund schools, which caused gross financial disparities across school districts, violated the Equal Protection Clause. 411 U.S. at 9–15. While conceding education's importance to our society, the Court recognized that "the importance of a service performed by the State does not determine whether it must be regarded as fundamental." *Id.* at 30. Rather, education's status as a fundamental right turns on whether "there is a right to education explicitly or implicitly guaranteed by the Constitution." *Id.* at 33. The Court could find no such right. Education "is not among the rights afforded explicit protection under our Federal Constitution." *Id.* at 35. And the Court refused to find education implicitly guaranteed on the ground that it was necessary to exercise other rights, such as the right to free speech or to vote. *Id.* at 35–36.

In a trio of equal-protection decisions since, the Court has repeatedly reaffirmed this conclusion. In *Plyler*, a Texas law gave school districts discretion to deny education to immigrant children who were in this country illegally. 457 U.S. at 205. Some of these children challenged a school district's decision to require them to pay tuition. *Id.* at 206 & n.2. While the Court ultimately found that this law violated equal protection under the relaxed standards that apply when fundamental rights are not at stake, it repeated: "Nor is education a fundamental right." *Id.* at 223. *Papasan* next addressed a challenge to Mississippi's unequal distribution of the income produced from its public-school lands. 478 U.S. at 267–68. The Court interpreted *Rodriguez* and *Plyler* to hold that "education is not a fundamental right." *Id.* at 284–85. *Kadrmas* lastly considered a challenge to North Dakota laws that allowed some school districts to charge for bus services but mandated that others offer those services for free. 487 U.S. at 452.

The Court noted for a fourth time: "Nor have we accepted the proposition that education is a 'fundamental right[.]'" *Id.* at 458. These decisions could not be clearer: "[A]ccess to education is not guaranteed by the Constitution." *Ambach v. Norwick*, 441 U.S. 68, 77 n.7 (1979).

The plaintiffs assure us that we can disregard these many statements. That is so, they say, because *Papasan* noted that the Court has "not yet definitively settled the question[] whether a minimally adequate education is a fundamental right." 478 U.S. at 285. Unlike the complaint in *Papasan*, the plaintiffs add, their complaint pleads that the state has not given them even a "minimally adequate" education. I am skeptical that we may sidestep this long line of authority so easily. But we need not decide whether the Constitution includes a fundamental right to a minimum education (or "access to literacy"). Even if the Constitution contains this implied right, the plaintiffs' substantive-due-process claim must fail for a more rudimentary reason.

## B

The Supreme Court has long recognized a "basic" constitutional difference between a state's use of its coercive power to regulate its residents and the state's refusal to use its spending power to give them things. *Maher v. Roe*, 432 U.S. 464, 475 (1977). To list one of many examples: Just because the Free Speech Clause bars a state from banning its citizens' political speech, *Eu v. San Francisco Cty. Democratic Cent. Comm.*, 489 U.S. 214, 222–23 (1989), does not mean that the clause requires the state to give them the funds they need to engage in that speech, *Ysursa v. Pocatell Educ. Ass'n*, 555 U.S. 353, 364 (2009). Under the Due Process Clause, too, this difference between state coercion and state assistance finds support in constitutional text, in Supreme Court precedent, in our federalist structure, and in the nature of the judicial power. These factors all lead me to reject the plaintiffs' novel claim that the Due Process Clause compels every state in this nation to affirmatively provide some minimum level of education.

### 1

Start with text. The Due Process Clause provides: "[N]or shall any state deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. This language is "phrased in the negative." *Archie v. City of Racine*, 847 F.2d 1211, 1220 (7th

Cir. 1988) (en banc). By barring a state from "depriv[ing]" individuals of their "life, liberty, or property," the clause limits the state's power to "take away" the people's lives, their liberty, or their property (at least without due process). Noah Webster, *An American Dictionary of the English Language* 358 (1882); *see* Joseph E. Worcester, *A Dictionary of the English Language* 386 (1878). The text would be a poor choice of words if the clause's Framers meant to compel a state to protect its people's lives, to promote their liberties, or to provide them with property.

This ordinary meaning comports with the way in which the text would have been viewed at the time of its enactment: as a limit on the states' power to intrude on private rights. By 1868, the Supreme Court had already held that the Fifth Amendment's Due Process Clause has its roots in Magna Carta and so imposes a "restraint on the legislative as well as on the executive and judicial powers of the government." *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276 (1856). Conversely, "[t]he Framers would have been astounded to hear" that the clause compelled Congress to offer public services. David P. Currie, *Positive and Negative Constitutional Rights*, 53 U. Chi. L. Rev. 864, 865–66 (1986). Similar provisions in state constitutions were also interpreted to limit "the aggressive tendency of power," not to command state assistance. Thomas M. Cooley, *A Treatise on the Constitutional Limitations which Rest upon the Legislative Power of the States of the American Union* 351 (1868); *see* Edward J. Eberle, *Procedural Due Process: The Original Understanding*, 4 Const. Comment. 339 (1987) (discussing cases). The Supreme Court thus quickly read the Fourteenth Amendment's Due Process Clause in the same limited fashion—as "secur[ing] the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (quoting *Hurtado v. California*, 110 U.S. 516, 527 (1884)); *see Davidson v. City of New Orleans*, 96 U.S. 97, 101–04 (1878).

The plaintiffs have not even attempted to reconcile their proposed positive right with this constitutional text. They do not argue that the State of Michigan has "take[n] away" their liberty to obtain a minimum education of their choice. Webster, *supra*, at 358. They do not, for example, allege that the state bars them from attending a private school, *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925), or from learning a particular subject, *Meyer v. Nebraska*, 262 U.S. 390, 400–03 (1923). No, the plaintiffs say that the state has *deprived* them of an

education because the state has not *provided* them with an education. But the text does not require states to provide their people with any services, let alone an unidentified level of schooling. Only in an area where "process" equals "substance" could "deprive" equal "provide."

Nor would Americans at the time of the Due Process Clause's adoption have read it to compel states to operate schools. No one would have viewed the clause as a check on the states' "aggressive tendency" to be stingy with their public services. Cooley, *supra*, at 351; *see Daniels*, 474 U.S. at 331. Such an unusual reading would have meant that Congress had been violating the Fifth Amendment for decades. After all, the federal government had not adopted a national system of schools. And most people would have thought that Article I of the Constitution did not give it that power. *See United States v. Lopez*, 514 U.S. 549, 565–66 (1995). Simply put, any claim that the Due Process Clause imposes a duty on states to provide a minimum education to their residents requires us to rewrite the text and to ignore the backdrop against which it was enacted.

2

Turn to precedent. The Supreme Court's substantive-due-process decisions have long been controversial "because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). But these controversies have involved a different topic altogether—the meaning of the phrase "due process," not the verb "deprive." Justices have debated when language sounding in process can impose absolute limits on a state's power to take away a person's liberty or property no matter the process provided. The Court has considered such things as whether states may limit the hours that people work, *compare Lochner v. New York*, 198 U.S. 45, 56 (1905), *with id.* at 75–76 (Holmes, J., dissenting); eliminate their ability to obtain an abortion, *compare Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846–53 (1992), *with id.* at 979–81 (Scalia, J., dissenting); or impose large punitive-damages awards, *compare State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416–18 (2003), *with id.* at 430–31 (Ginsburg, J., dissenting). Whoever has the better of these debates, they unquestionably addressed limits on the states' regulatory power.

These decisions have not, by contrast, touched the states' spending power.  Until now, the Due Process Clause has left little room for debate that a state generally "is under no constitutional duty to provide substantive services for those within its border."  *Youngberg v. Romeo*, 457 U.S. 307, 317 (1982).  While minimum levels of food, housing, and medical care are critical for human flourishing and for the exercise of constitutional rights, due process does not compel states to spend funds on these necessities of life.  True, the Supreme Court has never treated food, housing, or medical care themselves as "fundamental rights" triggering heightened scrutiny.  *Lyng v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., UAW*, 485 U.S. 360, 369 (1988) (food); *Maher*, 432 U.S. at 469 (medical care); *Lindsey v. Normet*, 405 U.S. 56, 73–74 (1972) (housing).  But the Court has drawn this same distinction between state coercion and state subsidies when fundamental rights were on the line.  The Due Process Clause generally confers "no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 196 (1989).

Take abortion.  The Court has held that substantive due process forbids the states from banning all abortions.  *Casey*, 505 U.S. at 846.  But the Court has rejected the notion that substantive due process also requires them to pay for abortions, *Rust v. Sullivan*, 500 U.S. 173, 201 (1991), or to provide access to abortion facilities, *Webster v. Reprod. Health Servs.*, 492 U.S. 490, 507–08 (1989).  That is because "[a] refusal to fund protected activity, without more, cannot be equated with the imposition of a 'penalty' on that activity."  *Rust*, 500 U.S. at 193 (citation omitted).  Or, in the Constitution's words, a state does not "deprive" individuals of their "liberty" interest in abortion merely by failing to provide access to the procedure.

The Court has kept to this rule even where the inclination to create an exception would reach its apex.  Substantive due process bars a state from arbitrarily injuring its residents (which deprives them of their liberty or lives).  *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998); *Guertin v. State*, 912 F.3d 907, 917, 920–21 (6th Cir. 2019).  Yet the doctrine gave four-year-old Joshua DeShaney no relief when a county failed to protect him from his abusive father.  *DeShaney*, 489 U.S. at 195–96.  Joshua's father beat him "so severely that he fell into a life-

threatening coma" and was "expected to spend the rest of his life confined to an institution." *Id.* at 193.  The boy nevertheless could not use substantive due process to challenge the state's deficient aid because "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

The plaintiffs' claim all but requires us to overrule this caselaw.  I do not see how the Due Process Clause can compel Michigan to provide the plaintiffs with educational services when it did not require Winnebago County to provide Joshua DeShaney with protective services.  Their claim must fail for the same reason his did: The Due Process Clause "confer[s] no affirmative right to governmental aid[.]" *Id.* at 196.  Nor can the plaintiffs sidestep this rule with *Papasan*'s dicta reserving whether a minimum education might qualify as a "fundamental right." 478 U.S. at 285.  Even when constitutional rights are at stake, the government has no duty to spend funds to promote those rights.  *Rust*, 500 U.S. at 201.  Before today, this rule would have foreclosed any due-process request for a taxpayer-funded education.  The plaintiffs' new right thus unmoors substantive due process (an already amorphous doctrine) from a clear limit on its reach.

3

Next consider the Framers' constitutional design.  The Constitution's federalist structure gives "few and defined" powers to the federal government and leaves "numerous and indefinite" powers to the states.  The Federalist No. 45, at 289 (J. Madison) (Clinton Rossiter ed., 1961).  This federalism enhances our liberty by allowing local communities to make local decisions free from a less accountable and more distant central power.  *Bond v. United States*, 564 U.S. 211, 221–22 (2011).  So "[t]he maintenance of the principles of federalism is a foremost consideration in interpreting any of the pertinent constitutional provisions under which this Court examines state action." *Rodriguez*, 411 U.S. at 44 (citation omitted); *cf.* Kurt T. Lash, *The Lost History of the Ninth Amendment* 352–53 (2009).  That is especially true for substantive due process.  Federal courts undercut the people's interest in local decisionmaking whenever they nationalize new extratextual rights.  That expansion "place[s] the matter outside the arena of public debate and legislative action" within each state. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

This federalism concern has great urgency here. The plaintiffs' proposed right to a state-provided education asks the federal government to intervene in an area that has long been "a traditional concern of the States." *Lopez*, 514 U.S. at 580 (Kennedy, J., concurring); *see Horne v. Flores*, 557 U.S. 433, 448 (2009). Countless examples show this tradition. To give but one, when a member of Congress proposed a national school system in 1870, many expressed constitutional doubts and the bill did not even get a vote. *See* David P. Currie, *The Reconstruction Congress*, 75 U. Chi. L. Rev. 383, 466–67 (2008); Gordon Canfield Lee, *The Struggle for Federal Aid, First Phase: A History of the Attempts to Obtain Federal Aid for the Common Schools, 1870-1890*, 42–55 (1949). (The legislator had relied primarily on the Constitution's Preamble and its Guarantee Clause as the purported basis for this congressional power.) Yet the plaintiffs' view that due process compels the states to provide a minimum education would trigger Congress's enforcement power under the Fourteenth Amendment, U.S. Const. amend. XIV, § 5, and so could allow Congress for the first time to "regulate the educational process directly," *Lopez*, 514 U.S. at 565.

To be sure, "it is doubtful that any State" would disagree with the plaintiffs' goal: States should strive to alleviate poor school conditions. *Id.* at 581 (Kennedy, J., concurring). But "considerable disagreement exists about how best to accomplish that goal." *Id.* Should states fix the problem of failing schools by sending more money into them? *Cf. DeRolph v. State*, 780 N.E.2d 529, 537–38 (Ohio 2002) (Moyer, C.J., dissenting). Or should they fix the problem by giving children a choice to attend other schools? *Cf. Zelman v. Simmons-Harris*, 536 U.S. 639, 644–45 (2002). Each state may choose a different policy mix to confront the "intractable economic, social, and even philosophical problems" associated with this issue. *Rodriguez*, 411 U.S. at 42 (citation omitted). "In this circumstance, the theory and utility of our federalism are revealed, for the States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear." *Lopez*, 514 U.S. at 581 (Kennedy, J., concurring); *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). The plaintiffs' nationwide right would undercut the educational experimentation so necessary to find solutions that work. *Cf. District Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 73 (2009).

Public education also requires public funds.  States facing tight budgets must make delicate tradeoffs about how much money to devote to education as compared to other priorities like healthcare, welfare, or police protection.  "Higher quality [education] may come at the expense of a higher budget for the police or [the roads], or at the expense of higher taxes that induce people to relocate to low-service (and low-tax) jurisdictions."  *Archie*, 847 F.2d at 1223–24.  The Supreme Court has traditionally given states wide discretion to make these financial tradeoffs.  *Rodriguez*, 411 U.S. at 40.  Yet the plaintiffs' claim would disrupt state fiscal policies too by creating an "extraordinary" positive right to education.  *Harris v. McRae*, 448 U.S. 297, 318 (1980).

And while the Due Process Clause has traditionally imposed only negative limits on states, the people of each state may impose positive duties in their state constitutions.  Jeffrey S. Sutton, *51 Imperfect Solutions* 35 (2018).  For centuries, states have done just that in this educational setting.  *See* Steven G. Calabresi & Michael W. Perl, *Originalism and Brown v. Board of Education*, 2014 Mich. St. L. Rev. 429, 450–54 & nn.97–126 (2015).  Yet, as evidenced by the "linguistic diversity of the various states' education clauses," *Conn. Coal. for Justice in Educ. Funding, Inc. v. Rell*, 990 A.2d 206, 244 (Conn. 2010), their decisions have been far from uniform.  While many courts have recently read their states' education clauses as giving them the authority to compel a certain level of education, *id.* at 244–50 & n.55, many others have read their clauses as leaving education policies to state legislatures, *see, e.g.*, *Citizens for Strong Sch., Inc. v. Fla. State Bd. of Educ.*, 262 So. 3d 127, 129–30 (Fla. 2019) (per curiam); *King v. State*, 818 N.W.2d 1, 4 (Iowa 2012); *Bonner ex rel. Bonner v. Daniels*, 907 N.E.2d 516, 521–22 (Ind. 2009).  Some two years before this case, for example, Michigan courts rejected a claim that the Michigan Constitution required public schools to meet a certain level of educational quality.  *See LM v. State*, 862 N.W.2d 246, 253 (Mich. Ct. App. 2014), *appeal denied*, *SS v. State*, 869 N.W.2d 273 (Mich. 2015).  The plaintiffs' nationwide rule thus would deprive the people in each state of their "political" liberty to decide for themselves the scope of any educational right that they want in their state constitutions.  *Bond*, 564 U.S. at 221.

4

Lastly consider the nature of our own authority. Article III gives federal courts the "judicial Power." U.S. Const. art. III, § 1. This power does not allow federal courts to declare state action unconstitutional "merely because it is, in their judgment, contrary to the principles of natural justice." *Calder v. Bull*, 3 U.S. 386, 399 (1798) (opinion of Iredell, J.). It allows them to declare state action unconstitutional only because the Constitution's text qualifies as "law" and takes supremacy over state law when an "irreconcilable variance" exists between the two. The Federalist No. 78, *supra*, at 466–67; *Marbury v. Madison*, 5 U.S. 137, 177 (1803). In other words, we have "the authority to interpret the law; we possess neither the expertise nor the prerogative to make policy judgments." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 538 (2012) (Roberts, C.J.). So we must "'exercise the utmost care whenever we are asked to break new ground in this field,' lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Glucksberg*, 521 U.S. at 720 (citations omitted).

The proposed right to a state-provided education shows why courts must exercise this caution. The right would entangle courts in policy controversies well outside their authority "to say what the law is." *Marbury*, 5 U.S. at 177. Many education disputes, for example, arise from a "shortage of money." Sutton, *supra*, at 38. Does the right to "access literacy" give federal judges the power to direct states to increase their taxes to provide the required education? Or allow courts to compel spending cuts for healthcare to free up the needed funds? I, for one, would be troubled by a federal court instructing a state legislature that "[b]ecause education is one of the state's most important functions, lack of financial resources will not be an acceptable reason for failure to provide the best educational system." *Campbell Cty. Sch. Dist. v. State*, 907 P.2d 1238, 1279 (Wyo. 1995). The Supreme Court has told us not "to second-guess state officials charged with the difficult responsibility of allocating [their] limited public . . . funds among the myriad of potential" programs. *Dandridge v. Williams*, 397 U.S. 471, 487 (1970). And it has said that we "lack both the expertise and the familiarity with local problems so necessary to the making of wise decisions with respect to the raising and disposition of public revenues." *Rodriguez*, 411 U.S. at 41.

Case 2:16-cv-13292-SJM-APP   ECF No. 128, filed 04/23/20   PageID.2930   Page 78 of 90

Debates over the best way to help children stuck in failing schools likewise "involve[] the most persistent and difficult questions of educational policy." *Id.* at 42.  Consider, for example, questions about the root causes of poorly performing schools.  The plaintiffs in this case allege that "high teacher turnover," including heavy reliance on teachers from Teach for America, has partially caused the poor learning environments.  Compl., R.1, PageID#101.  A similar California suit, by contrast, alleged that the state's tenure rules—which entrenched bad teachers in the state's public schools—caused those poor learning environments.  *See Vergara v. California*, 209 Cal. Rptr. 3d 532, 539–40 (Cal. Ct. App. 2016).  Who's right?  Federal courts are not equipped to determine personnel policies or teacher-certification rules for the schools across this country.

Next consider questions about the best solutions for failing schools.  The plaintiffs in this case request an injunction that would require Michigan to, among other things, fix public schools with "insufficient teacher capacity" or "deplorable school conditions."  Compl., R.1, PageID#132.  A similar Connecticut suit, by contrast, sought to enjoin "Anti-Opportunity Laws" that reduced the ability of children to choose other schools.  *See Martinez v. Malloy*, 350 F. Supp. 3d 74, 80–81 (D. Conn. 2018).  Do federal courts get to pick between investing more in traditional schools or investing more in alternatives?  It would be ironic if the voucher system that the Supreme Court narrowly upheld for the City of Cleveland could be constitutionally compelled for the entire nation.  *See Zelman*, 536 U.S. at 653.

Our judicial power gives us no "specialized knowledge and experience" about the best education policies.  *Rodriguez*, 411 U.S. at 42.  Just as the Due Process Clause "does not enact Mr. Herbert Spencer's" views in the economic sphere, *Lochner*, 198 U.S. at 75 (Holmes, J., dissenting), so too it does not enact Milton Friedman's, Horace Mann's, or any other individual's views in this education sphere.  The Constitution instead leaves these debates about education policy with the states and their people.

## II

To reach a contrary result, the majority invokes *Glucksberg*'s substantive-due-process test; makes analogies to other allegedly "positive" rights; relies on the dicta in the Supreme Court's education decisions; and recounts our history of racially discriminatory education. None of these points permits the positive right to education that the majority finds in the Due Process Clause.

## A

The majority cites *Glucksberg*'s historical framework for substantive-due-process claims and notes that most state constitutions have long included some type of clause about education or schools. Majority Op. 41–51. But *Glucksberg*'s framework does not extend to this distinct subsidy context, and it would not justify the plaintiffs' proposed right even if it did.

*Glucksberg* considered a law that banned physician-assisted suicide; it did not consider a law refusing to pay for the practice. In that regulatory context, the Supreme Court asked whether the activity that the state prohibited (suicide) was "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty." *Glucksberg*, 521 U.S. at 721 (citation omitted). This test should not even enter the field when a plaintiff challenges a state's alleged failure to provide a public service (as in this case), as opposed to its deprivation of a liberty or property interest (as in cases like *Glucksberg* or *Casey*). Relying on *Glucksberg* to find a right to a taxpayer-funded education is like relying on *Roe v. Wade*, 410 U.S. 113 (1973), to find a right to a taxpayer-funded abortion. *But see Maher*, 432 U.S. at 475–76.

*DeShaney* proves my point. That case did not ask whether state protection from private violence was deeply rooted in our history or implicit in the concept of ordered liberty. *See* 489 U.S. at 194–203. It is, of course, both. As for history, "[p]rotection" from private violence has always been the government's job. *Corfield v. Coryell*, 6 F. Cas. 546, 551 (Washington, Circuit Justice, C.C.E.D. Pa. 1823). Early state constitutions noted that "[e]ach individual of the society has a right to be protected by it in the enjoyment of his life, liberty, and property, according to standing laws." Mass. Const. of 1780, pt. I, art. X; *cf.* Pa. Const. of 1776, Declaration of Rights, art. VIII; Va. Declaration of Rights § 3 (1776). As for ordered liberty,

under the original social contract, individuals give up some of their freedom in exchange for security (not education) from the government. *See* John Locke, *Two Treatises of Government* 184–86 (Thomas I. Cook, ed., Hafner Publ'g Co. 1947) (1690); 1 William Blackstone, *Commentaries on the Laws of England* *226. If *Glucksberg*'s test extends to public services, *DeShaney* cannot stand. *DeShaney* instead adopted a much simpler rule: Substantive due process does not regulate a state's failure to provide public services. 489 U.S. at 194–97. Any claim for a state-provided education falls within *DeShaney*'s rule, not *Glucksberg*'s.

Even if *Glucksberg*'s framework applied, the plaintiffs' proposed right would not satisfy it. Other than the fact that they label their claim a right to "access literacy," I see little daylight between that claim and the one *Rodriguez* rejected. The plaintiffs rely on state constitutional provisions as their main support for the argument that literacy is "deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 721 (citation omitted). But these clauses address schools or education generally; they do not mention access to literacy specifically. *See* Calabresi & Perl, *supra*, at 450–54 & nn.97–126. The provisions thus provide no basis for a *standalone* right to literacy apart from a general right to education. If the Supreme Court thought that these clauses justified a fundamental right to education, it would have said so in *Rodriguez*.

The plaintiffs also merely cite these state education clauses; they do not discuss how the states have applied them. For most of our country's history, "[t]he overwhelming majority of States" did not treat the clauses as creating judicially enforceable individual rights to a minimum education (in contrast to a general mandate for the legislature to set up a statewide school system). John C. Eastman, *When Did Education Become a Civil Right? An Assessment of State Constitutional Provisions for Education 1776-1900*, 42 Am. J. Legal Hist. 1, 2 (1998). That is why, in 1992, a commentator could describe an "emerging" right to education, not a longstanding one. *See* Allen W. Hubsch, *The Emerging Right to Education Under State Constitutional Law*, 65 Temple L. Rev. 1325 (1992). And even under an approach using "reasoned judgment" to discover new rights, *Obergefell v. Hodges*, 135 S. Ct. 2584, 2598 (2015), these more recent suits have been met with decidedly mixed results. *See* Sutton, *supra*, at 30. Some courts have declined to adopt a state right to a minimum education precisely because of the way in which their sister courts have "struggled in [their] self-appointed role[s] as

overseer[s] of education" to find workable standards. *City of Pawtucket v. Sundlun*, 662 A.2d 40, 59 (R.I. 1995); *cf. Ex Parte James*, 836 So. 2d 813, 819 (Ala. 2002) (per curiam). This practical concern has far greater force as applied to the national due-process right that the plaintiffs ask us to mandate for all 50 states.

In that respect, *Glucksberg* requires a plaintiff to articulate "a 'careful description' of the asserted fundamental liberty interest." 521 U.S. at 721 (citation omitted). Here, however, the plaintiffs propose a vague right to the "access to literacy" without clearly identifying its contours. Their proposal would mandate far more day-to-day federal oversight of the states' schools than any narrow claim that children "are not taught to read or write." *Papasan*, 478 U.S. at 286. The complaint suggests that this right will require federal courts to evaluate such things as the minimum qualifications for teachers, Compl., R.1, PageID#120, the maximum number of students per class, *id.*, PageID#97–98, and the appropriate types and conditions of textbooks, *id.*, PageID#82–83. Their proposed right also does not appear limited to literacy, as the complaint makes allegations about physics and economics courses too. *Id.*, PageID#82, 104. All told, the plaintiffs seek to enforce the right to education that *Rodriguez* rejected simply by relabeling it.

B

Even if *DeShaney* sets the default rule in this subsidy context, the majority next says, the Supreme Court has created two other "exceptions" that are like the exception that the majority creates today. Majority Op. 52–53. Neither justifies the majority's departure from *DeShaney*.

As its first exception, the majority notes that the Sixth Amendment's right to counsel (as incorporated by the Due Process Clause) requires a state to provide a criminal defendant with a taxpayer-funded lawyer. *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963). But the state's prosecution triggering this right seeks to *deprive* the defendant of life, liberty, or property. So *Gideon* "did not expand the definition of deprivation to encompass the failure to provide services; it merely determined what constituted the process due when the state sought actively to deprive the individual of life, liberty, or property by means of the criminal law." Currie, *supra*, 53 U. Chi. L. Rev. at 874; *Archie*, 847 F.2d at 1221–22. It no more establishes a right to "public services" than does the right to a jury trial, which a state likewise must furnish before taking a

person's liberty.  Regardless, the Sixth Amendment right to "counsel" contains affirmative language; the Constitution contains no similar right to "education" that could be applied against the states under modern incorporation principles.  *See McDonald v. City of Chicago*, 561 U.S. 742, 763–67 (2010).

As its second exception, the majority notes that the Due Process Clause protects the right to marry even though "the performance of a marriage is an affirmative act by the State." Majority Op. 53.  But the Supreme Court has treated the "right to marry" not as a right to state aid, but as "part of the fundamental 'right of privacy'" that bars a state from interfering in an individual's intimate decisions.  *Zablocki v. Redhail*, 434 U.S. 374, 384 (1978).  "[I]t would make little sense to recognize a right of privacy with respect to other matters of family life," the Court has said, "and not with respect to the decision to enter the relationship that is the foundation of the family in our society."  *Id.* at 386.  It has thus found this right violated by criminal laws that deprived people of liberty merely for marrying.  *Id.* at 387; *Loving v. Virginia*, 388 U.S. 1, 2–3 (1967); *cf. Poe v. Ullman*, 367 U.S. 497, 545–46 (1961) (Harlan, J., dissenting). The Court made this same connection when holding that same-sex couples have the right to marry: "Like choices concerning contraception, family relationships, procreation, and childrearing, all of which are protected by the Constitution, decisions concerning marriage are among the most intimate that an individual can make."  *Obergefell*, 135 S. Ct. at 2599.

These decisions have not, however, compelled states to provide public assistance so that parties may exercise their privacy rights.  Apart from the abortion cases I have discussed, *Rust*, 500 U.S. at 201, other examples support this distinction.  Families have a right to live together, *Moore v. City of East Cleveland*, 431 U.S. 494, 504–06 (1977) (plurality op.), but they do not have a right to public funds for the rent, *cf. Lindsey*, 405 U.S. at 73–74.  Parents have a right to send their children to private schools, *Pierce*, 268 U.S. at 534–35, but they do not have a right to public funds for the tuition, *cf. Harris*, 448 U.S. at 318.  The right to marry fits this same mold. While the government may not bar two people from marrying, *Obergefell*, 135 S. Ct. at 2605, the Supreme Court has never held that the government must give married couples any minimum level of public benefits.  To the contrary, the Court has held that the government does not violate the right even when it stops providing benefits to individuals who choose to marry.  *Califano v.*

*Jobst*, 434 U.S. 47, 53–54 (1977); *see Druker v. Comm'r*, 697 F.2d 46, 50 (2d Cir. 1982) (Friendly, J.).

If the majority believes that *Obergefell* jettisoned *DeShaney* and allows courts to discover a new font of positive rights, I disagree. *Obergefell* "held invalid" state marriage laws "to the extent they exclude[d] same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." 135 S. Ct. at 2605. It did not set any minimum "terms and conditions" for those laws. And even were I wrong on this point, the Supreme Court has given clear marching orders to lower courts in this context: "[I]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (citation omitted). *DeShaney* has direct application to, and so controls, this case.

## C

The majority next notes that *Rodriguez* and the Supreme Court's other education cases "left open the possibility of the right to a basic minimum education, which works to negate the argument that its recognition is impossible given its positive or affirmative nature." Majority Op. 54. When *Rodriguez* refused to find a right to education in the right to speak or vote, it stated: "Even if it were conceded that some identifiable quantum of education is a constitutionally protected prerequisite to the meaningful exercise of either right, we have no indication that the present levels of educational expenditures in Texas provide an education that falls short." 411 U.S. at 36–37. *Papasan* read this sentence to reserve "whether a minimally adequate education is a fundamental right." 478 U.S. at 285. Even assuming these statements could be read to support a fundamental right to a minimum education, these decisions did not involve substantive due process, so their statements do not support any education exception to *DeShaney*'s default rule.

These cases instead considered equal-protection claims. That makes all the difference. Unlike the Due Process Clause, which does not generally compel a minimum level of public services, the Equal Protection Clause does sometimes compel an equal level of public services.

The rigor with which courts review the unequal provision of state aid turns on whether a state's distinctions "proceed[] along suspect lines" or "involv[e] fundamental rights." *Heller v. Doe*, 509 U.S. 312, 319 (1993). If state action does either, the Court applies demanding "strict scrutiny" review; if it does not, the Court applies forgiving rational-basis review. *See id.* at 319–20. As has been clear since *Brown v. Board of Education*, 347 U.S. 483 (1954), strict scrutiny applies to suspect racial classifications in education. *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007). Absent those pernicious classifications, parties have asked the Court to apply strict scrutiny to any unequal treatment in education on the ground that education is a "fundamental right." The Court has repeatedly said "no." *See Kadrmas*, 487 U.S. at 458.

This context clarifies what *Papasan* meant when it said that the Court has left open "whether a minimally adequate education is a fundamental right." 478 U.S. at 285. The Court did not reserve whether the Constitution contains a positive right to a minimum education. It reserved only "whether a statute alleged to discriminatorily infringe that [potential] right should be accorded heightened equal protection review." *Id.* If, for example, a state refused to set up a school system in disfavored counties, *Papasan* suggests (perhaps) that this discrimination could trigger stricter equal-protection scrutiny. The majority, by contrast, reads *Papasan* to conflict with cases holding that states need not subsidize fundamental rights. Yet by the time of *Papasan*, the Court had already "held in several contexts that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right[.]" *Regan v. Taxation With Representation of Wash.*, 461 U.S. 540, 549 (1983). Nothing in *Papasan* so much as hints at a retreat from this rule.

*Rodriguez*'s reasoning confirms this conclusion. Any hypothetical right to a minimum education would in part flow out of the right to free speech. *Rodriguez*, 411 U.S. at 35–37. It has, however, been black-letter law for decades that the Free Speech Clause does not require states to "affirmatively assist" speech. *Ysursa*, 555 U.S. at 364. As Justice Douglas said, the Supreme Court has rejected any "notion that First Amendment rights are somehow not fully realized unless they are subsidized by the State." *Cammarano v. United States*, 358 U.S. 498, 515 (1959) (Douglas, J., concurring). If we were to conclude that a state must subsidize

education because individuals need education to exercise free speech, we would be concluding that states must subsidize speech in conflict with this longstanding authority.

Nor is this distinction between substantive due process and equal protection meant to deny, as the majority rightly notes, that "a fundamental right is a fundamental right." Majority Op. 54. But the fundamental-rights analysis differs depending on the constitutional clause at issue. A state's provision of *unequal* public aid to subsidize a fundamental right of some (without extending that aid to others) can trigger heightened equal-protection scrutiny. *See Shapiro v. Thompson*, 394 U.S. 618, 638 (1969). And a state's regulatory restriction on the exercise of a fundamental right can trigger heightened substantive-due-process scrutiny. *See Casey*, 505 U.S. at 846. But a state's refusal to *subsidize* a fundamental right (in contrast to its *restriction* on the right) has not traditionally triggered heightened substantive-due-process scrutiny. *See Maher*, 432 U.S. at 475–76. And here, all agree that the plaintiffs' equal-protection claim fails. Nor do the plaintiffs argue that Michigan has unconstitutionally prohibited them from obtaining a minimum education from other sources. *See Pierce*, 268 U.S. at 534–35. Instead, they seek something quite novel: heightened scrutiny under substantive due process for Michigan's failure to properly subsidize their alleged fundamental right to a minimum education. The Supreme Court's equal-protection cases do not support that substantive-due-process request.

In all events, I do not think the Court's statements in these decisions can justify the plaintiffs' alleged fundamental right. Whatever *Papasan* meant by a fundamental right to a "minimally adequate education," 478 U.S. at 285, *Plyler* shows that this language does not cover the plaintiffs' claim that they have been "functionally excluded from Michigan's statewide system of public education," Compl., R.1, PageID#20. The immigrant children in *Plyler* were legally excluded from Texas's statewide system of public education because they could not attend without paying a "full tuition fee." 457 U.S. at 206 n.2. That case thus would have implicated any fundamental right to state-provided literacy if such a thing existed. But the Court made clear that "[p]ublic education is not a 'right' granted to individuals by the Constitution." *Id.* at 221. And while courts have read *Plyler* as using heightened rational-basis review, *see Toledo v. Sanchez*, 454 F.3d 24, 33 (1st Cir. 2006), the Court certainly did not apply the strict

scrutiny that would govern if that case concerned a fundamental right, *cf. Shapiro*, 394 U.S. at 634. If the *legal* exclusion from a free education did not implicate a fundamental right, *Plyler*, 457 U.S. at 223, I cannot see how the *functional* exclusion from a free education could either.

### D

The majority lastly notes that our country's history of racial injustice in education supports a right to a minimum education. Majority Op. 44–46. I agree that the Fourteenth Amendment was designed to stop the rampant discrimination that the majority describes. But I respectfully disagree that the amendment's Framers did so by creating a *substantive* right to a minimum education. They instead created an *equality* right that applies once the state decides to provide for education. Both precedent and original meaning support this distinction.

Since at least *Strauder v. West Virginia*, 100 U.S. 303 (1880), the Supreme Court has explained that the "central purpose of the Fourteenth Amendment was to eliminate racial discrimination emanating from official sources in the States." *Peña-Rodriguez v. Colorado*, 137 S. Ct. 855, 867 (2017) (citation omitted). The amendment thus bars racial distinctions in the provision of many public services that a state, as an initial matter, has no constitutional duty to provide. A state, for example, need not provide protection against private violence, but it cannot discriminate along racial lines in any protection it grants. *See DeShaney*, 489 U.S. at 195–97 & 197 n.3. A state also need not provide welfare to poorer residents, but it cannot engage in racial discrimination if it chooses to offer that aid. *See Dandridge*, 397 U.S. at 485–86 & 485 n.17.

The Supreme Court's decision in *Brown* extended this logic to the educational context. *Brown* recognized that "education is perhaps the most important function of state and local governments." 347 U.S. at 493. But nowhere did it suggest that the Constitution compels all states to provide a minimum education. Rather, it held that the right to an education, "*where the state has undertaken to provide it*, is a right which must be made available to all on equal terms." *Id.* (emphasis added). And it found that segregated schools deny "children of the minority group . . . equal educational opportunities." *Id.* No other Supreme Court decision suggests that the Due Process Clause creates an educational entitlement. When, for example, the Court held

that a state must give students process before expelling them from schools that they have a state-law right to attend, it suggested that the states were not "constitutionally obligated to establish and maintain a public school system." *Goss v. Lopez*, 419 U.S. 565, 574 (1975); *cf. Kadrmas*, 487 U.S. at 462.

This same substance-versus-equality distinction permeates the congressional debates over what became the Civil Rights Act of 1875, an act passed under Congress's power to enforce the Fourteenth Amendment. *See* Michael W. McConnell, *Originalism and the Desegregation Decisions*, 81 Va. L. Rev. 947, 1036–45 (1995); John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1425–33, 1462–63 (1992). That law, as enacted, barred racial discrimination in public accommodations and jury selection. Civil Rights Act of 1875, ch. 114, §§ 1, 4, 18 Stat. 335, 336–37. (The Supreme Court would later hold that the public-accommodations provisions exceeded Congress's power as applied against private actors. *Civil Rights Cases*, 109 U.S. 3, 11 (1883).) But earlier versions of the law also would have barred segregated schools. McConnell, *supra*, at 987–90 & 987 n.183. As Congress debated these bills, "half or more [of the legislators] voted repeatedly to abolish segregated schools under authority of the Fourteenth Amendment." *Id.* at 986.

The supporters of this desegregation decree did not dispute that the *substantive* "decision whether to have public schools . . . was regarded as a question of policy for the states." Harrison, *supra*, at 1428. Rather, they contended that, once a state opted to have schools, the state must open the schools *equally* to all races. *Id.* One senator, for example, "explained that the civil rights bill 'does not say that schools shall be kept at all, but it contemplates this: that where there are free schools kept at public expense, . . . in such cases there shall be an equal right to participate in the benefit of those schools created by common taxation.'" McConnell, *supra*, at 1041 (quoting Cong. Globe, 42d Cong., 2d Sess. 3191 (1872)). And when opponents argued that southern states would close their schools if this desegregation mandate passed, the proponents responded with statements like the following: "Let justice be done though the common schools and the very heavens fall." *Id.* at 1045 (quoting 2 Cong. Rec. 4151 (1874)). These legislators recognized that the Fourteenth Amendment required states to desegregate the schools that they

opened, even if it did not compel them to open schools to begin with. *Brown* thus has roots in the Fourteenth Amendment's original understanding in a way that today's decision does not.

III

Aside from a positive right to a state-funded education, the plaintiffs fall back on a "negative" substantive-due-process right. They point out that Michigan's compulsory-attendance laws force most children to attend school and so do deprive them of liberty. This restriction on children's liberty passes constitutional muster, the plaintiffs argue, only if a state reciprocates by operating schools that meet a minimum level of quality. I agree with the majority that the plaintiffs did not raise this claim below and so have forfeited it here. Majority Op. 31–32. But I disagree with any suggestion that this theory otherwise has "strong support in the law." *Id.* at 27.

The plaintiffs rely on *Youngberg* for their claim. That decision carved out a narrow exception to the rule that a state has no duty to provide public aid, but this exception generally applies only for those individuals under strict state control. *See* 457 U.S. at 317. "[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." *DeShaney*, 489 U.S. at 199–200. The Court has applied this rule to prisoners, *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and to individuals that the state has civilly "institutionalized," *Youngberg*, 457 U.S. at 317. The rule might also apply if, for example, a state monopolized the distribution of food to its citizens and barred them from obtaining food from private sources. *See* Majority Op. 56; *see also Archie*, 847 F.2d at 1222.

This exception, though, has never reached students. Courts have "consistently rejected" the argument that *Youngberg*'s custody exception covers children "based on compulsory attendance laws." *Stiles ex rel. D.S. v. Grainger County*, 819 F.3d 834, 854 (6th Cir. 2016); *Sargi v. Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995) (collecting cases). Although "a school system has an unmistakable duty to create and maintain a safe environment for its

students as a matter of common law, its *in loco parentis* status or a state's compulsory attendance laws do not sufficiently 'restrain' students to raise a school's common law obligation to the rank of a *constitutional* duty." *Doe v. Claiborne County*, 103 F.3d 495, 510 (6th Cir. 1996). If compulsory-attendance laws do not trigger a constitutional duty to provide students with a *safe* learning environment, *see id.*, those laws also cannot trigger a constitutional duty for states to provide an *adequate* learning environment.

This precedent comports with the nature of compulsory-attendance laws. *Youngberg*'s exception applies only in situations in which the state has "restrain[ed] the individual's freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200. When, by contrast, "the government does not monopolize the avenues of relief . . . it has no further obligation to give aid." *Archie*, 847 F.2d at 1222. Michigan's compulsory-attendance laws (like those of all other states) do not establish "a legal or a practical monopoly" on the schools that children must attend. *Kadrmas*, 487 U.S. at 460. The Supreme Court has held for nearly a century that substantive due process would in fact bar states from forcing children to attend public schools against their parents' wishes. *Pierce*, 268 U.S. at 534–35. Michigan law thus provides several options to satisfy its school-attendance requirement, including charter schools, private schools, cyber schools, and homeschooling. *See* Mich. Comp. Laws §§ 380.501, 380.553a, 380.1561. It does not compel attendance at any particular school, including the schools about which the plaintiffs complain in this case.

\* \* \*

My answer to this case's constitutional questions should not "be viewed as placing [any] judicial imprimatur on the status quo." *Rodriguez*, 411 U.S. at 58. As I said at the outset, the plaintiffs make concerning allegations about the conditions of their schools. "But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them." *Id.* at 59. I would affirm the district court's judgment in all respects.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 18-1855/1871

GARY B., JESSIE K., CRISTOPHER R., ISAIAS R.,
ESMERALDA V., PAUL M., and JAIME R., minors,

      Plaintiffs - Appellants,

    v.

GRETCHEN WHITMER, et al.,

      Defendants - Appellees.

> **FILED**
> Apr 23, 2020
> DEBORAH S. HUNT, Clerk

Before: CLAY, STRANCH, and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's dismissal of Plaintiffs' equal protection and compulsory-attendance due process claims is AFFIRMED, its dismissal of their due process claim based on the fundamental right to a basic minimum education is REVERSED, and the case is REMANDED for further proceedings consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

_____

Deborah S. Hunt, Clerk